```
1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
2

3      _____
                                     )
4      UNITED STATES OF AMERICA,     )
                                     ) No. 3:12-CR-238 (JBA)
5                    Plaintiff,      )
                                     ) November 1, 2019
6                                    )
       v.                            ) 9:31 a.m.
7                                    )
                                     ) 141 Church Street
8                                    ) New Haven, Connecticut
       LAWRENCE HOSKINS,             )
9                                    )
                     Defendant.      )
10     _____)

11

12
                          JURY TRIAL
13
                          VOLUME V
14

15

16

17     B E F O R E:

18           THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
                          AND A JURY
19

20

21

22

23

24           Official Court Reporter:
             Melissa J. Cianciullo, RMR, CRR, CRC
25           (203) 606-1794
```

```
 1   A P P E A R A N C E S:

 2   For the Government:

 3        DAVID E. NOVICK, AUSA
          U.S. Attorney's Office - NH
 4        157 Church Street, 23rd Floor
          New Haven, CT 06510
 5        (203) 821-3700
          E-mail: david.novick@usdoj.gov
 6
          DANIEL S. KAHN, ESQ.
 7        LORINDA LARYEA, ESQ.
          U.S. Department of Justice
 8        Fraud Section, Criminal Division
          1400 New York Avenue, N.W.
 9        Room 11308
          Washington, D.C., 20005
10        Email: daniel.kahn@usdoj.gov
                  lorinda.laryea@usdoj.gov
11
     For the Defendant:
12
          CHRISTOPHER J. MORVILLO, ESQ.
13        DANIEL SILVER, ESQ.
          BENJAMIN K. PEACOCK, ESQ.
14        Clifford Chance US LLP - NY
          New York, NY 10019-6131
15        (212) 878-8000
          E-mail: christopher.morvillo@cliffordchance.com
16                daniel.silver@cliffordchance.com
                  benjamin.peacock@cliffordchance.com
17
          BRIAN E. SPEARS, ESQ.
18        Spears Manning & Martini LLC
          2425 Post Road, Suite 203
19        Southport, CT 06890
          (203) 292-9766
20        E-mail: bspears@spearsmanning.com

21                                                          09:31

22                                                          09:31

23

24

25
```

```
1              I N D E X                        09:31

2                                               09:31

3  WITNESS:  LARRY E. PUCKETT        PAGE       09:31

4  Continued Direct Examination by Ms. Laryea    823    14:58

5  Cross-Examination by Mr. Silver              898    14:58

6  Redirect Examination by Ms. Laryea          939    14:58

7                                               14:58

8  WITNESS:  SPECIAL AGENT JEFFREY COLEMAN       12:20

9  Direct Examination by Mr. Novick             946    12:20

10                                              12:20

11                                              12:20

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              (Call to Order, 9:31 a.m.)                    12:20
2              (Outside the presence of the Jury and         12:20
3    witness.)                                               09:31
4              THE COURT:  Good morning, Counsel, ladies and 09:31
5    gentlemen.  Good morning, Mr. Hoskins.                  09:31
6              All right.  I understand the government       09:31
7    has -- please be seated -- has matters to raise.        09:31
8    We -- our jurors are not all here.                      09:31
9              So, Mr. Novick?                                09:31
10             MR. NOVICK:  Thank you, Your Honor.            09:31
11             Your Honor, just to -- the first thing I'd    09:31
12   like to talk about with the Court is just to discuss    09:31
13   again the issue of Exhibit 453.  It's still the         09:31
14   government's position that -- that was where we ended   09:31
15   yesterday, the e-mail from Reza Moenaf to Frederic      09:31
16   Pierucci forwarding an e-mail from Winan Kusno with     09:31
17   regard to the Tarahan Project and, among other          09:32
18   things, issues with agents.                             09:32
19             So as we explained yesterday, Your Honor,     09:32
20   it's our expectation that there will be, through the    09:32
21   testimony of the witness, an independent basis to       09:32
22   show that Mr. Kusno was a knowing participant in the    09:32
23   conspiracy.  But I don't actually think, Your Honor,    09:32
24   that we need to get that far.  I think that we have     09:32
25   been laboring under a false understanding or a          09:32
```

1    misunderstanding of the law advanced by the defense a                09:32
2    couple days ago when we began the discussion of what                09:32
3    is required with regard to 801(d)(2)(E) statements.                 09:32
4            And in part, Your Honor, I'd add, this is the               09:32
5    problem with raising these things as we go.                         09:32
6            So we did some research last night, and I                   09:32
7    just wanted to share with the Court what we found,                  09:32
8    which is that -- not that there needs to be                         09:32
9    independent corroboration of the declarant's                       09:32
10   participation of the conspiracy, but that there needs              09:33
11   to be independent corroboration of the conspiracy and              09:33
12   the defendant's participation in the conspiracy.  And              09:33
13   for that principle, Your Honor, I would cite to and                09:33
14   can pass up copies of, in a moment, *United States v.*             09:33
15   *Tellier*, T-e-l-l-i-e-r, that's 83 F.2d 578 which                 09:33
16   says, among other things, extrajudicial statements by             09:33
17   coconspirator --                                                   09:33
18           THE COURT:  That's Second Circuit, I'm                     09:33
19   assuming.                                                          09:33
20           MR. NOVICK:  Second Circuit, yeah.  I'm                    09:33
21   sorry, Your Honor.  Second Circuit 1996,                           09:33
22   extrajudicial statements by coconspirator may be                   09:33
23   admitted if the government establishes by a                        09:33
24   preponderance of the evidence that there was a                     09:33
25   conspiracy, that both the declarant and the party                  09:33

1    against who the statements are offered were members    09:34

2    of the conspiracy and the statements were made during    09:34

3    and in furtherance of the conspiracy citing    09:34

4    Bourjaily.  In making these preliminary factual    09:34

5    determinations under Federal Rule of Evidence 104A,    09:34

6    the Court may consider the hearsay statements    09:34

7    themselves; however, these hearsay statements are    09:34

8    presumptively unreliable and for such statements to    09:34

9    be admissible, there must be some independent    09:34

10   corroborating evidence of the defendant's    09:34

11   participation in the conspiracy.    09:34

12         The second case that I would cite for the    09:34

13   same proposition, Your Honor, is *United States v.*    09:34

14   *Gigante*, also known as "Chin."  That's 166 F. 3d 75,    09:34

15   1999, Second Circuit.  And there -- and the pincite    09:34

16   is page 82.    09:34

17         The conspiracy between the declarant and the    09:34

18   defendant need not be identical to any conspiracy    09:35

19   that's specifically charged in the indictment.  In    09:35

20   addition, while the hearsay statement itself may be    09:35

21   considered in establishing the existence of the    09:35

22   conspiracy, there must be some independent    09:35

23   corroborating evidence of the defendant's    09:35

24   participation in the conspiracy.    09:35

25         Your Honor, so, again, based on the law, it's    09:35

1    the government's position that the corroboration                  09:35
2    that's needed is the existence of the conspiracy and             09:35
3    here, it's the same conspiracy that's been the                   09:35
4    subject of this trial and the defendant's                        09:35
5    participation in it.                                             09:35
6         And certainly the testimony of David                       09:35
7    Rothschild at a minimum, but also the testimony of              09:35
8    Edward Thiessen, the myriad other e-mails with regard           09:35
9    to this conspiracy are evidence of both the                     09:35
10   defendant's participation in it and the existence of            09:35
11   the conspiracy which, again, we only need to prove by           09:35
12   a preponderance of the evidence.                                09:35
13        And I would just add, sure, in looking at                  09:36
14   the -- putting the corroboration issue aside, looking           09:36
15   at the face of the e-mail here to prove Mr. Kusno's             09:36
16   participation in the conspiracy, the face of the                09:36
17   e-mail is clear when he says, "The concern that if we           09:36
18   have won the job, whether the rewards will be                   09:36
19   satisfactory or this agent only give them pocket               09:36
20   money and disappear, nothing has been shown by the              09:36
21   agent that the agent is willing to spend money."  And           09:36
22   then continues later, "I strongly recommend that                09:36
23   AP/MC takes this seriously and guarantee that proper            09:36
24   actions will be taken."                                        09:36
25        So the face of the document, Your Honor, is               09:36

1    evidence of Mr. Kusno's participation in the                09:36
2    conspiracy with the defendant, and the existence of         09:36
3    the conspiracy and the defendant's participation            09:36
4    therein are amply corroborated by all of the other          09:36
5    evidence the Court has seen and, at any rate, the           09:36
6    Court need not make a final finding on this until the       09:37
7    end of trial if the defendant asks for a Geaney             09:37
8    finding.                                                    09:37
9          Oh, last point, Your Honor.  I'm sorry.  The          09:37
10   fact of Mr. -- I know counsel has raised the issue of       09:37
11   us identifying who and -- who is and who is not a           09:37
12   coconspirator.  Mr. Kusno was identified anonymously        09:37
13   as an indicting coconspirator in the indictment,           09:37
14   Paragraph 56 of the indictment which references this       09:37
15   e-mail which they have been on notice of for many          09:37
16   years now.  As Your Honor knows, an overt act can          09:37
17   only be done by a coconspirator.  So this is not a         09:37
18   mystery and the fact that we are now having to             09:37
19   litigate this piecemeal is, I think is a problem --        09:37
20   is problematic and I think inappropriate.                  09:37
21         But at any rate, under the law, I think that         09:38
22   the document is admissible as a coconspirator              09:38
23   statement.                                                 09:38
24         THE COURT:  In terms of Paragraph 56, is that        09:38
25   Employee E is --                                           09:38

1    MR. NOVICK:  No.  He is the -- an employee at    09:38

2  Alstom Indonesia sent an e-mail to Alstom Employee B.    09:38

3  So he is the employee at Alstom Indonesia.  He was a    09:38

4  project manager.    09:38

5    THE COURT:  And that's the Winan.    09:38

6    MR. NOVICK:  That's right, Your Honor.    09:38

7    THE COURT:  Kusno.    09:38

8    MR. NOVICK:  And the last point I'd make,    09:39

9  Your Honor, is even if we needed independent    09:39

10  corroboration of Mr. Kusno's participation in the    09:39

11  conspiracy, we have both the forward by Reza Moenaf    09:39

12  to Fred Pierucci verifying that this was Winan's    09:39

13  report from the meeting last night.  And then 454    09:39

14  which has Reza Moenaf forwarding to Mr. Hoskins the    09:39

15  same notes and commenting on them, "Below are Winan's    09:39

16  report from the meeting, et cetera."    09:39

17    So to the extent that the concern is the    09:39

18  reliability of the statement, you have two other --    09:39

19  excuse me.  You have two other e-mails in which it's    09:39

20  being reiterated and being -- his participation, his    09:39

21  knowledge is being reinforced by other participants    09:40

22  in the conspiracy.    09:40

23    That's all, Your Honor.  Thank you.    09:40

24    THE COURT:  All right.  Our jurors are all    09:40

25  present at this point.  But briefly, why don't I hear    09:40

1    Mr. Silver.                                              09:40

2        MR. SILVER:  Thank you, Your Honor.  Just           09:40

3    briefly, and we can --                                  09:40

4        THE COURT:  Did you have cases to hand up,           09:40

5    Mr. Novick?                                              09:40

6        MR. NOVICK:  Yes, Your Honor.  I can do that        09:40

7    right now.                                               09:40

8        MR. SILVER:  So I think to start with the           09:40

9    last point or the second to last point that             09:40

10   Mr. Novick raised, I think Paragraph 56 of the          09:40

11   indictment actually leads to exactly the opposite       09:40

12   conclusion that Mr. Novick suggested.  I think that     09:40

13   it's the unidentified employee at Alstom Indonesia,     09:40

14   who apparently was Mr. Kusno sending this e-mail is     09:40

15   clearly not identified as a coconspirator in the        09:40

16   indictment.  He's in fact not even listed as an         09:40

17   Alstom Indonesia Employee A, B or C.  He's not an       09:40

18   identified individual at all, let alone identified as   09:41

19   a coconspirator.  So I certainly disagree with the      09:41

20   characterization of the indictment put us on notice     09:41

21   that the government would claim that Mr. Kusno was a    09:41

22   coconspirator.                                           09:41

23       On the first point regarding the need for           09:41

24   independent corroboration of Mr. Kusno's membership     09:41

25   in the conspiracy, our understanding of the law is      09:41

1  quite contrary to that which Mr. Novick has just                09:41

2  advanced.  We just looked very quickly at the cases             09:41

3  that Mr. Novick cited while he was talking and it               09:41

4  appears that those cases, the issue at issue in those           09:41

5  cases was not the membership from the conspiracy of             09:41

6  the declarant, but rather the membership of the                 09:41

7  conspiracy of the defendant.                                    09:41

8          So in those cases, that's what was discussed,           09:41

9  but they certainly don't imply, on our reading, that            09:41

10 there is not a need for independent corroboration of            09:41

11 the declarant's membership in the conspiracy.  And I            09:41

12 think that, in fact, is the conclusion that's drawn             09:41

13 directly from Rule 801(d)(2)(E) itself.  If you look            09:42

14 at the text that follows 801(d)(2)(E), it says, "The            09:42

15 statement must be considered but does not by itself             09:42

16 establish," and then it has a list of different                 09:42

17 things, "the existence of the conspiracy or                     09:42

18 participation in it."                                           09:42

19         Now, I guess the government would contend               09:42

20 that that means only the defendant's participation.            09:42

21 But I think that the contrary conclusion is much more           09:42

22 obvious from the text of the rule.                              09:42

23         So we'd certainly like the opportunity to               09:42

24 respond more fully after having digested the case --            09:42

25         THE COURT:  You know what?  That should have            09:42

1  been done a long time ago.                              09:42

2          MR. SILVER:  Your Honor, I --                   09:42

3          THE COURT:  We've got a witness on the stand.   09:42

4  We've got an exhibit that's going to be used with       09:42

5  this witness.  You've known about this e-mail.  And I   09:42

6  don't understand why we are getting this ten minutes    09:42

7  into our trial day.                                     09:42

8          MR. SILVER:  Your Honor, I raised this issue    09:42

9  yesterday as soon as I realized -- well, the            09:42

10 government didn't tell me they were taking a witness    09:42

11 out of order.  We had been told that a different        09:42

12 witness would precede Mr. Puckett.  They didn't tell    09:43

13 us that they weren't going to do that.                  09:43

14         So as soon as I realized Mr. Puckett would be   09:43

15 next and realized they had not laid a foundation with   09:43

16 Mr. Thiessen, who I expected would testify about        09:43

17 Mr. Kusno but did not, that then made this issue ripe   09:43

18 and I raised it as soon as we knew it was going to      09:43

19 come up with Mr. Puckett later that afternoon.  So      09:43

20 I -- that was --                                        09:43

21         THE COURT:  I didn't get anything from you      09:43

22 last night.                                             09:43

23         MR. SILVER:  No.  I raised this yesterday at    09:43

24 the break, Your Honor.                                  09:43

25         THE COURT:  Right.                              09:43

1          MR. SILVER:  That was when it became apparent          09:43

2     to us.          09:43

3          THE COURT:  Right.  Nobody has been shy about          09:43

4     filing things late in the day and the night and so          09:43

5     forth.          09:43

6          MR. SILVER:  Well, that's correct, Your          09:43

7     Honor.          09:43

8          THE COURT:  So I'm going to just proceed with          09:43

9     the jury right now.  I'm going to take a look at          09:43

10    these cases.  If there are any other cases you want          09:43

11    to cite, I will take a look at them and I will try to          09:43

12    understand whether the government is right that there          09:43

13    is no need for independent corroboration of the          09:43

14    declarant's participation in the conspiracy, only          09:44

15    independent corroboration of the defendant's          09:44

16    participation in the conspiracy versus the          09:44

17    defendant's position that the cases that the          09:44

18    government cites do not stand for the proposition          09:44

19    that there's no need for independent corroboration of          09:44

20    the declarant's membership in the conspiracy.          09:44

21         Do I have the positions stated at least          09:44

22    generally correctly?          09:44

23         MR. NOVICK:  You do, Your Honor.  And I          09:44

24    think -- depending on how the Court rules, I think          09:44

25    this may hopefully be academic in the sense that,          09:44

| | |
|---|---|
| 1 | number one, I think you'll get a foundation from the | 09:44 |
| 2 | witness and, number two, as I said before, I think | 09:44 |
| 3 | that forwarding of this e-mail twice by Mr. Moenaf | 09:44 |
| 4 | and his comments on it are independent.  Those are | 09:44 |
| 5 | separate statements are independent corroboration of | 09:45 |
| 6 | the defendant's -- excuse me, of the declarant's | 09:45 |
| 7 | participation in the conspiracy. | 09:45 |
| 8 | The only other point I would add in response | 09:45 |
| 9 | to counsel is an overt act cannot be committed by | 09:45 |
| 10 | someone who is not a coconspirator.  It is very clear | 09:45 |
| 11 | that in Paragraph 36, this is an e-mail referenced -- | 09:45 |
| 12 | excuse me, 45.  I'm sorry, Your Honor.  Thirty-five | 09:45 |
| 13 | states that at least one of the coconspirators | 09:45 |
| 14 | committed or caused to be committed at least one of | 09:45 |
| 15 | the following overt acts, and then in Paragraph 56 is | 09:45 |
| 16 | reference to this e-mail sent by Mr. Kusno. | 09:45 |
| 17 | That's all, Your Honor.  Thank you. | 09:45 |
| 18 | THE COURT:  All right.  Let's bring in the | 09:45 |
| 19 | jury, please. | 09:45 |
| 20 | I'm sorry.  Does defense have any cases to | 09:45 |
| 21 | cite that are contrary -- either contrary to Geaney | 09:45 |
| 22 | or Tellier or that stand for the affirmative | 09:46 |
| 23 | proposition that there is need for independent | 09:46 |
| 24 | corroboration? | 09:46 |
| 25 | MR. SILVER:  We'll look right now, Your | 09:46 |

1    Honor.  If we can find any, we'll provide them to you    09:46
2    before lunch.    09:46
3         MR. NOVICK:  Your Honor, one other issue, and    09:46
4    I don't want to hold the jury, I think that we can    09:46
5    potentially take this up after this witness, is an    09:46
6    issue as to Special Agent Coleman's testimony who I    09:46
7    believe will be the next witness.    09:46
8         The government had made a motion to preclude    09:46
9    evidence or argument related to the government's    09:46
10   charging decisions in the case.  As it appears right    09:46
11   now, we do not intend to call Mr. Sharafi.  I believe    09:46
12   that any questioning of the agent or any evidence    09:46
13   regarding the government's decision with regard to a    09:46
14   nonprosecution agreement or decision not to charge is    09:46
15   entirely irrelevant.    09:46
16        Case law and the evidence certainly seems to    09:46
17   support that were he cooperating at the time the    09:47
18   coconspirator statements were made, and I would point    09:47
19   out there are very few coconspirator statements by    09:47
20   Mr. Sharafi, if any, in the case at this point, the    09:47
21   only thing that would be relevant would be whether he    09:47
22   was a cooperator at the time he made those statements    09:47
23   and he clearly was not.  And so I don't see anything    09:47
24   that would bear on his credibility that would come    09:47
25   from examination or evidence related to his -- his    09:47

1    nonprosecution agreement.                           09:47

2        THE COURT:  Is there a distinction between      09:47

3    the government's decision not to charge him versus  09:47

4    the fact that he had a nonprosecution agreement?    09:47

5        MR. NOVICK:  I think there are two issues       09:47

6    there, Your Honor.  I think on both scores, the     09:47

7    defendant should not be allowed to inquire.  On the 09:47

8    issue of who we decided to charge, we've already    09:48

9    briefed that and our position is clear.  And I don't 09:48

10   think anything that's come up during the trial has  09:48

11   changed that to the point where the Court ought to  09:48

12   allow that.                                          09:48

13       And with regard to his nonprosecution           09:48

14   agreement, as Your Honor is aware, that's an issue of 09:48

15   credibility.  He's not a witness at the trial.  As  09:48

16   far as Rule 806, goes only to -- it would only be   09:48

17   relevant to his credibility if one of his statements 09:48

18   was made at a time -- when his coconspirator        09:48

19   statements was made at a time when he was cooperating 09:48

20   such that it would undermine the credibility of the 09:48

21   coconspirator statements.  We don't have that       09:48

22   situation here.                                      09:48

23       THE COURT:  Mr. Spears.                          09:49

24       MR. SPEARS:  Thank you, Your Honor.  We do      09:49

25   intend to explore with Special Agent Coleman the    09:49

1    circumstances surrounding Mr. Sharafi's entry into          09:49
2    the nonprosecution agreement.  I don't know -- we          09:49
3    perhaps don't need to hold the jury up at this time.       09:49
4    But I did want to note that that is an area of             09:49
5    cross-examination I intended to get into.                  09:49
6         And I would also note that yesterday evening          09:49
7    we reached out to the government in regards to the         09:49
8    remaining e-mails that apparently are going to come        09:49
9    in through Special Agent Coleman.  There still are         09:49
10   about a hundred or so exhibits.  And we don't know         09:49
11   whether the government intends to put all of those in      09:49
12   through Special Agent Coleman.  I would imagine that       09:49
13   they don't.                                                09:49
14        So we had asked them to identify which ones           09:49
15   they do intend to elicit through or offer through          09:49
16   Special Agent Coleman so that we could have a              09:49
17   dialogue with them perhaps at lunchtime about whether      09:49
18   and to what extent we're going to have any objections      09:49
19   to those now that it's clear what foundations exist        09:49
20   and do not exist.                                          09:50
21        MR. NOVICK:  Respectfully, Your Honor,                09:50
22   that's -- it is absurd to suggest that in the middle       09:50
23   of the government trying to prepare its case, put on       09:50
24   its case after we've been asking for five weeks with       09:50
25   regard to a relatively -- given the number of             09:50

1    documents in this case, a relatively small universe    09:50
2    of documents and asking for them to articulate their    09:50
3    objections.    09:50
4         The government is not, in the middle of its    09:50
5    preparation, going to break and discuss with    09:50
6    counsel -- counsel is aware of the exhibits.  If they    09:50
7    have objections to the exhibits, they can make them    09:50
8    to -- they can discuss them with us.  We've been here    09:50
9    waiting for those all along and they have decided not    09:50
10   to do that.  It's not up to us to identify for them    09:50
11   which witness is going to put in which documents.    09:50
12   They have objections.  They're more than welcome to    09:50
13   raise them with us.    09:50
14        Your Honor, there is one case that I found,    09:50
15   an unreported case that I found which deals with the    09:51
16   same point with regard to Sharafi's testimony, and    09:51
17   I'll just hand it up and we can discuss it if the    09:51
18   Court wishes.    09:51
19        THE COURT:  All right.    09:51
20        MR. NOVICK:  It's *United States v. Basciano*,    09:51
21   B-a-s-c-i-a-n-o.  It is 2007 WL 1791221.    09:51
22        THE COURT:  Thank you.  Please bring in the    09:51
23   jury.  Yes.  Would you bring in Mr. Puckett, please.    09:51
24        MR. KAHN:  We're doing so, Your Honor.  Thank    09:51
25   you.    09:51

| | | |
|---|---|---|
| 1 | (Jury entered the proceedings, 9:52 a.m.) | 09:52 |
| 2 | THE COURT:  All right.  Please be seated, | 09:52 |
| 3 | ladies and gentlemen.  We will proceed with direct | 09:52 |
| 4 | examination of Mr. Puckett by Ms. Laryea. | 09:52 |
| 5 | MS. LARYEA:  Thank you, Your Honor. | 09:52 |
| 6 | CONTINUED DIRECT EXAMINATION OF LARRY E. PUCKETT | 09:52 |
| 7 | BY MS. LARYEA: | 09:52 |
| 8 | Q.   Good morning. | 09:53 |
| 9 | A.   Good morning. | 09:53 |
| 10 | THE COURT:  You'll note that I turned up the | 09:53 |
| 11 | microphone over there, so hopefully you will not have | 09:53 |
| 12 | to hear from me consistently about keeping voices up, | 09:53 |
| 13 | but keep your voice up anyhow. | 09:53 |
| 14 | MS. LARYEA:  May I, Your Honor? | 09:53 |
| 15 | THE COURT:  You may. | 09:53 |
| 16 | BY MS. LARYEA: | 09:53 |
| 17 | Q.   Mr. Puckett, yesterday you testified that you | 09:53 |
| 18 | worked for Alstom Power, Inc., around -- in the | 09:53 |
| 19 | 2000s, correct? | 09:53 |
| 20 | A.   Correct. | 09:53 |
| 21 | Q.   From your time at Alstom, are you familiar | 09:53 |
| 22 | with a group called International Network? | 09:53 |
| 23 | A.   Yes, I am. | 09:53 |
| 24 | Q.   Did International Network build anything? | 09:53 |
| 25 | A.   No. | 09:53 |

1    Q.    Back in the 2002, 2004 time frame, what was        09:53
2    International Network's role?                            09:53
3    A.    International Network's role was to provide         09:53
4    support to the business units in terms of sales, in      09:53
5    terms of local relationships.  It was basically set      09:53
6    up to provide local input, regional input to the        09:54
7    business units.                                          09:54
8    Q.    Did you ever work for International Network?        09:54
9    A.    Yes, I did.                                         09:54
10   Q.    What was your position when you worked for         09:54
11   International Network?                                    09:54
12   A.    I was director of sales.                           09:54
13   Q.    In what country did you work when you worked       09:54
14   for International Network?                                09:54
15   A.    When I worked for International Network, I          09:54
16   was in the U.S. based in Houston.                         09:54
17   Q.    Around when did you hold this position in          09:54
18   International Network?                                    09:54
19   A.    1991 and '92.                                       09:54
20   Q.    '91 to '92?                                         09:54
21   A.    No.  I'm sorry.  2001 to 2002.                      09:54
22   Q.    Okay.  Where did International Network's           09:54
23   funding come from?                                        09:54
24   A.    It came from the business units.                   09:54
25   Q.    And while you were working for International        09:54

1    Network, how was your salary computed?                    09:54

2      A.    My salary was computed on a basis salary.        09:54

3            MR. SILVER:  Objection.  Relevance, Your         09:54

4    Honor.                                                    09:54

5            MS. LARYEA:  It goes -- Your Honor, it goes       09:54

6    to how International Network employees get paid, what    09:55

7    their salary is based on.                                 09:55

8            THE COURT:  I'll allow the question.  There's    09:55

9    been a lot about the funding of it.  There's been a      09:55

10   lot about the responsibilities.  I'm going to permit     09:55

11   the question.                                             09:55

12           MS. LARYEA:  Thank you, Your Honor.  Let me       09:55

13   repeat the question.                                      09:55

14   BY MS. LARYEA:                                            09:55

15     Q.    While you were working for International          09:55

16   Network, how was your salary computed?                   09:55

17     A.    I had base salary and if we were fortunate       09:55

18   enough to sell a piece of equipment or a plant, I        09:55

19   received a commission.                                    09:55

20     Q.    So you received a commission based on selling    09:55

21   equipment, you said, right?                               09:55

22     A.    Yes.                                              09:55

23     Q.    Was your commission tied to sales targets?       09:55

24     A.    Yes, tied to sales targets as well.              09:55

25     Q.    Was it tied to how the business units that       09:55

1    you were helping sell products did?                    09:55

2        A.    Yes.                                          09:55

3        Q.    Mr. Puckett, I want to talk a bit about the   09:55

4    Tarahan Project.  Where was the project located?       09:55

5        A.    In Sumatra, Indonesia.                        09:55

6        Q.    And what was being built?                     09:55

7        A.    It was a power plant, basically comprised of  09:55

8    two circulating fluidized bed boilers.                 09:56

9        Q.    And you mentioned yesterday that PLN was the  09:56

10   customer for this power plant, correct?                09:56

11       A.    Correct.                                      09:56

12       Q.    What was PLN going to do with the electricity 09:56

13   that was being generated at the power plant?           09:56

14       A.    Provide electricity to the people and        09:56

15   businesses and companies in Indonesia in Sumatra.      09:56

16       Q.    And you mentioned that Alstom Power, Inc.,    09:56

17   bid on the Tarahan Project, right?                     09:56

18       A.    Yes.                                          09:56

19       Q.    Were there other companies interested in     09:56

20   winning the Tarahan Project?                           09:56

21       A.    Yes.                                          09:56

22       Q.    Who were Alstom Power, Inc.'s, main          09:56

23   competitors?                                           09:56

24       A.    Main competitors was a consortium of Foster  09:56

25   Wheeler and Mitsubishi Corporation.                    09:56

1    Q.    You mentioned a consortium, Foster Wheeler    09:56

2    and Mitsubishi, two different companies?    09:56

3    A.    Two different companies.    09:56

4    Q.    Were they working together?    09:56

5    A.    Working together.    09:56

6    Q.    Did Alstom Power, Inc., work alone to try to    09:56

7    win the Tarahan Project?    09:56

8    A.    No.    It was a consortium of Alstom Power,    09:56

9    Inc., and Marubeni Corporation, and also PT Energy    09:56

10    Systems Indonesia referred to as PTESI.    09:56

11    Q.    So let's talk a little bit about each of the    09:57

12    company's roles.    09:57

13        What products was Alstom Power, Inc.,    09:57

14    supposed to provide for the project?    09:57

15    A.    Alstom Power, Inc., was providing a boiler --    09:57

16    boilers and the auxiliaries, as well as the fuel, the    09:57

17    fuel supply system and environmental control system.    09:57

18    Q.    And you mentioned Marubeni was one of the    09:57

19    other companies?    09:57

20    A.    Yes.    09:57

21    Q.    What product was Marubeni --    09:57

22    A.    Marubeni was providing the balance of plant    09:57

23    and the steam turbine generator.    09:57

24    Q.    And did Marubeni have employees dedicated to    09:57

25    trying to win the Tarahan Project?    09:57

1    A.    Yes, they did.                                    09:57

2    Q.    And you mentioned a third company was part of    09:57

3    the consortium.  What was the name of that third       09:57

4    company?                                                09:57

5    A.    PT Energy Systems, Alstom Energy Systems         09:57

6    Indonesia.                                              09:57

7    Q.    Was that referred to by a shorthand?             09:57

8    A.    Yes.                                              09:57

9    Q.    What was that shorthand?                          09:57

10   A.    PTESI.                                            09:58

11   Q.    What products was PTESI supposed to provide       09:58

12   for the plant?                                          09:58

13   A.    PTESI was a manufacture fabricator and was       09:58

14   basically going to provide boiler components, boiler    09:58

15   parts for the project.                                  09:58

16   Q.    Was there a lead member of this consortium of    09:58

17   three companies?                                        09:58

18   A.    Alstom Power, Inc.                                09:58

19   Q.    Why was -- what did it mean to be the lead?      09:58

20   A.    Basically you define basic strategy.  You        09:58

21   would lead in proposal strategy as well as sales and    09:58

22   evaluation strategy.                                    09:58

23   Q.    Why was Alstom Power, Inc., the lead of this     09:58

24   consortium?                                             09:58

25   A.    Well, Alstom Power, Inc., had been in            09:58

1    Indonesia for -- since 1985 through the former          09:58
2    companies, had a lot of experience with -- with         09:58
3    boiler plants, particularly in Indonesia.               09:58
4        Q.    You said Alstom Power, Inc., had been in       09:59
5    Indonesia since 1985.  Was this back when it was         09:59
6    called Combustion Engineering?                          09:59
7        A.    Yes.                                           09:59
8        Q.    And did International Network have a role in   09:59
9    the efforts to win the Tarahan contract?                09:59
10       A.    International Network had a role in almost     09:59
11   every attempt to sell a project.  A gentleman by the    09:59
12   name of Eko Sulianto worked for International           09:59
13   Network, Indonesian local, but had a role to provide    09:59
14   intelligence, relationships, everything local,          09:59
15   everything regional to the business units.              09:59
16       Q.    Are you familiar with an individual named     09:59
17   Lawrence Hoskins?                                       09:59
18       A.    Yes.                                          09:59
19       Q.    How are you familiar with him?                09:59
20       A.    I'm familiar with him through -- mainly       09:59
21   through communication, written communication.          09:59
22       Q.    What was Mr. Hoskins' position at Alstom?     09:59
23       A.    I believe he was a senior vice president over 09:59
24   the Asia Pacific region.                                10:00
25       Q.    And what was Mr. Hoskins' role on the Tarahan 10:00

1  Project?

2     A.    Mr. Hoskins' role on the Tarahan Project is

3  to support AP -- Alstom Power, Inc., and support the

4  sale of the project.

5     Q.    Are you familiar with an individual named

6  Reza Moenaf?

7     A.    Yes.

8     Q.    Who -- what was Reza Moenaf's role at Alstom?

9     A.    He -- he was country manager for

10  International Network, country manager of Indonesia.

11  He was also president of PT Energy Systems Indonesia.

12     Q.    And as the country manager for Indonesia, who

13  did Mr. Moenaf report to?

14     A.    He reported to Lawrence Hoskins.

15     Q.    Now, you mentioned an individual by the name

16  of Eko Sulianto?

17     A.    Yes.

18     Q.    Who did Eko Sulianto report to?

19     A.    He reported to Reza Moenaf.

20     Q.    Did Reza Moenaf and Eko Sulianto have a role

21  on the Tarahan Project?

22     A.    Yes.

23     Q.    Mr. Puckett, how did you become involved in

24  the Tarahan Project?

25     A.    Well, I was working in Houston.  But the head

10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:01
10:01
10:01
10:01

1    of sales, global sales for Alstom Boilers asked me to          10:01

2    come back to Indonesia for a short while to help out          10:01

3    on a project where I knew the owner fairly well.  It          10:01

4    was a pulp and paper project.  And while I was there          10:01

5    working on the pulp and paper project, Fred Pierucci,          10:01

6    head of sales at Alstom Power, Inc., asked me to step          10:01

7    in and help support the Tarahan Project until the          10:01

8    lead salesman could be -- be in Indonesia.          10:01

9         Q.    And you mentioned Fred Pierucci.  Can you          10:01

10   remind the jury, what was his position again?          10:01

11        A.    He was global vice president of sales and          10:01

12   marketing for the utility boiler group.          10:01

13        Q.    What company did Mr. Pierucci work for?          10:02

14        A.    Alstom Power, Inc.          10:02

15        Q.    And where was Mr. Pierucci based?          10:02

16        A.    Windsor, Connecticut.          10:02

17        Q.    You said you were asked to fill in.  Who were          10:02

18   you asked to fill in for?          10:02

19        A.    A gentleman by the name of Bill Pomponi.          10:02

20        Q.    And what was Bill Pomponi's role on the          10:02

21   Tarahan Project?          10:02

22        A.    Bill Pomponi's role was to be the lead          10:02

23   sales -- salesperson working for the business unit.          10:02

24        Q.    And where was -- sorry, Mr. Puckett.          10:02

25              Where was Bill Pomponi based?          10:02

| | |
|---|---|
| 1 | A.    He was based out of Windsor, Connecticut as | 10:02 |
| 2 | well. | 10:02 |
| 3 | Q.    So if you were filling in, how long did you | 10:02 |
| 4 | actually work on the Tarahan Project? | 10:02 |
| 5 | A.    About six weeks, six or seven weeks. | 10:02 |
| 6 | Q.    Who were you reporting to while you were | 10:02 |
| 7 | working on the Tarahan Project? | 10:02 |
| 8 | A.    Fred Pierucci. | 10:02 |
| 9 | Q.    Did you report to anyone in International | 10:02 |
| 10 | Network in connection with your work on the Tarahan | 10:02 |
| 11 | Project? | 10:02 |
| 12 | A.    No, I didn't. | 10:02 |
| 13 | Q.    Mr. Puckett, I want to show you what has been | 10:02 |
| 14 | marked as Government's Exhibit 445 for | 10:03 |
| 15 | identification.  What is this document? | 10:03 |
| 16 | A.    It's an e-mail from Frederic Pierucci to | 10:03 |
| 17 | myself, William Pomponi, Eko Sulianto, P. Sharafi, | 10:03 |
| 18 | with a copy to Ion Sculy and Reza Moenaf. | 10:03 |
| 19 | Q.    What is the subject of the e-mail? | 10:03 |
| 20 | A.    The subject is Indonesia Tarahan coal-fired | 10:03 |
| 21 | Power Station 3 and 4, Lot 3, boiler package. | 10:03 |
| 22 | Q.    And the date of the e-mail? | 10:03 |
| 23 | A.    August 22, 2003. | 10:03 |
| 24 | MS. LARYEA:  At this time, the government | 10:03 |
| 25 | moves to admit Government's Exhibit 445. | 10:03 |

864

| | | |
|---|---|---|
| 1 | MR. SILVER:  No objection, Your Honor. | 10:03 |
| 2 | THE COURT:  Full exhibit. | 10:03 |
| 3 | BY MS. LARYEA: | 10:03 |
| 4 | Q.    Mr. Puckett, one of the recipients of this | 10:03 |
| 5 | e-mail that you read is psharafi@msn.com.  Who is | 10:03 |
| 6 | psharafi@msn.com? | 10:04 |
| 7 | A.    It's Pirooz Sharafi who was consultant on -- | 10:04 |
| 8 | consultant for the Alstom consortium for the Tarahan | 10:04 |
| 9 | Project. | 10:04 |
| 10 | Q.    Mr. Puckett, do you see that Mr. Pierucci is | 10:04 |
| 11 | forwarding another e-mail? | 10:04 |
| 12 | A.    Yes. | 10:04 |
| 13 | Q.    And he's forwarding another e-mail that he | 10:04 |
| 14 | sent? | 10:04 |
| 15 | A.    Yes. | 10:04 |
| 16 | Q.    Who is Mr. Pierucci writing the e-mail to? | 10:04 |
| 17 | Who is in the "to" line? | 10:04 |
| 18 | A.    Kusunoki Junji. | 10:04 |
| 19 | Q.    Who is Mr. Kusunoki Junji? | 10:04 |
| 20 | A.    He was a Marubeni employee, actually sales | 10:04 |
| 21 | manager living in Jakarta, Indonesia, working | 10:04 |
| 22 | exclusively on the Tarahan Project. | 10:05 |
| 23 | Q.    Mr. Puckett, can you read the last line of | 10:05 |
| 24 | Mr. Pierucci's e-mail to Kusunoki Junji? | 10:05 |
| 25 | A.    Yes.  "During Bill's absence, Larry will act | 10:05 |

1    as the sales lead on Alstom side."    10:05

2    Q.    Now, Mr. Puckett, is this around the time    10:05

3    that you became involved in the Tarahan Project?    10:05

4    A.    Yes, it is.    10:05

5    Q.    And can you read what the date is again for    10:05

6    the jury?    10:05

7    A.    August 22, 2003.    10:05

8    Q.    Now, looking at the top e-mail from Fred to a    10:05

9    number of people including yourself, can you read    10:05

10    that e-mail, please?    10:05

11    A.    Yes.    "We need to show one face towards MC    10:05

12    and PLN during this very sensitive period.    During    10:05

13    Bill's absence, I absolutely want to have Larry to    10:05

14    coordinate all lobbying actions regarding this    10:06

15    important project.    Please make sure that this is    10:06

16    strictly followed.    Fred."    10:06

17    Q.    What does MC mean?    10:06

18    A.    Marubeni Corporation.    10:06

19    Q.    And when Mr. Pierucci says "we need to show    10:06

20    one face towards MC and PLN during this very    10:06

21    sensitive period," what is that referring to?    10:06

22    A.    It's referring to the evaluation period when    10:06

23    PLN was evaluating the proposals from the different    10:06

24    company consortiums.    10:06

25    Q.    Why was the evaluation period very sensitive?    10:06

1      A.     Well, the evaluation period is very sensitive      10:06

2   because the evaluation factors could swing up and      10:06

3   down depending on a number of factors.  You could      10:06

4   be -- have a -- high evaluation factors one day and      10:06

5   low the next.  It all depended on who your friends      10:07

6   were in PLN.      10:07

7      Q.     And this is evaluating who had the best offer      10:07

8   for the project?      10:07

9      A.     Evaluating who had the best offer.      10:07

10      Q.     Now, Mr. Pierucci says "regarding this      10:07

11   important project."  Why was Tarahan an important      10:07

12   project?      10:07

13      A.     Well, Alstom hadn't won a project in      10:07

14   Indonesia in quite a while.  They had a long history      10:07

15   there but hadn't won a project.  And also it was      10:07

16   another reference plant for our circulating fluidized      10:07

17   bed technology with two CFBs.  It was an important      10:07

18   project politically for Fred Pierucci to put this      10:07

19   to -- to book this project.      10:07

20      Q.     These two individuals, Eko Sulianto and Reza      10:07

21   Moenaf, you mentioned they worked in Indonesia for      10:08

22   Alstom, correct?      10:08

23      A.     Correct.      10:08

24      Q.     Had these two individuals been working on the      10:08

25   Tarahan Project before you arrived in August 2003?      10:08

1    A.    Yes.    10:08

2    Q.    Why did Mr. Pierucci want -- why did    10:08

3    Mr. Pierucci want you to coordinate all lobbying    10:08

4    actions regarding this important project instead of    10:08

5    Mr. Sulianto and Mr. Moenaf?    10:08

6    A.    There was a number of reasons.  Marubeni    10:08

7    wants someone from Alstom -- since Alstom was    10:08

8    consortium leader, wanted someone from Alstom Power    10:08

9    being there.  And I was already there and I had    10:08

10   experience in Indonesia and experience with PLN.    10:08

11   That's the reason he wanted me to coordinate the --    10:08

12   all the activities.    10:09

13   Q.    And Mr. Pirooz Sharafi, you mentioned he was    10:09

14   a consultant on the Tarahan Project.  Did you know    10:09

15   Mr. Sharafi before this project?    10:09

16   A.    Yes.    10:09

17   Q.    How did you know him?    10:09

18   A.    He was a consultant on some other projects    10:09

19   historically for Alstom and ABB, and he had other    10:09

20   business endeavors in Indonesia.  He was in Indonesia    10:09

21   quite a bit.    10:09

22   Q.    Who hired Mr. Sharafi as a consultant on the    10:09

23   Tarahan Project?    10:09

24   A.    Fred Pierucci.    10:09

25   Q.    When was that decision made relative to when    10:09

1    you started working on the project?                    10:09

2        A.    Sometime before I started working on the     10:09

3    project, several months.                               10:09

4        Q.    Did you have any -- did you have any          10:09

5    conversations with other members of the team about     10:09

6    Sharafi when you started working on the Tarahan        10:09

7    Project?                                               10:10

8        A.    Yes.                                          10:10

9        Q.    Who did you have those conversations with?    10:10

10       A.    Eko Sulianto, Reza Moenaf and Bill Pomponi.   10:10

11       Q.    What did you tell them?                       10:10

12       A.    I told them that I didn't think much of       10:10

13   Pirooz Sharafi being our consultant.                   10:10

14       Q.    Why did you not think much of him?            10:10

15       A.    I didn't trust the man.                       10:10

16       Q.    Mr. Puckett, I am showing you what has been   10:10

17   marked as Government's Exhibit 446.  What is this       10:10

18   document?                                              10:10

19       A.    It's an e-mail from Lawrence Hoskins to Fred  10:10

20   Pierucci.                                              10:10

21       Q.    What's the date of the e-mail?               10:10

22       A.    The date of the e-mail is August 29, 2003.   10:10

23       Q.    And the subject?                             10:10

24       A.    The subject is Tarahan.                      10:10

25             MS. LARYEA:  At this time, the government     10:10

1    moves to admit Government's Exhibit 446.                10:10
2         MR. SILVER:  Your Honor, no objection to          10:10
3    admission but would just request that the witness be   10:10
4    restricted to only reading from the document since he  10:11
5    was never copied on it.                                10:11
6         THE COURT:  Do you have any further plan than      10:11
7    that?                                                   10:11
8         MS. LARYEA:  No, Your Honor.  I expect him         10:11
9    to --                                                   10:11
10        THE COURT:  Okay.  You may proceed.                10:11
11   BY MS. LARYEA:                                          10:11
12   Q.    Mr. Puckett, can you please read the first       10:11
13   paragraph?                                              10:11
14   A.    Yes.  "Fred, understand on above that            10:11
15   Marubeni pressing us to make bid EXTN (tomorrow)       10:11
16   without increasing price but Windsor wish to increase  10:11
17   price by $2.4 million.  Also understand from Reza      10:11
18   that we have significant price advantage over FW at    10:11
19   this stage and, therefore, he supports principle of    10:11
20   improving price, but not as part of the bid extension  10:11
21   process.  Reza believes we will get the increase       10:11
22   during negotiations and is checking with the team as   10:11
23   to whether they can guarantee this."                   10:11
24   Q.    Mr. Puckett, while you were working on the       10:12
25   Tarahan Project, did you ever hear the acronym FW?     10:12

1    A.    Yes.                                                      10:12

2    Q.    What was that a reference to when you heard            10:12

3 it?                                                               10:12

4    A.    Foster Wheeler.                                         10:12

5    Q.    What was Foster Wheeler's connection to the           10:12

6 Tarahan Project?                                                  10:12

7    A.    They were bidding against us on the Tarahan          10:12

8 Project.                                                          10:12

9    Q.    Mr. Puckett, what is a bid extension?                  10:12

10    A.    A bid extension is you have a bid date by            10:12

11 specification, a bid due date, and you ask for an              10:12

12 extension of that date.                                          10:12

13    Q.    This e-mail mentions a $2.4 million price          10:12

14 increase issue.  Did you become aware of such an               10:12

15 issue when you started working on the Tarahan               10:12

16 Project?                                                          10:12

17    A.    Yes, I did.                                            10:12

18    Q.    What did -- what was the issue?                       10:12

19    A.    The issue was -- I forget what kind of               10:12

20 equipment it was.  But it was a $2.4 million               10:12

21 oversight that Alstom didn't include in their                  10:13

22 proposal.                                                         10:13

23    Q.    What would be the significance of increasing        10:13

24 Alstom's price by 2.4 million at a bid extension            10:13

25 phase?                                                            10:13

1    A.    Well, at that time we were getting feedback    10:13

2    that the bids were very close, they could go either    10:13

3    way, and we certainly didn't want to add $2.4 million    10:13

4    more to our price with the bid extension.  And Alstom    10:13

5    was really pushing to add to the price.  And Reza and    10:13

6    myself was advocating, no, we don't want to increase    10:14

7    the price now.  It's something we don't want to do.    10:14

8    Q.    Because you were afraid if you increased the    10:14

9    price, it would --    10:14

10    A.    We'd lose the job, lose the project.    10:14

11    Q.    Looking at the last paragraph of this e-mail,    10:14

12    can you please read it for the jury?    10:14

13    A.    "If Reza puts his name to guaranteeing the    10:14

14    increase during negotiation, can Windsor be    10:14

15    persuaded?  Or do you have other ideas?  Lawrence."    10:14

16    Q.    Mr. Puckett, while you were working at    10:14

17    Alstom, did you ever hear the short term "Windsor"?    10:14

18    A.    Yes.    10:14

19    Q.    What was that a reference to?    10:14

20    A.    "Windsor" basically referred to Windsor,    10:14

21    Connecticut, the home base of Alstom Power, Inc.    10:14

22    Q.    Now, when this says "can Windsor be    10:14

23    persuaded," can you remind the jury, who was in    10:15

24    charge of the Tarahan bidding process?    10:15

25    A.    Fred Pierucci.    10:15

1    Q.    And which Alstom entity was in charge of the    10:15

2    Tarahan bidding project?    10:15

3    A.    Alstom Power, Inc.    10:15

4    Q.    And who had the decision-making authority as    10:15

5    to whether to add this $2.4 million increase at a bid    10:15

6    extension phase?    10:15

7    A.    Fred Pierucci.    10:15

8    Q.    And why?    10:15

9    A.    Because he controlled strategy, negotiation    10:15

10   tactics.  He controlled how we were going to    10:15

11   approach -- how we were going to approach the project    10:15

12   in terms of strategy and so forth.    10:15

13   Q.    Mr. Puckett, I am showing you what has been    10:15

14   marked as Government's Exhibit 451 for    10:15

15   identification.  What is this document?    10:15

16   A.    This is an e-mail from Fred Pierucci to Will    10:16

17   Pomponi, P. Sharafi, with a copy to me, Ion Sculy,    10:16

18   Reza Moenaf, Eko Sulianto, Lauren Buika and Steven    10:16

19   Sheckler.    10:16

20   Q.    What is the date of this e-mail?    10:16

21   A.    The date is 16 September, 2003.    10:16

22   Q.    And the subject?    10:16

23   A.    Tarahan coal-fired P/S Lot 3 critical    10:16

24   situation.    10:16

25        MS. LARYEA:  At this time, the government    10:16

```
 1    moves for the admission of Government's Exhibit 451.       10:16
 2            MR. SILVER:  No objection, Your Honor.            10:16
 3            THE COURT:  451 is a full exhibit.               10:16
 4    BY MS. LARYEA:                                            10:16
 5       Q.   Mr. Puckett, first let's talk about who          10:16
 6    Mr. Pierucci is e-mailing.  Can you remind the jury       10:16
 7    who is William Pomponi?                                   10:16
 8       A.   Yes.  Will Pomponi is the lead salesman for      10:17
 9    the Tarahan Project representing Alstom Power, Inc.       10:17
10       Q.   And who is psharafi@msn.com?                     10:17
11       A.   It's Pirooz Sharafi, the consultant for the      10:17
12    Tarahan Project.                                          10:17
13       Q.   Can you please read the highlighted portion      10:17
14    of the e-mail?                                            10:17
15       A.   Yes.  "When we spoke on Friday, you both told    10:17
16    me that everything was under control in the              10:17
17    evaluation and convinced me that there was no need to    10:17
18    have somebody from Windsor in Indonesia next week        10:17
19    even though I proposed to have Larry to replace          10:17
20    Bill."                                                    10:17
21       Q.   Why did Mr. Pierucci want somebody from          10:17
22    Windsor in Indonesia?                                     10:17
23       A.   He wanted someone from Windsor to control the    10:17
24    activities and also placate Marubeni.  Marubeni was      10:17
25    very nervous unless someone from Alstom Power, Inc.,     10:18
```

874

1    was there in Jakarta.                                    10:18

2        Q.    Can you please read the rest of this e-mail    10:18

3    that you see on the screen zoomed?                       10:18

4        A.    Yes.  "Now if the infos below are correct, we  10:18

5    are not only evaluated number 2 but by huge margin,      10:18

6    almost $40 million.  How can that be?  I thought we      10:18

7    were controlling what was happening in Palembang.        10:18

8    Please check ASAP if the below infos are correct and     10:18

9    give me by tomorrow a plan to recover this.  We          10:18

10   cannot lose this project."                               10:18

11       Q.    What is Palembang?                              10:18

12       A.    Palembang is a city in Sumatra where PLN was    10:18

13   stationed.  The PLN evaluation team was stationed in     10:18

14   Palembang in Sumatra to evaluate the proposals on       10:18

15   Tarahan.                                                 10:19

16       Q.    Now, when Mr. Pierucci says, "I thought we     10:19

17   were controlling what was happening in Palembang,"      10:19

18   how was Alstom controlling what was happening in        10:19

19   Palembang?                                               10:19

20       A.    It was to get our friends' help, friends in    10:19

21   PLN and the government to help us with evaluation       10:19

22   credits and factors and to basically give negative     10:19

23   evaluation factors to Foster Wheeler.                   10:19

24       Q.    And how were you going to get this help?      10:19

25       A.    Through the consultant.                        10:19

1    Q.    And how was the consultant going to get this    10:19

2  help?    10:19

3    A.    Paid bribes.    10:19

4    Q.    And when Mr. Pierucci says "we cannot lose    10:19

5  this project," can you remind the jury again, why was    10:19

6  Tarahan so important?    10:19

7    A.    It was -- at that point Fred had promised the    10:19

8  project, that we would win it to upper management.    10:20

9  And it was just a project we needed to win in    10:20

10  Southeast Asia, particularly Indonesia.  And it    10:20

11  gave -- it would be a good -- another good reference    10:20

12  plant for our technology.    10:20

13    Q.    For Alstom Power, Inc.?    10:20

14    A.    For Alstom Power, Inc.    10:20

15    Q.    I am showing you what has been marked as    10:20

16  Government's Exhibit 452 for identification.  What is    10:20

17  this document?    10:20

18    A.    It's an e-mail from Junji Kusunoki to    10:20

19  Frederic Pierucci with a copy to Bill -- William    10:20

20  Pomponi, myself, Eko Sulianto, Reza Moenaf,    10:20

21  Mizushima, Saito Toru, Shoji Tatsuya, Tsuzaki Suguru,    10:21

22  Yamamoto Takeshi is the last one.    10:21

23    Q.    What is the date of this e-mail?    10:21

24    A.    18 September 2003.    10:21

25    Q.    And the subject?    10:21

1    A.    The subject is Tarahan coal-fired P/S Lot 3    10:21
2    critical situation.    10:21
3        MS. LARYEA:  At this time, the government    10:21
4    moves to admit Exhibit 452.    10:21
5        MR. SILVER:  No objection, Your Honor.    10:21
6        THE COURT:  Full exhibit.    10:21
7    BY MS. LARYEA:    10:21
8    Q.    Can you please read the first sentence of    10:21
9    Kusunoki's e-mail?    10:21
10    A.    "This morning I tried to reconfirm today's    10:21
11    meeting with Mr. EW secretary.  Final as a result the    10:22
12    meeting has postponed to sometime in tonight at    10:22
13    Palembang.  So I have booked same flight of EW to    10:22
14    Palembang at 5 p.m. Eastern -- ETD Jakarta."    10:22
15    Q.    Who is Mr. EW?    10:22
16    A.    That's Mr. Eddie Widiono who was president of    10:22
17    PLN.    10:22
18    Q.    What influence, if any, did Mr. Widiono have    10:22
19    on awarding PLN projects like Tarahan?    10:22
20    A.    Well, he was the president of PLN, so he had    10:22
21    a lot of influence.    10:22
22    Q.    Can you read the highlighted portion starting    10:22
23    with "I already talked"?    10:22
24    A.    "I already talked with Messrs. Eko and Larry    10:22
25    about this matter and they intend to go to Palembang    10:23

| | | |
|---|---|---|
| 1 | with me, same flight, and attend the meeting.  We | 10:23 |
| 2 | shall do our best at Palembang.  Mr. Saito of | 10:23 |
| 3 | Marubeni will meet some persons in charge from | 10:23 |
| 4 | PLN/TEPCO tonight, so please let us rearrange the | 10:23 |
| 5 | time of telephone conference tonight now scheduled at | 10:23 |
| 6 | 18:30 Indonesia Standard Time.  Mr. Pierucci also go | 10:23 |
| 7 | to Palembang, same flight." | 10:23 |
| 8 | Q.    This e-mail mentions that a Mr. Saito of | 10:23 |
| 9 | Marubeni will meet with some persons in charge from | 10:23 |
| 10 | PLN.  Did you ever get a report of what happened at | 10:23 |
| 11 | that meeting? | 10:23 |
| 12 | A.    Yes, we did. | 10:23 |
| 13 | Q.    I am showing you what has been marked for | 10:23 |
| 14 | identification as Government's Exhibit 453.  What is | 10:23 |
| 15 | this document? | 10:24 |
| 16 | A.    It's an e-mail from Reza Moenaf to Frederic | 10:24 |
| 17 | Pierucci with a hidden copy to Eko Sulianto and to | 10:24 |
| 18 | me. | 10:24 |
| 19 | Q.    What is the subject of the e-mail? | 10:24 |
| 20 | A.    Tarahan visit Palembang 17/9 report. | 10:24 |
| 21 | Q.    What's the date? | 10:24 |
| 22 | A.    September 18, 2003. | 10:24 |
| 23 | Q.    Mr. Puckett, do you see that Mr. Moenaf is | 10:24 |
| 24 | forwarding an e-mail from someone named Winan Kusno? | 10:24 |
| 25 | A.    Yes. | 10:24 |

1    Q.    Who is Winan Kusno?                                    10:24

2    A.    Winan Kusno is a sales engineer, project              10:24

3    manager working for Reza Moenaf.                            10:24

4    Q.    Did he work on the efforts to win the Tarahan        10:24

5    contract?                                                   10:24

6    A.    Yes, he did.                                          10:24

7    Q.    Did he know that Alstom had hired a                  10:24

8    consultant to try to win that contract?                    10:25

9    A.    Yes, he did.                                          10:25

10          MR. SILVER:  Objection.  Foundation, Your           10:25

11   Honor.                                                      10:25

12          THE COURT:  Would you give the foundation?          10:25

13          MS. LARYEA:  Yeah.                                   10:25

14          THE COURT:  How does he know?                       10:25

15   BY MS. LARYEA:                                              10:25

16   Q.    Do you know whether Mr. Kusno knew that              10:25

17   consultants were hired on the Tarahan Project?             10:25

18   A.    Yes.                                                  10:25

19   Q.    Do you know whether Mr. Kusno knew what the          10:25

20   consultants were hired to do?                               10:25

21   A.    Yes.                                                  10:25

22          MR. SILVER:  Objection, foundation, Your            10:25

23   Honor.                                                      10:25

24          THE COURT:  Let's just get a yes or no and          10:25

25   then you can establish the foundation of why -- how        10:25

 1    he knows.  Okay?                                          10:25
 2          MS. LARYEA:  Let me repeat the question.            10:25
 3    BY MS. LARYEA:                                            10:25
 4      Q.   Did you know whether Mr. Kusno knew what the       10:25
 5    consultants were supposed to do on the Tarahan            10:25
 6    Project?                                                  10:25
 7      A.   Yes.  Reza Moenaf had given them specific --       10:25
 8          MR. SILVER:  Objection.  There's no question        10:25
 9    pending.  The next question has to come next.             10:25
10          THE COURT:  Let's have the next question,           10:25
11    please.                                                   10:25
12    BY MS. LARYEA:                                            10:25
13      Q.   How did you know that Mr. Kusno knew what          10:25
14    consultants were supposed to do on the Tarahan            10:26
15    Project?                                                  10:26
16      A.   Reza Moenaf and Eko Sulianto had instructed        10:26
17    Winan and the other sales engineers that worked for       10:26
18    them as to who was a consultant and what his job was.     10:26
19          MR. SILVER:  I'm sorry, Your Honor.  The            10:26
20    witness still hasn't said how he knows that.              10:26
21    BY MS. LARYEA:                                            10:26
22      Q.   Did you work -- Mr. Puckett, you mentioned         10:26
23    that you worked on the Tarahan Projects around this       10:26
24    time, correct?                                            10:26
25      A.   Yes.                                               10:26

1    Q.    In Indonesia?                                          10:26

2    A.    Yes.                                                   10:26

3    Q.    Did you work with Reza Moenaf on this                  10:26

4    project?                                                     10:26

5    A.    Yes.                                                   10:26

6    Q.    Now, you mentioned that Reza Moenaf had                10:26

7    instructed Winan and others about the consultants and       10:26

8    what they were supposed to do.  How do you know that?       10:26

9    A.    Reza told me.                                          10:26

10   Q.    And the instructions that Reza had given              10:26

11   about the consultant --                                     10:27

12        MS. LARYEA:  At this time, Your Honor, the             10:27

13   government moves to admit Government's Exhibit 453.          10:27

14        MR. SILVER:  Objection on 801(d)(2)(E)                 10:27

15   grounds, Your Honor.                                         10:27

16        THE COURT:  All right.  We've had that                 10:27

17   discussion.  I'm going to admit 453.  To the extent         10:27

18   it needs to be conditional in light of our colloquy         10:27

19   earlier, it will be.  But you may proceed.                  10:27

20        MS. LARYEA:  Thank you, Your Honor.                    10:27

21   BY MS. LARYEA:                                               10:27

22   Q.    Can you please read the e-mail from Reza to           10:27

23   Fred that I have highlighted?                                10:27

24   A.    Yes.  "Fred, following is Winan's (APESI PM           10:27

25   in Palembang) report from the meeting last night with      10:27

1    Muliyono, Saito (Marubeni) and Firman plus Sirait    10:28

2    PLN.  Since the report contains sensitive    10:28

3    information, please handle it accordingly.  Reza."    10:28

4        Q.    Now, Reza mentioned to Fred, you see here,    10:28

5    Winan's report from the meeting with Palembang.  Is    10:28

6    Reza forwarding an e-mail from Winan?    10:28

7        A.    Yes.    10:28

8        Q.    And this e-mail you mentioned is from Winan    10:28

9    Kusno.  What is the subject?    10:29

10       A.    The subject is Tarahan visit Palembang 17/9    10:29

11   report.    10:29

12       Q.    At this time, Mr. Puckett, I am showing you    10:29

13   what has been marked --    10:29

14           MR. KAHN:  It's not in evidence.  It's not in    10:29

15   evidence.    10:29

16           MS. LARYEA:  Yeah.  I'm sorry.    10:29

17   BY MS. LARYEA:    10:29

18       Q.    What is -- I'm showing you another exhibit    10:29

19   that is marked for identification as Government's    10:29

20   Exhibit 454.  What is this document?    10:29

21       A.    This is an e-mail from Reza Moenaf to    10:29

22   Lawrence Hoskins.    10:29

23       Q.    What's the subject of the e-mail?    10:29

24       A.    Tarahan visit Palembang 17/9 report.    10:29

25       Q.    What's the date?    10:29

1    A.    The date is September 18, 2003.                    10:30

2        MS. LARYEA:  At this time, Your Honor, the           10:30

3    government moves to admit Government's Exhibit 454.       10:30

4        MR. SILVER:  Same objection as to the prior          10:30

5    e-mail, Your Honor.  It's another version of the same    10:30

6    e-mail.                                                   10:30

7        THE COURT:  All right.  I'm going to admit it         10:30

8    conditionally as we've discussed.                        10:30

9    BY MS. LARYEA:                                            10:30

10   Q.    Mr. Puckett, I want to show you the document       10:30

11   you received from Reza Moenaf which is Government's       10:30

12   Exhibit 453.  That's the one on top.  Do you see         10:30

13   that?                                                     10:30

14   A.    Yes.                                                10:30

15   Q.    And this at the bottom is Government's             10:30

16   Exhibit 454.  This is the e-mail that Reza Moenaf        10:31

17   sent to Mr. Hoskins.  Do you see that?                    10:31

18   A.    Yes.                                                10:31

19   Q.    What do you notice about the date of the           10:31

20   e-mails?                                                  10:31

21   A.    The same dates.                                     10:31

22   Q.    What do you notice about the subject of the        10:31

23   e-mail?                                                   10:31

24   A.    Same subject.                                       10:31

25   Q.    Now, let's look at the substance of the            10:31

1    e-mail that went to you and to the defendant                10:31

2    Mr. Hoskins.  Now, again, comparing the two e-mails,        10:31

3    the one you received and the one Mr. Hoskins                10:32

4    received, do you see that same report from Winan            10:32

5    Kusno?                                                      10:32

6        A.    Yes.                                             10:32

7        Q.    The same report about the Tarahan visit          10:32

8    Palembang 17/9 report?                                     10:32

9        A.    Yes.  It's the same.                             10:32

10       Q.    So same e-mail that Winan sent about this         10:32

11   report was sent to you and to the defendant, correct?      10:32

12       A.    Correct.                                         10:32

13       Q.    Now let's look at the substance of Winan's       10:32

14   report.  Let's look at the second page of Winan's          10:32

15   report about that meeting in Palembang with PLN that       10:33

16   went to you and the defendant.                             10:33

17       A.    Yes.                                             10:33

18       Q.    Can you read the highlighted part of this        10:33

19   paragraph?                                                 10:33

20       A.    "PLN has expressed their concerns over our       10:33

21   agent.  They did not like the approach made by the         10:33

22   agent.  More importantly, they concern whether they        10:33

23   can trust on the agent or not in regards to rewards        10:33

24   issue.  They concern that if we have won the job,          10:34

25   whether their rewards will still be satisfactory or        10:34

1    this agent only give them pocket money and          10:34

2    disappear."                                          10:34

3        Q.    Okay.  I will stop you there, Mr. Puckett.  10:34

4            Who is the agent on the Tarahan?             10:34

5        A.    Pirooz Sharafi.                            10:34

6        Q.    And now here when you see "more importantly  10:34

7    they concern whether they can trust on the agent or   10:34

8    not in regards to the rewards issue," what did you    10:34

9    understand as the rewards issue?                      10:34

10       A.    I understood it to be bribes.              10:34

11       Q.    The next sentence, "They concern that if we  10:34

12   have won the job, whether their rewards will still be  10:34

13   satisfactory or this agent will only give them pocket  10:34

14   money and disappear."                                 10:34

15           What is the job that is being referenced to  10:34

16   here?                                                 10:35

17       A.    The job is the Tarahan Project.            10:35

18       Q.    Can you now read the remainder of this     10:35

19   paragraph starting with "nothing."                    10:35

20       A.    "Nothing has been shown by the agent that the  10:35

21   agent is willing to spend money.  Our friend are not   10:35

22   comfortable with this.  This issue they brought up to  10:35

23   me (in fact, they mentioned this two times) since      10:35

24   they knew that AP appointed the agent.  In critical    10:35

25   situation like this, I strongly recommend that AP/MC   10:35

1   takes this seriously and guarantee that proper                10:35
2   actions will be taken.  As things still changes              10:35
3   (until the contract signed), if we are not careful,          10:35
4   PLN personnel can take negative actions against us to        10:35
5   secure their personal interest."                             10:35
6       Q.   Now, here it mentions -- now, here it               10:36
7   mentions that "AP appointed the agent."  Who is AP?          10:36
8       A.   Alstom Power, Inc.                                  10:36
9       Q.   Why was Alstom Power, Inc., the one who            10:36
10  appointed the agent?                                         10:36
11      A.   Because they're the leader of the consortium        10:36
12  is one.  They had experience in Indonesia before and         10:36
13  they were familiar with Pirooz Sharafi, the agent.           10:36
14      Q.   Now, here it says, "I strongly recommend that       10:36
15  AP/MC takes this seriously and guarantee that proper         10:36
16  actions will be taken."                                      10:36
17           Who is MC?                                          10:36
18      A.   MC is Marubeni Corporation.                         10:36
19      Q.   Why was it up to Alstom Power, Inc., and           10:36
20  Marubeni to take proper actions with respect to the          10:36
21  agent?                                                       10:37
22      A.   Because they were the two main consortium           10:37
23  partners and provided most of the funding for the            10:37
24  agent, Alstom Power making the decision about the            10:37
25  agent.                                                       10:37

1    Q.    And can you remind the jury, which Alstom    10:37

2    company was in charge of the Tarahan Project?    10:37

3    A.    Alstom Power, Inc., based in Windsor,    10:37

4    Connecticut.    10:37

5    Q.    Now, the last sentence.  "As things still    10:37

6    changes (until the contract signed), if we are not    10:37

7    careful, PLN personnel can take negative actions    10:37

8    against us to secure their personal interest."    10:37

9          When it says "until the contract is signed,"    10:37

10   what contract are they -- is being referred to here?    10:37

11   A.    The contract for the Riau Andalan -- I mean    10:37

12   the contract for the Tarahan Project.    10:37

13   Q.    And when it says "the PLN personnel can take    10:37

14   negative actions to secure their personal interest,"    10:38

15   what did you understand that to mean?    10:38

16   A.    I understood that to mean that PLN can work    10:38

17   with Foster Wheeler, Mitsubishi, their consultant to    10:38

18   secure their personal interests.    10:38

19   Q.    What is their personal interests?    10:38

20   A.    Money.    10:38

21   Q.    Can you please now read Reza Moenaf's e-mail    10:38

22   to the defendant when he forwards this report?    10:38

23   A.    Yes.  "Lawrence, below are Winan's (our PM in    10:38

24   Palembang) report from meeting he had with Marubeni    10:38

25   and PLN last night.  As you will notice, we have a    10:38

1    serious agent problem (as predicted earlier).  I have    10:39

2    alert and discuss this issue with Fred many times but    10:39

3    it seems Windsor will or cannot make any changes.  I    10:39

4    have sent this report to Fred separately.  For the    10:39

5    time being, I kindly request you not to discuss it    10:39

6    with Fred.  I will try to call you and seek for your    10:39

7    advice on how we can improve the situation.  Reza."    10:39

8        Q.    Again, can you remind the jury the shorthand    10:39

9    reference to Windsor, what is that a reference --    10:39

10       A.    Alstom Power, Inc., boiler division.    10:39

11       Q.    And here it says, "Windsor will or cannot    10:39

12   make any changes."    10:39

13            Which Alstom entity decided whether to hire    10:39

14   or fire a consultant on the Tarahan Project?    10:39

15       A.    Alstom Power, Inc.    10:39

16       Q.    I am now showing you what has been marked for    10:40

17   identification as Government's Exhibit 456.  What is    10:40

18   this document?    10:40

19       A.    This is an e-mail from Junji Kusunoki to Fred    10:40

20   Pierucci, William Pomponi, myself, Eko Sulianto, Reza    10:40

21   Moenaf.    10:40

22       Q.    What is the subject of this e-mail?    10:40

23       A.    Tarahan coal-fired P/S Lot 3/draft price    10:40

24   evaluation report confidential.    10:40

25       Q.    What's the date of this e-mail?    10:40

1    A.    September 25, 2003.                              10:40

2         MS. LARYEA:  At this time, the government        10:40

3    moves to admit Government's Exhibit 456.              10:40

4         MR. SILVER:  No objection, Your Honor.           10:41

5         THE COURT:  Full exhibit.                        10:41

6    BY MS. LARYEA:                                        10:41

7    Q.    Mr. Puckett, can you please read the first      10:41

8    sentence of the e-mail?                               10:41

9    A.    "As you can understand, unfortunately our       10:41

10   agent almost did not execute his function at all so   10:41

11   far."                                                 10:41

12   Q.    When it says our agent did not execute his      10:41

13   function at all so far, what did you understand that  10:41

14   to mean?                                              10:41

15   A.    He didn't make the right promises to the        10:41

16   right people.                                         10:41

17   Q.    Promises to do what?                            10:41

18   A.    Pay money.                                       10:41

19   Q.    To what people?                                 10:41

20   A.    To PLN and other employees of the government    10:41

21   of Indonesia.                                         10:41

22   Q.    Can you read the remainder of the e-mail,       10:41

23   please.                                               10:41

24   A.    "In case we don't take immediate action now,    10:41

25   now we don't have any chance to get this project      10:42

1    forever.  We shall not wait for coming of decision                    10:42

2    maker any more.  Please direct your opinion to your                   10:42

3    representative today.  Best regards, J. Kusunoki,                     10:42

4    Marubeni Jakarta."                                                    10:42

5        Q.    And when Kusunoki said "we shall not wait for              10:42

6    coming of decision maker any more," who did you                       10:42

7    understand the decision maker to be?                                  10:42

8        A.    Fred Pierucci.                                             10:42

9        Q.    Why was Fred Pierucci the decision maker?                  10:42

10       A.    Because he was head of sales for this                      10:42

11   project.  This was his project.                                       10:42

12       Q.    And which Alstom entity did Mr. Pierucci work              10:42

13   for?                                                                  10:42

14       A.    Alstom Power, Inc.                                         10:42

15       Q.    And where was Mr. Pierucci based?                          10:42

16       A.    In Windsor, Connecticut.                                   10:42

17       Q.    I am showing you what has been marked for                  10:42

18   identification as Government's Exhibit 457.  What is                  10:43

19   this document?                                                        10:43

20       A.    It's an e-mail from Inez Lapian to Fredric                 10:43

21   Pierucci, William Pomponi, Ion Sculy, Lawrence                        10:43

22   Hoskins and hidden copy to Reza Moenaf.                               10:43

23       Q.    What is the subject?                                       10:43

24       A.    Subject is Tarahan 3 and 4.                                10:43

25       Q.    And the date of the e-mail?                                10:43

1    A.    Date of the e-mail is September 25, 2003.                    10:43

2    Q.    Who is Inez Lapian?                                         10:43

3    A.    Inez Lapian was my secretary when I was in                 10:43

4    Indonesia.                                                       10:43

5    Q.    Can you read the -- sorry.                                 10:43

6          MS. LARYEA:  At this time, the government                  10:43

7    moves to admit Government's Exhibit 457.                         10:43

8          MR. SILVER:  No objection.                                 10:43

9          THE COURT:  Full exhibit.                                  10:43

10   BY MS. LARYEA:                                                   10:44

11   Q.    Can you read the first sentence of this                    10:44

12   e-mail?                                                          10:44

13   A.    "Note, my laptop modem is shot.  Inez is                   10:44

14   forwarding my fax via her LN."                                  10:44

15   Q.    What is LN?                                                10:44

16   A.    Lotus Notes.                                               10:44

17   Q.    Now, you mentioned that this e-mail said it                10:44

18   came from Inez Lapian, but who was the e-mail                    10:44

19   actually from?                                                   10:44

20   A.    The e-mail was actually from me and I faxed               10:44

21   the e-mail to Inez and she retyped it on Lotus Notes.          10:44

22   Q.    Can you please read the highlighted                       10:44

23   paragraph?                                                      10:44

24   A.    "Last evening 9/24/03 Marubeni's T. Yamamoto,            10:44

25   H. Mizushima and J. Kusunoki asked to alert with               10:44

1    Alstom's R. Moenaf, E. Sulianto and L. Puckett.  The    10:44

2    subject of discussion was the increasingly negative    10:44

3    direction of the project's evaluation and report to    10:45

4    PLN board of directors Jakarta headquarters.  Draft    10:45

5    report scheduled to be submitted to PLN Pusat 9/26/03    10:45

6    coupled with the recent information that the key    10:45

7    Eddie W. to the project success is not pleased with    10:45

8    our agent's commitment and actions taken thus far."    10:45

9        Q.    Can you remind the jury, who is Eddie W.?    10:45

10       A.    Eddie Widiono, the president of PLN.    10:45

11       Q.    Why was Eddie Widiono the key to the    10:45

12   project's success?    10:45

13       A.    He was president of PLN and he carried a lot    10:45

14   of influence.    10:45

15       Q.    Influence on what?    10:45

16       A.    On the evaluation of the project.    10:45

17       Q.    Influence on who won the Tarahan Project?    10:45

18       A.    Oh, yes.  Yes.    10:45

19       Q.    What did you mean when you said that "Eddie    10:45

20   Widiono was not pleased with our agent's commitment    10:45

21   and actions taken thus far"?    10:46

22       A.    He wasn't happy with what promises Pirooz    10:46

23   Sharafi had made to him, and he didn't see any    10:46

24   evidence that Pirooz was going to take care of the    10:46

25   proper bribe.    10:46

1    Q.    Can you read the next paragraph, please.    10:46

2    A.    "Marubeni made clear their position that the    10:46

3    consortium should take immediate measures to    10:46

4    terminate our agreement with Mr. P., negotiate and    10:46

5    settlement and engage a new representative to turn    10:46

6    the situation around."    10:46

7    Q.    Who is Mr. P.?    10:46

8    A.    Pirooz Sharafi.    10:46

9    Q.    Can you read the next sentence, please.    10:46

10    A.    "Marubeni pressed Puckett and Moenaf to    10:46

11    convince Alstom Windsor, particularly Fred Pierucci,    10:46

12    to agree to take this immediate action."    10:47

13    Q.    What is Alstom Windsor?    10:47

14    A.    It's Alstom Power, Inc., Windsor,    10:47

15    Connecticut.    10:47

16    Q.    Why did you and Mr. Moenaf need to convince    10:47

17    Alstom Windsor to take immediate action on the agent    10:47

18    issue?    10:47

19    A.    It was Fred's call to take any action on the    10:47

20    consultant's role or nonrole.    10:47

21    Q.    Can you read the next sentence.    10:47

22    A.    "Reza and Mizushima then met separately where    10:47

23    Reza suggested that we not take any action now to    10:47

24    replace Mr. P, the situation could be salvageable.    10:47

25    Mizushima agreed subject to a meeting ASAP with Fred    10:47

1    to discuss and agree on a path forward which would    10:47

2    include a meeting with Fred and Lawrence Hoskins with    10:47

3    Eddie W. scheduled as soon as possible."    10:48

4        Q.    Now, why would Mizushima want a meeting ASAP    10:48

5    with Fred Pierucci to discuss and agree on a path    10:48

6    forward on the agent issue?    10:48

7        A.    Mizushima knew that Fred called the shots as    10:48

8    far as the strategy on the project and as far as a    10:48

9    consultant or agent.    10:48

10        Q.    Now, it says Mizushima would -- "the path    10:48

11    forward would include a meeting with Fred and    10:48

12    Lawrence Hoskins with Eddie W."?    10:48

13        A.    Yeah.    10:48

14        Q.    Why would Mr. Hoskins attend a meeting with    10:48

15    Eddie W.?    10:48

16        A.    Lawrence Hoskins was, I think, a senior vice    10:48

17    president with IN and would have -- probably had -- I    10:48

18    don't know, but maybe had meetings with Eddie Widiono    10:48

19    before.    10:48

20        MR. SILVER:  Objection to speculation, Your    10:48

21    Honor.    10:48

22        THE COURT:  Sustained.    10:48

23        THE WITNESS:  But he's a high-level executive    10:48

24    meeting with the president of Indonesia along with    10:49

25    Fred wanting to show some continuity.    10:49

894

| | | |
|---|---|---|
| 1 | BY MS. LARYEA: | 10:49 |
| 2 | Q.    President of Indonesia or president of PLN? | 10:49 |
| 3 | A.    President of PLN.  I'm sorry. | 10:49 |
| 4 | Q.    What happened after this e-mail with respect | 10:49 |
| 5 | to your role on the Tarahan Project? | 10:49 |
| 6 | A.    I repatriated back to Houston, Texas. | 10:49 |
| 7 | Q.    And after you left Indonesia, did you ever | 10:49 |
| 8 | receive information on the Tarahan bidding process? | 10:49 |
| 9 | A.    Yes. | 10:49 |
| 10 | Q.    Who did you speak to regarding the Tarahan | 10:49 |
| 11 | bid? | 10:49 |
| 12 | A.    Reza and Eko and Bill Pomponi. | 10:49 |
| 13 | Q.    Did you speak with Reza Moenaf, Eko Sulianto | 10:49 |
| 14 | and Bill Pomponi about what happened with | 10:49 |
| 15 | Mr. Sharafi? | 10:49 |
| 16 | A.    Yes. | 10:49 |
| 17 | Q.    What did you hear? | 10:49 |
| 18 | A.    I heard that they cut Mr. Sharafi's | 10:49 |
| 19 | commission to 1 percent and hired a new consultant | 10:50 |
| 20 | and his commission would be 2 percent. | 10:50 |
| 21 | Q.    And what did you hear about what the | 10:50 |
| 22 | consultant was supposed to do with his -- the new | 10:50 |
| 23 | consultant was supposed to do with his 2 percent | 10:50 |
| 24 | bribe -- 2 percent commission? | 10:50 |
| 25 | A.    Well, I didn't -- I didn't hear it directly. | 10:50 |

```
 1   But his function was to --
 2           MR. SILVER:  Well, objection to foundation,
 3   Your Honor.
 4           THE COURT:  I'm sorry.  Did you want to
 5   rephrase that question in terms of his knowledge of
 6   the new consultant's function.
 7   BY MS. LARYEA:
 8     Q.    What was your understanding of what the new
 9   consultant would be doing?
10     A.    My understanding --
11           MR. SILVER:  Objection to foundation, basis
12   for the understanding, Your Honor.
13           THE COURT:  Can you lay that?
14           MS. LARYEA:  Yeah.
15   BY MS. LARYEA:
16     Q.    Mr. Puckett, you mentioned that you worked on
17   the Tarahan Project in Indonesia around this time?
18     A.    Yes.
19     Q.    Before, correct?  And while you were working
20   on the Tarahan Project, you were involved in
21   discussions about consultants, right?
22     A.    Correct.
23     Q.    And these discussions, did you have an
24   understanding based on these discussions as to what
25   the consultants were hired to do on the Tarahan
```

10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:51
10:51
10:51

1   process -- project?                                    10:51

2       A.    Consultants were hired to pay bribes to the  10:51

3   right people in PLN and the government of Indonesia     10:51

4   to secure a good evaluation and win -- ultimately to    10:51

5   winning the project.                                    10:51

6       Q.    Based on your time working on the Tarahan     10:51

7   bidding efforts and your understanding and              10:51

8   involvement in hiring consultants to pay bribes, what   10:51

9   was your understanding of what this new consultant      10:51

10  would be doing?                                         10:51

11      A.    Paying bribes to the right people.            10:51

12      Q.    Mr. Puckett, did you receive -- did you       10:51

13  personally receive any kickbacks in connection to the   10:51

14  Tarahan Project?                                        10:51

15      A.    No.                                           10:51

16      Q.    Did you ultimately leave Alstom?              10:51

17      A.    Yes, I did.                                   10:51

18      Q.    When did you leave Alstom?                    10:51

19      A.    2005.                                         10:51

20      Q.    What were the circumstances of your           10:51

21  departure?                                              10:52

22      A.    I asked to be laid off.                       10:52

23      Q.    Did you have any involvement in the Tarahan   10:52

24  Project after you left Alstom?                          10:52

25      A.    No.                                           10:52

1    Q.    Did you make any efforts to get Pirooz
2    Sharafi paid after you left Alstom?
3    A.    No.
4    Q.    Did you make any efforts to help the second
5    consultant get paid after you left Alstom?
6    A.    No.
7    Q.    Mr. Puckett, did Lawrence Hoskins ever tell
8    you he was leaving Alstom?
9    A.    No.
10   Q.    Did you even know he left Alstom?
11   A.    No, I didn't.
12   Q.    Did he know that you worked at least for a
13   brief period on the Tarahan Project, efforts to win
14   the Tarahan Project?
15   A.    Assume by e-mail communication he did.
16   Q.    You were both copied on e-mails regarding
17   Tarahan?
18   A.    Right.
19   Q.    E-mails we just looked at?
20   A.    Right.
21   Q.    In fact, this last e-mail that we just looked
22   at, one of the people you had your secretary send it
23   to was Mr. Hoskins, correct?
24   A.    Right.
25   Q.    Did Mr. Hoskins ever tell you that he

10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:53
10:53

1    disapproved of making payments to foreign officials?    10:53

2    A.    No.    10:53

3    Q.    Did he ever tell you that he wished he had    10:53

4    not approved the consulting agreements on Tarahan?    10:53

5    A.    No.    10:53

6    Q.    Did anyone ever tell you that Mr. Hoskins did    10:53

7    not want Alstom to pay bribes to government    10:53

8    officials?    10:53

9    A.    No.    10:53

10    Q.    Did Mr. Hoskins ever do anything that made    10:53

11    you think that he did not approve of paying bribes to    10:53

12    government officials?    10:53

13    A.    No.    10:53

14    MS. LARYEA:  Thank you, Your Honor.    10:53

15    All right.  Cross-examination.    10:53

16    CROSS-EXAMINATION OF LARRY E. PUCKETT    10:53

17    BY MR. SILVER:    10:53

18    Q.    Good morning, Mr. Puckett.    10:54

19    A.    Good morning.    10:54

20    Q.    My name is Dan Silver.  I represent Lawrence    10:54

21    Hoskins.    10:54

22    We've never met before; is that right?    10:54

23    A.    No, we haven't.    10:54

24    Q.    In fact, you've never met Mr. Hoskins before,    10:54

25    correct?    10:54

1     A.    Not that I recall.                                    10:54

2     Q.    And to the best of your recollection, you             10:54

3  never spoke on the phone with Mr. Hoskins either              10:54

4  before; is that correct?                                      10:54

5     A.    Right.                                                10:54

6     Q.    So really aside from being copied on a few            10:54

7  e-mail chains with him in 2003, you had no further            10:54

8  interactions with Mr. Hoskins during your time at             10:54

9  Alstom; is that right?                                        10:54

10    A.    Right.                                                10:54

11    Q.    So Ms. Laryea asked you a series of questions          10:54

12 now about whether Mr. Hoskins contacted you when he           10:54

13 left Alstom to tell you he was leaving and you said           10:54

14 he did not, right?                                            10:54

15    A.    Correct.                                              10:54

16    Q.    It would have been kind of strange if he             10:54

17 contacted you out of the blue and told you good-bye          10:54

18 since you didn't know him to begin with, right?              10:54

19    A.    We didn't -- we weren't on that kind of a            10:54

20 communication basis.                                          10:55

21    Q.    Right.  So you agree that it would have been          10:55

22 very strange for him to call you up or send you an           10:55

23 e-mail out of the blue and tell you he was leaving           10:55

24 when you had really no relationship with him at all,          10:55

25 right?                                                        10:55

1    A.    Yes.                                              10:55
2    Q.    Okay.  So, Mr. Puckett, you have had a number     10:55
3  of meetings with the government prior to testifying       10:55
4  here today; isn't that right?                             10:55
5    A.    Right.                                            10:55
6    Q.    And those meetings began way back in 2012; is     10:55
7  that right?                                               10:55
8    A.    That's correct.                                   10:55
9    Q.    And in preparation for your testimony more        10:55
10 recently, you've had a series of meetings with the        10:55
11 government; is that right?                                 10:55
12   A.    Right.                                            10:55
13   Q.    How many meetings would you say you've had        10:55
14 with them since this summer?  More than five, less        10:55
15 than five?                                                10:55
16   A.    Five or six.                                      10:55
17   Q.    Five or six.  And each one was maybe two or       10:55
18 three hours long.  Would you agree with that?             10:55
19   A.    Yes.                                              10:55
20   Q.    Okay.  And they've discussed with you your        10:55
21 testimony that you gave in this trial; is that right?     10:55
22   A.    Yeah.  We discussed the testimony.               10:55
23   Q.    And they showed you e-mails including the         10:55
24 e-mails that you were shown during your direct            10:56
25 testimony; is that right?                                 10:56

901

1    A.    Correct.                                                    10:56

2    Q.    Okay.  You were first contacted by the FBI in              10:56

3    April of 2012; is that right?                                    10:56

4    A.    To the best of my recollection.                            10:56

5    Q.    And when they first contacted you, you said               10:56

6    you'd prefer to speak to them with an attorney,                  10:56

7    right?                                                           10:56

8    A.    Right.                                                     10:56

9    Q.    And then you retained counsel and had a                    10:56

10   subsequent meeting with them in more detail to talk             10:56

11   about these issues; isn't that right?                           10:56

12   A.    Yes.                                                       10:56

13   Q.    And that meeting, that first substantive                   10:56

14   actual interview was in the summer of 2012; is that             10:56

15   right?                                                           10:56

16   A.    I think so.                                                10:56

17   Q.    Okay.  And then you met with them a few more              10:56

18   times in 2012 and '13, correct?                                 10:56

19   A.    Yes.                                                       10:56

20   Q.    And then you entered into a cooperation and               10:56

21   plea agreement with the government in 2013, correct?            10:56

22   A.    Yes.                                                       10:56

23   Q.    And those were the documents that we saw                  10:56

24   during your direct testimony, I believe, yesterday,             10:57

25   right?                                                           10:57

1    A.    Yes.                                                      10:57

2    Q.    But you did not actually go to court and          10:57

3    plead guilty in 2013, did you?                          10:57

4    A.    No.                                                      10:57

5    Q.    So essentially you were waiting for the           10:57

6    government to tell you that it was time --              10:57

7         MS. LARYEA:  Object, Your Honor.  We have          10:57

8    gone down this path with another witness and decided    10:57

9    the issue of the delay was not an appropriate line of   10:57

10   cross-examination.                                      10:57

11        MR. SILVER:  Your Honor, I don't intend to         10:57

12   ask the witness about the reasons for the delay, but    10:57

13   I think the timeline is important here.                 10:57

14        THE COURT:  You may proceed.                       10:57

15        MR. SILVER:  Thank you, Your Honor.                10:57

16   BY MR. SILVER:                                          10:57

17   Q.    So just to back up a step, so you signed your     10:57

18   cooperation agreement in 2013, right?                   10:57

19   A.    Correct.                                          10:57

20   Q.    But you didn't actually go to court and enter     10:57

21   your guilty plea until just a few months ago in July    10:57

22   of this year, right?                                    10:57

23   A.    Yes.                                              10:57

24   Q.    So about a six-year -- five- to six-year          10:57

25   delay, correct?                                         10:57

1    A.    Yes.                                              10:57

2    Q.    And during that time period you were              10:57

3  essentially waiting for the government to tell you        10:57

4  that they were requesting that you come to court and      10:57

5  plead guilty, right?                                      10:58

6          MS. LARYEA:  Objection, Your Honor.  Again --    10:58

7          THE COURT:  I'm going to sustain that            10:58

8  objection.                                                10:58

9          MR. SILVER:  Okay.  We'll move on.               10:58

10 BY MR. SILVER:                                            10:58

11   Q.    You were willing to plead guilty at any time     10:58

12 during that period?                                       10:58

13         MS. LARYEA:  Objection, Your Honor.              10:58

14         THE COURT:  Sustained.                           10:58

15 BY MR. SILVER:                                            10:58

16   Q.    Okay.  Have you testified in any other           10:58

17 proceedings related to this case, Mr. Puckett?           10:58

18   A.    No, I haven't.                                    10:58

19   Q.    So the main purpose of your cooperation, as      10:58

20 you understand it, is to testify in this trial; isn't    10:58

21 that right?                                               10:58

22   A.    No.  The cooperation includes a lot more than    10:58

23 that.  But part of it is testifying in this trial.       10:58

24   Q.    Well, you met with the government many times     10:58

25 as you described, right?  Correct?  You have to          10:58

1    answer verbally.                                                    10:58

2        A.    Correct.                                                  10:58

3        Q.    And they asked you questions about the                    10:58

4    Tarahan Project and your time at Alstom, right?                     10:58

5        A.    Correct.                                                  10:58

6        Q.    And I'm sure they told you to be truthful at              10:58

7    all times, right?                                                   10:58

8        A.    Correct.                                                  10:58

9        Q.    And part of your cooperation agreement is you             10:58

10   have to be available to testify when asked, right?                  10:58

11       A.    Correct.                                                  10:58

12       Q.    And this is the only time the government has              10:59

13   asked you to testify in any proceeding; isn't that                  10:59

14   right?                                                              10:59

15       A.    Yes.                                                      10:59

16       Q.    And you know that, as set forth in your                   10:59

17   cooperation agreement, the government can decide                    10:59

18   whether or not to make what's called a 5K motion for                10:59

19   you, right?  Are you familiar with that term, "5K                   10:59

20   motion"?                                                            10:59

21       A.    No, I'm not.                                              10:59

22       Q.    Okay.  Well, the government can decide                    10:59

23   whether or not to make a motion to the Court when                   10:59

24   you're sentenced, correct?                                          10:59

25       A.    Correct.                                                  10:59

1    Q.    And what that motion does is allow the Judge,    10:59

2  if she chooses, to impose a lower sentence on you    10:59

3  than you would otherwise receive, right?    10:59

4    A.    Correct.    10:59

5    Q.    And it's up to the government to decide    10:59

6  whether or not to do that, correct?    10:59

7    A.    Yes.    10:59

8    Q.    Okay.  And obviously your testimony in this    10:59

9  trial is extremely important to you as to whether or    10:59

10  not you will in fact get that 5K motion from the    10:59

11  government, right?    10:59

12    A.    It certainly -- yes, it's important.    10:59

13    Q.    Okay.  You're hoping that if you do get that    10:59

14  5K motion, you will avoid any jail time at all,    11:00

15  right?    11:00

16    A.    Yes.    11:00

17    Q.    Okay.  You pled guilty to a single FCPA    11:00

18  conspiracy count; is that right, Mr. Puckett?    11:00

19    A.    Yes.    11:00

20    Q.    You were not charged with or pled guilty to    11:00

21  any specific, what we call, substantive FCPA    11:00

22  offenses, right?    11:00

23    A.    Correct.    11:00

24    Q.    No specific wire transfers or bribe payments    11:00

25  at all, correct?    11:00

1    A.    Correct.                                        11:00

2    Q.    Okay.  You also were not charged with money     11:00

3 laundering, correct?                                     11:00

4    A.    Correct.                                         11:00

5    Q.    And did not plead guilty to any money            11:00

6 laundering-related crimes; isn't that right?             11:00

7    A.    Correct.                                         11:00

8    Q.    Okay.  And there's no mention in your plea or    11:00

9 cooperation agreement of money laundering, right?        11:00

10    A.    No.                                             11:00

11    Q.    So you didn't receive any immunity or           11:00

12 coverage, as they say, for that in your agreements,      11:00

13 right?                                                   11:00

14    A.    Right.                                          11:00

15    Q.    I want to ask you some questions about some     11:00

16 of the other people involved in the Tarahan Project.     11:00

17          Let's start with Dave Rothschild.  Who is       11:01

18 Dave Rothschild?                                         11:01

19    A.    Dave Rothschild is a former colleague of mine   11:01

20 with Alstom Power, Inc.                                  11:01

21    Q.    And did you work closely with Mr. Rothschild    11:01

22 over the years?                                          11:01

23    A.    Yes.  But starting -- really starting in 1995   11:01

24 when I moved to Indonesia.                               11:01

25    Q.    So starting in '95, you worked closely with     11:01

1    him and then up until about when?                          11:01

2        A.    Up until about four or five years ago.           11:01

3        Q.    Okay.  Four or five years ago.  So you           11:01

4    continued to stay in touch with him after you left         11:01

5    Alstom in 2005; is that right?                             11:01

6        A.    Yes.                                             11:01

7        Q.    And did you work with him after 2005 or it       11:01

8    was just a personal relationship?                          11:01

9        A.    Personal relationship.                           11:01

10       Q.    Okay.  And would you say you and                 11:01

11   Mr. Rothschild were good friends?                          11:01

12       A.    Yeah, we were friends.                           11:01

13       Q.    Are you still friendly with Mr. Rothschild       11:01

14   now?                                                       11:01

15       A.    No.                                              11:01

16       Q.    Why is that?                                     11:02

17       A.    He took part in recording conversations that     11:02

18   we had.                                                    11:02

19       Q.    So he secretly recorded his conversations        11:02

20   with you; is that right?                                   11:02

21       A.    Secretly recorded, right.                        11:02

22       Q.    And because of that, you no longer are           11:02

23   friends with him, right?                                   11:02

24       A.    Right.                                           11:02

25       Q.    Now, Mr. Rothschild was very close with          11:02

| | |
|---|---|
| 1 | Pirooz Sharafi, correct? | 11:02 |
| 2 | A.    Yes. | 11:02 |
| 3 | Q.    What was your opinion of Mr. Sharafi? | 11:02 |
| 4 | A.    It wasn't very positive. | 11:02 |
| 5 | Q.    I think you said on direct that you didn't | 11:02 |
| 6 | trust him, correct? | 11:02 |
| 7 | A.    I didn't trust him. | 11:02 |
| 8 | Q.    And -- | 11:02 |
| 9 | A.    I didn't like him or trust him. | 11:02 |
| 10 | Q.    And why was that, Mr. Puckett? | 11:02 |
| 11 | A.    It's hard to explain.  It's kind of not | 11:02 |
| 12 | tangible but ... | 11:02 |
| 13 | Q.    Do your best, sir. | 11:02 |
| 14 | A.    He would always talk about having all these | 11:02 |
| 15 | relationships throughout government, throughout | 11:03 |
| 16 | Indonesia and other parts of Asia, and I never | 11:03 |
| 17 | believed these tall tales that he was telling. | 11:03 |
| 18 | Q.    So you didn't think he told the truth; is | 11:03 |
| 19 | that correct? | 11:03 |
| 20 | A.    Right. | 11:03 |
| 21 | Q.    And, in fact, at times you even suspected | 11:03 |
| 22 | that he might be pocketing some of his commission | 11:03 |
| 23 | fees; isn't that right? | 11:03 |
| 24 | A.    Yes. | 11:03 |
| 25 | Q.    Okay.  Now, you testified a bit on direct | 11:03 |

1    about your time in the International Network; isn't        11:03

2    that right?                                                11:03

3        A.    Yes.                                             11:03

4        Q.    And I think you said you worked there, I         11:03

5    guess, for about a year in 2001 to 2002; is that          11:03

6    right?                                                     11:03

7        A.    Correct.                                         11:03

8        Q.    Was that a full-time assignment or were you      11:03

9    sort of filling multiple --                                11:04

10       A.    Full-time assignment.                            11:04

11       Q.    Okay.  And you were based in the States at       11:04

12   that time, you said?                                       11:04

13       A.    Houston, Texas.                                  11:04

14       Q.    And who were you reporting to during that        11:04

15   period?                                                    11:04

16       A.    I was reporting to a gentleman by the name of    11:04

17   Michael Salerno.                                           11:04

18       Q.    Okay.  And was he based in the U.S. or was       11:04

19   he --                                                      11:04

20       A.    He was based in the U.S.                         11:04

21       Q.    And what was his position?                       11:04

22       A.    His position was director of -- director --      11:04

23   regional director of IN.                                   11:04

24       Q.    Regional director of IN.  And do you happen      11:04

25   to know who he -- who his boss was at the time?            11:04

| | | |
|---|---|---|
| 1 | A.    His boss was -- I can't recall.  Basically | 11:04 |
| 2 | head of IN over North America. | 11:04 |
| 3 | Q.    Okay. | 11:04 |
| 4 | A.    But I can't recall his name. | 11:04 |
| 5 | Q.    And you never worked in Paris for | 11:04 |
| 6 | International Network, did you? | 11:04 |
| 7 | A.    No. | 11:04 |
| 8 | Q.    You never worked in Paris at corporate | 11:04 |
| 9 | headquarters for Alstom at all; is that right? | 11:04 |
| 10 | A.    Not at all.  Just for meetings. | 11:04 |
| 11 | Q.    Just sorry? | 11:04 |
| 12 | A.    Just for meetings. | 11:05 |
| 13 | Q.    So you went there for meetings from time to | 11:05 |
| 14 | time.  Okay.  And did you know that Mr. Hoskins' boss | 11:05 |
| 15 | within International Network was Etienne Dé?  Did you | 11:05 |
| 16 | know that? | 11:05 |
| 17 | A.    Repeat that, please. | 11:05 |
| 18 | Q.    Did you know that Mr. Hoskins, his | 11:05 |
| 19 | supervisor, his boss in International Network was a | 11:05 |
| 20 | man named Etienne Dé, were you aware of that? | 11:05 |
| 21 | A.    I'm aware of that now that you reminded me. | 11:05 |
| 22 | Q.    Okay.  So you'd heard that name before? | 11:05 |
| 23 | A.    I've heard that name before. | 11:05 |
| 24 | Q.    Okay.  And at the time you worked in | 11:05 |
| 25 | International Network, in fact, Mr. Dé was the head | 11:05 |

1  of the entire International Network operation; isn't          11:05

2  that right?                                                   11:05

3      A.    I believe so.                                       11:05

4      Q.    Okay.  But you were a few levels down the           11:05

5  chain from him and so did not have any direct                11:05

6  interaction with him; is that right?                         11:05

7      A.    Right.                                              11:05

8      Q.    Okay.                                               11:05

9          THE COURT:  If you move to a new area,                11:05

10 Mr. Silver, we're going to need to take a recess.            11:05

11 All right?                                                    11:05

12         MR. SILVER:  Sure.                                    11:06

13         THE COURT:  So we're going to take a                  11:06

14 15-minute recess, ladies and gentlemen.  Leave your          11:06

15 notebooks here.                                               11:06

16         (Jury exited the proceedings, 11:06 a.m.)            11:06

17         THE COURT:  All right, Mr. Puckett.  You may          11:06

18 step down for 15 minutes.  Don't discuss your                11:06

19 testimony with anyone, please.                               11:06

20         THE WITNESS:  Thank you, Your Honor.                  11:06

21         THE COURT:  Thank you.  We will stand in             11:06

22 recess for ten minutes.                                       11:06

23         (Recess taken from 11:06 a.m. to 11:40 a.m.)         11:06

24         THE COURT:  Please be seated, ladies and             11:40

25 gentlemen.                                                    11:40

| | | |
|---|---|---|
| 1 | All right.  Please bring in the jury.  And we | 11:40 |
| 2 | will recess at 12:50. | 11:40 |
| 3 | (Jury entered the proceedings, 11:40 a.m.) | 11:40 |
| 4 | THE COURT:  All right.  Please be seated, | 11:41 |
| 5 | ladies and gentlemen.  We'll continue with | 11:41 |
| 6 | cross-examination of Mr. Puckett by Mr. Silver. | 11:41 |
| 7 | MR. SILVER:  Thank you, Your Honor. | 11:41 |
| 8 | BY MR. SILVER: | 11:41 |
| 9 | Q.    Mr. Puckett, I had asked you a couple | 11:41 |
| 10 | questions about International Network.  I just want | 11:41 |
| 11 | to go back to that topic briefly. | 11:41 |
| 12 | So Mr. Hoskins was the area senior vice | 11:41 |
| 13 | president for International Network for the Asia | 11:41 |
| 14 | Pacific region in 2003; isn't that right? | 11:41 |
| 15 | A.    Yes. | 11:41 |
| 16 | Q.    And you're aware also from your own time at | 11:41 |
| 17 | International Network that International Network had | 11:41 |
| 18 | its own reporting structure separate from the | 11:42 |
| 19 | business units; isn't that correct? | 11:42 |
| 20 | A.    Correct. | 11:42 |
| 21 | Q.    And so as we were discussing before we broke, | 11:42 |
| 22 | Mr. Hoskins had a boss in Paris who was the head of | 11:42 |
| 23 | International Network, correct? | 11:42 |
| 24 | A.    Correct. | 11:42 |
| 25 | Q.    And that person was Etienne Dé, right? | 11:42 |

1    A.    Yes.                                                      11:42

2    Q.    The sales team on the Tarahan Project                     11:42

3    reported to Alstom Power, Inc., in Windsor; isn't              11:42

4    that correct?                                                   11:42

5    A.    Correct.                                                  11:42

6    Q.    And you yourself became the sales lead for a             11:42

7    short period of time in -- in August and September of          11:42

8    2003, right?                                                    11:42

9    A.    Correct.                                                  11:42

10   Q.    And I think you said on direct, your boss,              11:42

11   the person who you reported to in that role was Fred           11:42

12   Pierucci, correct?                                             11:42

13   A.    Right.                                                   11:42

14   Q.    Mr. Hoskins, of course, did not report to              11:42

15   Fred Pierucci, right?                                           11:42

16   A.    For the Tarahan Project, it wasn't report              11:42

17   but --                                                         11:42

18   Q.    That's not my question, sir.                           11:42

19         My question is:  Everyone at Alstom has a              11:42

20   boss, right?  You worked there for a long time,               11:43

21   right?                                                         11:43

22   A.    Right.                                                   11:43

23   Q.    And so the whole time you worked there, you            11:43

24   had at least one boss, maybe sometimes two bosses,            11:43

25   right?                                                         11:43

| | | |
|---|---|---|
| 1 | A.    Right. | 11:43 |
| 2 | Q.    And Mr. Hoskins' boss was not Fred Pierucci, | 11:43 |
| 3 | right? | 11:43 |
| 4 | A.    Correct. | 11:43 |
| 5 | Q.    Okay.  And, in fact, International Network | 11:43 |
| 6 | did not report to anyone within Alstom Power, Inc.; | 11:43 |
| 7 | isn't that correct? | 11:43 |
| 8 | A.    Correct. | 11:43 |
| 9 | Q.    Okay.  So when you became temporarily | 11:43 |
| 10 | assigned to the Tarahan Project in 2003, you already | 11:43 |
| 11 | testified that Pirooz Sharafi had been already | 11:43 |
| 12 | selected as the outside agent on the project, right? | 11:43 |
| 13 | A.    Yes. | 11:43 |
| 14 | Q.    And Pirooz Sharafi was hired to do both | 11:43 |
| 15 | legitimate things and illegitimate things; isn't that | 11:43 |
| 16 | correct? | 11:43 |
| 17 | A.    That's correct. | 11:44 |
| 18 | Q.    And what were some of the legitimate things | 11:44 |
| 19 | that he was hired to do in your understanding? | 11:44 |
| 20 | A.    Relationships, develop close relationships | 11:44 |
| 21 | like with Eddie Widiono and other high-level | 11:44 |
| 22 | officials. | 11:44 |
| 23 | Q.    And can you just explain what you mean by | 11:44 |
| 24 | that?  I mean, why couldn't you go out and just | 11:44 |
| 25 | develop those relationships or why couldn't Reza | 11:44 |

1    Moenaf go out and do it or someone else?                    11:44

2        A.    Well, he did.  But typically the consultant       11:44

3    has very close relationships.  They develop into            11:44

4    family relationships, close relationships with              11:44

5    government employees.                                        11:44

6        Q.    And why does that -- again, putting aside          11:44

7    anything that was illegitimate that Sharafi was hired        11:44

8    to do, why does having legitimate close relationships        11:44

9    matter in that business?                                     11:44

10       A.    Well, sure it matters in influencing the bid.      11:44

11   He wants to help -- the official wants to help his           11:44

12   friend.                                                      11:44

13       Q.    Okay.  So, for example, Sharafi would have         11:44

14   been helpful in arranging meetings; is that fair to          11:44

15   say?                                                         11:44

16       A.    Correct.                                           11:44

17       Q.    And would have been helpful in providing           11:44

18   information to Alstom Power, Inc., and the other             11:45

19   consortium members about how the decision-making            11:45

20   process was going; is that fair to say?                      11:45

21       A.    It's fair to say as far as he knew.                11:45

22       Q.    As far as he knew, right, or as far as he          11:45

23   claimed to know, right?                                      11:45

24       A.    Right.                                             11:45

25       Q.    And that kind of insight and those kinds of        11:45

916

1    relationships is something that Alstom Power, Inc. --    11:45

2    neither Alstom Power, Inc., nor its consortium    11:45

3    members has internally.  That's why they had to turn    11:45

4    to someone like Sharafi to provide that information;    11:45

5    isn't that correct?    11:45

6    A.    Yeah.  Well, you had both.  Basically we had    11:45

7    relationships with Marubeni and Alstom Power, Inc.,    11:45

8    and PTESI had their own relationships.  But you also    11:45

9    used the relationship as a consultant because it's on    11:45

10   a personal basis.    11:45

11   Q.    Okay.  Because his relationships were    11:45

12   presumably stronger than or at least he claimed they    11:45

13   were stronger than the relationships --    11:45

14   A.    Right.    11:46

15   Q.    -- that anyone at PTESI like Reza Moenaf or    11:46

16   anyone else had on the bidding team; is that right?    11:46

17   A.    Correct.    11:46

18   Q.    Okay.  So, Mr. Puckett, in your testimony on    11:46

19   direct yesterday and today, I think actually just    11:46

20   today, you read from and reviewed various e-mails    11:46

21   related to Tarahan that you had not been copied on    11:46

22   originally, correct?    11:46

23   A.    Correct.    11:46

24   Q.    And in your prep sessions with the    11:46

25   government, they showed you various e-mails that you    11:46

1    had not been copied on originally back in -- back in          11:46

2    2003, correct?                                                11:46

3        A.    May have.  Most of them I had been copied on,       11:46

4    either hidden copied or copied.                               11:46

5        Q.    Okay.  But, I mean, the ones they showed you        11:46

6    in court today, presumably they'd showed you those            11:46

7    before in preparing your testimony, right?                    11:46

8        A.    Yes.                                                 11:46

9        Q.    Okay.  And when you first began meeting with         11:46

10   the government, you had some difficulty remembering           11:46

11   some details regarding the Tarahan bidding process,          11:46

12   right?                                                        11:46

13       A.    Yes.                                                 11:46

14       Q.    Which is certainly understandable considering       11:46

15   that it happened 15 years ago, right?                        11:46

16       A.    Correct.                                            11:47

17       Q.    Did you learn any new facts from the                11:47

18   government by reviewing these documents that you             11:47

19   hadn't seen before that you were not privy to back           11:47

20   during your time working on the Tarahan bid?                 11:47

21       A.    I didn't learn them from the government, but        11:47

22   I learned them from the documents that the government        11:47

23   provided me.  The documents refreshed my memory,            11:47

24   rejogged my memory.  As a matter of fact, without the        11:47

25   documents, I wouldn't have remembered many of the            11:47

1    details at all.                                          11:47

2        Q.    Okay.  In particular --                        11:47

3        A.    But the more I looked at them, the more it     11:47

4    came back to me.                                         11:47

5        Q.    Right.  But in particular, you did not know    11:47

6    the name of the second consultant who was hired to       11:47

7    replace Sharafi.  That was not a name that you knew      11:47

8    back in 2003, correct?                                   11:47

9        A.    Exactly.                                        11:47

10       Q.    Okay.  But you learned that from being shown    11:47

11   documents by the government in preparing for your        11:47

12   testimony, correct?                                      11:47

13       A.    No.                                             11:47

14       Q.    You didn't learn that for the first time when  11:47

15   the government showed you that e-mail?                    11:47

16       A.    I didn't know the name of the -- still don't   11:47

17   know the name of the second consultant.                  11:47

18       Q.    Okay.  Well, why don't we bring up what's      11:48

19   already in evidence as 461-T.                            11:48

20            MR. SILVER:  Can you just maybe expand the       11:48

21   top half of that e-mail, please.                         11:48

22   BY MR. SILVER:                                           11:48

23       Q.    This is an e-mail the government showed you    11:48

24   during your preparation; isn't that correct?            11:48

25            MS. LARYEA:  Objection, foundation.             11:48

1          THE COURT:  Well, it's a question.  Is it?          11:48
2    Did you get shown this?                                   11:48
3          THE WITNESS:  I'm trying to read it, Your          11:48
4    Honor.                                                    11:48
5    BY MR. SILVER:                                            11:48
6       Q.   Yeah, take a look at it.                          11:48
7       A.   And see if I can recall being shown this.        11:48
8          THE COURT:  Take your time.  The question is       11:48
9    whether the government showed it to you during your      11:48
10   preparation.                                              11:48
11         THE WITNESS:  Yes, ma'am.  Yes, Your Honor.        11:48
12         MR. SILVER:  It's in evidence, Your Honor.         11:48
13         THE WITNESS:  I've never seen this document.       11:48
14   BY MR. SILVER:                                            11:48
15      Q.   You don't recall being shown that document by    11:48
16   the government during --                                  11:49
17      A.   I do not recall being shown that document.       11:49
18      Q.   Okay.  Let me just -- you attended a meeting     11:49
19   with the government on August 12th of this year;         11:49
20   isn't that correct?                                       11:49
21      A.   Could be.  Very well be.  I don't remember       11:49
22   the exact date.                                           11:49
23      Q.   Okay.  Well, when you attend the meetings        11:49
24   with the government, they took notes; isn't that         11:49
25   right?                                                    11:49

1    A.    Yes.                                                    11:49

2    Q.    Okay.  And they made reports regarding those           11:49

3    meetings, correct?                                           11:49

4    A.    Correct.                                               11:49

5    Q.    Okay.  So would it refresh your recollection,          11:49

6    sir, if I showed you a report from the meeting on            11:49

7    August 12, 2009, as to whether or not you were shown         11:49

8    this e-mail during that -- during that meeting?              11:49

9    Would that refresh your recollection?                        11:49

10   A.    Yes.                                                   11:49

11   Q.    Okay.                                                  11:49

12         MR. SILVER:  I'd like to show the witness --           11:49

13   if I could approach, Your Honor, that would be               11:49

14   easier.  It's just a hard copy of the August 12,             11:49

15   2019, 302.                                                   11:50

16         THE COURT:  His testimony was he never saw             11:50

17   it, not that he doesn't have a recollection.                 11:50

18         MS. LARYEA:  Yes, Your Honor.                          11:50

19   BY MR. SILVER:                                               11:50

20   Q.    Your testimony today is that you never were           11:50

21   shown this document during your prep, sir?                   11:50

22   A.    No.  I've never seen the document.  I never           11:50

23   was shown the document.                                      11:50

24   Q.    Okay.  And your testimony is that you were            11:50

25   not shown a document that revealed to you the name of        11:50

| | | |
|---|---|---|
| 1 | the second consultant during your prep sessions? | 11:50 |
| 2 | A.    Right. | 11:50 |
| 3 | MR. SILVER:  Okay.  I'll move on, Your Honor. | 11:50 |
| 4 | BY MR. SILVER: | 11:50 |
| 5 | Q.    I'd like to bring up what's already in | 11:50 |
| 6 | evidence as Exhibit 445, please. | 11:50 |
| 7 | MR. SILVER:  If we could just expand the top | 11:50 |
| 8 | part of that e-mail, just the first part of the | 11:50 |
| 9 | chain.  Yeah. | 11:50 |
| 10 | BY MR. SILVER: | 11:50 |
| 11 | Q.    I believe you reviewed this e-mail during | 11:50 |
| 12 | your direct testimony, Mr. Puckett.  This is an | 11:51 |
| 13 | e-mail from Mr. Pierucci to you and others from | 11:51 |
| 14 | August of -- August 22, 2003, correct? | 11:51 |
| 15 | A.    Correct. | 11:51 |
| 16 | Q.    And it reads in part, "I absolutely want to | 11:51 |
| 17 | have Larry coordinate all lobbying actions regarding | 11:51 |
| 18 | this important project," referring to Tarahan, right? | 11:51 |
| 19 | A.    Correct. | 11:51 |
| 20 | Q.    And your understanding is that when | 11:51 |
| 21 | Mr. Pierucci said he wanted you to coordinate all | 11:51 |
| 22 | lobbying actions, he was referring to both legitimate | 11:51 |
| 23 | lobby activities, correct? | 11:51 |
| 24 | A.    Correct. | 11:51 |
| 25 | Q.    As well as illegitimate activities, correct? | 11:51 |

1    A.    Correct.                                                    11:51

2    Q.    And that comports with your understanding of     11:51

3    what Sharafi was doing as well, correct?              11:51

4    A.    Correct.                                          11:51

5    Q.    Thank you.                                        11:51

6         MR. SILVER:  Could we pull up 451 which is in      11:51

7    evidence.  And you could just expand the -- yeah,     11:51

8    from the beginning of the e-mail down to "we cannot    11:51

9    lose this project."  Thank you.  Thanks.              11:52

10   BY MR. SILVER:                                         11:52

11   Q.    So this is an e-mail, Mr. Puckett, from          11:52

12   Mr. Pierucci to a bunch of people including yourself   11:52

13   from September 16th of 2003, correct?                 11:52

14   A.    Correct.                                         11:52

15   Q.    And in this e-mail, Mr. Pierucci was quite       11:52

16   upset because he and you had received information      11:52

17   that the Alstom bid was being ranked as more          11:52

18   expensive as second in the evaluation process, right? 11:52

19   A.    Right.                                           11:52

20   Q.    Okay.  And in the e-mail he says, among other    11:52

21   things, Mr. Pierucci said, "I thought we had control   11:52

22   in Palembang," correct?                               11:52

23   A.    Right.                                           11:52

24   Q.    And it's your understanding that when he said    11:52

25   that, he was referring to legitimate lobbying efforts  11:52

1    that were giving the consortium, in his words,                11:52

2    control over the evaluation process, right?                   11:52

3       A.    Legitimate and illegitimate.                         11:52

4       Q.    Okay.  Because they were -- both types of            11:53

5    efforts were going on simultaneously, right?                  11:53

6       A.    Exactly.                                             11:53

7       Q.    Thank you.                                           11:53

8             MR. SILVER:  You can take that down,                 11:53

9    Ms. Goodwin.  Thank you.                                      11:53

10   BY MR. SILVER:                                                11:53

11      Q.    You were asked some questions during your            11:53

12   direct testimony about an individual named Winan              11:53

13   Kusno.  Do you recall discussing him?                         11:53

14      A.    Uh-huh.                                              11:53

15      Q.    And he was someone who worked for Alstom             11:53

16   PTESI, correct?                                               11:53

17      A.    Correct.                                             11:53

18      Q.    So he was a few levels down but under Reza           11:53

19   Moenaf, right?                                                11:53

20      A.    Right.                                               11:53

21      Q.    Did you personally ever have any discussions         11:53

22   with Winan Kusno about bribery?                               11:53

23      A.    Not personal discussions, no.                       11:53

24      Q.    Okay.  Did you -- and that would be either in        11:53

25   person or on the phone, correct?                             11:53

1    A.    No.    11:53

2    Q.    Did you ever attend any meetings with Winan    11:53

3    Kusno in which bribery was discussed?    11:53

4    A.    No.    11:53

5    Q.    Other than the e-mails that the government    11:53

6    showed you during your direct testimony, do you    11:53

7    recall ever receiving any other e-mail communications    11:54

8    from Winan Kusno that had -- to your view, in your    11:54

9    understanding related to bribery?    11:54

10    A.    No.  That's the only one I received.    11:54

11    Q.    Okay.    11:54

12    A.    I knew he was working on the project.    11:54

13    Q.    Okay.  And did Reza Moenaf or anyone else at    11:54

14    Alstom PTESI ever tell you specifically that they had    11:54

15    had communications with Winan Kusno about bribery?    11:54

16    A.    No.    11:54

17    Q.    Okay.  Let's move to Exhibit 456 which I    11:54

18    believe is already in evidence.    11:54

19        MR. SILVER:  And if we could just expand the    11:54

20    top, the text, not the "to" line, but just that text.    11:54

21    Yeah.  Exactly.  Okay.    11:54

22    BY MR. SILVER:    11:54

23    Q.    This was an e-mail that you also, I believe,    11:54

24    discussed during your direct testimony, Mr. Puckett,    11:54

25    from one of the Marubeni representatives to    11:55

1    Mr. Pierucci and Mr. Pomponi, correct?                    11:55

2        A.    Correct.                                        11:55

3        Q.    And you were copied as well, correct?           11:55

4        A.    Correct.                                        11:55

5        Q.    And this was the e-mail.  It's from September   11:55

6    of '03 where Marubeni provides a draft copy of the        11:55

7    PLN evaluation report reflecting the fact that Alstom     11:55

8    has been ranked second, right?                            11:55

9        A.    Correct.                                        11:55

10       Q.    Mr. Hoskins was not copied on this e-mail,      11:55

11   right?                                                    11:55

12       A.    Not that I'm aware of.                          11:55

13       Q.    Okay.  Well, we can -- if you want to pull up   11:55

14   the "from" and "to" lines just to confirm that.  He's     11:55

15   not copied there, right, Mr. Puckett?                     11:55

16       A.    No, he's not.                                   11:55

17       Q.    Okay.  And you never discussed with             11:55

18   Mr. Hoskins the fact that the bid evaluation was          11:55

19   going poorly, correct?                                    11:55

20       A.    No, I didn't.                                   11:55

21       Q.    Okay.  In fact, you never had any discussions   11:55

22   with him at all about Tarahan or anything else,           11:55

23   right?                                                    11:55

24       A.    Right.                                          11:55

25       Q.    Okay.  Why don't we go to 457 in evidence,      11:55

926

1    please.                                                    11:56

2        MR. SILVER:  Why don't we just pull up for            11:56

3    now that very first line of the e-mail about the          11:56

4    laptop modem.  Thank you.                                 11:56

5    BY MR. SILVER:                                            11:56

6    Q.    So, Mr. Puckett, this was an e-mail that you        11:56

7    talked about during your direct testimony which your     11:56

8    secretary sent on your behalf, right?                    11:56

9    A.    Yes.                                                11:56

10   Q.    September 25th of 2003.  And in the e-mail,         11:56

11   your secretary says "my laptop modem is shot."  That     11:56

12   sort of -- what that means is that your laptop modem      11:56

13   was shot, right?                                          11:56

14   A.    Right.                                              11:56

15   Q.    Meaning that it wasn't working, right, and,        11:56

16   therefore, you asked your secretary to send this         11:56

17   message on your behalf via her e-mail account,           11:56

18   correct?                                                  11:56

19   A.    Correct.                                            11:56

20   Q.    So back in 2003, this was before the era of        11:56

21   broadband wireless access, right?                        11:57

22   A.    Right.                                              11:57

23   Q.    So this was dial-up modems, correct?               11:57

24   A.    Right.                                              11:57

25   Q.    So when you were traveling, for example, like      11:57

| | |
|---|---|
| 1 | at the time of this e-mail in Indonesia, you didn't | 11:57 |
| 2 | have e-mail access all the time, right? | 11:57 |
| 3 | A.    Right. | 11:57 |
| 4 | Q.    And you would rely on your laptop and have to | 11:57 |
| 5 | physically log in via dial-up modem to send and | 11:57 |
| 6 | receive e-mails, correct? | 11:57 |
| 7 | A.    Correct. | 11:57 |
| 8 | Q.    And so presumably when you were having | 11:57 |
| 9 | meetings and you were on the road, you wouldn't be | 11:57 |
| 10 | checking or responding to e-mails all the time, | 11:57 |
| 11 | right? | 11:57 |
| 12 | A.    Correct. | 11:57 |
| 13 | Q.    You would do so -- would you even do so once | 11:57 |
| 14 | a day or was it even less than that? | 11:57 |
| 15 | A.    Three or four times a day. | 11:57 |
| 16 | Q.    Three or four times a day, yeah.  Sort of at | 11:57 |
| 17 | the hotel or the office? | 11:57 |
| 18 | A.    Hotel or at the office. | 11:57 |
| 19 | Q.    No smartphone back then, right? | 11:57 |
| 20 | A.    No smartphone. | 11:57 |
| 21 | Q.    Okay.  You can -- | 11:57 |
| 22 | MR. SILVER:  Please bring the exhibit back | 11:57 |
| 23 | but not the call out.  If you could just pull up the | 11:58 |
| 24 | "from" and "to" headings.  Yeah.  You -- if you | 11:58 |
| 25 | scroll down a little bit more, I want to make sure he | 11:58 |

1  saw the whole thing.  Yeah.                                    11:58

2  BY MR. SILVER:                                                 11:58

3      Q.    So you copied Mr. Hoskins on this e-mail,            11:58

4  correct?                                                       11:58

5      A.    Correct.                                             11:58

6      Q.    Or you directed your secretary to do so when        11:58

7  she sent it on your behalf, right?                             11:58

8      A.    Right.                                               11:58

9      Q.    And the only reason you did that is because         11:58

10 Mr. Moenaf had asked you to copy Mr. Hoskins, right?           11:58

11     A.    I don't recall that's the only reason I did          11:58

12 that.                                                          11:58

13     Q.    Well, other than sending this e-mail, you'd         11:58

14 never sent any other e-mails to Mr. Hoskins, right?            11:58

15     A.    Right.  But I don't recall if Reza asked me          11:58

16 to send this to Lawrence or not.  I just don't                 11:58

17 recall.                                                        11:58

18     Q.    Okay.  So you don't recall even why you             11:58

19 copied Mr. Hoskins on this?                                    11:58

20     A.    Well, I copied Mr. Hoskins on this because it        11:58

21 was a -- very pertinent to information that was going          11:59

22 back and forth.  This was a very, as we said,                  11:59

23 sensitive time and I felt like he should know about            11:59

24 this information.                                              11:59

25     Q.    Okay.  But you don't recall the fact that it        11:59

929

1    was Mr. Moenaf who asked you to copy him?                    11:59

2        A.    I don't recall.                                    11:59

3        Q.    Okay.  You, of course, never discussed the         11:59

4    contents of this e-mail with Mr. Hoskins either,             11:59

5    right?                                                       11:59

6        A.    No, I didn't.                                      11:59

7              MR. SILVER:  Okay.  If you could remove that       11:59

8    call out and just bring up the -- sure.  If you could        11:59

9    just highlight the main text of the e-mail, so               11:59

10   beginning "last evening" down to the end.  Yeah.             11:59

11   Thank you.                                                   11:59

12   BY MR. SILVER:                                               11:59

13       Q.    Okay.  Now, in the e-mail you refer to --          11:59

14   it's in the bottom of the first paragraph, "our              11:59

15   agent's commitment and actions taken thus far,"              11:59

16   correct?                                                     11:59

17       A.    Correct.                                           11:59

18       Q.    And that's referring to Mr. Sharafi's efforts      11:59

19   at that time, right?                                         11:59

20       A.    Correct.                                           11:59

21       Q.    And by "commitment," again, you're referring       11:59

22   here to both the legitimate work that he was supposed        12:00

23   to be doing, as well as the illegitimate work; isn't         12:00

24   that right?                                                  12:00

25       A.    Exactly.                                           12:00

1    Q.    Okay.  So often in these, in this and other    12:00

2    communications, those two topics would be essentially    12:00

3    intertwined; is that fair to say?    12:00

4    A.    Fair to say.    12:00

5    Q.    Okay.    12:00

6         MR. SILVER:  You can remove that exhibit.    12:00

7    Thank you.    12:00

8    BY MR. SILVER:    12:00

9    Q.    So Mr. Moenaf had never wanted Mr. Sharafi to    12:00

10    be the agent on Tarahan to begin with; isn't that    12:00

11    correct?    12:00

12    A.    Correct.    12:00

13    Q.    He had wanted to have his choice instead of    12:00

14    Mr. Sharafi, correct?    12:00

15    A.    His recommendation, yes.    12:00

16    Q.    Okay.  And that turned out to be this guy    12:00

17    Azmin whose name you didn't recall, right?    12:00

18    A.    Right.    12:00

19    Q.    Okay.  And that was because, to your    12:00

20    understanding, Reza was very close to Azmin Aulia;    12:00

21    isn't that right?    12:01

22    A.    I didn't know that.    12:01

23    Q.    Okay.  What was your understanding why he    12:01

24    wanted Azmin to be the agent instead of Sharafi?    12:01

25    A.    I can only speculate that he thought he would    12:01

| | | |
|---|---|---|
| 1 | be the right guy. | 12:01 |
| 2 |    Q.   I don't want you to speculate.  But isn't it | 12:01 |
| 3 | true that you suspected that Reza wanted Azmin to be | 12:01 |
| 4 | the agent because you thought that he might have -- | 12:01 |
| 5 | he Reza, might have some sort of a side arrangement | 12:01 |
| 6 | with Azmin; isn't that right? | 12:01 |
| 7 |        MS. LARYEA:  Objection, Your Honor. | 12:01 |
| 8 |        THE COURT:  Basis? | 12:01 |
| 9 |        MS. LARYEA:  He said "you suspected." | 12:01 |
| 10 |        THE COURT:  I'm going to sustain the | 12:01 |
| 11 | objection.  He says he didn't know the name until | 12:01 |
| 12 | even now. | 12:01 |
| 13 |        MR. SILVER:  I can back up and try to lay a | 12:01 |
| 14 | better foundation, Your Honor. | 12:01 |
| 15 |        THE COURT:  Let's stay away from suspicions | 12:01 |
| 16 | and get into knowledge. | 12:01 |
| 17 |        MR. SILVER:  Sure. | 12:01 |
| 18 | BY MR. SILVER: | 12:01 |
| 19 |    Q.   So, Mr. Puckett, you knew there was a second | 12:01 |
| 20 | agent being discussed on Tarahan, right? | 12:01 |
| 21 |    A.   Yes, I did. | 12:01 |
| 22 |    Q.   And of course you knew that ultimately that | 12:01 |
| 23 | second agent was in fact brought into the deal as | 12:01 |
| 24 | well, right? | 12:01 |
| 25 |    A.   Yes.  I found that out later. | 12:01 |

932

1    Q.    And you also knew that Reza Moenaf from the    12:01

2    beginning had been pushing to have this other agent    12:02

3    selected instead of Mr. Sharafi, right?    12:02

4    A.    Actually, I did not know that.  I didn't know    12:02

5    he'd been pushing for this other guy.    12:02

6    Q.    Well, when did you learn that he had been    12:02

7    pushing for the other guy?    12:02

8    A.    After it was done.  I didn't know his name.    12:02

9    Q.    Okay.  Well, you didn't know his name, but    12:02

10   you did learn that Mr. Moenaf had been pushing to    12:02

11   select this other guy from the beginning, correct?    12:02

12   A.    Yes.  From the beginning, I don't know when    12:02

13   the beginning is.  At some point Reza was pushing for    12:02

14   this guy.    12:02

15   MS. LARYEA:  Objection.  He has not clarified    12:02

16   with the defendant when he found out that Reza was    12:02

17   pushing for this guy.    12:02

18   THE COURT:  I think it is important to    12:02

19   clarify that.  So, Mr. Silver, if you could ask a few    12:02

20   more questions with that -- in that regard.    12:02

21   MR. SILVER:  Yes.    12:02

22   BY MR. SILVER:    12:02

23   Q.    When did you find out that Reza Moenaf was    12:02

24   pushing for the other agent to be selected instead of    12:02

25   Mr. Sharafi?    12:02

1    A.    Probably two or three weeks before the    12:02

2  meeting they had to straighten out the agent    12:02

3  situation.    12:03

4    Q.    So two or three weeks.  But -- so around    12:03

5  August or September?    12:03

6    A.    That's when I found out that Reza was pushing    12:03

7  for a certain guy.  But I didn't pay any attention to    12:03

8  what his name was.    12:03

9    Q.    Okay.  That's fine.  And isn't it true, sir,    12:03

10  that your understanding of why Reza wanted the other    12:03

11  guy was because Reza had a close relationship with    12:03

12  him, right?    12:03

13    A.    I didn't know that.    12:03

14    Q.    But when --    12:03

15    A.    I didn't know Reza had a close relationship    12:03

16  with him.    12:03

17    Q.    Okay.    12:03

18    A.    I knew that -- I found out that Reza wanted    12:03

19  to use this guy.  I didn't know about the close    12:03

20  relationship or how close or if it was just business    12:03

21  or personal.  I didn't know that.    12:03

22    Q.    Okay.  And isn't it true, Mr. Puckett, that    12:03

23  your understanding of why Reza wanted to use this    12:03

24  other guy was because you thought Reza had some sort    12:03

25  of --    12:03

1      MS. LARYEA:  Objection, Your Honor.  He said          12:03

2  he does not know.                                          12:03

3      THE COURT:  I sustain the objection.                   12:03

4      MR. SILVER:  Okay.                                     12:03

5  BY MR. SILVER:                                             12:04

6    Q.   I'll move on, Mr. Puckett.                          12:04

7      MR. SILVER:  Could we bring up what's in               12:04

8  evidence as Exhibit 660-B, Slide 23.                       12:04

9  BY MR. SILVER:                                             12:04

10   Q.   Mr. Puckett, take a look at this document           12:04

11 which is in evidence.  This is an approval process         12:04

12 chart for Alstom International Network with respect         12:04

13 to the hiring of outside agents; isn't that correct?       12:04

14   A.   Correct.                                            12:04

15   Q.   Correct?  Yes?                                      12:04

16   A.   Correct.                                            12:04

17   Q.   And if you look under "approvals,"                  12:04

18 International Network, specifically it says                 12:04

19 "approvals by IN," International Network, "area            12:04

20 senior VP and senior VP."  So area senior VP, that         12:05

21 would be Mr. Hoskins, correct?                             12:05

22   A.   Correct.                                            12:05

23   Q.   And as reflected in this chart, it was a            12:05

24 necessary step in the hiring of any outside agent to       12:05

25 have the approval of the International Network area         12:05

| | |
|---|---|
| 1 | SVP, right? | 12:05 |
| 2 | A.    Well, it was a necessary step by charter. | 12:05 |
| 3 | Q.    By charter, you said? | 12:05 |
| 4 | A.    I mean by -- just like this approval process, | 12:05 |
| 5 | I think this is part of air pollution control, but it | 12:05 |
| 6 | would apply for Alstom in general.  But Tarahan was a | 12:05 |
| 7 | unique case.  Fred Pierucci made a decision.  I don't | 12:05 |
| 8 | know if he made a decision with Lawrence's approval | 12:05 |
| 9 | or not. | 12:05 |
| 10 | Q.    Okay.  Well -- | 12:05 |
| 11 | A.    But Fred Pierucci made a decision who the | 12:05 |
| 12 | agent would be. | 12:06 |
| 13 | THE COURT:  Wait.  Let him finish his answer, | 12:06 |
| 14 | please.  "I don't know if he made a decision with | 12:06 |
| 15 | Lawrence's approval or not."  Did you have something | 12:06 |
| 16 | further to say?  "But Fred Pierucci made a decision | 12:06 |
| 17 | who the agent would be." | 12:06 |
| 18 | THE WITNESS:  Right. | 12:06 |
| 19 | THE COURT:  Is there something further? | 12:06 |
| 20 | THE WITNESS:  No, ma'am.  That, actually -- | 12:06 |
| 21 | yes, ma'am, it is. | 12:06 |
| 22 | Fred Pierucci made that decision and it | 12:06 |
| 23 | would -- that decision would stay whether Lawrence | 12:06 |
| 24 | approved or not.  If Lawrence didn't approve, really | 12:06 |
| 25 | strongly didn't approve to Fred's decision, he would | 12:06 |

1   have had to have gone to his boss and his boss would    12:06

2   have had to go to the head of the boiler group and    12:06

3   there would have been a discussion.    12:06

4   BY MR. SILVER:    12:06

5       Q.    Uh-huh.    12:06

6       A.    And Fred secured -- he won that argument that    12:06

7   we know Indonesia better than anyone.    12:06

8           MR. SILVER:  Move to strike the last answer    12:06

9   on basis, Your Honor.  He's talking about what Fred    12:06

10  Pierucci knew or understood.    12:06

11          MS. LARYEA:  Your Honor, he asked a question.    12:06

12          MR. SILVER:  Yes.  The witness gave a    12:06

13  nonresponsive question at the end.    12:06

14          MS. LARYEA:  Your Honor, he asked about    12:07

15  approval and the process and this is the witness's    12:07

16  understanding of the approvals and the process.    12:07

17          MR. SILVER:  The witness began speaking about    12:07

18  Fred Pierucci's understanding without any basis as to    12:07

19  how he was aware of that.    12:07

20          THE COURT:  I'm sorry for the delay.  This is    12:08

21  just messed up.    12:08

22          So the questioning started out with    12:09

23  Mr. Puckett saying, "Well, it was a necessary step by    12:09

24  charter."    12:09

25          "QUESTION:  By charter, you said?"    12:09

1    And he goes on.  It seems responsive to the

2    question of what in essence he meant by "by the

3    charter."  So why don't you proceed with your next

4    question.

5    MR. SILVER:  Thank you, Your Honor.

6    BY MR. SILVER:

7    Q.    So, Mr. Puckett, you yourself worked in

8    International Network, right?

9    A.    Yes.

10    Q.    For about a year.  And you also worked on the

11    Tarahan Project as well, correct?

12    A.    Yes.

13    Q.    And you were involved in some of the

14    agent-related issues on Tarahan, right?

15    A.    Yes.

16    Q.    And you certainly were aware, sir, that one

17    of the -- one of the roles of International Network

18    was to approve the hiring of outside agents and

19    consultants on all Alstom projects around the world;

20    isn't that right?

21    A.    That is correct.

22    Q.    And there -- it was a multistep process

23    involving approvals at many levels, both within

24    International Network and within the business unit;

25    isn't that right?

12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:09
12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:10

1    A.    That's correct.                                      12:10

2    Q.    Okay.  And this chart that we're looking at         12:10

3  here reflects that multistep approval process, does        12:10

4  it not?                                                     12:10

5    A.    It reflects the process.  This is what I mean       12:10

6  by as charter, Your Honor.  What I mean is that            12:10

7  this -- some business units, whether you're working        12:10

8  with consultants in the U.S. or consultants                12:10

9  internationally, took it as a guideline.  They knew        12:10

10  who they wanted, the business unit, whether you're         12:10

11  selling a steam turbine or a boiler or air pollution       12:10

12  control equipment.  He knew which agent he wanted.         12:10

13  He already knew.  And he might try to get --               12:11

14  politically try to get IN to agree, yeah, he is a          12:11

15  good guy, we agree.  But if it came down to a real         12:11

16  disagreement, the business would win out.                  12:11

17    Q.    Okay.  If that --                                  12:11

18    A.    I mean by charter and by guideline, this is        12:11

19  the guideline.                                             12:11

20    Q.    Okay.  And so as you said, if there was a          12:11

21  disagreement somewhere along the way.  So if, for          12:11

22  example, the business unit and International Network        12:11

23  and their approval role could not come to an               12:11

24  agreement, right, then what would have to happen is        12:11

25  they would have to go up their respective reporting        12:11

| | |
|---|---|
| 1 | lines, correct, to a more senior level, correct? | 12:11 |
| 2 | A.    Correct. | 12:11 |
| 3 | Q.    Where those reporting lines met, right? | 12:11 |
| 4 | A.    Correct. | 12:11 |
| 5 | Q.    Because everyone ultimately meets somewhere | 12:11 |
| 6 | up the approval chain, right? | 12:11 |
| 7 | A.    Correct. | 12:11 |
| 8 | Q.    And try to overrule that decision, correct? | 12:11 |
| 9 | A.    Exactly. | 12:11 |
| 10 | Q.    Okay.  To your knowledge, that did not happen | 12:11 |
| 11 | on the Tarahan case, correct? | 12:11 |
| 12 | A.    To my knowledge, it did not. | 12:12 |
| 13 | Q.    Okay. | 12:12 |
| 14 | MR. SILVER:  Just one moment, Your Honor. | 12:12 |
| 15 | Nothing further, Your Honor. | 12:12 |
| 16 | THE COURT:  Redirect? | 12:12 |
| 17 | Help yourself to water. | 12:12 |
| 18 | THE WITNESS:  I just did, Your Honor.  Thank | 12:12 |
| 19 | you. | 12:12 |
| 20 | THE COURT:  There's a tricky top to that | 12:12 |
| 21 | pitcher. | 12:12 |
| 22 | THE WITNESS:  It's clear anyway. | 12:12 |
| 23 | REDIRECT EXAMINATION OF LARRY E. PUCKETT | 12:12 |
| 24 | BY MS. LARYEA: | 12:12 |
| 25 | Q.    Mr. Puckett, Mr. Silver asked you on | 12:12 |

1  cross-examination whether Mr. Hoskins reported to                    12:12

2  Mr. Pierucci.  Do you remember that question?                        12:12

3    A.   Yes.                                                          12:13

4    Q.   And you started answering that -- about how                   12:13

5  it worked on the Tarahan Project, correct?  And                      12:13

6  Mr. Silver didn't let you finish that answer.  Can                   12:13

7  you finish that answer now?                                          12:13

8         MR. SILVER:  Objection to the                                 12:13

9  characterization.                                                    12:13

10        THE COURT:  Sustained.                                        12:13

11 BY MS. LARYEA:                                                       12:13

12   Q.   How did it work on the Tarahan Project with                   12:13

13 respect to Mr. Hoskins and Mr. Pierucci?                             12:13

14   A.   Well, Mr. Hoskins didn't call the shots or                    12:13

15 the strategy on Tarahan.  Fred Pierucci would call --                12:13

16 he was in control.  So in that sense, Mr. Hoskins                    12:13

17 would have been reporting to Fred on the Tarahan                     12:13

18 Project.                                                             12:13

19        MR. SILVER:  Objection as nonresponsive, Your                 12:13

20 Honor.                                                               12:13

21        MS. LARYEA:  That was --                                      12:13

22        THE COURT:  I think it's -- how did it work                   12:13

23 on the Tarahan Project with respect -- no.  That's                   12:13

24 appropriate.  Overruled.                                             12:13

25 BY MS. LARYEA:                                                       12:13

1    Q.    Now, Mr. Silver also asked you whether the

2    term "commitment" in the e-mail that Ms. Lapian sent

3    on your behalf meant both legitimate and illegitimate

4    work.  Do you remember that question?

5    A.    Yes.

6    Q.    I want to show you what has been admitted as

7    Government's Exhibit 454.  This is the e-mail that

8    Reza forwards to Mr. Hoskins with the report from

9    Winan Kusno, correct?

10    A.    I don't see it.

11        THE COURT:  It's not --

12        MS. LARYEA:  I'm sorry.

13        THE COURT:  It's still not up.

14        MS. LARYEA:  Do I have to --

15    BY MS. LARYEA:

16    Q.    This is an e-mail from Reza to Mr. Hoskins,

17    correct?

18    A.    Yes.

19    Q.    And going to the second page of the e-mail,

20    this contains the paragraph regarding the rewards

21    issue, correct?

22    A.    Correct.

23        MS. LARYEA:  One minute, Your Honor.

24    BY MS. LARYEA:

25    Q.    Now, on this, Mr. Puckett, can you read the

12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:14
12:15
12:15
12:15
12:15
12:15

1    sentence "they concern that if we have won the job,"    12:15

2    could you read that sentence?    12:15

3    A.    Yes.    "They concern that if we have won the    12:15

4    job, whether the rewards will still be satisfactory    12:15

5    or this agent only give them pocket money and    12:15

6    disappear."    12:16

7    Q.    And this sentence doesn't use the word    12:16

8    "commitment," correct?    12:16

9    A.    No, it does not.    12:16

10    Q.    It talks about pocket money, right?    12:16

11    A.    Correct.    12:16

12    Q.    And, again, Mr. Puckett, this is an e-mail    12:16

13    that Reza forwarded on to the defendant Lawrence    12:16

14    Hoskins; is that right?    12:16

15    A.    Correct.    12:16

16    MS. LARYEA:    Thank you, Your Honor.    12:16

17    MR. SILVER:    Just very, very briefly, Your    12:16

18    Honor.    Thank you.    You can remove that.    12:16

19    CONTINUED CROSS-EXAMINATION OF LARRY E. PUCKETT    12:16

20    BY MR. SILVER:    12:16

21    Q.    Mr. Puckett, you just said that for purposes    12:16

22    of the Tarahan Project, in your view, effectively    12:16

23    Mr. Hoskins reported to Mr. Pierucci.    That was your    12:16

24    testimony just now, correct?    12:16

25    A.    Correct.    12:16

1    Q.    But Mr. Pierucci couldn't fire Mr. Hoskins,    12:16

2    could he?    12:16

3    A.    No.    12:16

4    Q.    He couldn't reassign Mr. Hoskins, could he?    12:16

5    A.    No.    12:16

6    Q.    He couldn't demote Mr. Hoskins, could he?    12:16

7    A.    Could not.    12:16

8    Q.    Couldn't affect Mr. Hoskins' compensation,    12:16

9    could he?    12:17

10    A.    Could not.    12:17

11    Q.    Okay.  What you meant was that Mr. Pierucci    12:17

12    was the lead on the bidding process for the project,    12:17

13    correct?    12:17

14    A.    Correct.    12:17

15    Q.    And Mr. Hoskins in his role as SVP    12:17

16    International Network had an approval function to    12:17

17    approve the hiring of outside agents, correct?    12:17

18    A.    In support of the business group.  But part    12:17

19    of it was approval of an outside agent.    12:17

20    Q.    Part of it was an approval role, but he had    12:17

21    to approve the hiring of outside agents, right?    12:17

22    A.    Right.    12:17

23    Q.    And if there had been a disagreement, you    12:17

24    said, correct?  If there had been a disagreement,    12:17

25    which there was not in this instance, right?    12:17

1    A.    No, not that I'm aware of.                          12:17

2    Q.    Okay.  But had there been one, Mr. Pierucci        12:17

3    would have had to go up his chain, right, to Paris to    12:17

4    try to find someone who was senior to Mr. Hoskins in     12:17

5    Mr. Hoskins' reporting line, right?                       12:17

6    A.    Right.                                              12:17

7    Q.    To try to override that reporting decision,         12:17

8    correct?                                                  12:17

9    A.    Correct.                                            12:17

10   Q.    And to your knowledge, that did not happen on       12:17

11   Tarahan, right?                                           12:17

12   A.    That did not happen.                                12:17

13         MR. SILVER:  Thank you, Your Honor.                 12:17

14         THE COURT:  Are we finished?                        12:18

15         MS. LARYEA:  One more question, Your Honor.         12:18

16         MR. SILVER:  Object to reredirect, Your            12:18

17   Honor.                                                    12:18

18         THE COURT:  Overruled.                              12:18

19    FURTHER REDIRECT EXAMINATION OF LARRY E. PUCKETT         12:18

20   BY MS. LARYEA:                                            12:18

21   Q.    I just have one question, Mr. Puckett.              12:18

22         Mr. Silver mentioned Mr. Hoskins's approval        12:18

23   in the hiring consultants.  Who had the ultimate         12:18

24   decision on which consultant was hired on the Tarahan    12:18

25   Project?                                                  12:18

1       MR. SILVER:  Objection, asked and answered.      12:18

2  This was covered, I believe, in both direct and      12:18

3  redirect, Your Honor.                                12:18

4       THE COURT:  Wait.  It may be asked and          12:18

5  answered.  Isn't your objection that it's beyond the 12:18

6  scope of your recross?                               12:18

7       MR. SILVER:  Yes, Your Honor.  That too.        12:18

8       THE COURT:  That I will sustain.                12:18

9       MR. SILVER:  Thank you.                         12:18

10      MS. LARYEA:  Thank you, Your Honor.             12:18

11      THE COURT:  All right, then.  Mr. Puckett,      12:18

12  thank you very much.                                 12:18

13      THE WITNESS:  Thank you, Your Honor.            12:18

14      THE COURT:  You are excused.  You may leave     12:18

15  and we'll ask the government to call its next        12:18

16  witness.                                             12:18

17      THE WITNESS:  Thank you, Your Honor.            12:18

18      MR. NOVICK:  Your Honor, we call Special        12:19

19  Agent Jeffrey Coleman.                               12:19

20      THE COURT:  All right.  Please raise your       12:19

21  right hand.                                          12:20

22      (WITNESS SWORN.)                                 12:20

23      THE CLERK:  Please be seated.  And please       12:20

24  state your name for the record, spelling your first  12:20

25  and last name, and giving the town of employment.    12:20

1          THE WITNESS:  Full name is Jeffrey Coleman.                12:20

2   First name is spelled J-e-f-f-r-e-y, last name is                 12:20

3   C-o-l-e-m-a-n, and I am employed in Washington, D.C.              12:20

4          THE COURT:  You may proceed.                               12:20

5          MR. NOVICK:  Thank you, Your Honor.                        12:20

6   DIRECT EXAMINATION OF SPECIAL AGENT JEFFREY COLEMAN               12:20

7   BY MR. NOVICK:                                                    12:20

8      Q.    Sir, what's your current job title?                      12:20

9      A.    Supervisory special agent.                               12:20

10     Q.    With the Federal Bureau of Investigation?                12:20

11     A.    Yes, sir.                                                12:20

12     Q.    How long have you been a supervisory special             12:20

13  agent?                                                            12:20

14     A.    Just a few months.                                       12:20

15     Q.    And how long have you been a special agent               12:20

16  with the FBI in general?                                          12:20

17     A.    Eleven years.                                            12:20

18     Q.    Can you tell the jury basically your                     12:21

19  educational background?                                           12:21

20     A.    I received an undergraduate degree in history            12:21

21  and philosophy from the University of North Carolina,             12:21

22  and a law degree from the University of Virginia.                 12:21

23     Q.    Since you joined the FBI, have you received              12:21

24  law enforcement training?                                         12:21

25     A.    Yes, I have.                                             12:21

1    Q.    A very brief overview of that training for

2    the jury?

3    A.    I received the basic new-agent training,

4    which is six months in Quantico, Virginia, followed

5    by periodic training in laws and statutes related to

6    work that I do, which is primarily foreign bribery

7    and money laundering cases.

8    Q.    In the course of your eleven years in law

9    enforcement, have you been involved in a number of

10   different investigations?

11   A.    Yes, I have.

12   Q.    Some of those led to criminal charges?

13   A.    Yes, they did.

14   Q.    And have some of those led -- and have some

15   of those involved instances where charges were not

16   brought?

17   A.    Yes.

18   Q.    Are you currently assigned to a particular

19   group within the FBI?

20   A.    Yes, I am.

21   Q.    And what is that?

22   A.    The International Corruption Unit.

23   Q.    Okay.  Where is that located?

24   A.    That's located in FBI headquarters in

25   Washington, D.C.

12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:21
12:22

1    Q.    And how long have you been working on

2  international corruption cases?

3    A.    Over ten years.

4    Q.    So almost all the time you've been with the

5  FBI?

6    A.    Yes, sir.

7    Q.    As a special agent with the FBI in the

8  International Corruption Unit, what are your

9  responsibilities?

10    A.    My -- as an agent, my responsibilities were

11  to investigate allegations pertaining to foreign

12  bribery, usually U.S. companies and businesses, and

13  agents of those U.S. companies and businesses paying

14  bribes to government officials overseas, and also

15  when foreign officials bring their elicit assets to

16  the United States, efforts to seize those assets and

17  repatriate them to the countries from which they were

18  stolen.

19    Q.    And your involvement in the -- or assignment

20  to the International Corruption Unit is what brings

21  you here with us today?

22    A.    Yes, it is.

23    Q.    At some point were you assigned to work on a

24  case involving Alstom Power, Inc., and related

25  companies?

12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:23

1    A.    Yes, sir, I was.                                  12:23

2    Q.    Approximately when were you assigned as the       12:23

3    lead case agent?                                        12:23

4    A.    April of 2015.                                    12:23

5    Q.    And prior to that, did you have some              12:23

6    involvement with the case?                              12:23

7    A.    A little, yes.                                     12:23

8    Q.    Okay.  But there were other case agents who       12:23

9    handled the case from its inception?                    12:23

10   A.    There were, yes.                                  12:23

11   Q.    Since you joined the case as lead case agent,     12:23

12   have you participated in gathering and reviewing        12:23

13   documents?                                              12:23

14   A.    Yes, I have.                                      12:23

15   Q.    Have you participated in interviewing             12:23

16   witnesses?                                              12:23

17   A.    Yes, I have.                                      12:23

18   Q.    In addition to other agents who have done         12:23

19   that as well?                                           12:23

20   A.    Yes, sir.                                         12:23

21   Q.    And are you prepared today to provide the         12:23

22   jury with a number of documents that have been         12:23

23   gathered in the investigation over time?               12:23

24   A.    Yes, I am.                                        12:23

25   Q.    And are there different types of documents        12:23

1  that you've reviewed in the course of the                     12:23

2  investigation that we're going to talk about today?           12:23

3      A.    Yes, there are.                                     12:23

4      Q.    All right.  Now, as part of your                    12:23

5  responsibilities with regard to documents, have you           12:23

6  reviewed e-mails?                                             12:24

7      A.    Yes, I have.                                        12:24

8      Q.    And did you gather or review e-mails in             12:24

9  relation in particular to the Tarahan Project?                12:24

10     A.    Yes, I did.                                         12:24

11     Q.    As well as other projects in Indonesia?            12:24

12     A.    Yes, sir.                                           12:24

13     Q.    Principally, where did the e-mails that you        12:24

14 reviewed come from?                                           12:24

15     A.    Principally they were produced by Alstom and       12:24

16 its various subsidiaries to us over several years,            12:24

17 also some from Marubeni, some from --                         12:24

18     Q.    Other sources?                                     12:24

19     A.    Other sources, yes.                                12:24

20     Q.    Okay.  So I want to -- there's a binder in         12:24

21 front of you, and I'm going to talk to you about some         12:24

22 of the documents in there.                                    12:24

23     A.    Yes, sir.                                           12:24

24     Q.    Did you review e-mails related to the              12:24

25 defendant's role on the Tarahan Project in its early          12:24

1    stages?                                                          12:24

2      A.    Yes, I did.                                              12:24

3      Q.    Take a look first at Exhibit 410 for                    12:24

4    identification.  What is that?                                  12:24

5      A.    This is an e-mail from Lawrence Hoskins to              12:24

6    Roger Beyer sent the 20th of August 2002, subject:             12:25

7    "Indonesia Tarahan."                                           12:25

8          MR. NOVICK:  Your Honor, I offer 410.                     12:25

9          MR. SPEARS:  No objection, Your Honor.  I                 12:25

10   just note that it's not showing on our screen.                 12:25

11         THE COURT:  It's not showing on mine either.             12:25

12   Is it on everyone's screen now?  Not on the jury's.            12:25

13   Well, I'm going -- there's no objection, so I'll               12:25

14   admit 410.                                                     12:25

15   BY MR. NOVICK:                                                 12:25

16     Q.    When it comes up on this screen, I'll have             12:25

17   you read the document for us.  Go ahead.                       12:25

18         THE COURT:  Is it up on the juror's screen?             12:25

19   Okay.  Good.  All right.  You may proceed.                     12:25

20   BY MR. NOVICK:                                                 12:25

21     Q.    Go ahead, Special Agent.                               12:25

22     A.    "Roger, Fred P asked me to check with Reza on          12:25

23   latest position on Tarahan.  I spoke with Reza and             12:25

24   Eko and game plan is to get Mitsui out, corruption             12:25

25   scandal, et cetera, leaving likely bids from                   12:25

1    ourselves and FW Finland next month.  Spec apparently    12:25

2    does not allow Indian/Chinese/Korean components.  We    12:26

3    then plan to appoint Emir who I understand has been    12:26

4    previously used by G segment on a fee plus expenses    12:26

5    basis.  We also need Marubeni help to put pressure on    12:26

6    JBIC end to help our cause.  Fred will pass through    12:26

7    Paris next week and I will brief him.  Let me know if    12:26

8    you have any knowledge/views on Emir or JBIC issues.    12:26

9    Lawrence."    12:26

10    Q.    Okay.  Next, in addition to reviewing    12:26

11    documents related to the defendant's role on Tarahan,    12:26

12    did you also review documents related to the    12:26

13    defendant's role on Muara Tawar?    12:26

14    A.    Yes, I did.    12:26

15    Q.    Okay.  And in particular with regard to on    12:26

16    the subject of the selection of consultants?    12:26

17    A.    Yes, sir.    12:26

18    Q.    Now, we saw some of those e-mails already    12:26

19    during the course of the trial, and I want to put up    12:26

20    what's already in evidence, Exhibit 422.  Do you    12:27

21    recall seeing this e-mail earlier in the trial?    12:27

22    A.    Yes, sir, I do.    12:27

23    Q.    All right.  And who is it from and to?    12:27

24    A.    It's from Reza Moenaf to Lawrence Hoskins.    12:27

25    Q.    And it's on December 3, 2002, at 2:45 a.m.;    12:27

1    is that right?                                              12:27

2        A.    Yes, sir.                                         12:27

3        Q.    And the first line -- first couple lines          12:27

4    reads, "Lawrence, Emir Moeis is a member of Indonesia       12:27

5    parliament, precisely he is the vice chairman of            12:27

6    Commission VIII, a commission in charge of handling         12:27

7    power issues."                                              12:27

8              Did I read that correctly?                        12:27

9        A.    Yes, sir, you did.                                12:27

10       Q.    Okay.  And I want to just take a step back.       12:27

11   So we said that that's on December 3rd, correct?            12:27

12       A.    Yes, sir.                                         12:28

13       Q.    So let's take a look now for identification,      12:28

14   Exhibit 421.  What is that?                                 12:28

15       A.    This is an e-mail from Lawrence Hoskins to        12:28

16   Reza Moenaf sent December 2, 2002, subject: "MT."           12:28

17       Q.    Okay.                                             12:28

18             MR. NOVICK:  I'd offer this, Your Honor, 421.     12:28

19             MR. SPEARS:  No objection, Your Honor.            12:28

20             THE COURT:  Full exhibit.                         12:28

21   BY MR. NOVICK:                                              12:28

22       Q.    All right.  First let's take a look at the        12:28

23   date.  When is that in relation to Exhibit 422, that        12:28

24   long e-mail about Muara Tawar that we just looked at?       12:28

25       A.    That's the previous day.                          12:28

| | | |
|---|---|---|
| 1 | Q.    Okay.  This -- in other words, 421 is the | 12:28 |
| 2 | previous day? | 12:28 |
| 3 | A.    Yes, sir. | 12:28 |
| 4 | Q.    All right.  And what is -- what is the | 12:28 |
| 5 | message here from Mr. Hoskins to Reza? | 12:28 |
| 6 | A.    "Visitors are Mr. Pirooz and Dr. Amir. | 12:28 |
| 7 | Please advise any comments." | 12:29 |
| 8 | Q.    Okay.  And then the following day is sent | 12:29 |
| 9 | Exhibit 422 that's in evidence, correct? | 12:29 |
| 10 | A.    Yes, sir. | 12:29 |
| 11 | Q.    And that's a lengthy e-mail regarding, among | 12:29 |
| 12 | other things, Emir Moeis? | 12:29 |
| 13 | A.    Yes, sir, it is. | 12:29 |
| 14 | Q.    Is there also reference here to Pirooz? | 12:29 |
| 15 | A.    Yes, sir. | 12:29 |
| 16 | Q.    Okay.  And then just looking down further, | 12:29 |
| 17 | additional information about Pirooz Sharafi.  One | 12:29 |
| 18 | moment, please.  There we go.  And just read the | 12:29 |
| 19 | last -- the few highlighted lines I have there | 12:29 |
| 20 | beginning with "As the project." | 12:29 |
| 21 | MR. SPEARS:  Your Honor, I'm going to object | 12:29 |
| 22 | as to cumulative.  This language has already been | 12:30 |
| 23 | presented through a different witness. | 12:30 |
| 24 | THE COURT:  Well, it has.  I'm assuming that | 12:30 |
| 25 | Mr. Novick will be using this in a different way than | 12:30 |

1    just reading it; is that correct?                              12:30

2         MR. NOVICK:  Your Honor, my intention, this              12:30

3    is a summary witness, to -- in many ways the exhibits         12:30

4    have come in piecemeal through the witnesses who are          12:30

5    available.  This is pointing out the other e-mails            12:30

6    that haven't come in and the relationships of those           12:30

7    to this.  So, yes, I'm using it for a different               12:30

8    purpose than has already been disclosed for.                  12:30

9         MR. SPEARS:  Your Honor, it sounds like                  12:30

10   closing argument.                                             12:30

11        MR. NOVICK:  It's not closing argument.  I'm             12:30

12   not actually asking him to interpret anything, Your           12:30

13   Honor.                                                        12:30

14        THE COURT:  All right.  I'm going to permit              12:30

15   this questioning.  Go ahead.  Overruled.                      12:30

16   BY MR. NOVICK:                                                12:30

17   Q.   Go ahead and read that highlighted section.             12:30

18   A.   "As the project proceed, it shown that Pirooz           12:30

19   has been unable to fulfill his tasks and our                  12:30

20   expectation.  He has no grip on PLN tender team at            12:30

21   all.  Basically his function is more or less similar          12:30

22   to cashier which I feel we pay too much.  I still do          12:30

23   not understand why B-Seg has pushed so hard to                12:31

24   appoint him as agent."                                        12:31

25   Q.   Now, following this, I want to direct you --            12:31

1    I'm going to put 422 on the left side of the screen,    12:31

2    and now on the right side of the screen put up an    12:31

3    exhibit which is not yet in evidence which is 423.    12:31

4    Let me try that again.    12:31

5            Okay.  Taking a look at 423 and actually    12:31

6    423-T which is the translation, what is that?    12:31

7    A.    This is an e-mail from Reza Moenaf to Eko    12:31

8    Sulianto sent the 3rd of December, 2002, subject:    12:32

9    "Muara Tawar."    12:32

10            MR. NOVICK:  Okay.  I'd offer 423 and 423-T.    12:32

11            MR. SPEARS:  No objection, Your Honor.    12:32

12            THE COURT:  Full exhibits.    12:32

13    BY MR. NOVICK:    12:32

14    Q.    All right.  The bottom portion -- let me ask    12:32

15    you this:  Is this forwarding an earlier e-mail from    12:32

16    Reza Moenaf?    12:32

17    A.    Yes, it is.    12:32

18    Q.    And is -- comparing the two documents in 422    12:32

19    and 423-T, are those the same e-mails?    12:32

20    A.    Yes, it is.    12:32

21    Q.    Okay.  So let's focus on the forward here.    12:32

22    What does Reza write to Eko here?    12:32

23    A.    "Brother, I also talked to Lawrence."    12:32

24    Q.    Okay.  All right.  The next e-mail, keeping    12:32

25    again in line with also in evidence 424 on the    12:33

| | | |
|---|---|---|
| 1 | right-hand side of the screen. | 12:33 |
| 2 | THE COURT:  Has 424 actually been admitted? | 12:33 |
| 3 | MR. NOVICK:  I believe it has been.  I recall | 12:33 |
| 4 | offering it, Your Honor. | 12:33 |
| 5 | MR. SPEARS:  I think that's correct, Your | 12:33 |
| 6 | Honor. | 12:33 |
| 7 | THE COURT:  All right.  Then we will clear | 12:33 |
| 8 | our records and have it as a full exhibit. | 12:33 |
| 9 | BY MR. NOVICK: | 12:33 |
| 10 | Q.    All right.  So this e-mail here is from Reza | 12:33 |
| 11 | Moenaf to Goran Ehren and Mr. Hoskins, correct? | 12:33 |
| 12 | A.    Yes, and Mr. Sulianto. | 12:34 |
| 13 | Q.    And Mr. Sulianto, entitled "Muara Tawar crash | 12:34 |
| 14 | program"? | 12:34 |
| 15 | A.    Yes, sir. | 12:34 |
| 16 | Q.    And then it has a discussion below with | 12:34 |
| 17 | regard to Eddie's advice is to cover three main | 12:34 |
| 18 | areas, PPE engineering division, which is the | 12:34 |
| 19 | evaluator, Commission VIII, Emir and RI-1; is that | 12:34 |
| 20 | right? | 12:34 |
| 21 | A.    Yes, sir. | 12:34 |
| 22 | Q.    What is the date on this e-mail here? | 12:34 |
| 23 | A.    December 4, 2002. | 12:34 |
| 24 | Q.    Okay.  So now it's the following day or the | 12:34 |
| 25 | day after the longer e-mail about Pirooz Sharafi and | 12:34 |

| | | |
|---|---|---|
| 1 | Emir Moeis, correct? | 12:34 |
| 2 | A.    Yes, sir. | 12:34 |
| 3 | Q.    Let's take a look now at Exhibit 425 not in | 12:34 |
| 4 | evidence yet.  And, actually, 425 and an attachment, | 12:34 |
| 5 | 425-A.  Do you see those documents? | 12:35 |
| 6 | A.    Yes, sir, I do. | 12:35 |
| 7 | Q.    What's 425? | 12:35 |
| 8 | A.    425 is an e-mail from Lawrence Hoskins to | 12:35 |
| 9 | Roger Beyer dated the 5th of December 2002, subject: | 12:35 |
| 10 | "MT" with an attachment RM MT.doc. | 12:35 |
| 11 | MR. NOVICK:  Okay.  Your Honor, I'd offer 425 | 12:35 |
| 12 | and 425-A. | 12:35 |
| 13 | MR. SPEARS:  No objection. | 12:35 |
| 14 | THE COURT:  Full exhibits. | 12:35 |
| 15 | BY MR. NOVICK: | 12:35 |
| 16 | Q.    All right.  So, first, what's the date of | 12:35 |
| 17 | this document, the e-mail?  It says December 5, 2002? | 12:35 |
| 18 | A.    Yes, sir. | 12:35 |
| 19 | Q.    So that is, again, a couple days -- the | 12:35 |
| 20 | following day from Exhibit 424 and a couple days | 12:36 |
| 21 | after that longer e-mail about Emir Moeis? | 12:36 |
| 22 | A.    Yes, sir. | 12:36 |
| 23 | Q.    And we said it had an attachment.  Let's take | 12:36 |
| 24 | a look at the attachment.  Hard to read, but does | 12:36 |
| 25 | this appear to be a screenshot? | 12:36 |

1    A.    Yes, it is.                                    12:36

2    Q.    Okay.  Let me see if I can blow up a little    12:36

3    bit more of it.  What is this a screenshot of or what    12:36

4    does it appear to be a screenshot of?               12:36

5    A.    It appears to be a screenshot of the e-mail    12:36

6    that's shown in Exhibit 424.                        12:36

7    Q.    Okay.  So that e-mail about Eddie's advice is    12:36

8    to cover three main areas; is that right?           12:36

9    A.    Yes, sir.                                      12:36

10   Q.    Okay.  All right.  Let's take a look now at    12:36

11   Exhibit 427 for identification.  What is this?      12:37

12   A.    This is an e-mail from Lawrence Hoskins to     12:37

13   Roger Beyer dated the 9th of December 2002 regarding    12:37

14   MT express.                                          12:37

15          MR. NOVICK:  Your Honor, I'd offer 427.       12:37

16          MR. SPEARS:  No objection, Your Honor.        12:37

17          THE COURT:  Full exhibit.                     12:37

18   BY MR. NOVICK:                                       12:37

19   Q.    All right.  You said it's from Mr. Hoskins     12:37

20   December 9th, so a few days after the e-mails we just    12:37

21   looked at?                                           12:37

22   A.    Yes, sir.                                      12:37

23   Q.    To Roger Beyer, re:  MT express.  It appears    12:37

24   to be imbedding a prior e-mail from Roger Beyer to    12:37

25   Lawrence Hoskins, copying Reza Moenaf, correct?     12:38

| | |
|---|---|
| 1 | A.    Yes, sir. | 12:38 |
| 2 | Q.    On the same day? | 12:38 |
| 3 | A.    Yes, sir. | 12:38 |
| 4 | Q.    All right.  Let's take a look at the e-mail | 12:38 |
| 5 | first.  Can you read for us what I've just culled out | 12:38 |
| 6 | here? | 12:38 |
| 7 | A.    "I was called by G. Ragagnin who said that | 12:38 |
| 8 | after a joint review with S. Hatt and P. Anglaret, | 12:38 |
| 9 | the segment's concern is that Dr. Emir who has been | 12:38 |
| 10 | coming to Paris on the initiative invitation of | 12:38 |
| 11 | E. Widiono and/or Pirooz Sharafi might feel more | 12:38 |
| 12 | comfortable to work through Pirooz rather than via | 12:38 |
| 13 | Andi Salim as suggested by E. Widiono to Reza.  The | 12:38 |
| 14 | concern is if we do not choose Pirooz, we might not | 12:38 |
| 15 | have the full support from Dr. Amir or in the worst | 12:38 |
| 16 | case, Pirooz might turn Dr. Emir away from Alstom.  I | 12:38 |
| 17 | have given both Philippe and Giuseppe detailed | 12:38 |
| 18 | explanations why we believe Edie's proposal -- | 12:38 |
| 19 | Eddie's proposal to be the preferred one, but could | 12:39 |
| 20 | not fully convince them." | 12:39 |
| 21 | Q.    Okay.  Now let's take a look at the last few | 12:39 |
| 22 | lines of the e-mail continues. | 12:39 |
| 23 | A.    "Therefore, I am now suggesting that Reza | 12:39 |
| 24 | should find out if in fact Dr. Emir would feel as | 12:39 |
| 25 | comfortable with Andy Salim as with Pirooz Sharafi. | 12:39 |

1    How would Dr. Emir react if Alstom's interests were          12:39

2    to be represented via Andi Salim after he has been           12:39

3    introduced to Alstom by Pirooz?  The segment is              12:39

4    requiring an immediate answer on this issue.  Roger."        12:39

5    Q.    And this is an e-mail, you said -- this               12:39

6    imbeds an e-mail from Roger Beyer to Lawrence               12:39

7    Hoskins, correct?                                           12:39

8    A.    Yes, sir.                                             12:39

9    Q.    And it says that the segment is requiring an         12:39

10   immediate answer on this issue?                             12:39

11   A.    It does.                                              12:39

12   Q.    Okay.  The next exhibit, 428 for                      12:40

13   identification, what is this?                               12:40

14   A.    This is an e-mail from Lawrence Hoskins to           12:40

15   Roger Beyer with a copy to Hoskins and Reza Moenaf          12:40

16   sent on the 10th of December 2002, re:  MT express.         12:40

17          MR. NOVICK:  All right.  I'd offer 428.             12:40

18          MR. SPEARS:  No objection.                           12:40

19          THE COURT:  Full exhibit.                            12:40

20   BY MR. NOVICK:                                              12:40

21   Q.    I'm going to put 427 on the left-hand side           12:40

22   and 428 on the right-hand side.  All right.  Just          12:40

23   looking at the tops, top of 427 and the top of 428,        12:40

24   are they the same subjects a day later?                     12:40

25   A.    Yes, sir.                                             12:40

1    Q.    And does 428 appear to be a response to 427?    12:40

2    A.    It does.    12:41

3    Q.    Can you go ahead and read Mr. Hoskins'    12:41

4    message to Mr. Beyer?    12:41

5    A.    "Roger, understood.  I had some of the same    12:41

6    concerns and was trying to contact Reza yesterday    12:41

7    before I made any move with Pirooz.  We can go either    12:41

8    way, but my understanding from Reza was that Eddie    12:41

9    proposed route was the optimum one.  I agree we need    12:41

10   to be clear that there is no downside with Amir or    12:41

11   separately on Tarahan.  We should finalize with Reza    12:41

12   today.  Lawrence."    12:41

13   Q.    Okay.  Next let's take a look at 433 for    12:41

14   identification.  What is this?    12:41

15   A.    It's an mail from Lawrence Hoskins to    12:41

16   Philippe Anglaret, Giuseppe Ragagnin, copied to    12:42

17   Stefan Hatt and Goran Ehren, sent on the 30th of    12:42

18   December 2002, subject:  "MT Indonesia."    12:42

19        MR. NOVICK:  I'd offer 433, Your Honor.    12:42

20        MR. SPEARS:  No objection.    12:42

21        THE COURT:  433 is a full exhibit.    12:42

22   BY MR. NOVICK:    12:42

23   Q.    Can you read the highlighted portion for us?    12:42

24   A.    "Update re the above in case you are not up    12:42

25   to speed.  Meetings PLN, Marubeni, Emir, et cetera,    12:42

1  all as planned just before Christmas.  Local bids to            12:42

2  be requested mid-Jan to be submitted by mid-Feb.                12:42

3  Preference for Pirooz involvement expressed in first            12:42

4  meeting was questioned in later meetings and                    12:42

5  subsequent advice from Reza is that further                     12:42

6  discussions have concerned that Gajendra, Azmin Aulia           12:42

7  should be involved, not Pirooz."                                12:42

8      Q.    Again, the subject here is, MT Indonesia,             12:42

9  correct?                                                        12:42

10     A.    Yes, sir.                                             12:42

11     Q.    All right.  Let's move away from Muara Tawar          12:42

12  for a moment and go back to the subject of Tarahan.            12:43

13         Had you gathered documents related to the              12:43

14  locations of the consultant's company specific to             12:43

15  Pirooz Sharafi?                                                12:43

16     A.    Yes, sir, we did.                                     12:43

17     Q.    Where did he live?                                    12:43

18     A.    He lived in Bethesda, Maryland.                       12:43

19     Q.    Let's take a look now at Exhibit 437 for             12:43

20  identification.  What is this?                                 12:43

21     A.    This is an e-mail from Lawrence Hoskins to           12:43

22  Bruno Kaelin with a copy to Veronique Etienne, sent           12:43

23  on the 21st of January 2003, subject:  "Tarahan 3, 4          12:43

24  consultancy agreement."                                        12:43

25         MR. NOVICK:  I offer 437.                              12:43

```
1          MR. SPEARS:  No objection.                    12:43

2          THE COURT:  Full exhibit.                     12:43

3   BY MR. NOVICK:                                       12:43

4    Q.    All right.  Is this a three-page document     12:43

5   that -- or longer than that, four-page document that 12:43

6   includes an e-mail chain?                            12:43

7    A.    Yes, it is.                                    12:43

8    Q.    Okay.  I want to start on the third page of   12:43

9   the document.  Do you see an e-mail there from       12:44

10  Mr. Hoskins to Bruno Kaelin re Indonesia?            12:44

11   A.    Yes, I do.                                     12:44

12   Q.    On March 1, 2003?  Well, I should say January 12:44

13  3, 2003?                                             12:44

14   A.    Yes, sir.                                      12:44

15   Q.    Okay.  Can you read the e-mail for us?        12:44

16   A.    "Bruno, for info following recent             12:44

17  discussions.  I am in Jakarta again next week to put 12:44

18  appropriate systems in place.  Will advise further.  12:44

19  Did Mr. Sharafi contact you re Tarahan?  Lawrence."  12:44

20   Q.    Now let's go up a page to the next e-mail up  12:44

21  the chain from Bruno Kaelin to Lawrence Hoskins, copy 12:44

22  Veronique Etienne, January 3, 2003?                  12:44

23   A.    Yes, sir.                                      12:45

24   Q.    Go ahead and read that e-mail for us?         12:45

25   A.    "Lawrence.  Yes, he sent me the completed     12:45
```

1   agent profile for his very small company in

2   Baltimore, Maryland, with a branch office in

3   Washington.  But for the time being, no keys have

4   been sent by Alstom, Inc., Fred Pierucci.  I

5   understand that the Tarahan job is boiler supply from

6   the U.S. to Indonesia.  As I said before, it would

7   make more sense to have an agent in Indonesia where

8   Sharafi's company has obviously an office.  As you

9   know, we do not like to have a U.S. domiciliated

10  company as consultant with payment in the U.S. and

11  most probably in USD.  Could we talk about this

12  issue?"

13      Q.    Okay.  Now, the next e-mail up, response from

14  Mr. Hoskins, January 15, 2003; is that right?

15      A.    Yes, sir.

16      Q.    Go ahead.

17      A.    "Bruno, I talked to Reza and his financial

18  controller Lars Olssen on this subject to establish

19  whether they could implement an agreement locally in

20  Indonesia.  They were uneasy about dealing with a

21  local company but thought an arrangement with

22  Singapore may work.  Reza is going to check with

23  Pirooz to see if he has a company in Singapore.  I

24  will revert when we have further info.  Lawrence. "

25      Q.    Now let's go to the top page.  Let's go to

12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:45
12:46
12:46
12:46
12:46
12:46
12:46
12:46

1    the top e-mail from Mr. Hoskins to Mr. Kaelin copying          12:46

2    Veronique Etienne.  Just read that first e-mail for            12:46

3    us.                                                            12:46

4        A.    "Bruno, Reza came back to say that Pirooz has        12:46

5    company in Indonesia but only local personal bank A/C          12:46

6    in Singapore.  Reza was assuming we could go for an            12:46

7    arrangement Alstom Prom Pirooz local company in                12:46

8    Indonesia.  I think this is probably the simplest              12:46

9    route now subject to receiving keys.  Lawrence."               12:46

10       Q.    All right.  Let's now move to Exhibit 439 for        12:47

11   identification.  What's this?                                  12:47

12       A.    This is an e-mail from Bruno Kaelin to               12:47

13   Frederic Pierucci with a copy to Lawrence Hoskins and          12:47

14   Veronique Etienne, sent on the 12th of February 2003,          12:47

15   subject is Tarahan 3/4 consultancy agreement.                  12:47

16          MR. NOVICK:  Your Honor, I offer Exhibit 439.           12:47

17          MR. SPEARS:  No objection.                              12:47

18          THE COURT:  Full exhibit.                               12:47

19   BY MR. NOVICK:                                                 12:47

20       Q.    I'm just going to have you focus here.  Is           12:47

21   this a response to an earlier e-mail from Reza Moenaf          12:47

22   to Bruno Kaelin copying Lawrence Hoskins?                      12:47

23       A.    Yes, it is.                                          12:47

24       Q.    All right.  Just read the first paragraph            12:47

25   there, "Dear Bruno."                                           12:47

1    A.    "Dear Bruno, we met Pirooz twice on this

2    issue.  In the first meeting we informed him that it

3    is not possible to use his U.S. company for this

4    project and suggested him, if he has one, to use

5    either a Singapore or Indonesian company.  He

6    confirmed to have and Indonesian company and would

7    consider using it.  He also questioned why this was

8    not discussed in Paris.  He will to contact Lawrence

9    Hoskins on this issue."

10    Q.    All right.  Now let's look at 440 for

11    identification.  What's that?

12    A.    This is an e-mail from Bruno Kaelin to Fred

13    Pierucci with a copy to Lawrence Hoskins sent on the

14    18th of February 2003, subject:  "Tarahan."

15    Q.    And is this responding to -- is this e-mail

16    responding to an earlier e-mail from Fred Pierucci to

17    Bruno Kaelin?

18    A.    Yes, it is.

19        MR. NOVICK:  I'd offer 440.

20        MR. SPEARS:  No objection, Your Honor.

21    BY MR. NOVICK:

22    Q.    All right.  Let's take a look at the first

23    e-mail from Pierucci to Kaelin, subject:  "Tarahan."

24    Go ahead.

25    A.    "Bruno, can you please let me know if U.S.

12:47
12:47
12:47
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:48
12:49
12:49
12:49

1  company is okay for the consultant.  The agreement    12:49

2  will be ready on Thursday or Friday for me to take    12:49

3  back.  Thanks.  Fred."    12:49

4     Q.    And then is there a response above that with    12:49

5  regard to the consultancy agreement?    12:49

6     A.    Yes, there is.    12:49

7     Q.    All right.  Go ahead and read that to close    12:49

8  the loop on this particular subject.    12:49

9     A.    "Frederic, in this specific case, I propose    12:49

10  an agreement between Alstom Power, Inc., and the    12:49

11  agent directly.  In this case the U.S. company makes    12:49

12  sense, although its structure is very weak.  Do not    12:49

13  forget, you will have to make sure that the    12:49

14  remuneration, which is quite important, has to be    12:49

15  justified and documented.  I have prepared the file    12:49

16  and it is now in the approval process in IN, Lawrence    12:49

17  Hoskins and Etienne Dé.  I therefore cannot commit on    12:49

18  any date but we do our best.  Regards, Bruno."    12:49

19     Q.    In fact, was the consultancy agreement that    12:50

20  was entered into --    12:50

21         MR. SPEARS:  Objection.    12:50

22         MR. NOVICK:  What's the --    12:50

23         MR. SPEARS:  I hear a leading question    12:50

24  coming, Your Honor.  Objection.    12:50

25         THE COURT:  You know, we need to stop for    12:50

1    lunch right now.  So I think we'll stop and be back                  12:50

2    no later than ten past 2.  All right?  Enjoy the not                 12:50

3    rainy day.                                                            12:50

4            (Jury exited the proceedings, 12:50 p.m.)                     12:50

5            THE COURT:  All right.  Agent Coleman, you                    12:50

6    may step down and you may leave and be back at 2:10.                  12:51

7    Thank you.                                                            12:51

8            (Out of the presence of the witness.)                        12:51

9            MR. SILVER:  Your Honor, if we may before we                 12:51

10   break, we'd like to provide the Court with additional                12:51

11   authority on the issue raised this morning regarding                 12:51

12   the 801(d)(2)(E) issue.  I have two cases that I                      12:51

13   think are directly responsive to the cases that were                 12:51

14   presented by the government this morning.                            12:51

15           THE COURT:  On the issue of whether it's                     12:51

16   required that there be independent corroboration?                    12:51

17           MR. SILVER:  Yes, Your Honor.                                12:51

18           MR. NOVICK:  The government's position at                    12:51

19   this point, although I'm happy to engage in the                      12:51

20   academic question, is that it's moot.  I think there                 12:51

21   was sufficient foundation laid.  In addition, as we                  12:51

22   argued earlier, this is forwarded twice, additional                  12:51

23   messages from Reza Moenaf reinforcing that this was                  12:51

24   in fact Winan Kusno's report and that he was at this                 12:51

25   meeting.  Those are separate statements.                            12:51

```
 1          THE COURT:  But why does that -- Kusno was at      12:52
 2   the meeting.                                              12:52
 3          MR. NOVICK:  He's essentially adopting saying      12:52
 4   that these are the notes of this meeting.  He is          12:52
 5   essentially another coconspirator --                      12:52
 6          THE COURT:  Why --                                 12:52
 7          MR. NOVICK:  -- saying that there's a serious      12:52
 8   agent problem in the -- it's not just that he is          12:52
 9   saying at the meeting.  It's that he is reporting a       12:52
10   serious agent problem in it.                              12:52
11          THE COURT:  I understand what the text is.         12:52
12   But the substance of whether or not -- I thought you      12:52
13   were just saying even if independent corroboration       12:52
14   were required, you believe you've satisfied that.         12:52
15   But I didn't understand this last line.  Was that on      12:52
16   whether independent corroboration is required or          12:52
17   whether you've shown it?                                  12:52
18          MR. NOVICK:  I think what I was trying to          12:52
19   argue, Your Honor, is that even if it was required,       12:52
20   we have established independent corroboration.  So        12:53
21   getting the first box may be unnecessary at this          12:53
22   point given the state of the record.                      12:53
23          THE COURT:  May I have your cases, please?         12:53
24          MR. SILVER:  Yes, Your Honor.  I'll just read      12:53
25   the titles for the record.  So the one is a Second        12:53
```

1    Circuit case from 2008 in re terrorist bombings of                    12:53

2    U.S. embassies in East Africa.  That's 522 F.3d 93.                   12:53

3    The other is a Southern District of New York District                 12:53

4    Court case from 2005, *U.S. v. Saneaux* and it's 392 F.               12:53

5    Supp. 2d 506.  And I'll hand those up now.                            12:53

6            It actually appears, Your Honor, to be quite                  12:53

7    clear.  It looks like what happened is that the Rule                  12:53

8    801(d)(2)(E) prior to 2011 actually explicitly said                   12:53

9    that independent corroboration was required both for                  12:53

10   the declarant's membership in the conspiracy and the                  12:54

11   defendant's.                                                          12:54

12           And in 2011, the rule was slightly modified,                  12:54

13   but the notes say that they were stylistic changes                    12:54

14   only and not meant to change the meaning of the rule.                 12:54

15   So it's really kind of black-letter law, Your Honor,                  12:54

16   that there must be independent corroboration for the                  12:54

17   declarant's membership.                                               12:54

18           THE COURT:  Thank you.                                        12:54

19           Now, before we break for lunch, I would like                  12:54

20   to understand further about the question that we                      12:54

21   reserved on regarding the examination of Agent                        12:54

22   Coleman and what the defendant intends to attempt to                  12:54

23   elicit with respect to -- I guess it's Sharafi and                    12:54

24   his nonprosecution agreement.  I don't know if                        12:55

25   there's anything broader than that.  Who will --                      12:55

| | |
|---|---|
| 1 | Mr. Spears? | 12:55 |
| 2 | MR. SPEARS:  Yes, Your Honor.  Thank you.  So | 12:55 |
| 3 | we did intend to address with Agent Coleman the | 12:55 |
| 4 | nonprosecution agreement, the terms of that.  I would | 12:55 |
| 5 | note that at the outset that the government has | 12:55 |
| 6 | elicited testimony from Rothschild, for example, on | 12:55 |
| 7 | direct examination about the fact that they used | 12:55 |
| 8 | Sharafi to record Rothschild.  And even on the direct | 12:55 |
| 9 | of Coleman we just heard in the very beginning, that | 12:55 |
| 10 | Agent Coleman talked about circumstances in which | 12:55 |
| 11 | charges were not brought against. | 12:55 |
| 12 | THE COURT:  So in general terms, the | 12:55 |
| 13 | existence of the nonprosecution agreement certainly | 12:55 |
| 14 | is already in evidence, the nature of it? | 12:55 |
| 15 | MR. SPEARS:  Your Honor, it -- | 12:55 |
| 16 | MR. NOVICK:  I don't think that's -- I don't | 12:55 |
| 17 | think counsel is arguing that because I don't think | 12:56 |
| 18 | that that's true.  The reference to charges -- | 12:56 |
| 19 | THE COURT:  All right.  Let me get -- let | 12:56 |
| 20 | me -- so, Mr. Spears, you want to offer what? | 12:56 |
| 21 | MR. SPEARS:  So we believe that it's relevant | 12:56 |
| 22 | to the investigative -- | 12:56 |
| 23 | THE COURT:  And the "it" is what? | 12:56 |
| 24 | MR. SPEARS:  It is the terms of the | 12:56 |
| 25 | nonprosecution agreement, including the fact that | 12:56 |

1    Mr. Sharafi by agreement was not prosecuted for FCPA                12:56
2    violations and money laundering, and including the                  12:56
3    provisions through which he has agreed to testify at                12:56
4    the government's direction, including his -- the fact               12:56
5    that he testified in the grand jury.  Not getting                   12:56
6    into the substance of it, but -- so the basic                       12:56
7    outlines of the nonprosecution agreement is what we                 12:56
8    intend to address with Agent Coleman.                               12:56
9         THE COURT:  And what is it that you think                      12:56
10   that's relevant to given that the government has                    12:56
11   announced that Sharafi will not be testify -- will                  12:57
12   not be called?                                                      12:57
13        MR. SPEARS:  Thank you, Your Honor.  It's                      12:57
14   relevant to addressing the genesis of the                          12:57
15   investigation, the investigative techniques that were              12:57
16   used subsequently.  The government built its                        12:57
17   investigation on their initial debriefings with                     12:57
18   Mr. Sharafi that were made under this nonprosecution                12:57
19   agreement, and it goes to the credibility of the                    12:57
20   investigation and in our view, goes to sort of the                  12:57
21   classic cross-examination on investigative                          12:57
22   techniques, what was used, what wasn't used.                        12:57
23        And to add to that, Your Honor, the evidence                   12:57
24   has shown as well that the government's own                         12:57
25   cooperating witnesses have said that they distrust                  12:57

1    the very witness that lies at the core of their case.    12:57
2    And it just seems to be classic cross-examination.    12:58
3    They offer a case agent to talk about their    12:58
4    investigation, and we should be entitled to explore    12:58
5    the techniques that were used and that weren't used.    12:58
6        THE COURT:  So the jury gets an instruction    12:58
7    that they're -- it's not -- I'm not quite sure how it    12:58
8    reads, but that it's not a concern to the jury what    12:58
9    investigative techniques the government used or did    12:58
10    not use, only whether the evidence derived from their    12:58
11    techniques satisfied the standard of beyond a    12:58
12    reasonable doubt.    12:58
13        So explain to me why you think that you    12:58
14    should be entitled to explore techniques used and    12:58
15    techniques that weren't used when the Court is going    12:59
16    to be telling them that that's actually not their    12:59
17    province.    12:59
18        MR. SPEARS:  Your Honor, it goes to the    12:59
19    credibility of the investigation and the quality of    12:59
20    the evidence.    12:59
21        THE COURT:  So tell me about this credibility    12:59
22    of the investigation.  You're not claiming it's    12:59
23    credibility of Sharafi because he's not even going to    12:59
24    testify.  Give me a little better sense of why it    12:59
25    goes to the quality of the evidence that's before the    12:59

1    jury.                                                        12:59

2         MR. SPEARS:  Thank you, Your Honor.  This --          12:59

3    the chronology of this investigation was that it           12:59

4    began with Sharafi and it began with the                   13:00

5    nonprosecution agreement.  And from there it led to        13:00

6    the recording of Rothschild, and we know what the          13:00

7    chronology is from that point forward.                     13:00

8         But when the government's very own witnesses          13:00

9    are saying that the witness that it based its              13:00

10   investigation on is untrustworthy, that goes to the        13:00

11   credibility of the investigation and the -- it's just      13:00

12   challenging the basic core of the government's case.       13:00

13        THE COURT:  But that's where you're losing            13:00

14   me, so please explain.  You say that because Sharafi       13:00

15   wasn't trustworthy and everybody was telling -- I          13:00

16   don't know whether you're claiming that they told the      13:00

17   government that.  But why does that discredit what --      13:00

18   the investigation that's independent of Sharafi            13:01

19   thereafter, why does that discredit that part of the       13:01

20   investigation?                                             13:01

21        So you start out with a bad witness and,             13:01

22   nonetheless, you carry out your investigation and you      13:01

23   get some good witnesses.  So that's the link I don't       13:01

24   understand.                                                13:01

25        MR. SPEARS:  Your Honor, I appreciate the            13:01

1    question.  It just seems sort of -- sort of                13:01

2    fundamental almost in a cross-examination of a case        13:01

3    agent who's now marshaling their investigation.            13:01

4    Right now, it's happening.                                 13:01

5         And I tried to object to it, but he's                 13:01

6    marshaling the evidence that we can't come back and        13:01

7    say, well, but there were other problems with your         13:01

8    case, weren't there?  And to have struck a deal with       13:01

9    Sharafi and to now apparently not be calling him when      13:02

10    they have -- they have the ability to present his         13:02

11    testimony to this jury, the jury should know that.        13:02

12    The jury should know that.                                13:02

13         THE COURT:  Should know that they have the          13:02

14    ability to present it?                                    13:02

15         MR. SPEARS:  Yes.                                    13:02

16         THE COURT:  Do you not?                              13:02

17         MR. NOVICK:  Of course they do, Your Honor.         13:02

18    If they want to call him, I'm more than happy to         13:02

19    cross-examine him.                                        13:02

20         THE COURT:  You're not looking for a missing        13:02

21    witness instruction?                                      13:02

22         MR. SPEARS:  Your Honor, I think that's a           13:02

23    separate question, I think, that we may need to          13:02

24    address.                                                  13:02

25         THE COURT:  Do you have the capacity to            13:02

1    call -- to subpoena Sharafi and get him here?    13:02

2    MR. SPEARS:  I don't know where he is.    13:02

3    MR. NOVICK:  They don't even need to subpoena    13:02

4    him, Judge.  I will --    13:02

5    THE COURT:  What?    13:02

6    MR. NOVICK:  They don't even need to subpoena    13:02

7    him.  I will make him -- I'll have him come here.  If    13:02

8    they want to give a subpoena, we'll serve it.    13:02

9    THE COURT:  All right.  Let me just hear --    13:02

10    let me just take for the time being an assumption    13:02

11    that it's not that Sharafi is unavailable.    13:03

12    But what's the government's response to    13:03

13    Mr. Spears' argument that when you start out with    13:03

14    tainted material, your investigation is resultingly    13:03

15    potentially tainted and the jury is entitled to hear    13:03

16    that?    13:03

17    MR. NOVICK:  Your Honor, the case and the    13:03

18    trial is about the evidence before the jury and the    13:03

19    evidence to the witnesses and the evidence of the    13:03

20    documents.  And to the extent that he wants to employ    13:03

21    Sharafi against those witnesses, he can call them and    13:03

22    do that, put that evidence in.    13:03

23    There's no taint here in the way there would    13:03

24    be a Fourth Amendment taint from a search.  There's    13:03

25    no fruit of the poisonous tree just because we got    13:03

1    information early in the investigation from Sharafi.    13:03

2    I think it's entirely inaccurate to characterize us    13:04

3    as basing our trial case here against Mr. Hoskins on    13:04

4    Mr. Sharafi, evidenced by the fact that we have no    13:04

5    intent or in our view need to call him.    13:04

6            As far as Special Agent Coleman being a --    13:04

7    testifying about the investigation, that's just    13:04

8    patently not true.  I've not asked him how did this    13:04

9    investigation began.  In fact, in part because it's    13:04

10   irrelevant, in part because that's a long story, Your    13:04

11   Honor, that takes us onto a long sideshow and is    13:04

12   entirely irrelevant, involves issues of international    13:04

13   cooperation and MLATs, much of which Your Honor is    13:04

14   already aware of that I don't think is relevant for    13:04

15   the jury consideration as to the quality of the    13:04

16   government's evidence in this case.    13:04

17           I have no intention of asking Special Agent    13:04

18   Coleman anything other than what I'm doing now, which    13:04

19   is to read documents that we intend to put into    13:04

20   evidence.  I may ask him to read documents that    13:05

21   compare one to the other.  I may have transition    13:05

22   questions that are designed just to tell the jury    13:05

23   where I'm going next, which I can eliminate if need    13:05

24   be, and he's going to be a summary witness.  He's    13:05

25   going to put in some summary charts.    13:05

1    He is not talking about the history of the         13:05

2    investigation.  He is not talking about anything like   13:05

3    that.  There is zero, there is no fundamental        13:05

4    component to being allowed to explore the initiation   13:05

5    of investigation any more than in a wiretap trial     13:05

6    that the government is not obliged to put on or talk   13:05

7    about any informant who may have provided information   13:05

8    in the early stages.  It's just -- I'm not aware of    13:05

9    any fundamental rule that the counsel is referring    13:05

10   to.                                                  13:05

11        MR. SPEARS:  Your Honor, if I can just          13:05

12   respond.                                             13:05

13        THE COURT:  You may.                            13:05

14        MR. SPEARS:  It is a standard                   13:05

15   cross-examination technique, for example, to get into   13:05

16   the absence of recordings, and surely that's an      13:05

17   appropriate grounds for cross.  It's the same thing   13:06

18   here.  Where is Sharafi --                           13:06

19        MR. NOVICK:  Why is that --                     13:06

20        MR. SPEARS:  -- when the government can --      13:06

21   he's obligated under the agreement to appear at their   13:06

22   direction and that's what the nonprosecution         13:06

23   agreement sets forth.                                13:06

24        MR. NOVICK:  Our decision as to whether to      13:06

25   call him -- so then he's asking for a missing witness   13:06

1    charge, Judge, and that is inappropriate here.  He is        13:06

2    equally available to both parties.  The government's        13:06

3    decision as to who they call is entirely irrelevant         13:06

4    to the jury's consideration.                                13:06

5          MR. SPEARS:  And the reason the government            13:06

6    doesn't want this evidence in is because they know          13:06

7    how valuable it is to us in terms of exposing the           13:06

8    problems with their investigation.                          13:06

9          MR. NOVICK:  Then they can call him.  Then            13:06

10   they could call him.                                        13:06

11         THE COURT:  I have your case --                       13:06

12         MR. SPEARS:  Put the nonprosecution agreement         13:06

13   in?                                                         13:06

14         MR. NOVICK:  Then call him to testify.                13:06

15         THE COURT:  I have your briefings from the            13:06

16   motion in limine.  I will go back and refresh my            13:07

17   recollection on that.  I have your arguments.  I            13:07

18   understand what your respective positions are.  Thank       13:07

19   you.                                                        13:07

20         MR. SPEARS:  Thank you, Your Honor.                   13:07

21         THE COURT:  Why don't we plan to come back at         13:07

22   2, and hopefully I will be ready to talk to you.  All       13:07

23   right.  Thank you.  We stand in recess.                     13:07

24         (Lunch recess from 1:07 p.m. to 2:24 p.m.)            13:07

25         THE COURT:  All right.  Please be seated,             14:24

1    ladies and gentlemen.  I'm prepared -- I have                14:24

2    prepared a ruling on the issue of the admissibility          14:24

3    of 453 and 454.  I'm going to give that to you after         14:24

4    the jury goes home.                                          14:24

5            Let's bring the jury back and continue with          14:24

6    the testimony of Agent Coleman.  I have some further         14:24

7    questions with respect to what the defense intends           14:24

8    because -- intends to ask and why.  But we'll go over        14:24

9    that after the jury goes home.  All right?                   14:24

10           MR. NOVICK:  Your Honor, I'm sorry.  One --           14:24

11   because I don't know what the Court's ruling is on           14:24

12   the document, I do have another document that I could        14:24

13   put in through Special Agent Coleman with Winan Kusno        14:24

14   on it.  I wasn't intending to because I didn't think         14:25

15   it was important to my case, but it certainly has            14:25

16   reference to Mr. Kusno being --                              14:25

17           THE COURT:  I want to get -- I'm sorry.  I            14:25

18   want to get the jury back in here.  I know we're not         14:25

19   going to finish Agent Coleman today.                         14:25

20           MR. NOVICK:  No, we're not.                          14:25

21           THE COURT:  Okay.                                    14:25

22           (Jury entered the proceedings, 2:25 p.m.)            14:25

23           THE COURT:  All right.  Please be seated,            14:25

24   ladies and gentlemen.  Mr. Novick will continue with        14:25

25   the direct examination of Mr. Coleman.                       14:26

| | |
|---|---|
| 1 | You may proceed. | 14:26 |
| 2 | MR. NOVICK:  Thank you, Your Honor. | 14:26 |
| 3 | BY MR. NOVICK: | 14:26 |
| 4 | Q.    Special Agent Coleman, we had left off on | 14:26 |
| 5 | Exhibit 440 which is in evidence. | 14:26 |
| 6 | MR. NOVICK:  440, yeah. | 14:26 |
| 7 | BY MR. NOVICK: | 14:27 |
| 8 | Q.    All right.  So we had left off here on this | 14:27 |
| 9 | e-mail from Bruno Kaelin to Fred Pierucci, copying | 14:27 |
| 10 | Mr. Hoskins on February 18, 2003, correct? | 14:27 |
| 11 | A.    Yes, sir. | 14:27 |
| 12 | Q.    It was discussing -- I'm not going to have | 14:27 |
| 13 | you read it again.  But in short, it was discussing | 14:27 |
| 14 | using Sharafi's U.S. company for the consultancy | 14:27 |
| 15 | agreement.  Is that right in general terms? | 14:27 |
| 16 | A.    Yes, it is. | 14:27 |
| 17 | Q.    Okay.  So take a look now at Exhibit 53 for | 14:27 |
| 18 | identification.  What is this? | 14:27 |
| 19 | A.    It's a consultancy agreement between Alstom | 14:27 |
| 20 | Power, Inc., and Pacific Resources, Inc. | 14:27 |
| 21 | Q.    All right.  As regards the Tarahan contract? | 14:27 |
| 22 | A.    Yes, it is. | 14:27 |
| 23 | Q.    And what's the date of it? | 14:27 |
| 24 | A.    Third of March 2003. | 14:27 |
| 25 | MR. NOVICK:  Your Honor, I'd offer Exhibit | 14:27 |

1    53.                                                          14:28

2          MR. SPEARS:  No objection, Your Honor.          14:28

3          THE COURT:  Full exhibit.                       14:28

4    BY MR. NOVICK:                                         14:28

5    Q.    All right.  Just to highlight a couple of       14:28

6    sections, where -- this is an agreement between       14:28

7    Alstom Power, Inc., and Pacific Resources; is that    14:28

8    right?                                                14:28

9    A.    Yes, sir.                                        14:28

10   Q.    And Pacific Resources is listed as being        14:28

11   located where?                                        14:28

12   A.    United States.                                  14:28

13   Q.    In Bethesda, Maryland, specifically?            14:28

14   A.    Yes, sir.                                        14:28

15   Q.    And the jury has heard reference to multiple    14:28

16   consultancy agreements.  I just want to make sure we  14:28

17   are clear on which one this one is.  We can take a    14:28

18   look at the remuneration section on page 3.  What's   14:28

19   the percentage that this one entailed, the percentage 14:28

20   of the contract?                                      14:28

21   A.    Three percent.                                  14:28

22   Q.    So this was the first of the Sharafi -- the     14:28

23   Pacific Resources agreements?                         14:28

24   A.    Related to the Tarahan Project, yes, sir.       14:28

25   Q.    Okay.  Okay.  Let's switch topics.              14:29

1          You heard -- the jury has heard evidence

2     regarding a change in the Tarahan consultants.  Do

3     you recall that?

4          A.    Yes, sir.

5          Q.    Did you review documents related to that

6     issue?

7          A.    Yes, I did.

8          Q.    And related to consultancy agreements?

9          A.    Yes, sir.

10         Q.    All right.  Let's switch gears and -- first,

11    just to orient ourselves here, let's look at 485

12    which is already in evidence.  And I'll direct you to

13    the bottom e-mail, the last e-mail which begins at

14    the bottom of page 1 from Reza Moenaf, top of page 2

15    to Lawrence Hoskins.  Do you see that?

16         A.    Yes, I do.

17         Q.    And that's dated September 30, 2003; is that

18    right?  I'll take you back to the second page --

19    excuse me, the first page at the bottom there.

20         A.    Yes.  There it is.  Thank you.

21         Q.    All right.  I'm just going to highlight and

22    ask you to read those couple of lines that I've just

23    highlighted.

24         A.    "Eko also informed me there has been

25    discussion between Fred, Marubeni and Pirooz

1  yesterday where Pirooz committed to convince EM that          14:30

2  one is enough."                                               14:30

3      Q.    All right.  Now let's take a look at Exhibit        14:31

4  467.  What is this?                                           14:31

5      A.    This is an e-mail from Pirooz Sharafi to Fred       14:31

6  Pierucci sent on the 8th of October 2003, subject:           14:31

7  "Indonesia."                                                  14:31

8              MR. NOVICK:  I offer 467.                         14:31

9              MR. SPEARS:  No objection, Your Honor.            14:31

10             THE COURT:  Full exhibit.                         14:31

11 BY MR. NOVICK:                                                14:31

12     Q.    All right.  Can you please read the                 14:31

13 highlighted paragraph?                                        14:31

14     A.    "The contract is basically fine.  Emir is          14:31

15 trying to verify that in case he has to do horse             14:31

16 trading with Yusril, the expenses are not coming from        14:31

17 my contract, but he has not managed to talk to Eddie         14:31

18 directly in part because he does not want to address         14:31

19 the issue directly."                                          14:32

20     Q.    This e-mail, October 8, 2003, is a little          14:32

21 more than a week after the prior e-mail we just              14:32

22 looked to, looked at?                                         14:32

23     A.    Yes, sir.                                           14:32

24     Q.    Okay.  And now I'll just have you focus on         14:32

25 the next paragraph.  Go ahead and read that.                 14:32

1    A.    "I have one minor comment though.  Could you    14:32

2  fix the payment dates for the 30 percent and 70    14:32

3  percent?  First portion at the activation of the    14:32

4  contract when it is signed and the down payment is    14:32

5  made and the second one four or six months    14:32

6  thereafter.  Given the nature of my involvement or    14:32

7  lack thereof with PLN under the new scheme, my friend    14:32

8  and I do not want to be involved in the PLN    14:32

9  performance and payment issues."    14:32

10    Q.    And just again to take you back to that    14:33

11  earlier e-mail, 485.    14:33

12        MR. SPEARS:  Your Honor, I'm going to object    14:33

13  as cumulative.  We've read the e-mail previously,    14:33

14  again today.    14:33

15        THE COURT:  What is the purpose of going back    14:33

16  to 485?    14:33

17        MR. NOVICK:  To lay a foundation and    14:33

18  understanding of what the -- 467 is about, Your    14:33

19  Honor.    14:33

20        MR. SPEARS:  This isn't the witness to talk    14:33

21  about the understanding.    14:33

22        MR. NOVICK:  I'm not asking him for the    14:33

23  understanding.  I'm simply having him read words and    14:33

24  a document that's already in evidence.    14:33

25        THE COURT:  Well, we have 485.  We've had it    14:33

| | | |
|---|---|---|
| 1 | read to the jury.  Can't we move on, please? | 14:33 |
| 2 |       MR. NOVICK:  That's fine, Your Honor. | 14:33 |
| 3 | BY MR. NOVICK: | 14:33 |
| 4 |   Q.  Let's take a look now at Exhibit 470 for | 14:33 |
| 5 | identification.  What's this? | 14:33 |
| 6 |   A.  This is an e-mail from William Pomponi to | 14:34 |
| 7 | Lawrence Hoskins, with a copy to Bruno Kaelin, Reza | 14:34 |
| 8 | Moenaf, Veronique Etienne and Fenge Fengge, sent on | 14:34 |
| 9 | the 13th of October 2003, subject of Tarahan. | 14:34 |
| 10 |       MR. NOVICK:  Your Honor, I'd offer 470. | 14:34 |
| 11 |       MR. SPEARS:  No objection, Your Honor. | 14:34 |
| 12 |       THE COURT:  Full exhibit. | 14:34 |
| 13 | BY MR. NOVICK: | 14:34 |
| 14 |   Q.  Is this responding to an earlier e-mail from | 14:34 |
| 15 | Mr. Hoskins? | 14:34 |
| 16 |   A.  Yes, it is. | 14:34 |
| 17 |   Q.  Take a look at that earlier e-mail on October | 14:34 |
| 18 | 1, 2003, from Mr. Hoskins to Mr. Pomponi.  Can you | 14:34 |
| 19 | read that? | 14:34 |
| 20 |   A.  "Bill, my assistant Fengge will fax copy of | 14:34 |
| 21 | letter proposed to Azmin for your comment.  It is | 14:34 |
| 22 | more or less the same format as sent to him | 14:34 |
| 23 | originally on the MT project.  Regards, Lawrence." | 14:34 |
| 24 |   Q.  Now take a look at the response from | 14:35 |
| 25 | Mr. Pomponi.  Go ahead and read that. | 14:35 |

1    A.    "Based upon our telecon Sunday, please go                14:35

2  ahead using today's date and issue the fax officially            14:35

3  to Azmin.  Please send copy via LN attachment to                 14:35

4  myself."                                                         14:35

5    Q.    And that's from Mr. Pomponi to Mr. Hoskins?              14:35

6    A.    Yes, sir.                                                14:35

7    Q.    Take a look now at 476 and 476-A for                     14:35

8  identification.  What is it?                                     14:35

9    A.    This is an e-mail from William Pomponi to                14:35

10  Veronique Etienne, copied to Lawrence Hoskins and               14:35

11  Bruno Kaelin, sent on the 20th of January 2004,                 14:35

12  subject:  "Pacific Resources, Inc., Pirooz," with               14:36

13  attachment Pacific Resources.zip.                               14:36

14         MR. NOVICK:  I'd move 476, Your Honor.                   14:36

15         MR. SPEARS:  No objection.                               14:36

16         THE COURT:  Full exhibit.                                14:36

17  BY MR. NOVICK:                                                  14:36

18    Q.    All right.  So on the left-hand side --                 14:36

19         THE COURT:  76 and 76-A.  There's no                     14:36

20  objection to either, correct, Mr. Spears?                       14:36

21         MR. SPEARS:  No objection to either.                     14:36

22         THE COURT:  Full exhibits.                               14:36

23  BY MR. NOVICK:                                                  14:36

24    Q.    All right.  On the left-hand side is the                14:36

25  e-mail.  On the right-hand side, what is that?                  14:36

1    A.    On the right-hand side is a business card for    14:36

2    Pirooz Sharafi, president of Pacific Resources, Inc.    14:36

3    Q.    Okay.  And is it the first page of a    14:36

4    several-page document?    14:36

5    A.    Yes, it is.    14:36

6    Q.    That's the attachment to the e-mail 476-A?    14:36

7    A.    Yes, it is.    14:36

8    Q.    All right.  Let's just look at the e-mail    14:36

9    first.  What does Mr. Pomponi write here?    14:36

10    A.    "Please find attached Pirooz Sharafi's    14:37

11    agreement for Tarahan 3/4 with changes/corrections.    14:37

12    The changes/corrections have been discussed with Fred    14:37

13    Pierucci and are agreed.  Please finalize and submit    14:37

14    back to Fred and I for execution.  Thanks for your    14:37

15    assistance."    14:37

16    Q.    And it notes that there's an attachment    14:37

17    there, Pacific Resources.pdf; is that right?    14:37

18    A.    It does, yes.    14:37

19    Q.    All right.  And if you would just take a look    14:37

20    at the right-hand side, I'll go to the second page of    14:37

21    476-A.  What is that?    14:37

22    A.    This is the consultancy agreement or draft of    14:37

23    the consultancy agreement between Alstom Power, Inc.,    14:37

24    and Pacific Resources, Inc., regarding the Tarahan    14:37

25    Project in Indonesia.    14:37

1    Q.    Okay.  And if we scroll to the Article 6.1    14:37

2    section, and I'll highlight that, what's the    14:37

3    consultancy fee in this one?    14:37

4    A.    One percent.    14:38

5    Q.    You said this is a draft of the consultancy    14:38

6    agreement?    14:38

7    A.    Yes, sir.    14:38

8    Q.    All right.  Let's take a look at 477 for    14:38

9    identification.  I'll put 477 on the left-hand side    14:38

10   and 470- -- sorry, 478 -- 477-A on the left-hand    14:38

11   side.  Let me try that again.    14:38

12        We'll do 477 on the left-hand side and 477-A    14:38

13   on the right-hand side.  Do you see that?    14:38

14   A.    Yes, sir.    14:38

15   Q.    Okay.  What is 477?    14:38

16   A.    477 is an e-mail from William Pomponi to    14:38

17   Veronique Etienne, with a copy to Lawrence Hoskins    14:38

18   and Bruno Kaelin, sent on the 20th of January 2004.    14:38

19   Subject is Azmin's agreement, Tarahan 3/4, with an    14:39

20   attachment, Azmin's Agreement.zip.    14:39

21        MR. NOVICK:  I'd move 477 and 477-A.    14:39

22        MR. SPEARS:  No objection, Your Honor.    14:39

23        THE COURT:  Full exhibit -- full exhibits for    14:39

24   both.    14:39

25   BY MR. NOVICK:    14:39

1     Q.    Let's take a look now at 477.  You said this

2   is from Mr. Pomponi to Ms. Etienne, copying

3   Mr. Hoskins and Mr. Kaelin, correct?

4     A.    Yes, sir.

5     Q.    Can you read Mr. Pomponi's message?

6     A.    "Please find attached Azmin's agreement for

7   Tarahan 3/4 with associate keys."  And a document.

8     Q.    Does it read "Azmin's agreement.doc"?

9     A.    Yes, it does.

10    Q.    And then what's the next line?

11    A.    "Please create the agreement and submit back

12  to Fred and I for execution.  Thanks for your

13  assistance."

14    Q.    And then on 477-A, what's this document

15  entitled?

16    A.    "Consultancy Agreement Keys."

17    Q.    All right.  And reads, "Request made by

18  William Pomponi," correct?

19    A.    Yes.

20    Q.    And agreement prepared on behalf of, can you

21  read just those couple lines?

22    A.    "Name of concerned, Alstom sector, Alstom

23  Power, Inc., USA.  Name of concerned, Alstom business

24  unit, boiler and environmental."

25    Q.    And what's the place of business listed?

14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:39
14:40
14:40
14:40
14:40
14:40
14:40
14:40
14:40
14:40
14:40

1    A.    2000 Day Hill Road, Windsor, Connecticut,    14:40

2    06095, USA.    14:40

3    Q.    And then on -- sorry.  One moment.    14:40

4         Under "the consultant," what's listed?    14:40

5    A.    PT Gajendra Adhi Sakti.    14:40

6    Q.    And name of -- under name?    14:40

7    A.    Azmin Aulia, director.    14:41

8    Q.    Okay.  And then if we scroll down to the    14:41

9    third page under the remuneration and compensation    14:41

10   section, what's the percentage listed in this keys    14:41

11   document?    14:41

12   A.    Two percent.    14:41

13   Q.    And the basis of the remuneration?    14:41

14   A.    The total Alstom contract value.    14:41

15   Q.    All right.  And then it has listed a series    14:41

16   of terms of payment; is that right?    14:41

17   A.    It does, yes.    14:41

18   Q.    Okay.  Let's move on to Exhibit 481 for    14:41

19   identification.  What is this?    14:41

20   A.    This is an e-mail from Veronique Etienne to    14:41

21   William Pomponi, with a copy to Bruno Kaelin and    14:42

22   Lawrence Hoskins, sent on 5th of February 2004,    14:42

23   subject:  "Azmin's agreement."    14:42

24        MR. NOVICK:  I move 481.    14:42

25        MR. SPEARS:  No objection.    14:42

| | | |
|---|---|---|
| 1 | THE COURT:  Full exhibit. | 14:42 |
| 2 | BY MR. NOVICK: | 14:42 |
| 3 | Q.    And what does Ms. Etienne write? | 14:42 |
| 4 | A.    "Dear William, this file is now with L. | 14:42 |
| 5 | Hoskins for approval.  Best regards." | 14:42 |
| 6 | Q.    And it refers "Azmin's agreement," correct? | 14:42 |
| 7 | A.    It does. | 14:42 |
| 8 | Q.    And then 484-A, what's that?  Excuse me.  484 | 14:42 |
| 9 | and 484-A.  What are those? | 14:43 |
| 10 | A.    484 is an e-mail from William Pomponi to | 14:43 |
| 11 | Veronique Etienne, with a copy to Bruno Kaelin, | 14:43 |
| 12 | Lawrence Hoskins, Frederic Pierucci, sent on the 26th | 14:43 |
| 13 | of February 2004, subject:  "Pacific Resources Inc., | 14:43 |
| 14 | Pirooz." | 14:43 |
| 15 | Q.    And -- go ahead. | 14:43 |
| 16 | A.    With an attachment, Pacific Resources Pirooz | 14:43 |
| 17 | Sharafi Agreement.zip. | 14:43 |
| 18 | MR. NOVICK:  I would move admission of 484 | 14:43 |
| 19 | and 484-A, Your Honor. | 14:43 |
| 20 | MR. SPEARS:  No objection to either. | 14:43 |
| 21 | THE COURT:  Full exhibits. | 14:43 |
| 22 | BY MR. NOVICK: | 14:43 |
| 23 | Q.    Can you read Mr. Pomponi's message on 484, | 14:43 |
| 24 | please? | 14:43 |
| 25 | A.    "Agreement was signed yesterday, February | 14:43 |

1    25th, and signed copy is attached for your files.    14:43

2    This now negates the previous agreement with Pacific    14:43

3    Resources which had been signed last year from a" --    14:43

4    "form a total commission of 3 percent.  Please make    14:43

5    note in your files.  Thanks for your assistance."    14:43

6    Q.    And you said that there was an attachment    14:44

7    that was on the right-hand side of the screen.  What    14:44

8    is that?    14:44

9    A.    That is the executed version of a consultancy    14:44

10   agreement between Alstom Power, Inc., and Pacific    14:44

11   Resources, Inc., regarding the Tarahan Project in    14:44

12   Indonesia signed on the 25th of February 2004.    14:44

13   Q.    This is an executed version of the document,    14:44

14   the 3 percent -- excuse me, the 1 percent document we    14:44

15   just looked at?    14:44

16   A.    Yes, it is.    14:44

17   Q.    Okay.    14:44

18   MR. NOVICK:  Your Honor, at this point I    14:44

19   would also move admission of Exhibit 56 which is the    14:44

20   same documents in Alstom's files.    14:44

21   MR. SPEARS:  No objection.    14:44

22   THE COURT:  Full exhibit.    14:44

23   BY MR. NOVICK:    14:45

24   Q.    Next let's take a look at Exhibit 54.  What    14:45

25   is that?    14:45

1    A.    This is a service agreement entered into on                14:45

2    the 9th of December 2003 between Marubeni Corporation            14:45

3    and Pacific Resources, Inc.                                       14:45

4         MR. NOVICK:   I move admission of Exhibit 54.                14:45

5         MR. SPEARS:  No objection.                                   14:45

6         THE COURT:  Full exhibit.                                    14:45

7    BY MR. NOVICK:                                                    14:45

8    Q.    All right.  You said this is between Marubeni              14:45

9    and Pacific Resources, correct?                                   14:45

10   A.    Yes, sir.                                                   14:45

11   Q.    Okay.  And is that -- if I read this                       14:45

12   highlighted portion, "Whereas Marubeni in consortium             14:46

13   with Alstom Power, Inc., USA, desires to be qualified            14:46

14   and awarded the project," correct?                               14:46

15   A.    Yes, sir.                                                   14:46

16   Q.    And the project is defined above as the                    14:46

17   Tarahan coal-fired steam power plant Units 3 and 4?              14:46

18   A.    Yes, it is.                                                 14:46

19   Q.    And then, "Whereas Marubeni wishes to employ              14:46

20   the services of consultant as an advisor and                     14:46

21   consultant with respect to the project"?                         14:46

22   A.    Yes, that's what it says.                                  14:46

23   Q.    And then if we scroll to the second page,                 14:46

24   does it list a remuneration here for the consultant?            14:46

25   A.    Yes, it does.                                              14:46

```
 1    Q.    And what's that?                              14:46
 2    A.    One percentage of the Marubeni portion of the  14:46
 3    contract price.                                      14:46
 4    Q.    Same as the Alstom Power, Inc., agreement      14:46
 5    with Sharafi?                                        14:46
 6    A.    Yes, that's correct.                           14:46
 7    Q.    Okay.  Let's move on topics.                   14:46
 8          Do you recall or you've heard testimony        14:47
 9    regarding terms of payment for the consultants.  Do  14:47
10    you recall that?                                     14:47
11    A.    Yes, I do.                                     14:47
12    Q.    Did you review documents related to that       14:47
13    subject?                                             14:47
14    A.    Yes, I did.                                    14:47
15    Q.    Again, on which projects?                      14:47
16    A.    On Tarahan and Muara Tawar.                    14:47
17    Q.    Let's take a look at Exhibit 486.  What is     14:47
18    this?                                                14:47
19    A.    This is an e-mail from Lawrence Hoskins to     14:47
20    Yves Mouillet, subject:  "CA Tarahan 3 and 4," sent  14:47
21    on the 3rd of March 2004, with an attachment,        14:47
22    Appendix T-C 7-2 Tarahan.zip.                        14:47
23          MR. NOVICK:  Your Honor, I'd move admission    14:47
24    of 46.                                               14:47
25          MR. SPEARS:  No objection.                     14:48
```

1          THE COURT:  Full exhibit.                    14:48

2     BY MR. NOVICK:                                     14:48

3        Q.    So this, Special Agent Coleman, is this   14:48

4     responding to -- excuse me, or forwarding an earlier  14:48

5     e-mail from Reza Moenaf to Lawrence Hoskins?       14:48

6        A.    Yes, it is.                               14:48

7        Q.    Is that on -- and I'll highlight that,    14:48

8     March 3, 2004; is that right?                      14:48

9        A.    It is right, yes.                         14:48

10       Q.    All right.  Let's focus in on that e-mail for  14:48

11    a moment.  Can you read the first few lines?       14:48

12       A.    "Hi, Lawrence.  As you know, we just resolved  14:48

13    various CA issue on Tg Priok Gilimanuk and MT add-on  14:48

14    but the next one is coming, Tarahan.  The issue is  14:48

15    not much different with the others, payment term."  14:48

16       Q.    All right.  Go ahead and read the next    14:48

17    portion.                                           14:48

18       A.    "Last Monday we sent Tarahan CA to Azmin.  He  14:48

19    immediately feel cornered after reading the ToP which  14:49

20    said pro rata.  When I talked to him on the phone I  14:49

21    said I will look in -- look at it and I thought it  14:49

22    should not be that bad.  I then looked into the     14:49

23    Tarahan ToP, see attached, and realize that the     14:49

24    project payment is spread over 3 1/2 year.  You would  14:49

25    understand why he is worry, he is willing to        14:49

1    prefinance his scope fulfilling his commitment up          14:49

2    front prior he get paid to get the right influence          14:49

3    but certainly not waiting two to three years to get          14:49

4    paid while most of his scope completed in the                14:49

5    beginning."                                                  14:49

6        Q.    Then can you read the last few lines?            14:49

7        A.    "When he called me again today, he asked me      14:49

8    whether we could agree on ToP as per MT add-on.  I          14:49

9    said I doubt it.  He then said since his remuneration       14:49

10   is two and we asked him for help to turn our position       14:49

11   around, at least we should consider to complete the         14:49

12   payment in one year."                                        14:49

13       Q.    Okay.  Now let's take a look, you said that       14:50

14   this was forwarded by Mr. Hoskins to Yves Mouillet,         14:50

15   correct?                                                     14:50

16       A.    Yes, sir.                                          14:50

17       Q.    Can you read that one for us?                     14:50

18       A.    "Yves, can you discuss this with Veronique        14:50

19   and go back to Reza with a suggestion?  Veronique           14:50

20   knows the proposed terms for MT add-on.  These were         14:50

21   special and we must spread more on Tarahan.  Thanks.        14:50

22   Lawrence."                                                   14:50

23       Q.    Take a look now at 487 for identification.        14:50

24   What's that?                                                 14:50

25       A.    This is an e-mail from Reza Moenaf to             14:50

1    Lawrence Hoskins sent on the 11th of March 2004,                    14:50

2    subject:  "CA for Azmin."                                           14:50

3            MR. NOVICK:  I'd move admission of 487.                     14:50

4            MR. SPEARS:  No objection.                                  14:50

5            THE COURT:  Full exhibit.                                   14:51

6    BY MR. NOVICK:                                                      14:51

7      Q.    All right.  Is this e-mail forwarding an                    14:51

8    earlier chain of e-mails?                                           14:51

9      A.    I think it's responding to one that was                     14:51

10   forwarded, yes.                                                     14:51

11     Q.    Okay.  Well, let's go backwards in the                      14:51

12   document to the first of the e-mails.  It starts on                 14:51

13   page 2.  Do you see an e-mail from Yves Mouillet of                 14:51

14   International Network to Reza Moenaf, copying Ion                    14:51

15   Sculy, Bill Pomponi, Mr. Hoskins and Veronique                      14:51

16   Etienne.  Do you see that?                                          14:51

17     A.    Yes, I do.                                                  14:51

18     Q.    The subject is CA Tarahan 3 and 4; is that                  14:51

19   right?                                                              14:51

20     A.    Yes, it is.                                                 14:51

21     Q.    All right.  And then there's a message to                   14:51

22   Reza I'll put up on the screen.  I'm not going to                   14:51

23   have you read this.  The jury can see it.  But does                 14:52

24   it list a series of potential terms of payment?                     14:52

25     A.    It does, yes.                                               14:52

1    Q.    All right.  Let's go up one in the chain to          14:52

2    page 1.  Actually, I'll put page 1 on the left-hand        14:52

3    side and page 2 on the right-hand side.                    14:52

4           What is the e-mail in the middle at the            14:52

5    bottom of page 1?                                          14:52

6    A.    It's an e-mail from William Pomponi to Reza          14:52

7    Moenaf, copy to Fred Pierucci, Ion Sculy, Lawrence         14:52

8    Hoskins and Veronique Etienne.                             14:53

9    Q.    Okay.  And also Yves Mouillet?                       14:53

10   A.    Yes.  Sorry, yes.                                    14:53

11   Q.    It says "Reza."  And then can you read the           14:53

12   first couple lines?                                        14:53

13   A.    "We from Windsor cannot accept the terms             14:53

14   posed by Yves.  These are far too negative for             14:53

15   Windsor from a cash flow during execution."                14:53

16   Q.    Then again, without reading all of this, is          14:53

17   there a discussion about alternative terms of              14:53

18   payment?                                                   14:53

19   A.    Yes, that's correct.                                 14:53

20   Q.    So go to the top of page 2, a continuation of        14:53

21   that e-mail, and go ahead and read the last three          14:53

22   lines.                                                     14:53

23   A.    "I have discussed the above with Fred and he         14:53

24   is in agreement with my proposal especially since          14:53

25   this was agreed previously with Pirooz.  Please            14:53

| | |
|---|---|
| 1 | convince Azmin that this is our very best." | 14:53 |
| 2 | Q.   And then from Reza Moenaf to Lawrence | 14:54 |
| 3 | Hoskins, what does Mr. Moenaf write? | 14:54 |
| 4 | A.   "Lawrence, I would like to talk to you on how | 14:54 |
| 5 | we should handle this.  Please let me know when would | 14:54 |
| 6 | be the best timing for me to call you.  Best regards, | 14:54 |
| 7 | Reza." | 14:54 |
| 8 | Q.   All right.  Take a look now at Exhibit 490 | 14:54 |
| 9 | for identification.  What is this? | 14:54 |
| 10 | A.   This is an e-mail from Lawrence Hoskins to | 14:54 |
| 11 | Bill Pomponi, copy to Yves Mouillet, Frederic | 14:54 |
| 12 | Pierucci, Ion Sculy, and Veronique Etienne, sent on | 14:54 |
| 13 | the 18th of March 2004, subject:  "Tarahan CA." | 14:55 |
| 14 | MR. NOVICK:  I'd move admission of Exhibit | 14:55 |
| 15 | 490. | 14:55 |
| 16 | MR. SPEARS:  No objection. | 14:55 |
| 17 | THE COURT:  Full exhibit. | 14:55 |
| 18 | BY MR. NOVICK: | 14:55 |
| 19 | Q.   All right.  Let's take a look at the first -- | 14:55 |
| 20 | I should say the first e-mail, the bottom e-mail on | 14:55 |
| 21 | the first page.  Do you see that in the middle of the | 14:55 |
| 22 | page? | 14:55 |
| 23 | A.   Yes, sir. | 14:55 |
| 24 | Q.   Forwarded by Lawrence Hoskins, but then it | 14:55 |
| 25 | lists an e-mail from William Pomponi to Ion Sculy, | 14:55 |

1    Fred Pierucci copying Mr. Hoskins and Ms. Mouillet?                  14:55

2       A.    Yes, sir.                                                   14:55

3       Q.    And it reads, "I have Reza out in Indonesia                 14:55

4    negotiating the CA terms with Azmin.  As you know,                   14:55

5    the Tarahan estimate cannot tolerate such advance                    14:55

6    payments and I'm not sure how we can accommodate                     14:55

7    this."                                                               14:55

8             Did I read that correctly?                                  14:55

9       A.    Yes, you did.                                               14:55

10      Q.    And can you read Mr. Hoskins' response to                   14:55

11   Mr. Pomponi?                                                         14:56

12      A.    "Bill, not sure where we are with this, but                 14:56

13   for your info, Azmin is also requesting tougher terms               14:56

14   on other projects at the moment.  I cannot comment on               14:56

15   your cash flow but my advice in this instance is to                 14:56

16   go with the latest recommendation of Yves/Reza.                     14:56

17   Azmin has a lot of work to do to support us in a                    14:56

18   negotiation and he and others are slightly negative                 14:56

19   at the moment on Alstom support.  Lawrence."                        14:56

20      Q.    All right.  491 is the next exhibit I'll put               14:56

21   in front of you.  What's this?                                      14:56

22      A.    This is an e-mail from Reza Moenaf to Eko                   14:56

23   Sulianto, with a copy to Lawrence Hoskins, dated 18th               14:56

24   of March 2004, subject:  "Eddie."                                   14:56

25            MR. NOVICK:  I'd offer 491.                                 14:57

1    MR. SPEARS:  No objection.                      14:57

2    THE COURT:  Full exhibit.                       14:57

3 BY MR. NOVICK:                                      14:57

4    Q.    All right.  You said this is March 18, 2004?  14:57

5    A.    Yes.                                       14:57

6    Q.    From Reza Moenaf to Eko Sulianto, copying  14:57

7 Mr. Hoskins?                                         14:57

8    A.    Yes, that's correct.                       14:57

9    Q.    All right.  And go ahead and read the first  14:57

10 couple lines.                                       14:57

11   A.    "Eko, I have spoken to Eddie Widiono on the  14:57

12 phone as you suggested mainly to discuss two issues."  14:57

13   Q.    All right.  And then I'll have you read    14:57

14 beginning "Eddie said."                             14:57

15   A.    "Eddie said he was disappointed as every time  14:57

16 we go back to him we only asking for support without  14:57

17 showing any further commitment.  One of examples is  14:57

18 he understands from Azmin none CA on Tarahan is firm  14:57

19 to date.  He said we should do better like others   14:57

20 did.  Basically the discussion stop there.  I feel  14:57

21 that I am losing my grip never before.  I have tried  14:57

22 to contact Azmin in Amsterdam but cannot get through.  14:58

23 You should keep checking the temperature on other   14:58

24 project MT and Tuban.  I will talk with Lawrence and  14:58

25 discuss the situation with him."                    14:58

1     Q.    Take a look now at 492.  What's this?                14:58

2     A.    This is an e-mail from Reza Moenaf to                14:58

3   Frederic Pierucci, with a copy to Lawrence Hoskins           14:58

4   and William Pomponi, sent on the 22nd of March 2004,         14:58

5   subject:  "Indonesia."                                       14:58

6           MR. NOVICK:  Your Honor, I offer 492.                14:58

7           MR. SPEARS:  No objection.                           14:58

8           THE COURT:  Full exhibit.                            14:58

9   BY MR. NOVICK:                                               14:58

10    Q.    All right.  There are three e-mails in this          14:58

11  exhibit.  I want to take you to the second page.  At         14:58

12  the top you see an e-mail from P. Sharafi to Frederic        14:59

13  Pierucci?                                                    14:59

14    A.    Yes, I do.                                           14:59

15    Q.    Could you just read the paragraph beginning,         14:59

16  "We need a very strong support"?                             14:59

17    A.    "We need a very strong support from Eddie to         14:59

18  counter Mitsubishi's lobbying against us.  I am not          14:59

19  convinced that he is happy enough with us to provide         14:59

20  the support.  Emir is also unhappy because he thinks         14:59

21  Alstom has not firmly indicated its support to               14:59

22  Eddie."                                                      14:59

23    Q.    Now let's take a look at the next e-mail up          14:59

24  in the chain on the bottom of page 1 from Fred              14:59

25  Pierucci to Lawrence Hoskins, copying Bill Pomponi.          14:59

1    Do you see that?                                        14:59

2        A.    Yes, sir.                                     15:00

3        Q.    All right.  Could you read the message from   15:00

4    Mr. Pierucci?                                           15:00

5        A.    "See attached.  Please check this again       15:00

6    urgently with Azmin.  Fred."                            15:00

7        Q.    And then can you read the response or the     15:00

8    message from Reza to Pierucci?                          15:00

9        A.    "Fred, this is a known situation and it is    15:00

10   true that Eddie slowing down, no happy, in supporting   15:00

11   Alstom.  I have mentioned this in my earlier note to    15:00

12   Lawrence.  But what would you expect with 2 to 3        15:00

13   percent and a prorate ToP.  He shook his head when he   15:00

14   heard that the ToP is spread in three and a half        15:00

15   year.  Let's ask ourself what we have done which        15:00

16   showed our commitment to him.  Talking.  That is what   15:00

17   he said to me.  Be aware Eddie's reaction on Tarahan    15:00

18   is impacting Alstom's other project too.  I suggest     15:00

19   you to discuss this issue with Lawrence.  He is well    15:00

20   informed on the situation.  Unless we are willing to    15:00

21   change our approach, it is useless for me to talk to    15:00

22   Eddie.  Reza."                                          15:01

23       Q.    And just to be clear, this e-mail here was    15:01

24   from Reza to Pierucci, copying Mr. Hoskins and          15:01

25   Mr. Pomponi?                                            15:01

```
 1      A.    That's correct, yes.                          15:01
 2            MR. NOVICK:  Your Honor, I can keep going.     15:01
 3   I've got more documents.  I see it's 3 o'clock.  I'm    15:01
 4   happy to continue but --                                15:01
 5            THE COURT:  You have some more documents?      15:01
 6            MR. NOVICK:  I have a few more.                15:01
 7            THE COURT:  I am surprised.                    15:01
 8            Ladies and gentlemen, I'm going to let you go  15:01
 9   home.  Have a pleasant weekend.  See you at 9 -- at     15:01
10   9:30 on Monday.  We are on track.  Have a pleasant      15:01
11   weekend.                                                15:01
12            (Jury exited the proceedings, 3:01 p.m.)       15:01
13            THE COURT:  All right.  Agent Coleman, you     15:02
14   are excused.  Let me resume -- have a pleasant          15:02
15   weekend.                                                15:02
16            THE WITNESS:  Yes, ma'am.                      15:02
17            THE COURT:  Let me resume my colloquy with     15:02
18   counsel.                                                15:02
19            MR. NOVICK:  Your Honor, before we do that,    15:02
20   just to -- I had spoken to counsel and I don't think    15:02
21   they have an objection, given the scope of Special      15:02
22   Agent Coleman's testimony thus far which is             15:02
23   principally to read documents, I don't think they       15:02
24   have an objection to him to continue to serve as our    15:02
25   case agent over the weekend given that he is our case   15:03
```

1    agent.  I don't anticipate talking to him about the            15:03

2    documents that he has read, but it would be useful to          15:03

3    be able to have him available to us at this point.             15:03

4        MR. SPEARS:  No objection.                                 15:03

5        THE COURT:  All right.                                     15:03

6        MR. NOVICK:  I don't know that we'll need                  15:03

7    him, Your Honor, but just to be clear.                         15:03

8        THE COURT:  Okay.  I have considered your                  15:03

9    arguments and the evidence with respect to the                 15:03

10   government's motion to admit Exhibits 453 and 454 --           15:03

11   you all made be seated -- under 801(d)(2)(E) which            15:03

12   provides that a statement which is, quote, offered             15:03

13   against an opposing party and was made by the party's          15:03

14   coconspirator during and in furtherance of the                 15:03

15   conspiracy is not hearsay.  The defendant objects             15:04

16   arguing specifically that the statement made by Winan          15:04

17   Kusno, his e-mail included in those exhibits, is not          15:04

18   a coconspirator statement admissible under                     15:04

19   801(d)(2)(E) because defendant argues there must be           15:04

20   independent corroboration of Mr. Kusno's status as a          15:04

21   coconspirator and no such corroboration has been              15:04

22   provided.                                                      15:04

23       U.S. versus Tellier states, quote,                        15:04

24   extrajudicial statements by coconspirators may be             15:04

25   admitted if the government establishes by a                   15:04

1    preponderance of the evidence that there was a                    15:04

2    conspiracy that both a declarant and a party against              15:04

3    whom the statements are offered were members of the               15:04

4    conspiracy and that the statements were made during               15:04

5    and in furtherance of the conspiracy, 82 F.3d 578 at              15:05

6    580 2d Circuit 1996 citing *Bourjaily v. United*                  15:05

7    *States*, 483 US 171 at 175, 1987.                                15:05

8           As to Mr. Kusno's extrajudicial statement,                 15:05

9    defendant only argues that the government has not                 15:05

10   sufficiently established that the declarant Mr. Kusno             15:05

11   was a member of the conspiracy.                                    15:05

12          Rule 801 provides that the out-of-court                    15:05

13   statements at issue here, the e-mail by Mr. Kusno,                15:05

14   quote, must be considered but does not by itself                  15:05

15   establish the existence of the conspiracy or                      15:06

16   participation in it under Rule 801(d)(2)(E), end                  15:06

17   quote, but it doesn't specify whether the, quote,                 15:06

18   participation, quote, at issue is that of the                     15:06

19   defendant, the declarant Mr. Kusno, or both.                      15:06

20          The government urges, argues that the                      15:06

21   independent corroboration of the declarant's                      15:06

22   participation in the conspiracy is not required and              15:06

23   Mr. Kusno's statement alone may provide sufficient               15:06

24   evidence that Mr. Kusno was a coconspirator.                      15:06

25          In support of this position, the government              15:06

1    cites Tellier and *U.S. v. Gigante* 166 F.3d 75 2d    15:06

2    Cir.1999.  But those cases address the separate    15:06

3    question of whether independent corroboration of the    15:06

4    defendant's status as a coconspirator is required and    15:07

5    nearly squarely addresses the question of whether    15:07

6    independent corroboration of the declarant's status    15:07

7    as a coconspirator is required.    15:07

8         Although the current text of Rule 801 doesn't    15:07

9    clearly indicate whose, quote, participation in, end    15:07

10   quote, the conspiracy must be supported by some    15:07

11   independent corroborating evidence.  Prior to its    15:07

12   amendment in 2011, Rule 802 did specify that, quote,    15:07

13   there must be independent corroborating evidence of,    15:07

14   quote, the existence of the conspiracy and the    15:07

15   participation therein of the declarant and the    15:07

16   defendants, *United States v. Saneaux*, 392 F. Supp. 2d    15:07

17   502 at 511, District of Connecticut 2005, quoting    15:07

18   Rule 801(d)(2)(E).    15:08

19        And according to the advisory committee notes    15:08

20   to the 2011 amendments to the Federal Rules of    15:08

21   Evidence, those amendments were a, quote, part of the    15:08

22   general restyling of the evidence rules to make them    15:08

23   more easily understood, quote, and were, quote,    15:08

24   intended to be stylistic only, end quote.  There was    15:08

25   no, quote, intent.  There was, quote, no intent to    15:08

1    change any result in any ruling on evidence                    15:08

2    admissibility, end quote.                                       15:08

3         But even if independent corroborating                     15:08

4    evidence of a declarant's status as a coconspirator            15:08

5    is required by Rule 801, the government argues that            15:08

6    it has provided such corroboration of Mr. Kusno's             15:08

7    status and thus his testimony is admissible under             15:08

8    Rule 801(d)(2)(E).                                             15:09

9         Mr. Puckett testified that Winan Kusno worked            15:09

10   on the efforts to win the Tarahan contract and that          15:09

11   Mr. Kusno knew that Alstom had hired a consultant to          15:09

12   try to win that contract.  Mr. Puckett also testified        15:09

13   that Winan Kusno knew what the consultants were hired         15:09

14   to do, explaining that Mr. Reza Moenaf told                    15:09

15   Mr. Puckett that Mr. Moenaf and Eko Sulianto had              15:09

16   instructed Mr. Kusno, quote, as to who was a                   15:09

17   consultant and what his job was, end quote.                    15:09

18        In Exhibits 453 and 454, Reza Moenaf                      15:09

19   forwarded Mr. Kusno's e-mail to others, including             15:09

20   Frederic Pierucci, Eko Sulianto, Larry Puckett and            15:09

21   the defendant Lawrence Hoskins.  In forwarding                15:09

22   Mr. Kusno's statement to Mr. Hoskins, Mr. Moenaf              15:10

23   wrote below -- wrote, quote, "Below are Winan's (our          15:10

24   PN in Palembang) report from meeting he had with             15:10

25   Marubeni and Marubeni and PLN last night.  As you            15:10

1  will notice, we have a serious agent problem," end

2  quote.  That's Government's 454.

3          The Court finds that in combination,

4  Mr. Puckett's testimony, Mr. Moenaf's forwarding of

5  and comments on Mr. Kusno's e-mail and the e-mail

6  itself demonstrate by a preponderance of the evidence

7  that Mr. Kusno was a coconspirator, see Bourjaily 483

8  U.S. at 176, quote, behold that when the preliminary

9  facts relevant to 801(d)(2)(E) are disputed, the

10  offering party must prove them by a preponderance of

11  the evidence, end quote.

12          Because Mr. Puckett's testimony and

13  Mr. Moenaf's e-mail provide independent corroboration

14  of Mr. Kusno's status as a coconspirator, the Court

15  need not determine whether Mr. Kusno's statement

16  would be admissible absent such independent

17  corroboration.

18          Winan Kusno is a coconspirator for purposes

19  of 801(d)(2)(E) and thus, the defendant's objection

20  to the admission of 453 and 454 on that basis is

21  overruled.

22          Now, we still have the issue outstanding of

23  what's going to be the -- essentially the scope of

24  cross-examination of Agent White with respect to his

25  handling of Mr. Sharafi, Sharafi.

15:10
15:10
15:10
15:10
15:10
15:10
15:10
15:10
15:10
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:11
15:12

| | |
|---|---|
| 1 |     Could you clarify for me, Mr. Spears or | 15:12 |
| 2 | Mr. Novick, whether Mr. Sharafi has been the source | 15:12 |
| 3 | of evidence in this trial?  He is certainly | 15:12 |
| 4 | mentioned, copied and author of many of the | 15:12 |
| 5 | documents, but -- | 15:12 |
| 6 |     MR. NOVICK:  The answer is no, Your Honor. | 15:12 |
| 7 | We have certainly received documents from him on our | 15:12 |
| 8 | request.  We're not offering any of those into | 15:12 |
| 9 | evidence here. | 15:12 |
| 10 |     THE COURT:  All right.  So he's not a source | 15:12 |
| 11 | of evidence.  He's not -- | 15:12 |
| 12 |     MR. SPEARS:  Your Honor. | 15:13 |
| 13 |     THE COURT:  Yes? | 15:13 |
| 14 |     MR. SPEARS:  I'm sorry to interrupt.  But he | 15:13 |
| 15 | is -- he's certainly involved in the e-mail traffic. | 15:13 |
| 16 |     THE COURT:  Yeah.  But that's a little | 15:13 |
| 17 | different question, isn't it?  I said he is certainly | 15:13 |
| 18 | mentioned on the e-mails and in the discussions | 15:13 |
| 19 | necessarily because there's that whole discussion | 15:13 |
| 20 | about cutting his fee. | 15:13 |
| 21 |     MR. SPEARS:  I'm reminded by Attorney Silver | 15:13 |
| 22 | that he put in a few e-mails from Mr. Sharafi. | 15:13 |
| 23 |     MR. NOVICK:  Nope, we didn't. | 15:13 |
| 24 |     MR. SPEARS:  Rothschild. | 15:13 |
| 25 |     MR. NOVICK:  We did not.  There is no | 15:13 |

1    e-mails --                                                    15:13

2         MR. SPEARS:  We did.                                     15:13

3         MR. NOVICK:  That's not my --                            15:13

4         THE COURT:  Well, that was -- still my                   15:13

5    question was whether there was anything across the           15:13

6    board.  Okay.                                                 15:13

7         I'm going to assume that the sources of                  15:13

8    evidence -- that there are minimal sources of                15:13

9    evidence from Sharafi.  I don't remember anything            15:13

10   that stood out as a significant piece of evidence            15:13

11   from him about -- around which other witness's               15:14

12   testimony was -- that other witness's testimony was          15:14

13   related to.                                                   15:14

14        The other is -- and the reason I keep pushing            15:14

15   at you is that this is not an either/or proposition.          15:14

16   White makes it perfectly clear this is not -- there's        15:14

17   no categorical bar against admitting evidence related        15:14

18   to the basis for prosecution.                                 15:14

19        The case -- the case of White and the case               15:14

20   of, I guess, Davis from the Supreme Court and                15:14

21   otherwise don't really help here because they are not        15:14

22   the kind of case at all here.                                 15:14

23        Mr. Sharafi's testimony does not, to my way              15:15

24   of thinking here, bear his -- on whether -- on the           15:15

25   primary defense here of whether the defendant's an           15:15

1  agent.  And so we have Mr. Sharafi who is a U.S.      15:15
2  resident subject to the FCPA with any of the niceties  15:15
3  of whether he's an agent or not.  And I just don't     15:15
4  understand how cross-examination of the agent will     15:15
5  give rise to relevant testimony for the jury.  So      15:15
6  that if I follow Mr. Spears' thinking, he wants to     15:15
7  examine the circumstances of Sharafi's cooperation,    15:16
8  see if Sharafi identified the folks who ultimately     15:16
9  became cooperators and who would be examined by the    15:16
10 investigation to confirm Sharafi's version, they       15:16
11 would be motivated to do that, to help themselves.     15:16
12 But I still am lost on how the fact that Sharafi got    15:16
13 a nonprosecution agreement impacts the decision to --  15:16
14 or impacts the defendant's guilt or innocence or the   15:16
15 central issue of agency.                               15:17
16          And I certainly want to avoid any prejudice   15:17
17 of jury confusion on a 403 basis.  Obviously it's not  15:17
18 a binary situation like White.  In other words,        15:17
19 inquire on cross-examination can't prove that the      15:17
20 defendant was not guilty because Sharafi was guilty.   15:17
21 That's the shorthand on White.                         15:17
22          So the two aren't similarly situated.  The    15:17
23 ultimate question is whether the cooperators are       15:17
24 being truthful themselves.  If Sharafi identified      15:18
25 them as potential cooperators and that was the         15:18

| | |
|---|---|
| 1 | direction that the government's investigation took, I | 15:18 |
| 2 | don't see what relevance that is.  And undermining | 15:18 |
| 3 | Sharafi's credibility doesn't undermine the | 15:18 |
| 4 | cooperating witness's testimony. | 15:18 |
| 5 | So help me understand your theory a little | 15:18 |
| 6 | better, Mr. Spears. | 15:18 |
| 7 | MR. SPEARS:  Thank you, Your Honor.  I think | 15:18 |
| 8 | it really is akin to -- | 15:18 |
| 9 | THE COURT:  Cases would be good too. | 15:18 |
| 10 | MR. SPEARS:  Oh, yes.  Would the Court permit | 15:18 |
| 11 | some further research on this over the weekend? | 15:18 |
| 12 | THE COURT:  Yes. | 15:18 |
| 13 | MR. SPEARS:  I appreciate that, but -- | 15:18 |
| 14 | THE COURT:  You can send your further | 15:18 |
| 15 | research to Caroline Davis. | 15:18 |
| 16 | MR. SPEARS:  Will do. | 15:18 |
| 17 | THE COURT:  She and I will be discussing it. | 15:18 |
| 18 | MR. SPEARS:  Thank you very much. | 15:18 |
| 19 | THE COURT:  Do you want to make any further | 15:19 |
| 20 | argument at this point? | 15:19 |
| 21 | MR. SPEARS:  I just, in response to your | 15:19 |
| 22 | question that I was thinking as I was listening to | 15:19 |
| 23 | it, that it's akin to cross-examination on | 15:19 |
| 24 | investigative techniques, which of course is | 15:19 |
| 25 | commonplace.  It goes to the quality of the evidence. | 15:19 |

1      I appreciate Your Honor's reference to the    15:19

2   jury instructions and I think there's some debate    15:19

3   about that.  I certainly can think of cases in which    15:19

4   I've requested instruction that would ask the jury to    15:19

5   take that under consideration.    15:19

6      THE COURT:  That's not meant to be    15:19

7   categorical.  It's just absent something about the    15:19

8   circumstances of a particular case.  That would    15:19

9   ordinarily be the charge so that were there no    15:19

10   fingerprints, the jury isn't to dwell on that only.    15:19

11      MR. SPEARS:  Right.    15:19

12      THE COURT:  Only on what was offered.  But    15:19

13   when you say you want to -- that it's akin to    15:19

14   cross-examining on investigative techniques, that    15:20

15   goes to the quality of offered evidence, right?    15:20

16      MR. SPEARS:  It does.  It goes to the overall    15:20

17   quality of --    15:20

18      THE COURT:  Of the ballistics, the    15:20

19   fingerprint, the this, the that.    15:20

20      MR. SPEARS:  Right.  There's the ballistics    15:20

21   analogy, but then there's the analogy to failure to    15:20

22   record a defendant.  And you have, like we had here,    15:20

23   you know, investigation that involved multiple    15:20

24   recordings of other individuals, Rothschild and the    15:20

25   list -- and Puckett and the list goes on.  There are    15:20

1  no recordings of Mr. Hoskins in this case.  That is                    15:20

2  certainly a permissible line of cross-examination                      15:20

3  which I intend to get into.                                            15:20

4        This is an extension of that.  Another                           15:20

5  investigative technique is to sign up someone,                         15:20

6  immunize him and have him available to testify.  And                   15:20

7  the way the nonprosecution is structured gave the                      15:20

8  government the power to call him as a witness and                      15:21

9  he's available to them and he's required to testify                    15:21

10  at their direction.  So that was the other direction                  15:21

11  I thought would be appropriate to go in.                              15:21

12        THE COURT:  But if you get into the he's                        15:21

13  available for them, he's available to you as well.                    15:21

14  You have an invitation, an engraved invitation from                   15:21

15  the government to call Mr. Sharafi who they would be                  15:21

16  pleased to make available for your examination.  I                    15:21

17  don't think --                                                        15:21

18        MR. SPEARS:  The reason I think they're as                      15:21

19  eager to cross-examine him as we were.                                15:21

20        THE COURT:  I think neither side would like                     15:21

21  to have Mr. Sharafi here.                                             15:21

22        Let me just try to understand, it seems to me                   15:21

23  that -- okay.  Why don't you go on.  How does failure                 15:21

24  to do certain investigative techniques bear on                        15:22

25  Mr. Hoskins' guilt or innocence?                                      15:22

1          MR. SPEARS:  Again, it goes to the overall          15:22

2    quality of the evidence.  You know, for example, this          15:22

3    case involved a number of e-mails, as we've seen for          15:22

4    days now, and a number of individuals that haven't          15:22

5    testified, Reza Moenaf, and the list goes on, that          15:22

6    haven't been interviewed, that haven't been presented          15:22

7    in court.  That to me goes to the quality of the          15:22

8    evidence also.  And I think it's an extension of          15:22

9    that.  I think it's fair game.          15:22

10          I mean, the government has Agent Coleman on          15:22

11    the stand marshaling their presentation and basically          15:23

12    marshaling their investigation.  We should be able to          15:23

13    counter that by pointing out the failings in the          15:23

14    investigation.          15:23

15          THE COURT:  That may be.  But isn't that a          15:23

16    different question than what I thought what we were          15:23

17    after, which is going into the specifics of the          15:23

18    decision to offer Sharafi a nonprosecution agreement?          15:23

19          I don't disagree that you can't go into all          15:23

20    those other things.  But I thought the issue was you          15:23

21    wanted to inquire as to essentially why he was          15:23

22    offered a nonprosecution agreement and what the terms          15:23

23    were.  Have I misunderstood your argument?          15:23

24          MR. SPEARS:  I think you understood it well,          15:23

25    Your Honor, except I don't think that we intended to          15:23

1    get into why he was offered it, just that he was                    15:23

2    offered it and the basic terms of it.  We could just                15:23

3    offer it into evidence and put the language in front                15:23

4    of the jury and leave it at that.  It's Government's                 15:24

5    301, so ... but allow me some further research on it,                15:24

6    Your Honor.  I appreciate the opportunity for that.                  15:24

7         THE COURT:  Okay.  You're -- you've sort of                     15:24

8    expanded your argument but that's okay.  Let's get                   15:24

9    this right.  I'm going to be very keen to balance                    15:24

10   under 403 the relevance of any such thing versus the                 15:24

11   risk of confusion and relevance goes to what's the                   15:24

12   relationship between the circumstances of Sharafi's                  15:24

13   cooperation and the evidence of guilt or innocence of                15:24

14   Mr. Hoskins.                                                         15:25

15        Your issue about all of the other failures to                   15:25

16   record people, not calling witnesses who have been                   15:25

17   mentioned, et cetera, I think was a little different                 15:25

18   than what we started arguing before lunch.                           15:25

19        MR. SPEARS:  Understood, Your Honor.                            15:25

20        THE COURT:  All right, Mr. Novick.                              15:25

21        MR. NOVICK:  This is a moving target.                           15:25

22   Counsel spent a good deal of time explaining why the                 15:25

23   admission of this was relevant for the why.                          15:25

24        You know, in the first instance, I can't tell                   15:25

25   at this point what the basis is.  On the one hand, it                15:25

1    is true that impeachment evidence as to a                    15:25

2    coconspirator can come in as long, as I explained            15:25

3    earlier in the cases that I hand up -- handed up,            15:25

4    that as long as that happened prior to the relevant          15:25

5    period of time, which isn't the case here.  And so          15:25

6    that's not a basis.  There's no evidentiary, there's        15:26

7    no Federal Rule of Evidence basis for the admission          15:26

8    of the nonprosecution agreement.                             15:26

9         And now we're into the quality of the                   15:26

10   investigation.  The quality of the investigation,           15:26

11   defendant is certainly entitled to argue that we have       15:26

12   not met our burden, but it is our burden.  We don't         15:26

13   have a burden to put on any particular thing.  We           15:26

14   don't have a burden to record a particular witness.         15:26

15   We do not have a burden to call a particular witness        15:26

16   or to record one, whatever.                                 15:26

17        To the extent that -- I would also object to           15:26

18   him -- to counsel wanting to refer to a failure to          15:26

19   call a particular witness, these are                        15:26

20   equally-available witnesses, or interview a                 15:26

21   particular witness.  There is -- they're all equally        15:26

22   available, Your Honor.  There is no basis for him to        15:26

23   start -- for the defense to start attacking the,            15:26

24   quote, quality of the investigation.  This is not a         15:27

25   case where -- involving forensics or involving             15:27

1  ballistics or involving where you would be concerned    15:27

2  about any particular step.  The --    15:27

3        Your Honor, I think that's it.  I don't see    15:27

4  at all how there's -- and I've seen no evidence or    15:27

5  cases to support the idea that a legitimate line of    15:27

6  cross-examination is the, quote, quality of the    15:27

7  investigation categorically.    15:27

8        And as I said earlier, even if it was, the    15:27

9  lengths to which we would go to show the quality of    15:27

10  this investigation, which as Your Honor is well aware    15:27

11  has been going on for a long time, has involved the    15:28

12  charging of many people, guilty pleas of other    15:28

13  people, some of whom have testified, some of whom    15:28

14  have not, the guilty plea and settlement of the    15:28

15  company, none of which I think is germane to this    15:28

16  case, none of which do I expect to get into with    15:28

17  Special Agent Coleman.    15:28

18        Special Agent Coleman is not marshaling    15:28

19  anything.  I'm asking him to read documents and    15:28

20  that's it.  I am not asking him -- and I'm going to    15:28

21  ask him to do some summary charts so that we can    15:28

22  narrow that binder of documents a little bit, what we    15:28

23  have to go through, which I understand counsel does    15:28

24  not object to.  He is not going to be talking about    15:28

25  the origin of this investigation in any way because I    15:28

1    don't think it's relevant.                          15:28

2         THE COURT:  I think the quality of the         15:28

3    investigation equals whether the government has met 15:28

4    its burden of proof beyond a reasonable doubt.      15:28

5         MR. NOVICK:  Yes, Your Honor.                  15:28

6         THE COURT:  I don't see that there's some      15:28

7    separate finding a jury makes of we find guilt that 15:28

8    it was a crummy investigation.  I mean, that's not  15:29

9    what we're after.                                   15:29

10        But it seems to me that I will only be able    15:29

11   to rule on the questions as they come up.  If there 15:29

12   is some more generalized principle that would help  15:29

13   the parties formulate their questions, that's what I 15:29

14   was looking for.                                    15:29

15        And if you get me whatever it is, Mr. Spears,  15:29

16   as you develop or expand your view of what you ought 15:29

17   to be able to go into with the agent by when?       15:29

18        MR. SPEARS:  Sunday evening.  Sunday --        15:29

19        MR. NOVICK:  Your Honor, I ask it to be filed  15:29

20   tonight or tomorrow morning.  We need --            15:29

21        THE COURT:  I think tomorrow morning it's      15:29

22   really going to have to be filed.  So I'm sorry to  15:29

23   ruin your night.  But if you want to file it, I need 15:29

24   to use it.                                          15:30

25        And then the government's needs to be in by    15:30

1    Saturday night.                                           15:30

2          MR. NOVICK:  Fine, Your Honor.  Can we have        15:30

3    until Sunday morning so we have 24 hours to look at      15:30

4    this and respond to it?  I'll be shocked if there's a    15:30

5    case that actually permits this.  But nonetheless,       15:30

6    we'll get something in by Sunday at 9 a.m.               15:30

7          THE COURT:  Okay.  That does not mean I will       15:30

8    be fully apprised of what every case you cite says,      15:30

9    but I will do my best.                                   15:30

10         MR. NOVICK:  Your Honor, I just add, I             15:30

11   understand Your Honor is saying that we need to          15:30

12   address the questions as they come.  But I would         15:30

13   vehemently oppose counsel being able to ask a            15:30

14   question, a leading question referencing Sharafi's       15:30

15   nonprosecution agreement, assuming the Court --          15:30

16   depending on the Court's ruling here.                    15:30

17         THE COURT:  That's been one discrete               15:30

18   question.  Then there seem to be a number of other       15:30

19   things.                                                  15:30

20         MR. NOVICK:  Understand, Your Honor.               15:30

21         THE COURT:  So the first part of the briefing      15:31

22   should be on the -- questioning the existence of the     15:31

23   nonprosecution agreement and the copy of it.  Okay?      15:31

24         MR. NOVICK:  I would ask, Your Honor, that         15:31

25   anything else that counsel plans on getting into that    15:31

```
 1   has to do with this quality of the investigation be       15:31
 2   fronted in the motion so that we can address it.          15:31
 3           THE COURT:  Well, I don't know that he has to      15:31
 4   give you a full road map to his cross-examination.        15:31
 5           MR. SPEARS:  I do not.                             15:31
 6           MR. NOVICK:  I think these questions are           15:31
 7   going to be inflammatory, Your Honor, depending on        15:31
 8   what they are.                                            15:31
 9           MR. SPEARS:  Your Honor, I see no basis for        15:31
10   the government to try to tease out my entire              15:31
11   cross-examination.                                        15:31
12           MR. NOVICK:  I'm not talking to the -- I'm         15:31
13   not prepping the agents on these questions.  But I        15:31
14   would like to deal with the legal issues before the       15:31
15   jury has heard something they cannot unhear.              15:31
16           MR. SPEARS:  The issue that I think Your           15:31
17   Honor is focused on is the relevance of the               15:31
18   nonprosecution agreement, and that is what I intend       15:31
19   to focus on in the research to the extent that            15:32
20   there's additional authority that supports our           15:32
21   position.                                                 15:32
22           MR. NOVICK:  Counsel has now expanded that to      15:32
23   this broader -- and, in fact, as I understand it, the     15:32
24   nonprosecution agreement is one part of a broader         15:32
25   attack on the quality of the government's                 15:32
```

1 investigation.  And so I would move to exclude all of
2 that.  And I think that all of those questions would
3 be objectionable in the first instance and we ought
4 to be knowing what's coming rather than having the
5 jury hear something that they cannot unhear.
6      THE COURT:  Tell me what your authority is on
7 both sides and we'll make this trial as effective,
8 efficient and fair as possible.  You need to think
9 about when the defense -- this is your last witness,
10 right, Mr. Novick?
11      MR. NOVICK:  It is, Your Honor, yes.
12      THE COURT:  And any sense of when you're
13 finished with him?
14      MR. NOVICK:  It will be during the morning on
15 Monday, I think.
16      THE COURT:  All right.  Then there will be
17 cross-examination.  And what, Mr. Spears or others,
18 will be your witnesses?
19      MR. MORVILLO:  Your Honor, good afternoon.
20 At this point we are inclined to call Professor
21 Gilson.  We have notified the government that that is
22 our intention to do so as our first witness; however,
23 we are also still considering that and hope to be
24 able to make a decision, final decision tonight.
25      THE COURT:  Well, you've said you were

15:32
15:32
15:32
15:32
15:32
15:32
15:32
15:32
15:32
15:32
15:32
15:33
15:33
15:33
15:33
15:33
15:33
15:33
15:33
15:33
15:33
15:33
15:33
15:33
15:33

1    calling him, right?                                15:33

2         MR. MORVILLO:  I'm sorry?                     15:33

3         THE COURT:  You are calling Gilson?           15:33

4         MR. MORVILLO:  That is our current intention, 15:33

5    yes.                                               15:33

6         THE COURT:  Well, here's the question:  Is    15:33

7    there some chance you're not going to call anyone, in  15:33

8    which case we've got to get the charge conference  15:33

9    scheduled, et cetera?                              15:33

10        MR. MORVILLO:  I think there is a chance,      15:33

11   yes.                                               15:33

12        But part of the question, Your Honor, is      15:34

13   whether there will be sufficient documents in      15:34

14   evidence to allow certain arguments to be made     15:34

15   without the necessity of Professor Gilson's        15:34

16   testimony.  I don't know what the rest of the      15:34

17   government's exhibits are.  We have some exhibits we  15:34

18   want to put in through Agent Coleman.  And if that is  15:34

19   all accomplished, it may not be necessary to call  15:34

20   Professor Gilson.                                  15:34

21        MR. NOVICK:  I'm not sure what documents       15:34

22   counsel is planning on putting in through Gilson   15:34

23   since he has no association with the case other than  15:34

24   being hired by the defense.                        15:35

25        MR. MORVILLO:  That's my point.                15:35

| | |
|---|---|
| 1 | THE COURT: Let's do this: If the government | 15:35 |
| 2 | finishes Monday and the defendant elects not to | 15:35 |
| 3 | present any evidence, we can start with our charge | 15:35 |
| 4 | conference at 9:30 on Tuesday morning. | 15:35 |
| 5 | MR. NOVICK: Okay. | 15:35 |
| 6 | THE COURT: And I will by that time try to | 15:35 |
| 7 | get you a working draft for discussion purposes which | 15:35 |
| 8 | hopefully will make our charge conference more | 15:35 |
| 9 | efficient. All right? | 15:35 |
| 10 | Okay. Have a nice weekend. Thank you very | 15:35 |
| 11 | much. | 15:35 |
| 12 | We stand adjourned. | 15:35 |
| 13 | (Proceedings adjourned, 3:35 p.m.) | 15:35 |

1                 C E R T I F I C A T E

2

3     RE: UNITED STATES OF AMERICA v. LAWRENCE HOSKINS
                  No. 3:12-CR-238 (JBA)

4

5              I, Melissa J. Cianciullo, RMR, CRR, CRC,

6     Official Court Reporter for the United States

7     District Court for the District of Connecticut, do

8     hereby certify that the foregoing pages 836 through

9     1027 are a true and accurate transcription of my

10    shorthand notes taken in the aforementioned matter to

11    the best of my skill and ability.

12

13

14

15

16           /s/_Melissa J. Cianciullo_____

17           MELISSA J. CIANCIULLO, RMR, CRR
                  Official Court Reporter
18            United States District Court
              141 Church Street, Room 147
19            New Haven, Connecticut  06510
                  (203) 606-1794

20

21

22

23

24

25

## $

**$40** [1] - 873:6

## '

**'03** [1] - 924:6
**'13** [1] - 900:18
**'91** [1] - 854:20
**'92** [2] - 854:19, 854:20
**'95** [1] - 905:25

## /

**/s/_Melissa** [1] - 1027:16

## 0

**06095** [1] - 991:2
**06510** [2] - 837:4, 1027:19
**06890** [1] - 837:20

## 1

**1** [10] - 836:5, 893:19, 963:12, 983:14, 986:18, 993:14, 999:2, 999:5, 1003:24
**1/2** [1] - 996:24
**10019-6131** [1] - 837:15
**1026** [1] - 1027:9
**104A** [1] - 840:5
**10th** [1] - 960:16
**11308** [1] - 837:10
**11:06** [2] - 910:16, 910:23
**11:40** [2] - 910:23, 911:3
**11th** [1] - 998:1
**12** [2] - 919:7, 919:14
**12:50** [2] - 911:2, 968:4
**12th** [2] - 918:19, 965:14
**13th** [1] - 986:9
**1400** [1] - 837:9
**141** [2] - 836:7, 1027:18
**147** [1] - 1027:18
**15** [3] - 910:18, 916:15, 964:14
**15-minute** [1] - 910:14
**157** [1] - 837:4
**16** [1] - 871:21
**166** [2] - 840:14,

## 1008:1

**16th** [1] - 921:13
**17/9** [4] - 876:20, 880:10, 880:24, 882:8
**171** [1] - 1007:7
**175** [1] - 1007:7
**176** [1] - 1010:8
**1791221** [1] - 852:21
**18** [5] - 874:24, 876:22, 881:1, 981:10, 1002:4
**18:30** [1] - 876:6
**18th** [3] - 966:14, 1000:13, 1001:23
**1985** [2] - 859:1, 859:5
**1987** [1] - 1007:7
**1991** [1] - 854:19
**1995** [1] - 905:23
**1996** [2] - 839:21, 1007:6
**1999** [1] - 840:15
**1:07** [1] - 979:24

## 2

**2** [12] - 873:5, 893:20, 893:23, 893:24, 952:16, 968:2, 979:22, 983:14, 998:13, 999:3, 999:20, 1004:12
**2.4** [6] - 868:17, 869:13, 869:20, 869:24, 870:3, 871:5
**2000** [1] - 991:1
**20005** [1] - 837:10
**2000s** [1] - 853:19
**2001** [2] - 854:21, 908:5
**2002** [13] - 854:1, 854:21, 908:5, 950:6, 951:25, 952:16, 955:8, 956:23, 957:9, 957:17, 958:13, 960:16, 961:18
**2003** [35] - 862:23, 864:7, 865:25, 867:22, 871:21, 874:24, 876:22, 881:1, 887:1, 889:1, 898:7, 911:14, 912:8, 913:10, 916:2, 917:8, 920:14, 921:13, 925:10, 925:20, 962:23, 963:12, 963:13, 963:22, 964:14, 965:14,

## 966:14, 981:10,

981:24, 983:17, 984:6, 984:20, 986:9, 986:18, 994:2
**2004** [13] - 854:1, 987:11, 989:18, 991:22, 992:13, 993:12, 995:21, 996:8, 998:1, 1000:13, 1001:24, 1002:4, 1003:4
**2005** [5] - 895:19, 906:5, 906:7, 970:4, 1008:17
**2007** [1] - 852:21
**2008** [1] - 970:1
**2009** [1] - 919:7
**2011** [4] - 970:8, 970:12, 1008:12, 1008:20
**2012** [4] - 899:6, 900:3, 900:14, 900:18
**2013** [3] - 900:21, 901:3, 901:18
**2015** [1] - 948:4
**2019** [2] - 836:5, 919:15
**203** [5] - 836:25, 837:5, 837:19, 837:20, 1027:19
**20th** [3] - 950:6, 987:11, 989:18
**212** [1] - 837:16
**21st** [1] - 962:23
**22** [3] - 862:23, 864:7, 920:14
**22nd** [1] - 1003:4
**23** [1] - 933:8
**23rd** [1] - 837:4
**24** [1] - 1022:3
**2425** [1] - 837:19
**25** [2] - 887:1, 889:1
**25th** [2] - 925:10, 993:1, 993:12
**26th** [1] - 992:12
**29** [1] - 867:22
**292-9766** [1] - 837:20
**2:10** [1] - 968:6
**2:24** [1] - 979:24
**2:25** [1] - 980:22
**2:45** [1] - 951:25
**2d** [4] - 970:5, 1007:6, 1008:1, 1008:16

## 3

**3** [19] - 862:21, 871:23, 875:1, 888:24, 951:25, 962:23,

## 963:13, 963:22,

982:18, 993:4, 993:14, 994:17, 995:20, 996:8, 996:24, 998:18, 1004:12, 1005:3
**3/4** [4] - 965:15, 988:11, 989:19, 990:7
**3/draft** [1] - 886:23
**30** [2] - 983:17, 985:2
**301** [1] - 1018:5
**302** [1] - 919:15
**30th** [1] - 961:17
**36** [1] - 848:11
**392** [2] - 970:4, 1008:16
**3:01** [1] - 1005:12
**3:12-CR-238** [2] - 836:4, 1027:3
**3:35** [1] - 1026:13
**3d** [1] - 840:14
**3rd** [3] - 952:11, 955:8, 995:21

## 4

**4** [7] - 862:21, 888:24, 956:23, 962:23, 994:17, 995:20, 998:18
**403** [2] - 1013:17, 1018:10
**410** [3] - 950:3, 950:8, 950:14
**421** [3] - 952:14, 952:18, 953:1
**422** [5] - 951:20, 952:23, 953:9, 955:1, 955:18
**423** [3] - 955:3, 955:5, 955:10
**423-T** [3] - 955:6, 955:10, 955:19
**424** [4] - 955:25, 956:2, 957:20, 958:6
**425** [5] - 957:3, 957:4, 957:7, 957:8, 957:11
**425-A** [2] - 957:5, 957:12
**427** [5] - 958:11, 958:15, 960:21, 960:23, 961:1
**428** [5] - 960:12, 960:17, 960:22, 960:23, 961:1
**433** [3] - 961:13, 961:19, 961:21
**437** [2] - 962:19, 962:25

## 439

**439** [2] - 965:10, 965:16
**440** [4] - 966:10, 966:19, 981:5, 981:6
**445** [3] - 862:14, 862:25, 920:6
**446** [2] - 867:17, 868:1
**45** [1] - 848:12
**451** [4] - 871:14, 872:1, 872:3, 921:6
**452** [2] - 874:16, 875:4
**453** [9] - 838:13, 876:14, 879:13, 879:17, 881:12, 980:3, 1006:10, 1009:18, 1010:20
**454** [10] - 843:13, 880:20, 881:3, 881:16, 940:7, 980:3, 1006:10, 1009:18, 1010:2, 1010:20
**456** [3] - 886:17, 887:3, 923:17
**457** [3] - 888:18, 889:7, 924:25
**46** [1] - 995:24
**461-T** [1] - 917:19
**467** [3] - 984:4, 984:8, 985:18
**470** [3] - 986:4, 986:10, 989:10
**476** [2] - 987:7, 987:14
**476-A** [3] - 987:7, 988:6, 988:21
**477** [7] - 989:8, 989:9, 989:12, 989:15, 989:16, 989:21, 990:1
**477-A** [4] - 989:10, 989:12, 989:21, 990:14
**478** [1] - 989:10
**481** [2] - 991:18, 991:24
**483** [2] - 1007:7, 1010:7
**484** [4] - 992:8, 992:10, 992:18, 992:23
**484-A** [3] - 992:8, 992:9, 992:19
**485** [4] - 983:11, 985:11, 985:16, 985:25
**486** [1] - 995:17
**487** [2] - 997:23, 998:3
**490** [2] - 1000:8, 1000:15
**491** [2] - 1001:20,

1001:25
**492** [2] - 1003:1, 1003:6

## 5

**5** [2] - 875:14, 957:17
**502** [1] - 1008:17
**506** [1] - 970:5
**511** [1] - 1008:17
**522** [1] - 970:2
**53** [2] - 981:17, 982:1
**54** [2] - 993:24, 994:4
**56** [5] - 842:14, 842:24, 844:10, 848:15, 993:19
**578** [2] - 839:15, 1007:5
**580** [1] - 1007:6
**5K** [4] - 903:18, 903:19, 904:10, 904:14
**5th** [2] - 957:9, 991:22

## 6

**6.1** [1] - 989:1
**606-1794** [2] - 836:25, 1027:19
**660-B** [1] - 933:8

## 7

**7-2** [1] - 995:22
**70** [1] - 985:2
**75** [2] - 840:14, 1008:1
**76** [1] - 987:19
**76-A** [1] - 987:19

## 8

**8** [1] - 984:20
**801** [3] - 1007:12, 1008:8, 1009:5
**801(d)(2)(E** [11] - 839:3, 845:13, 845:14, 879:14, 968:12, 970:8, 1006:11, 1006:19, 1007:16, 1010:9, 1010:19
**801(d)(2)(E)** [2] - 1008:18, 1009:8
**802** [1] - 1008:12
**806** [1] - 850:16
**82** [2] - 840:16, 1007:5
**821-3700** [1] - 837:5
**83** [1] - 839:15
**836** [1] - 1027:8
**878-8000** [1] - 837:16

**8th** [1] - 984:6

## 9

**9** [2] - 1005:9, 1022:6
**9/24/03** [1] - 889:24
**9/26/03** [1] - 890:5
**93** [1] - 970:2
**9:30** [2] - 1005:10, 1026:4
**9:31** [2] - 836:6, 838:1
**9:52** [1] - 853:1
**9th** [3] - 958:13, 958:20, 994:2

## A

**a.m** [9] - 836:6, 838:1, 853:1, 910:16, 910:23, 911:3, 951:25, 1022:6
**A/C** [1] - 965:5
**ABB** [1] - 866:19
**ability** [3] - 975:10, 975:14, 1027:11
**able** [6] - 1006:3, 1017:12, 1021:10, 1021:17, 1022:13, 1024:24
**absence** [3] - 863:25, 864:13, 978:16
**absent** [2] - 1010:16, 1015:7
**absolutely** [2] - 864:13, 920:16
**absurd** [1] - 851:22
**academic** [2] - 847:25, 968:20
**accept** [1] - 999:13
**access** [2] - 925:21, 926:2
**accommodate** [1] - 1001:6
**accomplished** [1] - 1025:19
**according** [1] - 1008:19
**accordingly** [1] - 880:3
**account** [1] - 925:17
**accurate** [1] - 1027:9
**acronym** [1] - 868:25
**act** [3] - 842:16, 848:9, 863:25
**action** [5] - 887:24, 891:12, 891:17, 891:19, 891:23
**actions** [14] - 841:24, 864:14, 866:4, 884:2, 884:4,

884:16, 884:20, 885:7, 885:14, 890:8, 890:21, 920:17, 920:22, 928:15
**activation** [1] - 985:3
**activities** [4] - 866:12, 872:24, 920:23, 920:25
**acts** [1] - 848:15
**actual** [1] - 900:14
**add** [11] - 839:4, 841:13, 848:8, 870:3, 870:5, 871:5, 972:23, 996:13, 997:8, 997:20, 1022:10
**add-on** [2] - 996:13, 997:8, 997:20
**addition** [4] - 840:20, 948:18, 951:10, 968:21
**additional** [4] - 953:17, 968:10, 968:22, 1023:20
**address** [7] - 971:3, 972:8, 975:24, 984:18, 1008:2, 1022:12, 1023:2
**addresses** [1] - 1008:5
**addressing** [1] - 972:14
**Adhi** [1] - 991:5
**adjourned** [2] - 1026:12, 1026:13
**admissibility** [2] - 980:2, 1009:2
**admissible** [5] - 840:9, 842:22, 1006:18, 1009:7, 1010:16
**admission** [11] - 868:3, 872:1, 992:18, 993:19, 994:4, 995:23, 998:3, 1000:14, 1010:20, 1018:23, 1019:7
**admit** [11] - 862:25, 868:1, 875:4, 879:13, 879:17, 881:3, 881:7, 887:3, 889:7, 950:14, 1006:10
**admitted** [4] - 839:23, 940:6, 956:2, 1006:25
**admitting** [1] - 1012:17

**adopting** [1] - 969:3
**advance** [1] - 1001:5
**advanced** [2] - 839:1, 845:2
**advantage** [1] - 868:18
**advice** [5] - 886:7, 956:17, 958:7, 962:5, 1001:15
**advise** [2] - 953:7, 963:18
**advisor** [1] - 994:20
**advisory** [1] - 1008:19
**advocating** [1] - 870:6
**affect** [1] - 942:8
**aforementioned** [1] - 1027:10
**afraid** [1] - 870:8
**Africa** [1] - 970:2
**afternoon** [2] - 846:19, 1024:19
**agency** [1] - 1013:15
**agent** [66] - 841:19, 841:21, 849:12, 882:21, 882:22, 882:23, 883:1, 883:4, 883:7, 883:13, 883:20, 883:21, 883:24, 884:7, 884:10, 884:13, 884:21, 884:24, 884:25, 886:1, 887:10, 887:12, 891:17, 892:6, 892:9, 913:12, 929:10, 929:24, 930:4, 930:20, 930:23, 931:2, 931:24, 932:2, 933:24, 934:12, 934:17, 936:14, 937:12, 941:5, 942:19, 945:9, 945:13, 945:15, 946:3, 947:7, 947:10, 948:3, 948:11, 954:24, 964:1, 964:7, 967:11, 968:5, 969:8, 969:10, 973:3, 975:3, 1005:25, 1006:1, 1010:1, 1013:1, 1013:3, 1013:4, 1021:17
**Agent** [25] - 849:6, 850:25, 851:9, 851:12, 851:16, 944:19, 950:21, 970:21, 971:3,

971:10, 972:8, 977:6, 977:17, 980:6, 980:13, 980:19, 981:4, 996:3, 1005:13, 1005:22, 1010:24, 1017:10, 1020:17, 1020:18, 1025:18
**AGENT** [1] - 945:6
**agent's** [3] - 890:8, 890:20, 928:15
**agent-related** [1] - 936:14
**agents** [9] - 838:18, 933:13, 936:18, 942:17, 942:21, 947:13, 948:8, 948:18, 1023:13
**ago** [6] - 839:2, 846:1, 901:21, 906:2, 906:3, 916:15
**agree** [9] - 891:12, 892:1, 892:5, 898:21, 899:18, 937:14, 937:15, 961:9, 997:8
**agreed** [4] - 891:25, 972:3, 988:13, 999:25
**agreement** [57] - 849:14, 850:1, 850:4, 850:14, 851:2, 891:4, 900:21, 901:18, 903:9, 903:17, 905:9, 937:24, 962:24, 964:19, 965:15, 967:1, 967:5, 967:10, 967:19, 970:24, 971:4, 971:13, 971:25, 972:1, 972:7, 972:19, 974:5, 978:21, 978:23, 979:12, 981:15, 981:19, 982:6, 988:11, 988:22, 988:23, 989:6, 989:19, 990:6, 990:11, 990:20, 991:23, 992:6, 992:25, 993:2, 993:10, 994:1, 995:4, 999:24, 1013:13, 1017:18, 1017:22, 1019:8, 1022:15, 1022:23, 1023:18, 1023:24
**Agreement** [1] -

990:16
**agreement.doc** [1] - 990:8
**Agreement.zip** [2] - 989:20, 992:17
**agreements** [5] - 897:4, 905:12, 982:16, 982:23, 983:8
**ahead** [16] - 950:17, 950:21, 954:15, 954:17, 961:3, 963:24, 964:16, 966:24, 967:7, 984:25, 986:25, 987:2, 992:15, 996:16, 999:21, 1002:9
**air** [2] - 934:5, 937:11
**akin** [3] - 1014:8, 1014:23, 1015:13
**alert** [2] - 886:2, 889:25
**allegations** [1] - 947:11
**allow** [6] - 850:12, 855:8, 904:1, 951:2, 1018:5, 1025:14
**allowed** [2] - 850:7, 978:4
**almost** [5] - 859:10, 873:6, 887:10, 947:4, 975:2
**alone** [3] - 844:18, 857:6, 1007:23
**Alstom** [108] - 843:2, 843:3, 844:13, 844:17, 853:18, 853:21, 856:16, 856:22, 857:6, 857:8, 857:13, 857:15, 858:5, 858:18, 858:23, 858:25, 859:4, 859:22, 860:3, 860:8, 861:1, 861:6, 861:14, 863:8, 864:1, 865:13, 865:22, 866:7, 866:8, 866:19, 869:21, 870:4, 870:17, 870:21, 871:1, 871:3, 872:9, 872:25, 873:18, 874:13, 874:14, 877:7, 884:8, 884:9, 884:19, 884:24, 885:1, 885:3, 886:10, 886:13, 886:15, 888:12,

888:14, 891:11, 891:13, 891:14, 891:17, 895:16, 895:18, 895:24, 896:2, 896:5, 896:8, 896:10, 897:7, 898:9, 898:13, 903:4, 905:20, 906:5, 909:9, 912:3, 912:19, 913:6, 914:18, 915:1, 915:2, 915:7, 921:17, 922:15, 923:14, 924:7, 933:12, 934:6, 936:19, 947:24, 949:15, 959:16, 960:3, 964:4, 965:7, 967:10, 981:19, 982:7, 988:23, 990:22, 990:23, 991:14, 993:10, 994:13, 995:4, 1001:19, 1003:21, 1004:11, 1009:11
**Alstom's** [5] - 869:24, 890:1, 960:1, 993:20, 1004:18
**alternative** [1] - 999:17
**amendment** [1] - 1008:12
**Amendment** [1] - 976:24
**amendments** [2] - 1008:20, 1008:21
**America** [1] - 909:2
**AMERICA** [2] - 836:4, 1027:3
**Amir** [3] - 953:6, 959:15, 961:10
**amply** [1] - 842:4
**Amsterdam** [1] - 1002:22
**analogy** [2] - 1015:21
**AND** [1] - 836:18
**Andalan** [1] - 885:11
**Andi** [2] - 959:13, 960:2
**Andy** [1] - 959:25
**Anglaret** [2] - 959:8, 961:16
**announced** [1] - 972:11
**anonymously** [1] - 842:12
**answer** [8] - 903:1, 934:13, 935:8, 939:6, 939:7, 960:4, 960:10, 1011:6

**answered** [2] - 944:1, 944:5
**answering** [1] - 939:4
**anticipate** [1] - 1006:1
**anyhow** [1] - 853:13
**anyway** [1] - 938:22
**AP** [4] - 860:3, 883:24, 884:7
**AP/MC** [3] - 841:23, 883:25, 884:15
**APESI** [1] - 879:24
**apparent** [1] - 847:1
**appear** [4] - 957:25, 958:4, 961:1, 978:21
**Appendix** [1] - 995:22
**apply** [1] - 934:6
**appoint** [2] - 951:3, 954:24
**appointed** [3] - 883:24, 884:7, 884:10
**appreciate** [4] - 974:25, 1014:13, 1015:1, 1018:6
**apprised** [1] - 1022:8
**approach** [5] - 871:11, 882:21, 919:13, 1004:21
**appropriate** [5] - 901:9, 939:24, 963:18, 978:17, 1016:11
**approval** [15] - 933:11, 933:25, 934:4, 934:8, 934:15, 935:15, 937:3, 937:23, 938:6, 942:16, 942:19, 942:20, 943:22, 967:16, 992:5
**approvals** [4] - 933:17, 933:19, 935:16, 936:23
**approve** [6] - 897:11, 934:24, 934:25, 936:18, 942:17, 942:21
**approved** [2] - 897:4, 934:24
**April** [2] - 900:3, 948:4
**area** [6] - 851:4, 910:9, 911:12, 933:19, 933:20, 933:25
**areas** [2] - 956:18, 958:8
**argue** [2] - 969:19, 1019:11
**argued** [1] - 968:22
**argues** [4] - 1006:19, 1007:9, 1007:20,

1009:5
**arguing** [3] - 971:17, 1006:16, 1018:18
**argument** [8] - 849:9, 935:6, 954:10, 954:11, 976:13, 1014:20, 1017:23, 1018:8
**arguments** [3] - 979:17, 1006:9, 1025:14
**arrangement** [3] - 930:5, 964:21, 965:7
**arranging** [1] - 914:14
**arrived** [1] - 865:25
**ARTERTON** [1] - 836:18
**Article** [1] - 989:1
**articulate** [1] - 852:2
**ASAP** [3] - 873:8, 891:25, 892:4
**Asia** [4] - 859:24, 874:10, 907:16, 911:13
**aside** [3] - 841:14, 898:6, 914:6
**assets** [2] - 947:15, 947:16
**assigned** [4] - 913:10, 946:18, 947:23, 948:2
**assignment** [3] - 908:8, 908:10, 947:19
**assistance** [3] - 988:15, 990:13, 993:5
**assistant** [1] - 986:20
**associate** [1] - 990:7
**association** [1] - 1025:23
**assume** [2] - 896:15, 1012:7
**assuming** [4] - 839:19, 953:24, 965:6, 1022:15
**assumption** [1] - 976:10
**attached** [5] - 988:10, 990:6, 993:1, 996:23, 1004:5
**attachment** [12] - 957:4, 957:10, 957:23, 957:24, 987:3, 987:13, 988:6, 988:16, 989:20, 992:16, 993:6, 995:21
**attack** [1] - 1023:25
**attacking** [1] -

1019:23
**attempt** [2] - 859:11, 970:22
**attend** [4] - 876:1, 892:14, 918:23, 923:2
**attended** [1] - 918:18
**attention** [1] - 932:7
**attorney** [2] - 900:6, 1011:21
**Attorney's** [1] - 837:3
**August** [12] - 862:23, 864:7, 865:25, 867:22, 912:7, 918:19, 919:7, 919:14, 920:14, 932:5, 950:6
**Aulia** [3] - 929:20, 962:6, 991:7
**AUSA** [1] - 837:3
**author** [1] - 1011:4
**authority** [4] - 871:4, 968:11, 1023:20, 1024:6
**auxiliaries** [1] - 857:16
**available** [11] - 903:10, 954:5, 979:2, 1006:3, 1016:6, 1016:9, 1016:13, 1016:16, 1019:20, 1019:22
**Avenue** [1] - 837:9
**avoid** [2] - 904:14, 1013:16
**awarded** [1] - 994:14
**awarding** [1] - 875:19
**aware** [14] - 850:14, 852:6, 869:14, 909:20, 909:21, 911:16, 924:12, 935:19, 936:16, 943:1, 977:14, 978:8, 1004:17, 1020:10
**Azmin** [18] - 929:17, 929:20, 929:24, 930:3, 930:6, 962:6, 986:21, 987:3, 991:7, 996:18, 998:2, 1000:1, 1001:4, 1001:13, 1001:17, 1002:18, 1002:22, 1004:6
**Azmin's** [6] - 989:19, 989:20, 990:6, 990:8, 991:23, 992:6

**B**

**B-a-s-c-i-a-n-o** [1] - 852:21

**B-Seg** [1] - 954:23

**background** [1] - 945:19

**backwards** [1] - 998:11

**bad** [2] - 974:21, 996:22

**balance** [2] - 857:22, 1018:9

**ballistics** [3] - 1015:18, 1015:20, 1020:1

**Baltimore** [1] - 964:2

**bank** [1] - 965:5

**bar** [1] - 1012:17

**Basciano** [1] - 852:20

**base** [2] - 855:17, 870:21

**based** [16] - 840:25, 854:16, 855:7, 855:20, 861:15, 861:25, 862:1, 885:3, 888:15, 894:24, 895:6, 908:11, 908:18, 908:20, 974:9, 987:1

**basic** [5] - 858:20, 946:3, 972:6, 974:12, 1018:2

**basing** [1] - 977:3

**basis** [18] - 838:21, 855:2, 894:11, 898:20, 915:10, 930:8, 935:9, 935:18, 951:5, 991:13, 1010:20, 1012:18, 1013:17, 1018:25, 1019:6, 1019:7, 1019:22, 1023:9

**bear** [3] - 849:24, 1012:24, 1016:24

**became** [5] - 847:1, 864:3, 912:6, 913:9, 1013:9

**become** [2] - 860:23, 869:14

**bed** [2] - 856:8, 865:17

**began** [7] - 839:2, 899:6, 916:9, 935:17, 974:4, 977:9

**begin** [2] - 898:18, 929:10

**beginning** [11] - 921:8, 928:10, 931:2, 931:11,

931:12, 931:13, 953:20, 971:9, 997:5, 1002:14, 1003:15

**begins** [1] - 983:13

**behalf** [5] - 925:8, 925:17, 927:7, 940:3, 990:20

**behold** [1] - 1010:8

**believes** [1] - 868:21

**below** [6] - 843:15, 873:4, 873:8, 885:23, 956:16, 1009:23

**Below** [1] - 1009:23

**BENJAMIN** [1] - 837:14

**benjamin.peacock@
cliffordchance.com**
[1] - 837:17

**best** [14] - 865:7, 865:9, 876:2, 888:3, 898:2, 900:4, 907:13, 967:18, 992:5, 1000:1, 1000:6, 1022:9, 1027:11

**Bethesda** [2] - 962:18, 982:13

**better** [5] - 930:14, 935:7, 973:24, 1002:19, 1014:6

**between** [11] - 840:17, 850:2, 967:10, 981:19, 982:6, 983:25, 988:23, 993:10, 994:2, 994:8, 1018:12

**Beyer** [7] - 950:6, 957:9, 958:13, 958:23, 958:24, 960:6, 960:15

**beyer** [1] - 961:4

**beyond** [3] - 944:5, 973:11, 1021:4

**bid** [15] - 856:17, 868:15, 868:20, 869:9, 869:10, 869:11, 869:24, 870:4, 871:5, 893:11, 914:10, 916:20, 921:17, 924:18

**bidding** [8] - 869:7, 870:24, 871:2, 893:8, 895:7, 915:16, 916:11, 942:12

**bids** [3] - 870:2, 950:25, 962:1

**Bill** [14] - 861:19, 861:20, 861:22, 861:25, 867:10, 872:20, 874:19, 893:12, 893:14, 986:20, 998:15, 1000:11, 1001:12, 1003:25

**Bill's** [2] - 863:25, 864:13

**binary** [1] - 1013:18

**binder** [2] - 949:20, 1020:22

**bit** [7] - 856:3, 857:11, 866:21, 907:25, 926:25, 958:3, 1020:22

**black** [1] - 970:15

**black-letter** [1] - 970:15

**blow** [1] - 958:2

**blue** [2] - 898:17, 898:23

**board** [2] - 890:4, 1012:6

**boiler** [1] - 857:15, 858:14, 859:3, 861:12, 862:21, 886:10, 935:2, 937:11, 964:5, 990:24

**Boilers** [1] - 861:1

**boilers** [2] - 856:8, 857:16

**bombings** [1] - 970:1

**BOND** [1] - 836:18

**book** [1] - 865:19

**booked** [1] - 875:13

**boss** [11] - 908:25, 909:1, 909:14, 909:19, 911:22, 912:10, 912:20, 912:24, 913:2, 935:1

**bosses** [1] - 912:24

**bottom** [9] - 881:15, 928:14, 955:14, 983:13, 983:14, 983:19, 999:5, 1000:20, 1003:24

**Bourjaily** [3] - 840:4, 1007:6, 1010:7

**box** [1] - 969:21

**branch** [1] - 964:2

**break** [4] - 846:24, 852:5, 868:10, 970:19

**BRIAN** [1] - 837:18

**bribe** [3] - 890:25, 893:24, 904:24

**bribery** [6] - 922:22,

923:3, 923:9, 923:15, 946:6, 947:12

**bribes** [8] - 874:3, 883:10, 895:2, 895:8, 895:11, 897:7, 897:11, 947:14

**brief** [3] - 896:13, 946:1, 951:7

**briefed** [1] - 850:9

**briefing** [1] - 1022:21

**briefings** [1] - 979:15

**briefly** [4] - 843:25, 844:3, 911:11, 941:17

**bring** [11] - 848:18, 852:22, 852:23, 911:1, 917:18, 920:5, 926:22, 928:8, 933:7, 947:15, 980:5

**brings** [1] - 947:20

**broadband** [1] - 925:21

**broader** [3] - 970:25, 1023:23, 1023:24

**broke** [1] - 911:21

**brother** [1] - 955:23

**brought** [4] - 883:22, 930:23, 946:16, 971:11

**Bruno** [20] - 962:22, 963:10, 963:16, 963:21, 964:17, 965:4, 965:12, 965:22, 965:25, 966:1, 966:12, 966:17, 966:25, 967:18, 981:9, 986:7, 987:11, 989:18, 991:21, 992:11

**bspears@
spearsmanning.
com** [1] - 837:21

**Buika** [1] - 871:18

**build** [1] - 853:24

**built** [2] - 856:6, 972:16

**bunch** [1] - 921:12

**burden** [6] - 1019:12, 1019:13, 1019:14, 1019:15, 1021:4

**Bureau** [1] - 945:10

**business** [19] - 854:4, 854:7, 854:24, 855:25, 859:15, 861:23, 866:20, 911:19, 914:9,

932:20, 936:24, 937:7, 937:10, 937:16, 937:22, 942:18, 988:1, 990:23, 990:25

**businesses** [3] - 856:15, 947:12, 947:13

**BY** [82] - 853:7, 853:16, 855:14, 863:3, 868:11, 872:4, 875:7, 877:15, 878:3, 878:12, 878:21, 879:21, 880:17, 881:9, 887:6, 889:10, 893:1, 894:7, 894:15, 897:17, 901:16, 902:10, 902:15, 911:8, 917:22, 918:5, 918:14, 919:19, 920:4, 920:10, 921:10, 922:10, 923:22, 925:5, 927:2, 928:12, 929:8, 930:18, 931:22, 933:5, 933:9, 935:4, 936:6, 938:24, 939:11, 939:25, 940:15, 940:24, 941:20, 943:20, 945:7, 950:15, 950:20, 952:21, 954:16, 955:13, 956:9, 957:15, 958:18, 960:20, 961:22, 963:3, 965:19, 966:21, 981:3, 981:7, 982:4, 984:11, 986:3, 986:13, 987:17, 987:23, 989:25, 992:2, 992:22, 993:23, 994:7, 996:2, 998:6, 1000:18, 1002:3, 1003:9

**bye** [1] - 898:17

**C**

**CA** [8] - 995:20, 996:13, 996:18, 998:2, 998:18, 1000:13, 1001:4, 1002:18

**cannot** [13] - 848:9, 873:10, 874:4, 886:3, 886:11,

921:8, 967:17, 999:13, 1001:5, 1001:14, 1002:22, 1023:15, 1024:5
**capacity** [1] - 975:25
**card** [1] - 988:1
**care** [1] - 890:24
**careful** [2] - 884:3, 885:7
**Carolina** [1] - 945:21
**Caroline** [1] - 1014:15
**carried** [1] - 890:13
**carry** [1] - 974:22
**case** [54] - 840:12, 845:24, 849:10, 849:16, 849:20, 851:23, 851:24, 852:1, 852:14, 852:15, 887:24, 902:17, 934:7, 938:11, 947:24, 948:3, 948:6, 948:8, 948:9, 948:11, 959:16, 961:24, 967:9, 967:11, 970:1, 970:4, 973:1, 973:3, 974:12, 975:2, 975:8, 976:17, 977:3, 977:16, 979:11, 980:15, 984:15, 1005:25, 1012:19, 1012:22, 1015:8, 1016:1, 1017:3, 1019:5, 1019:25, 1020:16, 1022:5, 1022:8, 1025:8, 1025:23
**cases** [19] - 844:4, 845:2, 845:4, 845:5, 845:8, 847:10, 847:17, 848:20, 946:7, 947:2, 968:12, 968:13, 969:23, 1008:2, 1014:9, 1015:3, 1019:3, 1020:5
**cash** [2] - 999:15, 1001:15
**cashier** [1] - 954:22
**categorical** [2] - 1012:17, 1015:7
**categorically** [1] - 1020:7
**caused** [1] - 848:14
**central** [1] - 1013:15
**certain** [3] - 932:7, 1016:24, 1025:14
**certainly** [20] - 841:6, 844:19, 845:9,

845:23, 849:16, 870:3, 904:12, 916:14, 936:16, 971:13, 980:15, 997:3, 1011:3, 1011:7, 1011:15, 1011:17, 1013:16, 1015:3, 1016:2, 1019:11
**certify** [1] - 1027:8
**cetera** [5] - 843:16, 950:25, 961:25, 1018:17, 1025:9
**CFBs** [1] - 865:17
**chain** [9] - 910:5, 920:9, 938:6, 943:3, 963:6, 963:21, 998:8, 999:1, 1003:24
**chains** [1] - 898:7
**chairman** [1] - 952:5
**challenging** [1] - 974:12
**Chance** [1] - 837:15
**chance** [3] - 887:25, 1025:7, 1025:10
**change** [4] - 970:14, 983:2, 1004:21, 1009:1
**changed** [1] - 850:11
**changes** [5] - 884:2, 885:6, 886:3, 886:12, 970:13
**changes/corrections** [2] - 988:11, 988:12
**characterization** [2] - 844:20, 939:9
**characterize** [1] - 977:2
**charge** [14] - 849:14, 850:3, 850:8, 870:24, 871:1, 876:3, 876:9, 885:2, 952:6, 979:1, 1015:9, 1025:8, 1026:3, 1026:8
**charged** [3] - 840:19, 904:20, 905:2
**charges** [4] - 946:12, 946:15, 971:11, 971:18
**charging** [2] - 849:10, 1020:12
**chart** [3] - 933:12, 933:23, 937:2
**charter** [7] - 934:2, 934:3, 935:24, 935:25, 936:3, 937:6, 937:18
**charts** [2] - 977:25,

1020:21
**check** [4] - 873:8, 950:22, 964:22, 1004:5
**checking** [3] - 868:22, 926:10, 1002:23
**Chin** [1] - 840:14
**choice** [1] - 929:13
**choose** [1] - 959:14
**chooses** [1] - 904:2
**Christmas** [1] - 962:1
**CHRISTOPHER** [1] - 837:13
**christopher.morvillo @cliffordchance. com** [1] - 837:16
**chronology** [2] - 974:3, 974:7
**Church** [3] - 836:7, 837:4, 1027:18
**CIANCIULLO** [1] - 1027:17
**Cianciullo** [3] - 836:24, 1027:5, 1027:16
**Cir.1999** [1] - 1008:2
**Circuit** [6] - 839:18, 839:20, 839:21, 840:15, 970:1, 1007:6
**circulating** [2] - 856:8, 865:16
**circumstances** [6] - 851:1, 895:20, 971:10, 1013:7, 1015:8, 1018:12
**cite** [5] - 839:13, 840:12, 847:11, 848:21, 1022:8
**cited** [1] - 845:3
**cites** [2] - 847:18, 1008:1
**citing** [2] - 840:3, 1007:6
**city** [1] - 873:12
**claim** [1] - 844:21
**claimed** [2] - 914:23, 915:12
**claiming** [2] - 973:22, 974:16
**clarified** [1] - 931:15
**clarify** [2] - 931:19, 1011:1
**classic** [2] - 972:21, 973:2
**clear** [13] - 841:17, 848:10, 850:9, 851:19, 891:2, 938:22, 956:7, 961:10, 970:7,

982:17, 1004:23, 1006:7, 1012:16
**clearly** [3] - 844:15, 849:23, 1008:9
**CLERK** [1] - 944:23
**Clifford** [1] - 837:15
**close** [12] - 870:2, 906:25, 913:20, 914:3, 914:4, 914:8, 929:20, 932:11, 932:15, 932:19, 932:20, 967:7
**closely** [2] - 905:21, 905:25
**closing** [2] - 954:10, 954:11
**coal** [5] - 862:20, 871:23, 875:1, 886:23, 994:17
**coal-fired** [5] - 862:20, 871:23, 875:1, 886:23, 994:17
**coconspirator** [26] - 839:17, 839:22, 842:12, 842:13, 842:17, 842:22, 844:15, 844:19, 844:22, 848:10, 849:18, 849:19, 850:18, 850:21, 969:5, 1006:14, 1006:18, 1006:21, 1007:24, 1008:4, 1008:7, 1009:4, 1010:7, 1010:14, 1010:18, 1019:2
**coconspirators** [2] - 848:13, 1006:24
**COLEMAN** [2] - 945:3, 945:6
**Coleman** [25] - 850:25, 851:9, 851:12, 851:16, 944:19, 945:1, 968:5, 970:22, 971:3, 971:9, 971:10, 972:8, 977:6, 977:18, 980:6, 980:13, 980:19, 980:25, 981:4, 996:3, 1005:13, 1017:10, 1020:17, 1020:18, 1025:18
**Coleman's** [2] - 849:6, 1005:22
**colleague** [1] - 905:19
**colloquy** [2] - 879:18, 1005:17
**combination** [1] -

1010:3
**Combustion** [1] - 859:6
**comfortable** [3] - 883:22, 959:12, 959:25
**coming** [7] - 888:1, 888:6, 959:10, 967:24, 984:16, 996:14, 1024:4
**comment** [3] - 985:1, 986:21, 1001:14
**commenting** [1] - 843:15
**comments** [3] - 848:4, 953:7, 1010:5
**Commission** [2] - 952:6, 956:19
**commission** [9] - 855:19, 855:20, 855:23, 893:19, 893:20, 893:24, 907:22, 952:6, 993:4
**commit** [1] - 967:17
**commitment** [9] - 890:8, 890:20, 928:15, 928:21, 940:2, 941:8, 997:1, 1002:17, 1004:16
**committed** [4] - 848:9, 848:14, 984:1
**committee** [1] - 1008:19
**commonplace** [1] - 1014:25
**communication** [4] - 859:21, 896:15, 898:20
**communications** [3] - 923:7, 923:15, 929:2
**companies** [10] - 856:15, 856:19, 857:2, 857:3, 857:19, 858:17, 859:2, 947:12, 947:13, 947:25
**company** [20] - 858:2, 858:4, 861:13, 864:24, 885:2, 962:14, 964:1, 964:8, 964:10, 964:21, 964:23, 965:5, 965:7, 966:3, 966:5, 966:6, 967:1, 967:11, 981:14, 1020:15
**company's** [1] - 857:12
**compare** [1] - 977:21
**comparing** [2] - 882:2,

955:18
**compensation** [2] - 942:8, 991:9
**competitors** [2] - 856:23, 856:24
**complete** [1] - 997:11
**completed** [2] - 963:25, 997:4
**component** [1] - 978:4
**components** [2] - 858:14, 951:2
**comports** [1] - 921:2
**comprised** [1] - 856:7
**computed** [3] - 855:1, 855:2, 855:16
**concern** [11] - 841:17, 843:17, 882:22, 882:24, 883:7, 883:11, 941:1, 941:3, 959:9, 959:14, 973:8
**concerned** [4] - 962:6, 990:22, 990:23, 1020:1
**concerns** [2] - 882:20, 961:6
**conclusion** [3] - 844:12, 845:12, 845:21
**conditional** [1] - 879:18
**conditionally** [1] - 881:8
**conference** [4] - 876:5, 1025:8, 1026:4, 1026:8
**confidential** [1] - 886:24
**confirm** [2] - 924:14, 1013:10
**confirmed** [1] - 966:6
**confusion** [2] - 1013:17, 1018:11
**CONNECTICUT** [1] - 836:1
**Connecticut** [11] - 836:8, 861:16, 862:1, 870:21, 885:4, 888:16, 891:15, 991:1, 1008:17, 1027:7, 1027:19
**connection** [3] - 862:10, 869:5, 895:13
**consider** [3] - 840:6, 966:7, 997:11
**consideration** [3] - 977:15, 979:4, 1015:5

**considered** [4] - 840:21, 845:15, 1006:8, 1007:14
**considering** [2] - 916:14, 1024:23
**consistently** [1] - 853:12
**consortium** [15] - 856:24, 857:1, 857:8, 858:3, 858:16, 858:24, 863:8, 866:8, 884:11, 884:22, 891:3, 914:19, 915:2, 922:1, 994:12
**consortiums** [1] - 864:24
**conspiracy** [41] - 838:23, 839:10, 839:11, 839:12, 839:25, 840:2, 840:3, 840:11, 840:17, 840:18, 840:22, 840:24, 841:2, 841:3, 841:9, 841:11, 841:16, 842:2, 842:3, 843:11, 843:22, 844:25, 844:5, 845:7, 845:11, 845:17, 847:14, 847:16, 847:20, 848:7, 904:18, 970:10, 1006:15, 1007:2, 1007:4, 1007:5, 1007:11, 1007:15, 1007:22, 1008:10, 1008:14
**consultancy** [14] - 962:24, 965:15, 967:5, 967:19, 981:14, 981:19, 982:16, 983:8, 988:22, 988:23, 989:3, 989:5, 990:16, 993:9
**consultant** [35] - 863:7, 863:8, 866:14, 866:18, 866:22, 867:13, 872:11, 873:25, 874:1, 877:8, 878:18, 879:11, 885:17, 886:14, 892:9, 893:19, 893:22, 893:23, 894:9, 895:9, 896:5, 914:2, 915:9, 917:6, 917:17, 920:1, 943:24, 964:10,

967:1, 991:4, 994:20, 994:21, 994:24, 1009:11, 1009:17
**consultant's** [3] - 891:20, 894:6, 962:14
**consultants** [17] - 877:17, 877:20, 878:5, 878:14, 879:7, 894:21, 894:25, 895:2, 895:8, 936:19, 937:8, 943:23, 951:16, 983:2, 995:9, 1009:13
**consulting** [1] - 897:4
**contact** [4] - 961:6, 963:19, 966:8, 1002:22
**contacted** [4] - 898:12, 898:17, 900:2, 900:5
**contains** [2] - 880:2, 940:20
**contend** [1] - 845:19
**contents** [1] - 928:4
**continuation** [1] - 999:20
**continue** [5] - 911:5, 980:5, 980:24, 1005:4, 1005:24
**continued** [1] - 906:4
**CONTINUED** [2] - 853:6, 941:19
**continues** [2] - 841:22, 959:22
**continuity** [1] - 892:25
**contract** [18] - 859:9, 877:5, 877:8, 884:3, 885:6, 885:9, 885:10, 885:11, 885:12, 981:21, 982:20, 984:14, 984:17, 985:4, 991:14, 995:3, 1009:10, 1009:12
**contrary** [4] - 845:1, 845:21, 848:21
**control** [8] - 857:17, 872:16, 872:23, 921:21, 922:2, 934:5, 937:12, 939:16
**controlled** [2] - 871:9, 871:10
**controller** [1] - 964:18
**controlling** [3] - 873:7, 873:17, 873:18

**conversations** [4] - 867:5, 867:9, 906:17, 906:19
**convince** [5] - 891:11, 891:16, 959:20, 984:1, 1000:1
**convinced** [2] - 872:17, 1003:19
**cooperating** [4] - 849:17, 850:19, 972:25, 1014:4
**cooperation** [10] - 900:20, 901:18, 902:19, 902:22, 903:9, 903:17, 905:9, 977:13, 1013:7, 1018:13
**cooperator** [1] - 849:22
**cooperators** [3] - 1013:9, 1013:23, 1013:25
**coordinate** [5] - 864:14, 866:3, 866:11, 920:17, 920:21
**copied** [17] - 868:5, 896:16, 898:6, 915:21, 916:1, 916:3, 916:4, 924:3, 924:10, 924:15, 927:3, 927:19, 927:20, 961:16, 987:10, 1011:4
**copies** [1] - 839:14
**copy** [26] - 862:18, 871:17, 874:19, 876:17, 888:22, 919:14, 924:6, 927:10, 928:1, 960:15, 962:22, 963:21, 965:13, 966:13, 986:7, 986:20, 987:3, 989:17, 991:21, 992:11, 993:1, 999:7, 1000:11, 1001:23, 1003:3, 1022:23
**copying** [10] - 958:25, 965:1, 965:22, 981:9, 990:2, 998:14, 1001:1, 1002:6, 1003:25, 1004:24
**core** [2] - 973:1, 974:12
**cornered** [1] - 996:19
**corporate** [1] - 909:8
**Corporation** [5] -

856:25, 857:9, 864:18, 884:18, 994:2
**correct** [158] - 847:6, 853:19, 853:20, 856:10, 856:11, 865:22, 865:23, 873:4, 873:8, 878:24, 882:11, 882:12, 894:19, 894:22, 896:23, 897:25, 898:4, 898:15, 899:8, 900:1, 900:18, 900:21, 901:19, 901:25, 902:25, 903:2, 903:5, 903:8, 903:11, 903:24, 903:25, 904:4, 904:6, 904:23, 904:25, 905:1, 905:3, 905:4, 905:7, 907:1, 907:6, 907:19, 908:7, 911:19, 911:20, 911:23, 911:24, 912:4, 912:5, 912:9, 912:12, 913:4, 913:7, 913:8, 913:16, 913:17, 914:16, 915:5, 915:17, 915:22, 915:23, 916:2, 916:16, 917:8, 917:12, 917:24, 918:20, 919:3, 919:4, 920:14, 920:15, 920:19, 920:23, 920:24, 920:25, 921:1, 921:3, 921:4, 921:13, 921:14, 921:22, 922:16, 922:17, 922:25, 924:1, 924:2, 924:3, 924:4, 924:9, 924:19, 925:18, 925:19, 925:23, 926:6, 926:7, 926:12, 927:4, 927:5, 928:16, 928:17, 928:20, 929:11, 929:12, 929:14, 931:11, 933:13, 933:14, 933:15, 933:16, 933:21, 933:22, 936:11, 936:21, 937:1, 938:1, 938:2, 938:4, 938:7, 938:8, 938:11, 939:5,

940:9, 940:17,
940:21, 940:22,
941:8, 941:11,
941:15, 941:24,
941:25, 942:13,
942:14, 942:17,
942:24, 943:8,
943:9, 952:11,
953:9, 954:1, 956:5,
956:11, 957:1,
958:25, 960:7,
962:9, 981:10,
987:20, 990:3,
990:18, 992:6,
994:9, 994:14,
995:6, 997:15,
999:19, 1002:8,
1005:1
**correctly** [3] - 847:22,
952:8, 1001:8
**corroborated** [1] -
842:4
**corroborating** [5] -
840:10, 840:23,
1008:11, 1008:13,
1009:3
**corroboration** [26] -
839:9, 839:11,
841:1, 841:14,
843:10, 844:24,
845:10, 847:13,
847:15, 847:19,
848:5, 848:24,
968:16, 969:13,
969:16, 969:20,
970:9, 970:16,
1006:20, 1006:21,
1007:21, 1008:3,
1008:6, 1009:6,
1010:13, 1010:17
**Corruption** [3] -
946:22, 947:8,
947:20
**corruption** [2] - 947:2,
950:24
**counsel** [17] - 838:4,
842:10, 848:9,
852:6, 900:9,
971:17, 978:9,
1005:18, 1005:20,
1018:22, 1019:18,
1020:23, 1022:13,
1022:25, 1023:22,
1025:22
**count** [1] - 904:18
**counter** [2] - 1003:18,
1017:13
**countries** [1] - 947:17
**country** [4] - 854:13,
860:9, 860:10,

860:12
**couple** [10] - 839:2,
911:9, 952:3,
957:19, 957:20,
982:5, 983:22,
990:21, 999:12,
1002:10
**coupled** [1] - 890:6
**course** [8] - 912:14,
928:3, 930:22,
946:8, 949:1,
951:19, 975:17,
1014:24
**court** [6] - 901:2,
901:20, 902:4,
916:6, 1007:12,
1017:7
**COURT** [172] - 836:1,
838:4, 839:18,
842:24, 843:5,
843:7, 843:24,
844:4, 845:25,
846:3, 846:21,
846:25, 847:3,
847:8, 848:18,
850:2, 850:23,
852:19, 852:22,
853:2, 853:10,
853:15, 855:8,
863:2, 868:6,
868:10, 872:3,
875:6, 877:12,
877:14, 877:24,
878:10, 879:16,
881:7, 887:5, 889:9,
892:22, 894:4,
894:13, 901:14,
902:7, 902:14,
910:9, 910:13,
910:17, 910:21,
910:24, 911:4,
918:1, 918:8,
919:16, 930:8,
930:10, 930:15,
931:18, 933:3,
934:13, 934:19,
935:20, 938:16,
938:20, 939:10,
939:22, 940:11,
940:13, 943:14,
943:18, 944:4,
944:8, 944:11,
944:14, 944:20,
945:4, 950:11,
950:18, 952:20,
953:24, 954:14,
955:12, 956:2,
956:7, 957:14,
958:17, 960:19,
961:21, 963:2,

965:18, 967:25,
968:5, 968:15,
969:1, 969:6,
969:11, 969:23,
970:18, 971:12,
971:19, 971:23,
972:9, 973:6,
973:21, 974:13,
975:13, 975:16,
975:20, 975:25,
976:5, 976:9,
978:13, 979:11,
979:15, 979:21,
979:25, 980:17,
980:21, 980:23,
982:3, 984:10,
985:15, 985:25,
986:12, 987:16,
987:19, 987:22,
989:23, 992:1,
992:21, 993:22,
994:6, 996:1, 998:5,
1000:17, 1002:2,
1003:8, 1005:5,
1005:7, 1005:13,
1005:17, 1006:5,
1006:8, 1011:10,
1011:13, 1011:16,
1012:4, 1014:9,
1014:12, 1014:14,
1014:17, 1014:19,
1015:6, 1015:12,
1015:18, 1016:12,
1016:20, 1017:15,
1018:7, 1018:20,
1021:2, 1021:6,
1021:21, 1022:7,
1022:17, 1022:21,
1023:3, 1024:6,
1024:12, 1024:16,
1024:25, 1025:3,
1025:6, 1026:1,
1026:6
**Court** [22] - 836:24,
838:12, 839:7,
840:6, 842:5, 842:6,
847:24, 850:11,
852:18, 903:23,
968:10, 970:4,
973:15, 1010:3,
1010:14, 1012:20,
1014:10, 1012:15,
1027:6, 1027:7,
1027:17, 1027:18
**Court's** [2] - 980:11,
1022:16
**cover** [2] - 956:17,
958:8
**coverage** [1] - 905:12
**covered** [1] - 944:2

**crash** [1] - 956:13
**CRC** [2] - 836:24,
1027:5
**create** [1] - 990:11
**credibility** [10] -
849:24, 850:15,
850:17, 850:20,
972:19, 973:19,
973:21, 973:23,
974:11, 1014:3
**credits** [1] - 873:22
**crimes** [1] - 905:6
**Criminal** [1] - 837:9
**criminal** [1] - 946:12
**critical** [3] - 871:23,
875:2, 883:24
**cross** [22] - 851:5,
897:15, 901:10,
911:6, 939:1,
972:21, 973:2,
975:2, 975:19,
978:15, 978:17,
1010:24, 1013:4,
1013:19, 1014:23,
1015:14, 1016:2,
1016:19, 1020:6,
1023:4, 1023:11,
1024:17
**CROSS** [2] - 897:16,
941:19
**cross-examination**
[18] - 851:5, 897:15,
901:10, 911:6,
939:1, 972:21,
973:2, 975:2,
978:15, 1010:24,
1013:4, 1013:19,
1014:23, 1016:2,
1020:6, 1023:4,
1023:11, 1024:17
**CROSS-**
**EXAMINATION** [2] -
897:16, 941:19
**cross-examine** [2] -
975:19, 1016:19
**cross-examining** [1] -
1015:14
**CRR** [3] - 836:24,
1027:5, 1027:17
**crummy** [1] - 1021:8
**CT** [2] - 837:4, 837:20
**culled** [1] - 959:5
**cumulative** [2] -
953:22, 985:13
**current** [3] - 945:8,
1008:8, 1025:4
**customer** [1] - 856:10
**cut** [1] - 893:18
**cutting** [1] - 1011:20

# D

**D.C** [3] - 837:10,
945:3, 946:25
**Dan** [1] - 897:20
**DANIEL** [2] - 837:6,
837:14
**daniel.kahn@usdoj.**
**gov** [1] - 837:11
**daniel.silver@**
**cliffordchance.com**
[1] - 837:17
**date** [25] - 862:22,
864:5, 867:21,
867:22, 869:10,
869:11, 869:12,
871:20, 871:21,
874:23, 876:21,
880:25, 881:1,
881:19, 886:25,
888:25, 889:1,
918:22, 952:23,
956:22, 957:16,
967:18, 981:23,
987:2, 1002:19
**dated** [4] - 957:9,
958:13, 983:17,
1001:23
**dates** [2] - 881:21,
985:2
**Dave** [3] - 905:17,
905:18, 905:19
**David** [1] - 841:6
**DAVID** [1] - 837:3
**david.novick@usdoj**
**.gov** [1] - 837:5
**Davis** [2] - 1012:20,
1014:15
**days** [5] - 839:2,
957:19, 957:20,
958:20, 1017:4
**deal** [4] - 930:23,
975:8, 1018:22,
1023:14
**dealing** [1] - 964:20
**deals** [1] - 852:15
**Dear** [1] - 965:25
**dear** [2] - 966:1, 992:4
**debate** [1] - 1015:2
**debriefings** [1] -
972:17
**December** [12] -
951:25, 952:11,
952:16, 955:8,
956:23, 957:9,
957:17, 958:13,
958:20, 960:16,
961:18, 994:2
**decide** [3] - 903:17,
903:22, 904:5

**decided** [4] - 850:8,
852:9, 886:13, 901:8
**decision** [28] - 849:13,
849:14, 850:3,
866:25, 871:4,
884:24, 888:1,
888:6, 888:7, 888:9,
914:19, 934:7,
934:8, 934:11,
934:14, 934:16,
934:22, 934:23,
934:25, 938:8,
943:7, 943:24,
978:24, 979:3,
1013:13, 1017:18,
1024:24
**decision-making** [2] -
871:4, 914:19
**decisions** [1] - 849:10
**declarant** [7] - 839:25,
840:17, 845:6,
1007:2, 1007:10,
1007:19, 1008:15
**declarant's** [10] -
839:9, 845:11,
847:14, 847:20,
848:6, 970:10,
970:17, 1007:21,
1008:6, 1009:4
**dedicated** [1] - 857:24
**defendant** [21] -
840:18, 842:2,
842:7, 845:7, 850:7,
882:1, 882:11,
882:16, 885:22,
931:16, 941:13,
970:22, 1006:15,
1006:19, 1007:9,
1007:19, 1009:21,
1013:20, 1015:22,
1019:11, 1026:2
**Defendant** [2] - 836:9,
837:12
**defendant's** [18] -
839:12, 840:10,
840:23, 841:4,
841:10, 842:3,
845:20, 847:15,
847:17, 848:6,
949:25, 951:11,
951:13, 970:11,
1008:4, 1010:19,
1012:25, 1013:14
**defendants** [1] -
1008:16
**defense** [7] - 839:1,
848:20, 980:7,
1012:25, 1019:23,
1024:9, 1025:24
**define** [1] - 858:20

**defined** [1] - 994:16
**degree** [2] - 945:20,
945:22
**delay** [4] - 901:9,
901:12, 901:25,
935:20
**demonstrate** [1] -
1010:6
**demote** [1] - 942:6
**Department** [1] -
837:8
**departure** [1] - 895:21
**depended** [1] - 865:5
**derived** [1] - 973:10
**described** [1] - 902:25
**designed** [1] - 977:22
**desires** [1] - 994:13
**detail** [1] - 900:10
**detailed** [1] - 959:17
**details** [2] - 916:11,
917:1
**determinations** [1] -
840:5
**determine** [1] -
1010:15
**develop** [4] - 913:20,
913:25, 914:3,
1021:16
**dial** [2] - 925:23, 926:5
**dial-up** [2] - 925:23,
926:5
**dialogue** [1] - 851:17
**different** [14] - 845:16,
846:11, 857:2,
857:3, 864:23,
946:10, 948:25,
953:23, 953:25,
954:7, 996:15,
1011:17, 1017:16,
1018:17
**difficulty** [1] - 916:10
**digested** [1] - 845:24
**direct** [20] - 853:3,
888:2, 899:24,
900:24, 907:5,
907:25, 910:5,
912:10, 915:19,
920:12, 922:12,
923:6, 923:24,
925:7, 944:2,
954:25, 971:7,
971:8, 980:25,
983:12
**DIRECT** [2] - 853:6,
945:6
**directed** [1] - 927:6
**direction** [6] - 890:3,
972:4, 978:22,
1014:1, 1016:10
**directly** [6] - 845:13,

893:25, 967:11,
968:13, 984:18,
984:19
**director** [6] - 854:12,
908:22, 908:23,
908:24, 991:7
**directors** [1] - 890:4
**disagree** [2] - 844:19,
1017:19
**disagreement** [4] -
937:16, 937:21,
942:23, 942:24
**disappear** [4] -
841:20, 883:2,
883:14, 941:6
**disappointed** [1] -
1002:15
**disapproved** [1] -
897:1
**disclosed** [1] - 954:8
**discredit** [2] - 974:17,
974:19
**discrete** [1] - 1022:17
**discuss** [13] - 838:12,
852:5, 852:8,
852:17, 886:2,
886:5, 892:1, 892:5,
910:18, 997:18,
1002:12, 1002:25,
1004:19
**discussed** [12] -
845:8, 881:8,
899:20, 899:22,
923:3, 923:24,
924:17, 928:3,
930:20, 966:8,
988:12, 999:23
**discussing** [5] -
911:21, 922:13,
981:12, 981:13,
1014:17
**discussion** [10] -
839:2, 879:17,
890:2, 935:3,
956:16, 983:25,
999:17, 1002:20,
1011:19, 1026:7
**discussions** [9] -
894:21, 894:23,
894:24, 922:21,
922:23, 924:21,
962:6, 963:17,
1011:18
**disputed** [1] - 1010:9
**distinction** [1] - 850:2
**District** [6] - 970:3,
1008:17, 1027:7,
1027:18
**DISTRICT** [2] - 836:1,
836:1

**distrust** [1] - 972:25
**Division** [1] - 837:9
**division** [2] - 886:10,
956:18
**document** [35] -
841:25, 842:22,
862:15, 867:18,
868:4, 871:15,
874:17, 876:15,
880:20, 881:10,
886:18, 888:19,
918:13, 918:15,
918:17, 919:21,
919:22, 919:23,
919:25, 933:10,
950:17, 957:17,
963:4, 963:5, 963:9,
980:12, 985:24,
988:4, 990:7,
990:14, 991:11,
993:13, 993:14,
998:12
**documented** [1] -
967:15
**documents** [35] -
852:1, 852:2,
852:11, 900:23,
916:18, 916:22,
916:23, 916:25,
917:11, 948:13,
948:22, 948:25,
949:5, 949:22,
951:11, 951:12,
955:18, 957:5,
962:13, 976:20,
977:19, 977:20,
983:5, 993:20,
995:12, 1005:3,
1005:5, 1005:23,
1006:2, 1011:5,
1011:7, 1020:19,
1020:22, 1025:13,
1025:21
**domiciliated** [1] -
964:9
**done** [5] - 842:17,
846:1, 931:8,
948:18, 1004:15
**doubt** [3] - 973:12,
997:9, 1021:4
**down** [15] - 865:3,
901:8, 910:4,
910:18, 921:8,
922:8, 922:18,
926:25, 928:10,
937:15, 953:16,
968:6, 985:4, 991:8,
1004:10
**downside** [1] - 961:10
**Dr** [6] - 953:6, 959:9,

959:15, 959:16,
959:24, 960:1
**draft** [5] - 890:4,
924:6, 988:22,
989:5, 1026:7
**drawn** [1] - 845:12
**due** [1] - 869:11
**during** [32] - 840:2,
850:10, 863:25,
864:12, 864:20,
868:22, 870:14,
898:8, 899:24,
900:24, 902:2,
902:12, 908:14,
916:20, 917:24,
918:9, 918:16,
919:8, 919:21,
920:1, 920:11,
922:11, 923:6,
923:24, 925:7,
951:19, 999:15,
1006:14, 1007:4,
1024:14
**dwell** [1] - 1015:10
**Dé** [5] - 909:15,
909:20, 909:25,
911:25, 967:17

---

## E

**E-mail** [3] - 837:5,
837:16, 837:21
**e-mail** [179] - 838:15,
838:16, 841:15,
841:17, 842:15,
843:2, 844:14,
846:5, 848:3,
848:11, 848:16,
862:16, 862:19,
862:22, 863:5,
863:11, 863:13,
863:16, 863:24,
864:8, 864:10,
867:19, 867:21,
867:22, 869:13,
870:11, 871:16,
871:20, 872:14,
873:2, 874:18,
874:23, 875:9,
876:8, 876:16,
876:19, 876:24,
879:22, 880:6,
880:8, 880:21,
880:23, 881:5,
881:6, 881:16,
881:23, 882:1,
882:10, 885:21,
886:19, 886:22,
886:25, 887:8,
887:22, 888:20,
888:25, 889:1,

889:12, 889:17, 889:18, 889:20, 889:21, 893:4, 896:15, 896:21, 898:7, 898:23, 917:15, 917:21, 917:23, 919:8, 920:8, 920:11, 920:13, 921:8, 921:11, 921:15, 921:20, 923:7, 923:23, 924:5, 924:10, 925:3, 925:6, 925:10, 925:17, 926:1, 926:2, 927:3, 927:13, 928:4, 928:9, 928:13, 940:2, 940:7, 940:16, 940:19, 941:12, 950:5, 951:21, 952:15, 952:24, 953:11, 955:7, 955:15, 955:24, 956:10, 956:22, 956:25, 957:8, 957:17, 957:21, 958:5, 958:7, 958:12, 958:24, 959:4, 959:22, 960:5, 960:6, 960:14, 962:21, 963:6, 963:9, 963:15, 963:20, 963:24, 964:13, 965:1, 965:2, 965:12, 965:21, 966:12, 966:15, 966:16, 966:23, 981:9, 983:13, 984:5, 984:20, 984:21, 985:11, 985:13, 986:6, 986:14, 986:17, 987:9, 987:25, 988:6, 988:8, 989:16, 991:20, 992:10, 995:19, 996:5, 996:10, 997:25, 998:7, 998:13, 999:4, 999:6, 999:21, 1000:10, 1000:20, 1000:25, 1001:22, 1003:2, 1003:12, 1003:23, 1004:23, 1006:17, 1007:13, 1009:19, 1010:5, 1010:13, 1011:15
**e-mailing** [1] - 872:6

**e-mails** [30] - 841:8, 843:19, 851:8, 881:20, 882:2, 896:16, 896:19, 899:23, 899:24, 915:20, 915:25, 923:5, 926:6, 926:10, 927:14, 949:6, 949:8, 949:13, 949:24, 951:18, 954:5, 955:19, 958:20, 998:8, 998:12, 1003:10, 1011:18, 1011:22, 1012:1, 1017:3
**eager** [1] - 1016:19
**earlier)** [1] - 886:1
**early** [3] - 949:25, 977:1, 978:8
**easier** [1] - 919:14
**easily** [1] - 1008:23
**East** [1] - 970:2
**Eastern** [1] - 875:14
**Eddie** [21] - 875:16, 890:7, 890:9, 890:10, 890:11, 890:19, 892:3, 892:12, 892:15, 892:18, 913:21, 961:8, 984:17, 1001:24, 1002:11, 1002:14, 1002:15, 1003:17, 1003:22, 1004:10, 1004:22
**Eddie's** [4] - 956:17, 958:7, 959:19, 1004:17
**Edie's** [1] - 959:18
**educational** [1] - 945:19
**Edward** [1] - 841:8
**effective** [1] - 1024:7
**effectively** [1] - 941:22
**efficient** [2] - 1024:8, 1026:9
**efforts** [11] - 859:9, 877:4, 895:7, 896:1, 896:4, 896:13, 921:25, 922:5, 928:18, 947:16, 1009:10
**Ehren** [2] - 956:11, 961:17
**either** [12] - 848:21, 870:2, 898:3, 916:4, 922:24, 928:4, 950:11, 961:7, 966:5, 987:20, 987:21, 992:20

**either/or** [1] - 1012:15
**Eko** [24] - 859:12, 860:16, 860:18, 860:20, 862:17, 865:20, 867:10, 871:18, 874:20, 875:24, 876:17, 878:16, 886:20, 893:12, 893:13, 950:24, 955:7, 955:22, 983:24, 1001:22, 1002:6, 1002:11, 1009:15, 1009:20
**electricity** [2] - 856:12, 856:14
**elects** [1] - 1026:2
**eleven** [2] - 945:17, 946:8
**elicit** [3] - 851:15, 947:15, 970:23
**elicited** [1] - 971:6
**eliminate** [1] - 977:23
**EM** [1] - 984:1
**Email** [1] - 837:11
**embassies** [1] - 970:2
**emir** [3] - 959:9, 959:16, 959:24
**Emir** [11] - 951:3, 951:8, 952:4, 953:12, 956:19, 957:1, 957:21, 960:1, 961:25, 984:14, 1003:20
**employ** [2] - 976:20, 994:19
**employed** [1] - 945:3
**Employee** [3] - 842:25, 843:2, 844:17
**employee** [4] - 843:1, 843:3, 844:13, 863:20
**employees** [4] - 855:6, 857:24, 887:20, 914:5
**employment** [1] - 944:25
**end** [11] - 842:7, 928:10, 935:13, 951:6, 1007:16, 1008:9, 1008:24, 1009:2, 1009:17, 1010:1, 1010:11
**endeavors** [1] - 866:20
**ended** [1] - 838:14
**Energy** [4] - 857:9, 858:5, 860:11
**enforcement** [2] -

945:24, 946:9
**engage** [2] - 891:5, 968:19
**engineer** [1] - 877:2
**engineering** [1] - 956:18
**Engineering** [1] - 859:6
**engineers** [1] - 878:17
**engraved** [1] - 1016:14
**enjoy** [1] - 968:2
**entailed** [1] - 982:19
**enter** [1] - 901:20
**entered** [6] - 853:1, 900:20, 911:3, 967:20, 980:22, 994:1
**entire** [2] - 910:1, 1023:10
**entirely** [4] - 849:15, 977:2, 977:12, 979:3
**entitled** [6] - 956:13, 973:4, 973:14, 976:15, 990:15, 1019:11
**entity** [3] - 871:1, 886:13, 888:12
**entry** [1] - 851:1
**environmental** [2] - 857:17, 990:24
**equally** [3] - 979:2, 1019:20, 1019:21
**equally-available** [1] - 1019:20
**equals** [1] - 1021:3
**equipment** [4] - 855:18, 855:21, 869:20, 937:12
**era** [1] - 925:20
**especially** [1] - 999:24
**ESQ** [6] - 837:6, 837:7, 837:13, 837:14, 837:14, 837:18
**essence** [1] - 936:2
**essentially** [7] - 901:5, 902:3, 929:2, 969:3, 969:5, 1010:23, 1017:21
**establish** [4] - 845:14, 877:25, 964:18, 1007:15
**established** [2] - 969:20, 1007:10
**establishes** [2] - 839:23, 1006:25
**establishing** [1] - 840:21
**estimate** [1] - 1001:5

**et** [5] - 843:16, 950:25, 961:25, 1018:17, 1025:9
**ETD** [1] - 875:14
**Etienne** [18] - 909:15, 909:20, 911:25, 962:22, 963:22, 965:2, 965:14, 967:17, 986:8, 987:10, 989:17, 990:2, 991:20, 992:3, 992:11, 998:16, 999:8, 1000:12
**evaluate** [1] - 873:14
**evaluated** [1] - 873:5
**evaluating** [3] - 864:23, 865:7, 865:9
**evaluation** [18] - 858:22, 864:22, 864:25, 865:1, 865:2, 865:4, 872:17, 873:13, 873:21, 873:23, 886:24, 890:3, 890:16, 895:4, 921:18, 922:2, 924:7, 924:18
**evaluator** [1] - 956:19
**evening** [4] - 851:6, 889:24, 928:10, 1021:18
**evidence** [71] - 839:24, 840:10, 840:23, 841:9, 841:12, 842:1, 842:5, 849:9, 849:12, 849:16, 849:25, 880:14, 880:15, 890:24, 917:19, 918:12, 920:6, 921:7, 923:18, 924:25, 933:8, 933:11, 951:20, 953:9, 955:3, 955:25, 957:4, 971:14, 972:23, 973:10, 973:20, 973:25, 975:6, 976:18, 976:19, 976:22, 977:16, 977:20, 979:6, 981:5, 983:1, 983:12, 985:24, 1006:9, 1007:1, 1007:24, 1008:11, 1008:13, 1008:22, 1009:1, 1009:4, 1010:6, 1010:11, 1011:3, 1011:9,

1011:11, 1012:8,
1012:9, 1012:10,
1012:17, 1014:25,
1015:15, 1017:2,
1017:8, 1018:3,
1018:13, 1019:1,
1020:4, 1025:14,
1026:3
**Evidence** [3] - 840:5,
1008:21, 1019:7
**evidenced** [1] - 977:4
**evidentiary** [1] -
1019:6
**EW** [3] - 875:11,
875:13, 875:15
**exact** [1] - 918:22
**exactly** [6] - 844:11,
917:9, 922:6,
923:21, 928:25,
938:9
**EXAMINATION** [6] -
853:6, 897:16,
938:23, 941:19,
943:19, 945:6
**examination** [24] -
849:25, 851:5,
853:4, 897:15,
901:10, 911:6,
939:1, 970:21,
971:7, 972:21,
973:2, 975:2,
978:15, 980:25,
1010:24, 1013:4,
1013:19, 1014:23,
1016:2, 1016:16,
1020:6, 1023:4,
1023:11, 1024:17
**examine** [3] - 975:19,
1013:7, 1016:19
**examined** [1] - 1013:9
**examining** [1] -
1015:14
**example** [6] - 914:13,
925:25, 937:22,
971:6, 978:15,
1017:2
**examples** [1] -
1002:17
**except** [1] - 1017:25
**exclude** [1] - 1024:1
**exclusively** [1] -
863:22
**excuse** [7] - 843:19,
848:6, 848:12,
983:19, 992:8,
993:14, 996:4
**excused** [2] - 944:14,
1005:14
**execute** [2] - 887:10,
887:12

**executed** [2] - 993:9,
993:13
**execution** [3] -
988:14, 990:12,
999:15
**executive** [1] - 892:23
**Exhibit** [47] - 838:13,
862:14, 862:25,
867:17, 868:1,
871:14, 872:1,
874:16, 875:4,
876:14, 879:13,
880:20, 881:3,
881:12, 881:16,
886:17, 887:3,
888:18, 889:7,
920:6, 923:17,
933:8, 940:7, 950:3,
951:20, 952:14,
952:23, 953:9,
957:3, 957:20,
958:6, 958:11,
962:19, 965:10,
965:16, 981:5,
981:17, 981:25,
984:3, 986:4,
991:18, 993:19,
993:24, 994:4,
995:17, 1000:8,
1000:14
**exhibit** [33] - 846:4,
863:2, 872:3, 875:6,
880:18, 887:5,
889:9, 926:22,
929:6, 952:20,
955:3, 956:8,
958:17, 960:12,
960:19, 961:21,
963:2, 965:18,
982:3, 984:10,
986:12, 987:16,
989:23, 992:1,
993:22, 994:6,
996:1, 998:5,
1000:17, 1001:20,
1002:2, 1003:8,
1003:11
**exhibits** [13] - 851:10,
852:6, 852:7, 954:3,
955:12, 957:14,
987:22, 989:23,
992:21, 1006:17,
1009:18, 1025:17
**Exhibits** [1] - 1006:10
**exist** [2] - 851:19,
851:20
**existence** [9] - 840:21,
841:2, 841:10,
842:2, 845:17,
971:13, 1007:15,

1008:14, 1022:22
**exited** [3] - 910:16,
968:4, 1005:12
**expand** [5] - 917:20,
920:7, 921:7,
923:19, 1021:16
**expanded** [2] -
1018:8, 1023:22
**expect** [3] - 868:8,
1004:12, 1020:16
**expectation** [2] -
838:20, 954:20
**expected** [1] - 846:16
**expenses** [1] - 951:4,
984:16
**expensive** [1] - 921:18
**experience** [4] -
859:2, 866:10,
884:12
**explain** [4] - 907:11,
913:23, 973:13,
974:14
**explained** [2] -
838:19, 1019:2
**explaining** [2] -
1009:14, 1018:22
**explanations** [1] -
959:18
**explicitly** [1] - 970:8
**explore** [4] - 850:25,
973:4, 973:14, 978:4
**exposing** [1] - 979:7
**express** [3] - 958:14,
958:23, 960:16
**expressed** [2] -
882:20, 962:3
**extension** [9] -
868:20, 869:9,
869:10, 869:12,
869:24, 870:4,
871:6, 1016:4,
1017:8
**extent** [6] - 843:17,
851:18, 879:17,
976:20, 1019:17,
1023:19
**EXTN** [1] - 868:15
**extrajudicial** [4] -
839:16, 839:22,
1006:24, 1007:8
**extremely** [1] - 904:9

## F

**F.2d** [1] - 839:15
**F.3d** [3] - 970:2,
1007:5, 1008:1
**fabricator** [1] - 858:13
**face** [5] - 841:15,
841:16, 841:25,

864:11, 864:20
**fact** [28] - 842:10,
842:18, 844:16,
845:12, 850:4,
883:23, 896:21,
897:24, 904:10,
907:21, 909:25,
913:5, 916:24,
924:7, 924:18,
924:21, 927:25,
930:23, 959:24,
967:19, 968:24,
971:7, 971:25,
972:4, 977:4, 977:9,
1013:12, 1023:23
**factors** [5] - 865:2,
865:3, 865:4,
873:22, 873:23
**facts** [2] - 916:17,
1010:9
**factual** [1] - 840:4
**failings** [1] - 1017:13
**failure** [3] - 1015:21,
1016:23, 1019:18
**failures** [1] - 1018:15
**fair** [7] - 914:14,
914:20, 914:21,
929:3, 929:4,
1017:9, 1024:8
**fairly** [1] - 861:3
**false** [1] - 838:25
**familiar** [7] - 853:21,
859:16, 859:19,
859:20, 860:5,
884:13, 903:19
**family** [1] - 914:4
**far** [15] - 838:24,
850:16, 887:11,
887:13, 890:8,
890:21, 892:8,
914:21, 914:22,
928:15, 977:6,
999:14, 1005:22
**fax** [1] - 889:14,
986:20, 987:2
**faxed** [1] - 889:20
**FBI** [7] - 900:2,
945:16, 945:23,
946:19, 946:24,
947:5, 947:7
**FCPA** [4] - 904:17,
904:21, 972:1,
1013:2
**Feb** [1] - 962:2
**February** [7] - 965:14,
966:14, 981:10,
991:22, 992:13,
992:25, 993:12
**Federal** [4] - 840:5,
945:10, 1008:20,

1019:7
**fee** [3] - 951:4, 989:3,
1011:20
**feedback** [1] - 870:1
**fees** [1] - 907:23
**felt** [1] - 927:23
**Fenge** [1] - 986:8
**Fengge** [2] - 986:8,
986:20
**few** [15] - 849:19,
898:6, 900:17,
901:21, 910:4,
922:18, 931:19,
945:14, 953:19,
958:20, 959:21,
996:11, 997:6,
1005:6, 1011:22
**file** [3] - 967:15, 992:4,
1021:23
**filed** [2] - 1021:19,
1021:22
**files** [3] - 993:1, 993:5,
993:20
**filing** [1] - 847:4
**fill** [2] - 861:17, 861:18
**filling** [2] - 862:3,
908:9
**final** [3] - 842:6,
875:11, 1024:24
**finalize** [2] - 961:11,
988:13
**financial** [1] - 964:17
**fine** [4] - 932:9,
984:14, 986:2,
1022:2
**fingerprint** [1] -
1015:19
**fingerprints** [1] -
1015:10
**finish** [4] - 934:13,
939:6, 939:7, 980:19
**finished** [2] - 943:14,
1024:13
**finishes** [1] - 1026:2
**Finland** [1] - 951:1
**fire** [2] - 886:14, 942:1
**fired** [5] - 862:20,
871:23, 875:1,
886:23, 994:17
**firm** [1] - 1002:18
**Firman** [1] - 880:1
**firmly** [1] - 1003:21
**first** [46] - 838:11,
844:23, 868:12,
872:5, 875:8, 887:7,
889:11, 900:2,
900:5, 900:13,
916:9, 917:14,
920:8, 925:3,
928:14, 944:24,

945:2, 950:3, 952:3, 952:22, 957:16, 959:5, 962:3, 965:2, 965:24, 966:2, 966:22, 969:21, 982:22, 983:10, 983:19, 985:3, 988:3, 988:9, 996:11, 998:12, 999:12, 1000:19, 1000:20, 1000:21, 1002:9, 1018:24, 1022:21, 1024:3, 1024:22

**five** [9] - 848:12, 851:24, 899:14, 899:15, 899:16, 899:17, 901:24, 906:2, 906:3

**fix** [1] - 985:2

**flight** [3] - 875:13, 876:1, 876:7

**Floor** [1] - 837:4

**flow** [2] - 999:15, 1001:15

**fluidized** [2] - 856:8, 865:16

**focus** [5] - 955:21, 965:20, 984:24, 996:10, 1023:19

**focused** [1] - 1023:17

**folks** [1] - 1013:8

**follow** [1] - 1013:6

**followed** [2] - 864:16, 946:4

**following** [7] - 848:15, 879:24, 953:8, 954:25, 956:24, 957:20, 963:16

**follows** [1] - 845:14

**foregoing** [1] - 1027:8

**foreign** [4] - 897:1, 946:6, 947:11, 947:15

**forensics** [1] - 1019:25

**forever** [1] - 888:1

**forget** [2] - 869:19, 967:13

**form** [1] - 993:4

**format** [1] - 986:22

**former** [2] - 859:1, 905:19

**formulate** [1] - 1021:13

**forth** [5] - 847:5, 871:12, 903:16, 927:22, 978:23

**fortunate** [1] - 855:17

**forward** [6] - 843:11,

892:1, 892:6, 892:11, 955:21, 974:7

**forwarded** [6] - 941:13, 968:22, 997:14, 998:10, 1000:24, 1009:19

**forwarding** [13] - 838:16, 843:14, 848:3, 863:11, 863:13, 876:24, 880:6, 889:14, 955:15, 996:4, 998:7, 1009:21, 1010:4

**forwards** [2] - 885:22, 940:8

**Foster** [6] - 856:24, 857:1, 869:4, 869:5, 873:23, 885:17

**foundation** [12] - 846:15, 848:1, 877:10, 877:12, 877:22, 877:25, 894:2, 894:11, 917:25, 930:14, 968:21, 985:17

**foundations** [1] - 851:19

**four** [6] - 906:2, 906:3, 926:15, 926:16, 963:5, 985:5

**four-page** [1] - 963:5

**Fourth** [1] - 976:24

**frame** [1] - 854:1

**Fraud** [1] - 837:9

**Fred** [60] - 843:12, 861:5, 861:9, 862:8, 864:8, 864:16, 865:18, 866:24, 867:19, 868:14, 870:25, 871:7, 871:16, 874:7, 879:23, 879:24, 880:4, 886:2, 886:4, 886:6, 886:19, 888:8, 888:9, 891:11, 891:25, 892:2, 892:5, 892:7, 892:11, 892:25, 912:11, 912:15, 913:2, 934:7, 934:11, 934:16, 934:22, 935:6, 935:9, 935:18, 939:15, 939:17, 950:22, 951:6, 964:4, 966:12, 966:16, 967:3, 981:9, 983:25,

984:5, 988:12, 988:14, 990:12, 999:7, 999:23, 1001:1, 1003:24, 1004:6, 1004:9

**Fred's** [2] - 891:19, 934:25

**Frederic** [11] - 838:15, 862:16, 874:19, 876:16, 965:13, 967:9, 992:12, 1000:11, 1003:3, 1003:12, 1009:20

**Fredric** [1] - 888:20

**Friday** [2] - 872:15, 967:2

**friend** [3] - 883:21, 914:12, 985:7

**friendly** [1] - 906:13

**friends** [5] - 865:5, 873:20, 906:11, 906:12, 906:23

**friends'** [1] - 873:20

**front** [4] - 949:21, 997:2, 1001:21, 1018:3

**fronted** [1] - 1023:2

**fruit** [1] - 976:25

**fuel** [2] - 857:16, 857:17

**fulfill** [1] - 954:19

**fulfilling** [1] - 997:1

**full** [35] - 863:2, 872:3, 875:6, 887:5, 889:9, 908:8, 908:10, 945:1, 952:20, 955:12, 956:8, 957:14, 958:17, 959:15, 960:19, 961:21, 963:2, 965:18, 982:3, 984:10, 986:12, 987:16, 987:22, 989:23, 992:1, 992:21, 993:22, 994:6, 996:1, 998:5, 1000:17, 1002:2, 1003:8, 1023:4

**full-time** [2] - 908:8, 908:10

**fully** [1] - 845:24, 959:20, 1022:8

**function** [6] - 887:10, 887:13, 894:1, 894:6, 942:16, 954:21

**fundamental** [3] - 975:2, 978:3, 978:9

**funding** [3] - 854:23, 855:9, 884:23

**FURTHER** [1] - 943:19

**furtherance** [3] - 840:3, 1006:14, 1007:5

**FW** [3] - 868:18, 868:25, 951:1

## G

**Gajendra** [2] - 962:6, 991:5

**game** [2] - 950:24, 1017:9

**gather** [1] - 949:8

**gathered** [2] - 948:23, 962:13

**gathering** [1] - 948:12

**Geaney** [2] - 842:7, 848:21

**gears** [1] - 983:10

**general** [5] - 934:6, 945:16, 971:12, 981:15, 1008:22

**generalized** [1] - 1021:12

**generally** [1] - 847:22

**generated** [1] - 856:13

**generator** [1] - 857:23

**genesis** [1] - 972:14

**gentleman** [3] - 859:11, 861:19, 908:16

**gentlemen** [8] - 838:5, 853:3, 910:14, 910:25, 911:5, 980:1, 980:24, 1005:8

**germane** [1] - 1020:15

**Gigante** [2] - 840:14, 1008:1

**Gilimanuk** [1] - 996:13

**Gilson** [4] - 1024:21, 1025:3, 1025:20, 1025:22

**Gilson's** [1] - 1025:15

**Giuseppe** [2] - 959:17, 961:16

**given** [9] - 851:25, 878:7, 879:10, 959:17, 969:22, 972:10, 985:6, 1005:21, 1005:25

**global** [2] - 861:1, 861:11

**good-bye** [1] - 898:17

**Goodwin** [1] - 922:9

**Goran** [2] - 956:11, 961:17

**Government** [1] - 837:2

**government** [74] - 838:6, 839:23, 844:21, 845:19, 846:10, 847:12, 847:18, 849:8, 851:7, 851:11, 851:23, 852:4, 862:24, 867:25, 871:25, 873:21, 875:3, 879:13, 881:3, 887:2, 887:20, 889:6, 895:3, 897:7, 897:12, 899:3, 899:11, 900:21, 901:6, 902:3, 902:24, 903:12, 903:17, 903:22, 904:5, 904:11, 907:15, 914:5, 915:25, 916:10, 916:18, 916:21, 916:22, 917:11, 917:15, 917:23, 918:9, 918:16, 918:19, 918:24, 923:5, 944:15, 947:14, 968:14, 971:5, 972:10, 972:16, 973:9, 974:17, 978:6, 978:20, 979:5, 1006:25, 1007:9, 1007:20, 1007:25, 1009:5, 1016:8, 1016:15, 1017:10, 1021:3, 1023:10, 1024:21, 1026:1

**Government's** [19] - 862:14, 862:25, 867:17, 868:1, 871:14, 872:1, 874:16, 876:14, 879:13, 880:19, 881:3, 881:11, 881:15, 886:17, 887:3, 888:18, 889:7, 940:7, 1018:4

**government's** [19] - 838:14, 841:1, 849:9, 849:13, 850:3, 968:18, 972:4, 972:24, 974:8, 974:12, 976:12, 977:16, 979:2, 1006:10, 1010:2, 1014:1, 1021:25, 1023:25, 1025:17

**grand** [1] - 972:5

**grip** [2] - 954:20, 1002:21
**grounds** [2] - 879:15, 978:17
**group** [5] - 853:22, 861:12, 935:2, 942:18, 946:19
**guarantee** [4] - 841:23, 868:23, 884:1, 884:15
**guaranteeing** [1] - 870:13
**guess** [4] - 845:19, 908:5, 970:23, 1012:20
**guideline** [3] - 937:9, 937:18, 937:19
**guilt** [4] - 1013:14, 1016:25, 1018:13, 1021:7
**guilty** [11] - 901:3, 901:21, 902:5, 902:11, 904:17, 904:20, 905:5, 1013:20, 1020:12, 1020:14
**guy** [12] - 929:16, 930:1, 931:5, 931:7, 931:11, 931:14, 931:17, 932:7, 932:11, 932:19, 932:24, 937:15

# H

**half** [2] - 917:21, 1004:14
**hand** [21] - 844:4, 852:17, 944:21, 956:1, 960:21, 960:22, 970:5, 987:18, 987:24, 987:25, 988:1, 988:20, 989:9, 989:10, 989:12, 989:13, 993:7, 999:2, 999:3, 1018:25, 1019:3
**handed** [1] - 1019:3
**handle** [2] - 880:3, 1000:5
**handled** [1] - 948:9
**handling** [2] - 952:6, 1010:25
**happy** [6] - 890:22, 968:19, 975:18, 1003:19, 1004:10, 1005:4
**hard** [4] - 907:11, 919:14, 954:23,

957:24
**Hatt** [2] - 959:8, 961:17
**Haven** [3] - 836:8, 837:4, 1027:19
**head** [8] - 860:25, 861:6, 888:10, 909:2, 909:25, 911:22, 935:2, 1004:13
**headings** [1] - 926:24
**headquarters** [3] - 890:4, 909:9, 946:24
**hear** [11] - 843:25, 853:12, 868:25, 870:17, 893:17, 893:21, 893:25, 967:23, 976:9, 976:15, 1024:5
**heard** [11] - 869:2, 893:18, 909:22, 909:23, 971:9, 982:15, 983:1, 995:8, 1004:14, 1023:15
**hearsay** [4] - 840:6, 840:7, 840:20, 1006:15
**help** [17] - 861:2, 861:7, 873:20, 873:21, 873:24, 874:2, 896:4, 914:11, 938:17, 951:5, 951:6, 997:10, 1012:21, 1013:11, 1014:5, 1021:12
**helpful** [2] - 914:14, 914:17
**helping** [1] - 856:1
**hereby** [1] - 1027:8
**hi** [1] - 996:12
**hidden** [3] - 876:17, 888:22, 916:4
**high** [3] - 865:4, 892:23, 913:21
**high-level** [2] - 892:23, 913:21
**highlight** [5] - 928:9, 982:5, 983:21, 989:2, 996:7
**highlighted** [11] - 872:13, 875:22, 879:23, 882:18, 889:22, 953:19, 954:17, 961:23, 983:23, 984:13, 994:12
**Hill** [1] - 991:1
**hire** [1] - 886:13

**hired** [15] - 866:22, 877:7, 877:17, 877:20, 893:19, 894:25, 895:2, 913:14, 913:19, 914:7, 917:6, 943:24, 1009:11, 1009:13, 1025:24
**hiring** [7] - 895:8, 933:13, 933:24, 936:18, 942:17, 942:21, 943:23
**historically** [1] - 866:19
**history** [3] - 865:14, 945:20, 978:1
**hold** [3] - 849:4, 851:3, 854:17
**home** [4] - 870:21, 980:4, 980:9, 1005:9
**Honor** [172] - 838:10, 838:11, 838:19, 838:23, 839:4, 839:13, 839:21, 840:13, 840:25, 841:25, 842:9, 842:16, 843:6, 843:9, 843:23, 844:2, 844:6, 846:2, 846:8, 846:24, 847:7, 847:23, 848:12, 848:17, 849:1, 849:3, 850:6, 850:14, 850:24, 851:21, 852:14, 852:24, 853:5, 853:14, 855:4, 855:5, 855:12, 863:1, 868:2, 868:8, 872:2, 875:5, 877:11, 877:23, 878:19, 879:12, 879:15, 879:20, 881:2, 881:5, 887:4, 892:21, 894:3, 894:12, 897:14, 901:7, 901:11, 901:15, 902:6, 902:13, 910:20, 911:7, 918:4, 918:11, 918:12, 919:13, 919:18, 920:3, 930:7, 930:14, 933:1, 935:9, 935:11, 935:14, 936:5, 937:6, 938:14, 938:15, 938:18, 939:20, 940:23, 941:16, 941:18,

943:13, 943:15, 943:17, 944:3, 944:7, 944:10, 944:13, 944:17, 944:18, 945:5, 950:8, 950:9, 952:18, 952:19, 953:21, 954:2, 954:9, 954:13, 955:11, 956:4, 956:6, 957:11, 958:15, 958:16, 961:19, 965:16, 966:20, 967:24, 968:9, 968:17, 969:19, 969:24, 970:6, 970:15, 971:2, 971:15, 972:13, 972:23, 973:18, 974:2, 974:25, 975:17, 975:22, 976:17, 977:11, 977:13, 978:11, 979:20, 980:10, 981:2, 981:25, 982:2, 984:9, 985:12, 985:19, 986:2, 986:10, 986:11, 987:14, 989:22, 992:19, 993:18, 995:23, 1003:6, 1005:2, 1005:19, 1006:7, 1011:6, 1011:12, 1014:7, 1017:25, 1018:6, 1018:19, 1019:22, 1020:3, 1020:10, 1021:5, 1021:19, 1022:2, 1022:10, 1022:11, 1022:20, 1022:24, 1023:7, 1023:9, 1023:17, 1024:11, 1024:19, 1025:12
**Honor's** [1] - 1015:1
**HONORABLE** [1] - 836:18
**hope** [1] - 1024:23
**hopefully** [4] - 847:25, 853:11, 979:22, 1026:8
**hoping** [1] - 904:13
**horse** [1] - 984:15
**HOSKINS** [2] - 836:8, 1027:3
**Hoskins** [106] - 838:5, 843:14, 859:17, 860:14, 867:19, 880:22, 881:17,

882:2, 882:3, 888:22, 892:2, 892:12, 892:14, 892:16, 896:7, 896:23, 896:25, 897:6, 897:10, 897:21, 897:24, 898:3, 898:8, 898:12, 909:18, 911:12, 911:22, 912:14, 924:10, 924:18, 927:3, 927:10, 927:14, 927:19, 927:20, 928:4, 933:21, 939:1, 939:13, 939:14, 939:16, 940:8, 940:16, 941:14, 941:23, 942:1, 942:4, 942:6, 942:15, 943:4, 950:5, 951:24, 952:15, 953:5, 956:11, 957:8, 958:12, 958:19, 958:25, 960:7, 960:14, 960:15, 961:15, 962:21, 963:10, 963:21, 964:14, 965:1, 965:13, 965:22, 966:9, 966:13, 967:17, 977:3, 981:10, 983:15, 986:7, 986:15, 986:18, 987:5, 987:10, 989:17, 990:3, 991:22, 992:5, 992:12, 995:19, 996:5, 997:14, 998:1, 998:15, 999:8, 1000:3, 1000:10, 1000:24, 1001:1, 1001:23, 1002:7, 1003:3, 1003:25, 1004:24, 1009:21, 1009:22, 1016:1, 1018:14
**Hoskins'** [10] - 859:22, 859:25, 860:2, 909:14, 913:2, 942:8, 943:5, 961:3, 1001:10, 1016:25
**Hoskins's** [1] - 943:22
**hotel** [2] - 926:17, 926:18
**hours** [2] - 899:18, 1022:3
**Houston** [4] - 854:16,

860:25, 893:6,
908:13
**huge** [1] - 873:5
**hundred** [1] - 851:10

**I**

**idea** [1] - 1020:5
**ideas** [1] - 870:15
**identical** [1] - 840:18
**identification** [22] -
862:15, 871:15,
874:16, 876:14,
880:19, 886:17,
888:18, 950:4,
952:13, 958:11,
960:13, 961:14,
962:20, 965:11,
966:11, 981:18,
986:5, 987:8, 989:9,
991:19, 997:23,
1000:9
**identified** [6] - 842:12,
844:15, 844:18,
1013:8, 1013:24
**identify** [2] - 851:14,
852:10
**identifying** [1] -
842:11
**illegitimate** [6] -
913:15, 914:7,
920:25, 922:3,
928:23, 940:3
**imagine** [1] - 851:12
**imbedding** [1] -
958:24
**imbeds** [1] - 960:6
**immediate** [6] -
887:24, 891:3,
891:12, 891:17,
960:4, 960:10
**immediately** [1] -
996:19
**immunity** [1] - 905:11
**immunize** [1] - 1016:6
**impacting** [1] -
1004:18
**impacts** [2] - 1013:13,
1013:14
**impeachment** [1] -
1019:1
**implement** [1] -
964:19
**imply** [1] - 845:9
**important** [13] -
864:15, 865:11,
865:17, 866:4,
874:6, 901:13,
904:9, 904:12,
920:18, 931:18,

967:14, 980:15
**importantly** [2] -
882:22, 883:6
**impose** [1] - 904:2
**improve** [1] - 886:7
**improving** [1] - 868:20
**IN** [7] - 892:17,
908:23, 908:24,
909:2, 933:19,
937:14, 967:16
**inaccurate** [1] - 977:2
**inappropriate** [2] -
842:20, 979:1
**Inc** [51] - 853:18,
856:16, 857:6,
857:9, 857:13,
857:15, 858:18,
858:23, 858:25,
859:4, 860:3, 861:6,
861:14, 870:21,
871:3, 872:9,
872:25, 874:13,
874:14, 884:8,
884:9, 884:19,
885:3, 886:10,
886:15, 888:14,
891:14, 905:20,
912:3, 913:6,
914:18, 915:1,
915:2, 915:7,
947:24, 964:4,
967:10, 981:20,
982:7, 987:12,
988:2, 988:23,
988:24, 990:23,
992:13, 993:10,
993:11, 994:3,
994:13, 995:4
**Inc.'s** [1] - 856:22
**inception** [1] - 948:9
**inclined** [1] - 1024:20
**include** [3] - 869:21,
892:2, 892:11
**included** [1] - 1006:17
**includes** [2] - 902:22,
963:6
**including** [7] - 864:9,
899:23, 921:12,
971:25, 972:2,
972:4, 1009:19
**increase** [6] - 868:16,
868:21, 869:14,
870:6, 870:14, 871:5
**increased** [1] - 870:8
**increasing** [2] -
868:16, 869:23
**increasingly** [1] -
890:2
**independent** [30] -
838:21, 839:9,

839:11, 840:9,
840:22, 843:9,
844:24, 845:10,
847:13, 847:15,
847:19, 848:4,
848:5, 848:23,
968:16, 969:13,
969:16, 969:20,
970:9, 970:16,
974:18, 1006:20,
1007:21, 1008:3,
1008:6, 1008:11,
1008:13, 1009:3,
1010:13, 1010:16
**Indian/Chinese/
Korean** [1] - 951:2
**indicate** [1] - 1008:9
**indicated** [1] -
1003:21
**indicting** [1] - 842:13
**indictment** [6] -
840:19, 842:13,
842:14, 844:11,
844:16, 844:20
**individual** [5] -
844:18, 859:16,
860:5, 860:15,
922:12
**individuals** [4] -
865:20, 865:24,
1015:24, 1017:4
**Indonesia** [56] - 843:2,
843:3, 844:13,
844:17, 856:5,
856:15, 857:10,
858:6, 859:1, 859:3,
859:5, 860:10,
860:11, 860:12,
861:2, 861:8,
862:20, 863:21,
865:14, 865:21,
866:10, 866:20,
872:18, 872:22,
874:10, 876:6,
879:1, 884:12,
887:21, 889:4,
892:24, 893:2,
893:7, 894:17,
895:3, 905:24,
907:16, 926:1,
935:7, 949:11,
950:7, 952:4,
961:18, 962:8,
963:10, 964:6,
964:7, 964:20,
965:5, 965:8, 984:7,
988:25, 993:12,
1001:3, 1003:5
**Indonesian** [3] -
859:13, 966:5, 966:6

**Inez** [6] - 888:20,
889:2, 889:3,
889:13, 889:18,
889:21
**inflammatory** [1] -
1023:7
**influence** [6] - 875:18,
875:21, 890:14,
890:15, 890:17,
997:2
**influencing** [1] -
914:10
**info** [3] - 963:16,
964:24, 1001:13
**informant** [1] - 978:7
**information** [11] -
880:3, 890:6, 893:8,
914:18, 915:4,
921:16, 927:21,
927:24, 953:17,
977:1, 978:7
**informed** [3] - 966:2,
983:24, 1004:20
**infos** [2] - 873:4,
873:8
**initial** [1] - 972:17
**initiation** [1] - 978:4
**initiative** [1] - 959:10
**innocence** [3] -
1013:14, 1016:25,
1018:13
**input** [2] - 854:6
**inquire** [3] - 850:7,
1013:19, 1017:21
**insight** [1] - 914:25
**instance** [4] - 942:25,
1001:15, 1018:24,
1024:3
**instances** [1] - 946:15
**instead** [5] - 866:4,
929:13, 929:24,
931:3, 931:24
**instructed** [3] -
878:16, 879:7,
1009:16
**instruction** [3] -
973:6, 975:21,
1015:4
**instructions** [2] -
879:10, 1015:2
**intelligence** [1] -
859:14
**intend** [10] - 849:11,
850:25, 851:15,
875:25, 901:11,
971:3, 972:8,
977:19, 1016:3,
1023:18
**intended** [3] - 851:5,
1008:24, 1017:25

**intending** [1] - 980:14
**intends** [4] - 851:11,
970:22, 980:7, 980:8
**intent** [3] - 977:5,
1008:25
**intention** [1] - 954:2,
977:17, 1024:22,
1025:4
**interaction** [1] - 910:6
**interactions** [1] -
898:8
**interest** [3] - 884:5,
885:8, 885:14
**interested** [1] - 856:19
**interests** [3] - 885:18,
885:19, 960:1
**internally** [1] - 915:3
**international** [2] -
947:2, 977:12
**International** [43] -
853:22, 853:24,
854:2, 854:3, 854:8,
854:11, 854:14,
854:15, 854:18,
854:22, 854:25,
855:6, 855:15,
859:8, 859:10,
859:12, 860:10,
862:9, 908:1, 909:6,
909:15, 909:19,
909:25, 910:1,
911:10, 911:13,
911:17, 911:23,
913:5, 933:12,
933:18, 933:19,
933:25, 936:8,
936:17, 936:24,
937:22, 942:16,
946:22, 947:8,
947:20, 998:14
**internationally** [1] -
937:9
**interpret** [1] - 954:12
**interrupt** [1] - 1011:14
**intertwined** [1] - 929:3
**interview** [3] - 900:14,
1019:20
**interviewed** [1] -
1017:6
**interviewing** [1] -
948:15
**introduced** [1] - 960:3
**investigate** [1] -
947:11
**Investigation** [1] -
945:10
**investigation** [37] -
948:23, 949:2,
972:15, 972:17,
972:20, 973:4,

973:19, 973:22, 974:3, 974:10, 974:11, 974:18, 974:20, 974:22, 975:3, 976:14, 977:1, 977:7, 977:9, 978:2, 978:5, 979:8, 1013:10, 1014:1, 1015:23, 1017:12, 1017:14, 1019:10, 1019:24, 1020:7, 1020:10, 1020:25, 1021:3, 1021:8, 1023:1, 1024:1

**investigations** [1] - 946:10

**investigative** [8] - 971:22, 972:15, 972:21, 973:9, 1014:24, 1015:14, 1016:5, 1016:24

**invitation** [3] - 959:10, 1016:14

**involved** [13] - 860:23, 864:3, 894:20, 905:16, 936:13, 946:9, 946:15, 962:7, 985:8, 1011:15, 1015:23, 1017:3, 1020:11

**involvement** [6] - 895:8, 895:23, 947:19, 948:6, 962:3, 985:6

**involves** [1] - 977:12

**involving** [5] - 936:23, 947:24, 1019:25, 1020:1

**Ion** [7] - 862:18, 871:17, 888:21, 998:14, 999:7, 1000:12, 1000:25

**irrelevant** [4] - 849:15, 977:10, 977:12, 979:3

**issue** [46] - 838:13, 841:14, 842:10, 845:4, 846:8, 846:17, 849:3, 849:6, 850:8, 850:14, 869:14, 869:15, 869:18, 869:19, 882:24, 883:8, 883:9, 883:22, 886:2, 891:18, 892:6, 901:9, 940:21, 960:4, 960:10, 964:12, 966:2, 966:9, 968:11,

968:12, 968:15, 980:2, 983:6, 984:19, 987:2, 996:13, 996:14, 1004:19, 1007:13, 1007:18, 1010:22, 1013:15, 1017:20, 1018:15, 1023:16

**issues** [10] - 838:18, 850:5, 900:11, 936:14, 951:8, 952:7, 977:12, 985:9, 1002:12, 1023:14

**itself** [5] - 840:20, 845:13, 845:15, 1007:14, 1010:6

## J

**jail** [1] - 904:14

**Jakarta** [6] - 863:21, 873:1, 875:14, 888:4, 890:4, 963:17

**Jan** [1] - 962:2

**JANET** [1] - 836:18

**January** [6] - 962:23, 963:12, 963:22, 964:14, 987:11, 989:18

**JBA** [2] - 836:4, 1027:3

**JBIC** [2] - 951:6, 951:8

**Jeffrey** [2] - 944:19, 945:1

**JEFFREY** [2] - 945:2, 945:6

**job** [12] - 841:18, 870:10, 878:18, 882:24, 883:12, 883:15, 883:17, 941:1, 941:4, 945:8, 946:5, 1009:17

**joined** [2] - 945:23, 948:11

**joint** [1] - 959:8

**JONES** [1] - 837:7

**judge** [3] - 904:1, 976:4, 979:1

**July** [1] - 901:21

**Junji** [5] - 863:18, 863:19, 863:24, 874:18, 886:19

**juror's** [1] - 950:18

**jurors** [2] - 838:8, 843:24

**jury** [46] - 847:9, 848:19, 849:4, 851:3, 852:23, 861:10, 864:6,

870:12, 870:23, 872:6, 874:5, 885:1, 886:8, 890:9, 911:1, 945:18, 946:2, 948:22, 972:5, 973:6, 973:8, 974:1, 975:11, 975:12, 976:15, 976:18, 977:15, 977:22, 980:4, 980:5, 980:9, 980:18, 982:15, 983:1, 986:1, 998:23, 1013:5, 1013:17, 1015:2, 1015:4, 1015:10, 1018:4, 1021:7, 1023:15, 1024:5

**Jury** [7] - 838:2, 853:1, 910:16, 911:3, 968:4, 980:22, 1005:12

**JURY** [2] - 836:12, 836:18

**jury's** [2] - 950:12, 979:4

**Justice** [1] - 837:8

**justified** [1] - 967:15

## K

**Kaelin** [16] - 962:22, 963:10, 963:21, 965:1, 965:12, 965:22, 966:12, 966:17, 966:23, 981:9, 986:7, 987:11, 989:18, 990:3, 991:21, 992:11

**KAHN** [3] - 837:6, 852:24, 880:14

**keen** [1] - 1018:9

**keep** [4] - 853:13, 1002:23, 1005:2, 1012:14

**keeping** [2] - 853:12, 955:24

**key** [1] - 890:6, 890:11

**Keys** [1] - 990:16

**keys** [4] - 964:3, 965:9, 990:7, 991:10

**kickbacks** [1] - 895:13

**kind** [7] - 869:19, 898:16, 898:19, 907:11, 914:25, 970:15, 1012:22

**kindly** [1] - 886:5

**kinds** [1] - 914:25

**knowing** [2] - 838:22, 1024:4

knowledge [6] - 843:21, 894:5, 930:16, 938:10, 938:12, 943:10

**knowledge/views** [1] - 951:8

**known** [3] - 840:14, 846:5, 1004:9

**knows** [4] - 842:16, 878:1, 878:20, 997:20

**Kusno** [37] - 838:16, 838:22, 842:12, 843:7, 844:14, 844:21, 846:17, 848:16, 876:24, 877:1, 877:2, 877:16, 877:19, 878:4, 878:13, 880:9, 882:5, 922:13, 922:22, 923:3, 923:8, 923:15, 940:9, 969:1, 980:13, 980:16, 1006:17, 1007:10, 1007:13, 1007:19, 1007:24, 1009:9, 1009:11, 1009:13, 1009:16, 1010:7, 1010:18

**Kusno's** [14] - 841:15, 842:1, 843:10, 844:24, 968:24, 1006:20, 1007:8, 1007:23, 1009:6, 1009:19, 1009:22, 1010:5, 1010:14, 1010:15

**Kusunoki** [8] - 863:18, 863:19, 863:24, 874:18, 886:19, 888:3, 888:5, 889:25

**Kusunoki's** [1] - 875:9

## L

**laboring** [1] - 838:25

**lack** [1] - 985:7

**ladies** [8] - 838:4, 853:3, 910:14, 910:24, 911:5, 980:1, 980:24, 1005:8

**laid** [3] - 846:15, 895:22, 968:21

**language** [2] - 953:22, 1018:3

**Lapian** [5] - 888:20, 889:2, 889:3, 889:18, 940:2

laptop [5] - 889:13, 925:4, 925:11, 925:12, 926:4

**Larry** [6] - 863:25, 864:13, 872:19, 875:24, 920:17, 1009:20

**LARRY** [5] - 853:6, 897:16, 938:23, 941:19, 943:19

**Lars** [1] - 964:18

**LARYEA** [63] - 837:7, 853:5, 853:7, 853:14, 853:16, 855:5, 855:12, 855:14, 862:24, 863:3, 867:25, 868:8, 868:11, 871:25, 872:4, 875:3, 875:7, 877:13, 877:15, 878:2, 878:3, 878:12, 878:21, 879:12, 879:20, 879:21, 880:16, 880:17, 881:2, 881:9, 887:2, 887:6, 889:6, 889:10, 893:1, 894:7, 894:14, 894:15, 897:14, 901:7, 902:6, 902:13, 917:25, 919:18, 930:7, 930:9, 931:15, 933:1, 935:11, 935:14, 938:24, 939:11, 939:21, 939:25, 940:12, 940:14, 940:15, 940:23, 940:24, 941:16, 943:15, 943:20, 944:10

**Laryea** [2] - 853:4, 898:11

**last** [29] - 839:6, 842:9, 843:8, 843:13, 844:9, 846:22, 863:23, 870:11, 874:22, 879:25, 885:5, 885:25, 889:24, 896:21, 928:10, 935:8, 944:25, 945:2, 953:19, 959:21, 969:15, 983:13, 993:3, 996:18, 997:6, 999:21, 1009:25, 1024:9

late [1] - 847:4
latest [2] - 950:23,
1001:16
laundering [5] - 905:3,
905:6, 905:9, 946:7,
972:2
laundering-related [1]
- 905:6
Lauren [1] - 871:18
law [9] - 839:1,
840:25, 842:21,
844:25, 849:16,
945:22, 945:24,
946:8, 970:15
Lawrence [65] -
859:17, 860:14,
867:19, 870:15,
880:22, 885:23,
888:21, 892:2,
892:12, 892:16,
896:7, 897:20,
927:16, 934:23,
934:24, 941:13,
950:5, 951:9,
951:24, 952:4,
952:15, 955:23,
957:8, 958:12,
958:25, 960:6,
960:14, 961:12,
961:15, 962:21,
963:19, 963:21,
963:25, 964:24,
965:9, 965:13,
965:22, 966:8,
966:13, 967:16,
983:15, 986:7,
986:23, 987:10,
989:17, 991:22,
992:12, 995:19,
996:5, 996:12,
997:22, 998:1,
999:7, 1000:2,
1000:4, 1000:10,
1000:24, 1001:19,
1001:23, 1002:24,
1003:3, 1003:25,
1004:12, 1004:19,
1009:21
LAWRENCE [2] -
836:8, 1027:3
Lawrence's [2] -
934:8, 934:15
laws [1] - 946:5
lay [3] - 894:13,
930:13, 985:17
lead [12] - 858:16,
858:19, 858:21,
858:23, 861:8,
861:22, 864:1,
872:8, 912:6,

942:12, 948:3,
948:11
leader [2] - 866:8,
884:11
leading [2] - 967:23,
1022:14
leads [1] - 844:11
learn [5] - 916:17,
916:21, 917:14,
931:6, 931:10
learned [2] - 916:22,
917:10
least [7] - 847:21,
848:13, 848:14,
896:12, 912:24,
915:12, 997:11
leave [6] - 895:16,
895:18, 910:14,
944:14, 968:6,
1018:4
leaving [4] - 896:8,
898:13, 898:23,
950:25
led [3] - 946:12,
946:14, 974:5
left [17] - 893:7,
895:24, 896:2,
896:5, 896:10,
898:13, 906:4,
955:1, 960:21,
981:4, 981:8,
987:18, 987:24,
989:9, 989:10,
989:12, 999:2
left-hand [7] - 960:21,
987:18, 987:24,
989:9, 989:10,
989:12, 999:2
legal [1] - 1023:14
legitimate [9] -
913:15, 913:18,
914:8, 920:22,
921:25, 922:3,
928:22, 940:3,
1020:5
lengths [1] - 1020:9
lengthy [1] - 953:11
less [4] - 899:14,
926:14, 954:21,
986:22
letter [2] - 970:15,
986:21
level [3] - 892:23,
913:21, 938:1
levels [3] - 910:4,
922:18, 936:23
lies [1] - 973:1
light [1] - 879:18
likely [1] - 950:25
limine [1] - 979:16

line [12] - 863:17,
863:23, 901:9,
923:20, 925:3,
943:5, 952:3,
955:25, 969:15,
990:10, 1016:2,
1020:5
lines [13] - 924:14,
938:1, 938:3, 952:3,
953:19, 959:22,
983:22, 990:21,
996:11, 997:6,
999:12, 999:22,
1002:10
link [1] - 974:23
LINSENMAYER [1] -
837:8
list [6] - 845:16,
994:24, 998:24,
1015:25, 1017:5
listed [6] - 844:16,
982:10, 990:25,
991:4, 991:10,
991:15
listening [1] - 1014:22
lists [1] - 1000:25
litigate [1] - 842:19
live [1] - 962:17
lived [1] - 962:18
living [1] - 863:21
LLC [1] - 837:19
LLP [1] - 837:15
LN [3] - 889:14,
889:15, 987:3
lobby [1] - 920:23
lobbying [6] - 864:14,
866:3, 920:17,
920:22, 921:25,
1003:18
local [8] - 854:5,
854:6, 859:13,
859:14, 962:1,
964:21, 965:5, 965:7
locally [1] - 964:19
located [4] - 856:4,
946:23, 946:24,
982:11
locations [1] - 962:14
log [1] - 926:5
look [46] - 845:13,
847:9, 847:11,
848:25, 881:25,
882:13, 882:14,
918:6, 933:10,
933:17, 950:3,
952:13, 952:22,
955:5, 957:3,
957:24, 958:10,
959:4, 959:21,
961:13, 962:19,

966:10, 966:22,
981:17, 982:18,
983:11, 984:3,
986:4, 986:17,
986:24, 987:7,
988:8, 988:19,
989:8, 990:1,
993:24, 995:17,
996:21, 997:13,
997:23, 1000:8,
1000:19, 1003:1,
1003:23, 1022:3
looked [10] - 845:2,
896:19, 896:21,
917:3, 952:24,
958:21, 984:22,
993:15, 996:22
looking [9] - 841:13,
841:14, 864:8,
870:11, 937:2,
953:16, 960:23,
975:20, 1021:14
looks [1] - 970:7
loop [1] - 967:8
LORINDA [1] - 837:7
lorinda.laryea@
usdoj.gov [1] -
837:11
lose [5] - 870:10,
873:10, 874:4, 921:9
losing [2] - 974:13,
1002:21
lost [1] - 1013:12
Lotus [2] - 889:16,
889:21
low [1] - 865:5
lower [1] - 904:2
lunch [4] - 849:2,
968:1, 970:19,
1018:18
Lunch [1] - 979:24
lunchtime [1] - 851:17

M

ma'am [4] - 918:11,
934:20, 934:21,
1005:16
mail [183] - 837:5,
837:16, 837:21,
838:15, 838:16,
841:15, 841:17,
842:15, 843:2,
844:14, 846:5,
848:3, 848:11,
848:16, 862:16,
862:19, 862:22,
863:5, 863:11,
863:13, 863:16,
863:24, 864:8,

864:10, 867:19,
867:21, 867:22,
869:13, 870:11,
871:16, 871:20,
872:14, 873:2,
874:18, 874:23,
875:9, 876:8,
876:16, 876:19,
876:24, 879:22,
880:6, 880:8,
880:21, 880:23,
881:5, 881:6,
881:16, 881:23,
882:1, 882:10,
885:21, 886:19,
886:22, 886:25,
887:8, 887:22,
888:20, 888:25,
889:1, 889:12,
889:17, 889:18,
889:20, 889:21,
893:4, 896:15,
896:21, 898:7,
898:23, 917:15,
917:21, 917:23,
919:8, 920:8,
920:11, 920:13,
921:8, 921:11,
921:15, 921:20,
923:7, 923:23,
924:5, 924:10,
925:3, 925:6,
925:10, 925:17,
926:1, 926:2, 927:3,
927:13, 928:4,
928:9, 928:13,
940:2, 940:7,
940:16, 940:19,
941:12, 950:5,
951:21, 952:15,
952:24, 953:11,
955:7, 955:15,
955:24, 956:10,
956:22, 956:25,
957:8, 957:17,
957:21, 958:5,
958:7, 958:12,
958:24, 959:4,
959:22, 960:5,
960:6, 960:14,
961:15, 962:21,
963:6, 963:9,
963:15, 963:20,
963:24, 964:13,
965:1, 965:2,
965:12, 965:21,
966:12, 966:15,
966:16, 966:23,
981:9, 983:13,
984:5, 984:20,
984:21, 985:11,

985:13, 986:6,
986:14, 986:17,
987:9, 987:25,
988:6, 988:8,
989:16, 991:20,
992:10, 995:19,
996:5, 996:10,
997:25, 998:7,
998:13, 999:4,
999:6, 999:21,
1000:10, 1000:20,
1000:25, 1001:22,
1003:2, 1003:12,
1003:23, 1004:23,
1006:17, 1007:13,
1009:19, 1010:5,
1010:13, 1011:15
**mailing** [1] - 872:6
**mails** [30] - 841:8,
843:19, 851:8,
881:20, 882:2,
896:16, 896:19,
899:23, 899:24,
915:20, 915:25,
923:5, 926:6,
926:10, 927:14,
949:6, 949:8,
949:13, 949:24,
951:18, 954:5,
955:19, 958:20,
998:8, 998:12,
1003:10, 1011:18,
1011:22, 1012:1,
1017:3
**main** [7] - 856:22,
856:24, 884:22,
902:19, 928:9,
956:17, 958:8
**maker** [4] - 888:2,
888:6, 888:7, 888:9
**man** [2] - 867:15,
909:20
**managed** [1] - 984:17
**management** [1] -
874:8
**manager** [6] - 843:4,
860:9, 860:10,
860:12, 863:21,
877:3
**Manning** [1] - 837:19
**manufacture** [1] -
858:13
**map** [1] - 1023:4
**March** [9] - 963:12,
981:24, 995:21,
996:8, 998:1,
1000:13, 1001:24,
1002:4, 1003:4
**margin** [1] - 873:5
**marked** [9] - 862:14,

867:17, 871:14,
874:15, 876:13,
880:13, 880:19,
886:16, 888:17
**marketing** [1] - 861:12
**marshaling** [5] -
975:3, 975:6,
1017:11, 1017:12,
1020:18
**Martini** [1] - 837:19
**Marubeni** [34] - 857:9,
857:18, 857:21,
857:22, 857:24,
863:20, 864:18,
866:6, 868:15,
872:24, 876:3,
876:9, 880:1,
884:18, 884:20,
885:24, 888:4,
891:2, 891:10,
915:7, 923:25,
924:6, 949:17,
951:5, 961:25,
983:25, 994:2,
994:8, 994:12,
994:19, 995:2,
1009:25
**Marubeni's** [1] -
889:24
**Maryland** [3] - 962:18,
964:2, 982:13
**material** [1] - 976:14
**matter** [4] - 875:25,
914:9, 916:24,
1027:10
**matters** [2] - 838:7,
914:10
**MC** [5] - 864:11,
864:17, 864:20,
867:17, 884:18
**mean** [17] - 858:19,
864:17, 885:11,
885:15, 885:16,
887:14, 890:19,
913:23, 913:24,
916:5, 934:4, 937:5,
937:6, 937:18,
1017:10, 1021:8,
1022:7
**meaning** [2] - 925:15,
970:14
**means** [2] - 845:20,
925:12
**meant** [5] - 936:2,
940:3, 942:11,
970:14, 1015:6
**measures** [1] - 891:3
**meet** [2] - 876:3, 876:9
**meeting** [30] - 843:13,
843:16, 875:11,

875:12, 876:1,
876:11, 879:25,
880:5, 882:15,
885:24, 891:25,
892:2, 892:4,
892:11, 892:14,
892:24, 900:10,
900:13, 916:9,
918:18, 919:6,
919:8, 932:2, 962:4,
966:2, 968:25,
969:2, 969:4, 969:9,
1009:24
**meetings** [15] -
892:18, 899:3,
899:6, 899:10,
899:13, 909:10,
909:12, 909:13,
914:14, 918:23,
919:3, 923:2, 926:9,
961:25, 962:4
**meets** [1] - 938:5
**Melissa** [2] - 836:24,
1027:5
**MELISSA** [1] -
1027:17
**member** [3] - 858:16,
952:4, 1007:11
**members** [5] - 840:1,
867:5, 914:19,
915:3, 1007:3
**membership** [7] -
844:24, 845:5,
845:6, 845:11,
847:20, 970:10,
970:17
**memory** [2] - 916:23,
916:24
**mention** [1] - 905:8
**mentioned** [21] -
856:9, 856:16,
857:1, 857:18,
858:2, 860:15,
861:9, 865:21,
866:13, 878:22,
879:6, 880:4, 880:8,
883:23, 889:17,
894:16, 943:22,
1004:11, 1011:4,
1011:18, 1018:17
**mentions** [4] - 869:13,
876:8, 884:6, 884:7
**message** [8] - 925:17,
953:5, 961:4, 990:5,
992:23, 998:21,
1004:3, 1004:8
**messages** [1] - 968:23
**messed** [1] - 935:21
**Messrs** [1] - 875:24
**met** [9] - 891:22,

897:22, 897:24,
900:17, 902:24,
938:3, 966:1,
1019:12, 1021:3
**Michael** [1] - 908:17
**microphone** [1] -
853:11
**mid** [2] - 962:2
**mid-Feb** [1] - 962:2
**mid-Jan** [1] - 962:2
**middle** [4] - 851:22,
852:4, 999:4,
1000:21
**might** [7] - 907:22,
930:4, 930:5,
937:13, 959:11,
959:14, 959:16
**million** [7] - 868:17,
869:13, 869:20,
869:24, 870:3,
871:5, 873:6
**mine** [2] - 905:19,
950:11
**minimal** [1] - 1012:8
**minimum** [1] - 841:7
**minor** [1] - 985:1
**minute** [1] - 940:23
**minutes** [3] - 846:6,
910:18, 910:22
**missing** [2] - 975:20,
978:25
**misunderstanding** [1]
- 839:1
**misunderstood** [1] -
1017:23
**Mitsubishi** [3] -
856:25, 857:2,
885:17
**Mitsubishi's** [1] -
1003:18
**Mitsui** [1] - 950:24
**Mizushima** [7] -
874:21, 889:25,
891:22, 891:25,
892:4, 892:7, 892:10
**MLATs** [1] - 977:13
**modem** [5] - 889:13,
925:4, 925:11,
925:12, 926:5
**modems** [1] - 925:23
**modified** [1] - 970:12
**Moeis** [4] - 952:4,
953:12, 957:1,
957:21
**Moenaf** [65] - 838:15,
843:11, 843:14,
848:3, 860:6,
860:13, 860:19,
860:20, 862:18,
865:21, 866:5,

867:10, 871:18,
874:20, 876:16,
876:23, 877:3,
878:7, 878:16,
879:3, 879:6,
880:21, 881:11,
881:16, 886:21,
888:22, 890:1,
891:10, 891:16,
893:13, 914:1,
915:15, 922:19,
923:13, 927:10,
928:1, 929:9, 931:1,
931:10, 931:23,
951:24, 952:16,
955:7, 955:16,
956:11, 958:25,
960:15, 965:21,
968:23, 983:14,
986:8, 996:5,
997:25, 998:14,
999:7, 1000:2,
1000:3, 1001:22,
1002:6, 1003:2,
1009:14, 1009:15,
1009:18, 1009:22,
1017:5
**Moenaf's** [4] - 860:8,
885:21, 1010:4,
1010:13
**moment** [8] - 839:14,
938:14, 953:18,
962:12, 991:3,
996:11, 1001:14,
1001:19
**Monday** [4] - 996:18,
1005:10, 1024:15,
1026:2
**money** [14] - 841:20,
841:21, 883:1,
883:14, 883:21,
885:20, 887:18,
905:2, 905:5, 905:9,
941:5, 941:10,
946:7, 972:2
**month** [1] - 951:1
**months** [5] - 867:3,
901:21, 945:14,
946:4, 985:5
**moot** [1] - 968:20
**morning** [14] - 838:4,
838:5, 853:8, 853:9,
875:10, 897:18,
897:19, 968:11,
968:14, 1021:20,
1021:21, 1022:3,
1024:14, 1026:4
**MORVILLO** [6] -
837:13, 1024:19,
1025:2, 1025:4,

1025:10, 1025:25
**most** [4] - 884:23, 916:3, 964:11, 997:4
**motion** [10] - 849:8, 903:18, 903:20, 903:23, 904:1, 904:10, 904:14, 979:16, 1006:10, 1023:2
**motivated** [1] - 1013:11
**Mouillet** [6] - 995:20, 997:14, 998:13, 999:9, 1000:11, 1001:1
**move** [22] - 902:9, 910:9, 920:3, 923:17, 933:6, 935:8, 961:7, 962:11, 965:10, 986:1, 987:14, 989:21, 991:18, 991:24, 992:18, 993:19, 994:4, 995:7, 995:23, 998:3, 1000:14, 1024:1
**moved** [1] - 905:24
**moves** [8] - 862:25, 868:1, 872:1, 875:4, 879:13, 881:3, 887:3, 889:7
**moving** [1] - 1018:21
**MR** [282] - 838:10, 839:20, 843:1, 843:6, 843:8, 844:2, 844:6, 844:8, 846:2, 846:8, 846:23, 847:1, 847:6, 847:23, 848:25, 849:3, 850:5, 850:24, 851:21, 852:20, 852:24, 855:3, 863:1, 868:2, 872:2, 875:5, 877:10, 877:22, 878:8, 878:19, 879:14, 880:14, 881:4, 887:4, 889:8, 892:20, 894:2, 894:11, 897:17, 901:11, 901:15, 901:16, 902:9, 902:10, 902:15, 910:12, 911:7, 911:8, 917:20, 917:22, 918:5, 918:12, 918:14, 919:12, 919:19, 920:3, 920:4, 920:7,

920:10, 921:6, 921:10, 922:8, 922:10, 923:19, 923:22, 925:2, 925:5, 926:22, 927:2, 928:7, 928:12, 929:6, 929:8, 930:13, 930:17, 930:18, 931:21, 931:22, 933:4, 933:5, 933:7, 933:9, 935:4, 935:8, 935:12, 935:17, 936:5, 936:6, 938:14, 939:8, 939:19, 941:17, 941:20, 943:13, 943:16, 944:1, 944:7, 944:9, 944:18, 945:5, 945:7, 950:8, 950:9, 950:15, 950:20, 952:18, 952:19, 952:21, 953:21, 954:2, 954:9, 954:11, 954:16, 955:10, 955:11, 955:13, 956:3, 956:5, 956:9, 957:11, 957:13, 957:15, 958:15, 958:16, 958:18, 960:17, 960:18, 960:20, 961:19, 961:20, 961:22, 962:25, 963:1, 963:3, 965:16, 965:17, 965:19, 966:19, 966:20, 966:21, 967:21, 967:22, 967:23, 968:9, 968:17, 968:18, 969:3, 969:7, 969:18, 969:24, 971:2, 971:15, 971:16, 971:21, 971:24, 972:13, 973:18, 974:2, 974:25, 975:15, 975:17, 975:22, 976:2, 976:3, 976:6, 976:17, 978:11, 978:14, 978:19, 978:20, 978:24, 979:5, 979:9, 979:12, 979:14, 979:20, 980:10, 980:20, 981:2, 981:3, 981:6, 981:7, 981:25, 982:2,

982:4, 984:8, 984:9, 984:11, 985:12, 985:17, 985:20, 985:22, 986:2, 986:3, 986:10, 986:11, 986:13, 987:14, 987:15, 987:17, 987:21, 987:23, 989:21, 989:22, 989:25, 991:24, 991:25, 992:2, 992:18, 992:20, 992:22, 993:18, 993:21, 993:23, 994:4, 994:5, 994:7, 995:23, 995:25, 996:2, 998:3, 998:4, 998:6, 1000:14, 1000:16, 1000:18, 1001:25, 1002:1, 1002:3, 1003:6, 1003:7, 1003:9, 1005:2, 1005:6, 1005:19, 1006:4, 1006:6, 1011:6, 1011:12, 1011:14, 1011:21, 1011:23, 1011:24, 1011:25, 1012:2, 1012:3, 1014:7, 1014:10, 1014:13, 1014:16, 1014:18, 1014:21, 1015:11, 1015:16, 1015:20, 1016:18, 1017:1, 1017:24, 1018:19, 1018:21, 1021:5, 1021:18, 1021:19, 1022:2, 1022:10, 1022:20, 1022:24, 1023:5, 1023:6, 1023:9, 1023:12, 1023:16, 1023:22, 1024:11, 1024:14, 1024:19, 1025:2, 1025:4, 1025:10, 1025:21, 1025:25, 1026:5
**MS** [62] - 853:5, 853:7, 853:14, 853:16, 855:5, 855:12, 855:14, 862:24, 863:3, 867:25, 868:8, 868:11, 871:25, 872:4, 875:3, 875:7, 877:13, 877:15, 878:2, 878:3, 878:12, 878:21, 879:12, 879:20, 879:21, 880:16,

880:17, 881:2, 881:9, 887:2, 887:6, 889:6, 889:10, 893:1, 894:7, 894:14, 894:15, 897:14, 901:7, 902:6, 902:13, 917:25, 919:18, 930:7, 930:9, 931:15, 933:1, 935:11, 935:14, 938:24, 939:11, 939:21, 939:25, 940:12, 940:14, 940:15, 940:23, 940:24, 941:16, 943:15, 943:20, 944:10
**MT** [12] - 952:16, 957:10, 958:14, 958:23, 960:16, 961:18, 962:8, 986:23, 996:13, 997:8, 997:20, 1002:24
**MT.doc** [1] - 957:10
**Muara** [6] - 951:13, 952:24, 955:9, 956:13, 962:11, 995:16
**Muliyono** [1] - 880:1
**multiple** [3] - 908:9, 982:15, 1015:23
**multistep** [2] - 936:22, 937:3
**must** [10] - 840:9, 840:22, 845:15, 970:16, 997:21, 1006:19, 1007:14, 1008:10, 1008:13, 1010:10
**myriad** [1] - 841:8
**mystery** [1] - 842:18

---

**N**

**N.W** [1] - 837:9
**name** [28] - 858:3, 859:12, 860:15, 861:19, 870:13, 897:20, 908:16, 909:4, 909:22, 909:23, 917:6, 917:7, 917:16, 917:17, 919:25, 929:17, 930:11, 931:8, 931:9, 932:8, 944:24, 944:25, 945:1, 945:2, 990:23, 991:6

**Name** [1] - 990:22
**named** [5] - 859:16, 860:5, 876:24, 909:20, 922:12
**narrow** [1] - 1020:22
**nature** [2] - 971:14, 985:6
**nearly** [1] - 1008:5
**necessarily** [1] - 1011:19
**necessary** [4] - 933:24, 934:2, 935:23, 1025:19
**necessity** [1] - 1025:15
**need** [31] - 838:24, 840:18, 841:11, 842:6, 844:23, 845:10, 847:13, 847:19, 848:23, 851:3, 864:11, 864:19, 872:17, 891:16, 910:10, 951:5, 961:9, 967:25, 975:23, 976:3, 976:6, 977:5, 977:23, 1003:16, 1003:17, 1006:6, 1010:15, 1021:20, 1021:23, 1022:11, 1024:8
**needed** [3] - 841:2, 843:9, 874:9
**needs** [4] - 839:8, 839:10, 879:18, 1021:25
**negates** [1] - 993:2
**negative** [7] - 873:22, 884:4, 885:7, 885:14, 890:2, 999:14, 1001:18
**negotiate** [1] - 891:4
**negotiating** [1] - 1001:4
**negotiation** [3] - 870:14, 871:9, 1001:18
**negotiations** [1] - 868:22
**nervous** [1] - 872:25
**Network** [37] - 853:22, 853:24, 854:8, 854:11, 854:14, 854:15, 854:18, 855:1, 855:6, 855:16, 859:8, 859:10, 859:13, 860:10, 862:10, 908:1, 909:6, 909:15, 909:19,

909:25, 910:1, 911:10, 911:13, 911:17, 911:23, 913:5, 933:12, 933:18, 933:19, 933:25, 936:8, 936:17, 936:24, 937:22, 942:16, 998:14

**Network's** [3] - 854:2, 854:3, 854:22

**never** [18] - 868:5, 897:22, 897:24, 898:3, 907:16, 909:5, 909:8, 918:13, 919:16, 919:20, 919:22, 924:17, 924:21, 927:14, 928:3, 929:9, 1002:21

**new** [10] - 891:5, 893:19, 893:22, 894:6, 894:8, 895:9, 910:9, 916:17, 946:3, 985:7

**New** [6] - 836:8, 837:4, 837:9, 837:15, 970:3, 1027:19

**new-agent** [1] - 946:3

**next** [30] - 846:15, 849:7, 865:5, 872:18, 878:9, 878:10, 883:11, 891:1, 891:9, 891:21, 936:3, 944:15, 951:1, 951:7, 951:10, 955:24, 960:12, 961:13, 963:17, 963:20, 964:13, 977:23, 984:25, 990:10, 993:24, 996:14, 996:16, 1001:20, 1003:23

**NH** [1] - 837:3

**nice** [1] - 1026:10

**niceties** [1] - 1013:2

**night** [9] - 839:6, 843:13, 846:22, 847:4, 879:25, 885:25, 1009:25, 1021:23, 1022:1

**nobody** [1] - 847:3

**none** [3] - 1002:18, 1020:15, 1020:16

**nonetheless** [2] - 974:22, 1022:5

**nonprosecution** [23] - 849:14, 850:1, 850:4, 850:13,

851:2, 970:24, 971:4, 971:13, 971:25, 972:7, 972:18, 974:5, 978:22, 979:12, 1013:13, 1016:7, 1017:18, 1017:22, 1019:8, 1022:15, 1022:23, 1023:18, 1023:24

**nonresponsive** [2] - 935:13, 939:19

**nonrole** [1] - 891:20

**North** [2] - 909:2, 945:21

**note** [8] - 851:4, 851:6, 853:10, 889:13, 950:10, 971:5, 993:5, 1004:11

**notebooks** [1] - 910:15

**Notes** [2] - 889:16, 889:21

**notes** [7] - 843:15, 918:24, 969:4, 970:13, 988:16, 989:19, 1027:10

**nothing** [4] - 841:20, 883:19, 883:20, 938:15

**notice** [6] - 842:15, 844:20, 881:19, 881:22, 885:25, 1010:1

**notified** [1] - 1024:21

**November** [1] - 836:5

**Novick** [11] - 838:9, 844:5, 844:10, 844:12, 845:1, 845:3, 953:25, 980:24, 1011:2, 1018:20, 1024:10

**NOVICK** [116] - 837:3, 838:10, 839:20, 843:1, 843:6, 843:8, 844:6, 847:23, 849:3, 850:5, 851:21, 852:20, 944:18, 945:5, 945:7, 950:8, 950:15, 950:20, 952:18, 952:21, 954:2, 954:11, 954:16, 955:10, 955:13, 956:3, 956:9, 957:11, 957:15, 958:15, 958:18, 960:17, 960:20, 961:19,

961:22, 962:25, 963:3, 965:16, 965:19, 966:19, 966:21, 967:22, 968:18, 969:3, 969:7, 969:18, 971:16, 975:17, 976:3, 976:6, 976:17, 978:19, 978:24, 979:9, 979:14, 980:10, 980:20, 981:2, 981:3, 981:6, 981:7, 981:25, 982:4, 984:8, 984:11, 985:17, 985:22, 986:2, 986:3, 986:10, 986:13, 987:14, 987:17, 987:23, 989:21, 989:25, 991:24, 992:2, 992:18, 992:22, 993:18, 993:23, 994:4, 994:7, 995:23, 996:2, 998:3, 998:6, 1000:14, 1000:18, 1001:25, 1002:3, 1003:6, 1003:9, 1005:2, 1005:6, 1005:19, 1006:6, 1011:6, 1011:23, 1011:25, 1012:3, 1018:21, 1021:5, 1021:19, 1022:2, 1022:10, 1022:20, 1022:24, 1023:6, 1023:12, 1023:22, 1024:11, 1024:14, 1025:21, 1026:5

**number** [13] - 848:1, 848:2, 851:25, 864:9, 865:3, 866:6, 873:5, 899:2, 946:9, 948:22, 1017:3, 1017:4, 1022:18

**NY** [2] - 837:15, 837:15

## O

**o'clock** [1] - 1005:3

**object** [7] - 901:7, 943:16, 953:21, 975:5, 985:12, 1019:17, 1020:24

**objection** [61] - 855:3, 863:1, 868:2, 872:2, 875:5, 877:10, 877:22, 878:8, 879:14, 881:4,

887:4, 889:8, 892:20, 894:2, 894:11, 902:6, 902:8, 902:13, 917:25, 930:7, 930:11, 931:15, 933:1, 933:3, 939:8, 939:19, 944:1, 944:5, 950:9, 950:13, 952:19, 955:11, 957:13, 958:16, 960:18, 961:20, 963:1, 965:17, 966:20, 967:21, 967:24, 982:2, 984:9, 986:11, 987:15, 987:20, 987:21, 989:22, 991:25, 992:20, 993:21, 994:5, 995:25, 998:4, 1000:16, 1002:1, 1003:7, 1005:21, 1005:24, 1006:4, 1010:19

**objectionable** [1] - 1024:3

**objections** [4] - 851:18, 852:3, 852:7, 852:12

**objects** [1] - 1006:15

**obligated** [1] - 978:21

**obliged** [1] - 978:6

**obvious** [1] - 845:22

**obviously** [3] - 904:8, 964:8, 1013:17

**October** [4] - 984:6, 984:20, 986:9, 986:17

**OF** [9] - 836:1, 836:4, 853:6, 897:16, 938:23, 941:19, 943:19, 945:6, 1027:3

**offenses** [1] - 904:22

**offer** [22] - 851:15, 865:7, 865:9, 950:8, 952:18, 955:10, 957:11, 958:15, 960:17, 961:19, 962:25, 965:16, 966:19, 971:20, 973:3, 981:25, 984:8, 986:10, 1001:25, 1003:6, 1017:18, 1018:3

**offered** [8] - 840:1, 1006:12, 1007:3, 1015:12, 1015:15, 1017:22, 1018:1,

1018:2

**offering** [3] - 956:4, 1010:10, 1011:8

**office** [4] - 926:17, 926:18, 964:2, 964:8

**Office** [1] - 837:3

**official** [1] - 914:11

**Official** [3] - 836:24, 1027:6, 1027:17

**officially** [1] - 987:2

**officials** [6] - 897:1, 897:8, 897:12, 913:22, 947:14, 947:15

**often** [1] - 929:1

**OLIVIA** [1] - 837:7

**Olssen** [1] - 964:18

**once** [1] - 926:13

**one** [56] - 848:1, 848:13, 848:14, 849:3, 850:17, 852:14, 857:18, 863:4, 864:11, 864:20, 865:4, 874:22, 881:12, 882:3, 884:9, 884:12, 896:22, 899:17, 912:24, 923:10, 923:25, 936:16, 936:17, 938:14, 940:23, 943:2, 943:15, 943:21, 953:17, 959:19, 961:9, 966:4, 969:25, 977:21, 980:10, 982:17, 982:19, 984:2, 985:1, 985:5, 989:3, 989:4, 991:3, 995:2, 996:14, 997:12, 997:17, 998:9, 999:1, 1002:17, 1018:25, 1019:16, 1022:17, 1023:24

**ones** [2] - 851:14, 916:5

**operation** [1] - 910:1

**opinion** [2] - 888:2, 907:3

**opportunity** [2] - 845:23, 1018:6

**oppose** [1] - 1022:13

**opposing** [1] - 1006:13

**opposite** [1] - 844:11

**optimum** [1] - 961:9

**Order** [1] - 838:1

**order** [1] - 846:11

**ordinarily** [1] - 1015:9

orient [1] - 983:11
origin [1] - 1020:25
originally [3] - 915:22, 916:1, 986:23
otherwise [2] - 904:3, 1012:21
ought [3] - 850:11, 1021:16, 1024:3
ourself [1] - 1004:15
ourselves [2] - 951:1, 983:11
out-of-court [1] - 1007:12
outlines [1] - 972:7
outset [1] - 971:5
outside [7] - 913:12, 933:13, 933:24, 936:18, 942:17, 942:19, 942:21
Outside [1] - 838:2
outstanding [1] - 1010:22
overall [2] - 1015:16, 1017:1
override [1] - 943:7
overrule [1] - 938:8
overruled [4] - 939:24, 943:18, 954:15, 1010:21
overseas [1] - 947:14
oversight [1] - 869:21
overt [3] - 842:16, 848:9, 848:15
overview [1] - 946:1
own [5] - 911:16, 911:18, 915:8, 972:24, 974:8
owner [1] - 861:3

**P**

p.m [7] - 875:14, 968:4, 979:24, 980:22, 1005:12, 1026:13
P/S [3] - 871:23, 875:1, 886:23
Pacific [17] - 859:24, 911:14, 981:20, 982:7, 982:10, 982:23, 987:12, 987:13, 988:2, 988:17, 988:24, 992:13, 992:16, 993:2, 993:10, 994:3, 994:9
package [1] - 862:21
page [28] - 840:16, 882:14, 940:19, 963:4, 963:5, 963:8,

963:20, 964:25, 982:18, 983:14, 983:18, 983:19, 988:3, 988:4, 988:20, 991:9, 994:23, 998:13, 999:2, 999:3, 999:5, 999:20, 1000:21, 1000:22, 1003:11, 1003:24
pages [1] - 1027:8
paid [6] - 855:6, 874:3, 896:2, 896:5, 997:2, 997:4
Palembang [21] - 873:7, 873:11, 873:12, 873:14, 873:17, 873:19, 875:13, 875:14, 875:25, 876:2, 876:7, 876:20, 879:25, 880:5, 880:10, 880:24, 882:8, 882:15, 885:24, 921:22, 1009:24
paper [2] - 861:4, 861:5
Paragraph [2] - 842:14, 848:11
paragraph [15] - 842:24, 844:10, 848:15, 868:13, 870:11, 882:19, 883:19, 889:23, 891:1, 928:14, 940:20, 965:24, 984:13, 984:25, 1003:15
Paris [7] - 909:5, 909:8, 911:22, 943:3, 951:7, 959:10, 966:8
parliament [1] - 952:5
part [22] - 839:4, 858:2, 868:20, 882:18, 902:23, 903:9, 906:17, 920:8, 920:16, 934:5, 942:18, 942:20, 949:4, 974:19, 977:9, 977:10, 984:18, 1008:21, 1022:21, 1023:24, 1025:12
participant [1] - 838:22
participants [1] - 843:21
participated [2] -

948:12, 948:15
participation [21] - 839:10, 839:12, 840:11, 840:24, 841:5, 841:10, 841:16, 842:1, 842:3, 843:10, 843:20, 845:18, 845:20, 847:14, 847:16, 848:7, 1007:16, 1007:18, 1007:22, 1008:9, 1008:15
particular [13] - 917:2, 917:5, 946:18, 949:9, 951:15, 967:8, 1015:8, 1019:13, 1019:14, 1019:15, 1019:19, 1019:21, 1020:2
particularly [4] - 859:3, 874:10, 891:11
parties [2] - 979:2, 1021:13
partners [1] - 884:23
parts [2] - 858:15, 907:16
party [4] - 839:25, 1006:13, 1007:2, 1010:10
party's [1] - 1006:13
pass [2] - 839:14, 951:6
past [1] - 968:2
patently [1] - 977:8
path [4] - 892:1, 892:5, 892:10, 901:8
pay [6] - 887:18, 895:2, 895:8, 897:7, 932:7, 954:22
paying [3] - 895:11, 897:11, 947:13
payment [11] - 964:10, 985:2, 985:4, 985:9, 991:16, 995:9, 996:15, 996:24, 997:12, 998:24, 999:18
payments [3] - 897:1, 904:24, 1001:6
PEACOCK [1] - 837:14
pending [1] - 878:9
people [12] - 856:14, 864:9, 887:16, 887:19, 895:3, 895:11, 896:22, 905:16, 921:12, 1018:16, 1020:12,

1020:13
per [1] - 997:8
percent [13] - 893:19, 893:20, 893:23, 893:24, 982:21, 985:2, 985:3, 989:4, 991:12, 993:4, 993:14, 1004:13
percentage [4] - 982:19, 991:10, 995:2
perfectly [1] - 1012:16
performance [1] - 985:9
perhaps [2] - 851:3, 851:17
period [11] - 864:12, 864:21, 864:22, 864:25, 865:1, 896:13, 902:2, 902:12, 908:15, 912:7, 1019:5
periodic [1] - 946:5
permissible [1] - 1016:2
permit [3] - 855:10, 954:14, 1014:10
permits [1] - 1022:5
person [3] - 911:25, 912:11, 922:25
personal [1] - 884:5, 885:8, 885:14, 885:18, 885:19, 906:8, 906:9, 915:10, 922:23, 932:21, 965:5
personally [2] - 895:13, 922:21
personnel [3] - 884:4, 885:7, 885:13
persons [2] - 876:3, 876:9
persuaded [2] - 870:15, 870:23
pertaining [1] - 947:11
pertinent [1] - 927:21
phase [2] - 869:25, 871:6
Philippe [2] - 959:17, 961:16
philosophy [1] - 945:21
phone [4] - 898:3, 922:25, 996:20, 1002:12
physically [1] - 926:5
piece [2] - 855:18, 1012:10
piecemeal [2] - 842:19, 954:4

Pierucci [74] - 838:16, 843:12, 861:5, 861:9, 861:13, 861:15, 862:8, 862:16, 863:10, 863:16, 864:19, 865:10, 865:18, 866:2, 866:3, 866:24, 867:20, 870:25, 871:7, 871:16, 872:6, 872:21, 873:16, 874:4, 874:19, 876:6, 876:17, 886:20, 888:8, 888:9, 888:12, 888:15, 888:21, 891:11, 892:5, 912:12, 912:15, 913:2, 920:13, 920:21, 921:12, 921:15, 921:21, 924:1, 934:7, 934:11, 934:16, 934:22, 935:10, 939:2, 939:13, 939:15, 941:23, 942:11, 943:2, 964:4, 965:13, 966:13, 966:16, 966:23, 981:9, 984:6, 988:13, 992:12, 999:7, 1000:12, 1001:1, 1003:3, 1003:13, 1003:25, 1004:4, 1004:8, 1004:24, 1009:20
Pierucci's [2] - 863:24, 935:18
pincite [1] - 840:15
Pirooz [41] - 863:7, 866:13, 867:13, 872:11, 883:5, 884:13, 890:22, 890:24, 891:8, 896:1, 907:1, 913:11, 913:14, 953:6, 953:14, 953:17, 954:18, 956:25, 959:11, 959:12, 959:14, 959:16, 959:25, 960:3, 961:7, 962:3, 962:7, 962:15, 964:23, 965:4, 965:7, 966:1, 983:25, 984:1, 984:5, 987:12, 988:2, 988:10, 992:14, 992:16,

999:25
**pitcher** [1] - 938:21
**placate** [1] - 872:24
**place** [2] - 963:18, 990:25
**plaintiff** [1] - 836:5
**plan** [5] - 868:6, 873:9, 950:24, 951:3, 979:21
**planned** [1] - 962:1
**planning** [1] - 1025:22
**plans** [1] - 1022:25
**plant** [9] - 855:18, 856:7, 856:10, 856:13, 857:22, 858:12, 865:16, 874:12, 994:17
**plants** [1] - 859:3
**plea** [4] - 900:21, 901:21, 905:8, 1020:14
**plead** [4] - 901:3, 902:5, 902:11, 905:5
**pleas** [1] - 1020:12
**pleasant** [3] - 1005:9, 1005:10, 1005:14
**pleased** [3] - 890:7, 890:20, 1016:16
**pled** [2] - 904:17, 904:20
**PLN** [36] - 856:9, 856:12, 864:12, 864:20, 864:23, 865:6, 866:10, 873:12, 873:13, 873:21, 875:17, 875:19, 875:20, 876:10, 880:2, 882:15, 882:20, 884:4, 885:7, 885:13, 885:16, 885:25, 887:20, 890:4, 890:5, 890:10, 890:13, 893:2, 893:3, 895:3, 924:7, 954:20, 961:25, 985:7, 985:8, 1009:25
**PLN/TEPCO** [1] - 876:4
**plus** [2] - 880:1, 951:4
**PM** [2] - 879:24, 885:23
**PN** [1] - 1009:24
**pocket** [5] - 841:19, 883:1, 883:13, 941:5, 941:10
**pocketing** [1] - 907:22
**point** [23] - 842:9, 843:8, 843:25,

844:9, 844:23, 848:8, 849:18, 849:20, 850:11, 852:16, 874:7, 931:13, 947:23, 968:19, 969:22, 974:7, 993:18, 1006:3, 1014:20, 1018:25, 1024:20, 1025:25
**pointing** [2] - 954:5, 1017:13
**poisonous** [1] - 976:25
**politically** [2] - 865:18, 937:14
**pollution** [2] - 934:5, 937:11
**Pomponi** [32] - 861:19, 861:25, 862:17, 867:10, 871:17, 872:7, 872:8, 874:20, 886:20, 888:21, 893:12, 893:14, 924:1, 986:6, 986:18, 986:25, 987:5, 987:9, 988:9, 989:16, 990:2, 990:18, 991:21, 992:10, 998:15, 999:6, 1000:11, 1000:25, 1001:11, 1003:4, 1003:25, 1004:25
**Pomponi's** [4] - 861:20, 861:22, 990:5, 992:23
**poorly** [1] - 924:19
**portion** [8] - 872:13, 875:22, 955:14, 961:23, 985:3, 994:12, 995:2, 996:17
**posed** [1] - 999:14
**position** [16] - 838:14, 841:1, 847:17, 850:9, 854:10, 854:17, 859:22, 861:10, 891:2, 908:21, 908:22, 950:23, 968:18, 997:10, 1007:25, 1023:21
**positions** [2] - 847:21, 979:18
**positive** [1] - 907:4
**possible** [3] - 892:3, 966:3, 1024:8
**Post** [1] - 837:19

**postponed** [1] - 875:12
**potential** [2] - 998:24, 1013:25
**potentially** [2] - 849:5, 976:15
**power** [6] - 856:7, 856:10, 856:13, 952:7, 994:17, 1016:8
**Power** [47] - 853:18, 856:16, 856:22, 857:6, 857:8, 857:13, 857:15, 858:18, 858:23, 858:25, 859:4, 860:3, 861:6, 861:14, 862:21, 866:8, 870:21, 871:3, 872:9, 872:25, 874:13, 874:14, 884:8, 884:9, 884:19, 884:24, 885:3, 886:10, 886:15, 888:14, 891:14, 905:20, 912:3, 913:6, 914:18, 915:1, 915:2, 915:7, 947:24, 967:10, 981:20, 982:7, 988:23, 990:23, 993:10, 994:13, 995:4
**PPE** [1] - 956:18
**precede** [1] - 846:12
**precisely** [1] - 952:5
**preclude** [1] - 849:8
**predicted** [1] - 886:1
**prefer** [1] - 900:6
**preference** [1] - 962:3
**preferred** [1] - 959:19
**prefinance** [1] - 997:1
**prejudice** [1] - 1013:16
**preliminary** [2] - 840:4, 1010:8
**prep** [3] - 915:24, 919:21, 920:1
**preparation** [4] - 852:5, 899:9, 917:24, 918:10
**prepare** [1] - 851:23
**prepared** [5] - 948:21, 967:15, 980:1, 980:2, 990:20
**preparing** [2] - 916:7, 917:11
**preponderance** [5] - 839:24, 841:12,

1007:1, 1010:6, 1010:10
**prepping** [1] - 1023:13
**presence** [2] - 838:2, 968:8
**present** [4] - 843:25, 975:10, 975:14, 1026:3
**presentation** [1] - 1017:11
**presented** [3] - 953:23, 968:14, 1017:6
**president** [14] - 859:23, 860:11, 861:11, 875:16, 875:20, 890:10, 890:13, 892:17, 892:24, 893:2, 893:3, 911:13, 988:2
**pressed** [1] - 891:10
**pressing** [1] - 868:15
**pressure** [1] - 951:5
**presumably** [3] - 915:12, 916:6, 926:8
**presumptively** [1] - 840:8
**previous** [3] - 952:25, 953:2, 993:2
**previously** [3] - 951:4, 985:13, 999:25
**price** [12] - 868:16, 868:17, 868:18, 868:20, 869:13, 869:24, 870:4, 870:5, 870:7, 870:9, 886:23, 995:3
**primarily** [1] - 946:6
**primary** [1] - 1012:25
**principally** [3] - 949:13, 949:15, 1005:23
**principle** [3] - 839:13, 868:19, 1021:12
**Priok** [1] - 996:13
**privy** [1] - 916:19
**pro** [1] - 996:20
**problem** [6] - 839:5, 842:19, 886:1, 969:8, 969:10, 1010:1
**problematic** [1] - 842:20
**problems** [2] - 975:7, 979:8
**proceed** [10] - 847:8, 853:3, 868:10, 879:19, 901:14, 936:3, 945:4, 950:19, 954:18,

981:1
**proceeding** [1] - 903:13
**proceedings** [7] - 853:1, 902:17, 910:16, 911:3, 968:4, 980:22, 1005:12
**Proceedings** [1] - 1026:13
**process** [17] - 868:21, 870:24, 893:8, 895:1, 914:20, 916:11, 921:18, 922:2, 933:11, 934:4, 935:15, 935:16, 936:22, 937:3, 937:5, 942:12, 967:16
**produced** [1] - 949:15
**product** [1] - 857:21
**products** [3] - 856:1, 857:13, 858:11
**Professor** [3] - 1024:20, 1025:15, 1025:20
**profile** [1] - 964:1
**program** [1] - 956:14
**Project** [60] - 838:17, 856:4, 856:17, 856:20, 857:7, 857:25, 860:1, 860:2, 860:21, 860:24, 861:7, 861:21, 862:4, 862:7, 862:11, 863:9, 863:22, 864:3, 865:25, 866:14, 866:23, 867:7, 868:25, 869:6, 869:8, 869:16, 872:9, 872:12, 877:17, 878:6, 878:15, 883:17, 885:2, 885:12, 886:14, 890:17, 893:5, 894:17, 894:20, 895:14, 895:24, 896:13, 896:14, 903:4, 905:16, 912:2, 912:16, 913:10, 936:11, 939:5, 939:12, 939:18, 939:23, 941:22, 943:25, 949:9, 949:25, 982:24, 988:25, 993:11
**project** [53] - 843:4,

856:4, 857:14,
858:15, 859:11,
860:4, 861:3, 861:4,
861:5, 864:15,
865:8, 865:11,
865:12, 865:13,
865:15, 865:18,
865:19, 866:4,
866:15, 867:1,
867:3, 870:10,
871:2, 871:11,
873:10, 874:5,
874:8, 874:9, 877:2,
879:4, 887:25,
888:11, 890:7,
890:16, 892:8,
895:1, 895:5,
913:12, 920:18,
921:9, 923:12,
942:12, 953:20,
954:18, 966:4,
986:23, 994:14,
994:16, 994:21,
996:24, 1002:24,
1004:18
**project's** [2] - 890:3,
890:12
**projects** [6] - 866:18,
875:19, 936:19,
949:11, 995:15,
1001:14
**Projects** [1] - 878:23
**Prom** [1] - 965:7
**promised** [1] - 874:7
**promises** [3] - 887:15,
887:17, 890:22
**proof** [1] - 1021:4
**proper** [5] - 841:23,
884:1, 884:15,
884:20, 890:25
**proposal** [5] - 858:21,
869:22, 959:18,
959:19, 999:24
**proposals** [2] -
864:23, 873:14
**propose** [1] - 967:9
**proposed** [4] - 872:19,
961:9, 986:21,
997:20
**proposition** [4] -
840:13, 847:18,
848:23, 1012:15
**prorate** [1] - 1004:13
**prosecuted** [1] - 972:1
**prosecution** [1] -
1012:18
**prove** [4] - 841:11,
841:15, 1010:10,
1013:19
**provide** [14] - 849:1,

854:3, 854:6,
856:14, 857:14,
858:11, 858:14,
859:13, 915:4,
948:21, 968:10,
1003:19, 1007:23,
1010:13
**provided** [5] - 884:23,
916:23, 978:7,
1006:22, 1009:6
**provides** [3] - 924:6,
1006:12, 1007:12
**providing** [3] - 857:15,
857:22, 914:17
**province** [1] - 973:17
**provisions** [1] - 972:3
**psharafi@msn.com**
[3] - 863:5, 863:6,
872:10
**PT** [4] - 857:9, 858:5,
860:11, 991:5
**PTESI** [8] - 857:10,
858:10, 858:11,
858:13, 915:8,
915:15, 922:16,
923:14
**Puckett** [63] - 846:12,
846:14, 846:19,
852:23, 853:4,
853:17, 856:3,
860:23, 861:24,
862:13, 863:4,
863:10, 863:23,
864:2, 867:16,
868:12, 868:24,
869:9, 870:16,
871:13, 872:5,
876:23, 878:22,
880:12, 881:10,
883:3, 887:7, 890:1,
891:10, 894:16,
895:12, 896:7,
897:18, 899:2,
902:17, 904:18,
907:10, 910:17,
911:6, 911:9,
915:18, 920:12,
921:11, 923:24,
924:15, 925:6,
930:19, 932:22,
933:6, 933:10,
935:23, 936:7,
938:25, 940:25,
941:12, 941:21,
943:21, 944:11,
1009:9, 1009:12,
1009:15, 1009:20,
1015:25
**PUCKETT** [5] - 853:6,
897:16, 938:23,

941:19, 943:19
**Puckett's** [2] - 1010:4,
1010:12
**pull** [4] - 921:6,
924:13, 925:2,
926:23
**pulp** [2] - 861:4, 861:5
**purpose** [3] - 902:19,
954:8, 985:15
**purposes** [3] - 941:21,
1010:18, 1026:7
**Pusat** [1] - 890:5
**pushed** [1] - 954:23
**pushing** [10] - 870:5,
931:2, 931:5, 931:7,
931:10, 931:13,
931:17, 931:24,
932:6, 1012:14
**put** [24] - 844:20,
851:11, 851:23,
852:11, 865:18,
951:5, 951:19,
955:1, 955:2,
960:21, 963:17,
976:22, 977:19,
977:25, 978:6,
980:13, 989:9,
998:22, 999:2,
1001:20, 1011:22,
1018:3, 1019:13,
1025:18
**Put** [1] - 979:12
**puts** [1] - 870:13
**putting** [3] - 841:14,
914:6, 1025:22

**Q**

**qualified** [1] - 994:13
**quality** [16] - 973:19,
973:25, 977:15,
1014:25, 1015:15,
1015:17, 1017:2,
1017:7, 1019:9,
1019:10, 1019:24,
1020:6, 1020:9,
1021:2, 1023:1,
1023:25
**Quantico** [1] - 946:4
**QUESTION** [1] -
935:25
**questioned** [2] -
962:4, 966:7
**questioning** [4] -
849:12, 935:22,
954:15, 1022:22
**questions** [14] -
898:11, 903:3,
905:15, 911:10,
922:11, 931:20,

977:22, 980:7,
1021:11, 1021:13,
1022:12, 1023:6,
1023:13, 1024:2
**quickly** [1] - 845:2
**quite** [7] - 845:1,
865:14, 866:21,
921:15, 967:14,
970:6, 973:7
**quote** [25] - 1006:12,
1006:23, 1007:14,
1007:17, 1007:18,
1008:9, 1008:10,
1008:12, 1008:14,
1008:21, 1008:23,
1008:24, 1008:25,
1009:2, 1009:16,
1009:17, 1009:23,
1010:2, 1010:8,
1010:11, 1019:24,
1020:6
**quoting** [1] - 1008:17

**R**

**RACHELLE** [1] - 837:8
**Ragagnin** [2] - 959:7,
961:16
**rainy** [1] - 968:3
**raise** [3] - 838:7,
852:13, 944:20
**raised** [6] - 842:10,
844:10, 846:8,
846:18, 846:23,
968:11
**raising** [1] - 839:5
**ranked** [2] - 921:17,
924:8
**rata** [1] - 996:20
**rate** [2] - 842:5, 842:21
**rather** [3] - 845:6,
959:12, 1024:4
**RE** [1] - 1027:3
**re** [6] - 958:23, 960:16,
961:24, 963:10,
963:19, 970:1
**reached** [1] - 851:7
**react** [1] - 960:1
**reaction** [1] - 1004:17
**read** [73] - 863:5,
863:23, 864:5,
864:9, 868:12,
870:12, 872:13,
873:2, 875:8,
875:22, 879:22,
882:18, 883:18,
885:21, 887:7,
887:22, 889:5,
889:11, 889:22,
891:1, 891:9,

891:21, 915:20,
918:3, 940:25,
941:2, 950:17,
952:8, 953:18,
954:17, 957:24,
959:5, 961:3,
961:23, 963:15,
963:24, 965:2,
965:24, 967:7,
969:24, 977:19,
977:20, 981:13,
983:22, 984:12,
984:25, 985:13,
985:23, 986:1,
986:19, 986:25,
990:5, 990:8,
990:21, 992:23,
994:11, 996:11,
996:16, 997:6,
997:17, 998:23,
999:11, 999:21,
1001:8, 1001:10,
1002:9, 1002:13,
1003:15, 1004:3,
1004:7, 1005:23,
1006:2, 1020:19
**reading** [5] - 845:9,
868:4, 954:1,
996:19, 999:16
**reads** [5] - 920:16,
952:4, 973:8,
990:17, 1001:3
**ready** [2] - 967:2,
979:22
**real** [1] - 937:15
**realize** [1] - 996:23
**realized** [3] - 846:9,
846:14, 846:15
**really** [9] - 870:5,
898:6, 898:24,
905:23, 934:24,
970:15, 1012:21,
1014:8, 1021:22
**rearrange** [1] - 876:4
**reason** [6] - 866:11,
927:9, 927:11,
979:5, 1012:14,
1016:18
**reasonable** [2] -
973:12, 1021:4
**reasons** [2] - 866:6,
901:12
**reassign** [1] - 942:4
**receive** [6] - 893:8,
895:12, 895:13,
904:3, 905:11, 926:6
**received** [11] - 855:19,
855:20, 881:11,
882:3, 882:4,
921:16, 923:10,

945:20, 945:23, 946:3, 1011:7
**receiving** [2] - 923:7, 965:9
**recent** [2] - 890:6, 963:16
**recently** [1] - 899:10
**recess** [6] - 910:10, 910:14, 910:22, 911:2, 979:23, 979:24
**Recess** [1] - 910:23
**recipients** [1] - 863:4
**recollection** [6] - 898:2, 900:4, 919:5, 919:9, 919:17, 979:17
**recommend** [3] - 841:22, 883:25, 884:14
**recommendation** [2] - 929:15, 1001:16
**reconfirm** [1] - 875:10
**record** [8] - 944:24, 969:22, 969:25, 971:8, 1015:22, 1018:16, 1019:14, 1019:16
**recorded** [2] - 906:19, 906:21
**recording** [2] - 906:17, 974:6
**recordings** [3] - 978:16, 1015:24, 1016:1
**records** [1] - 956:8
**recover** [1] - 873:9
**recross** [1] - 944:6
**redirect** [2] - 938:14, 944:3
**REDIRECT** [2] - 938:23, 943:19
**refer** [2] - 928:13, 1019:18
**reference** [12] - 848:16, 865:16, 869:2, 870:19, 874:11, 886:9, 953:14, 971:18, 980:16, 982:15, 1015:1
**referenced** [2] - 848:11, 883:15
**references** [1] - 842:14
**referencing** [1] - 1022:14
**referred** [4] - 857:10, 858:7, 870:20, 885:10

**referring** [8] - 864:21, 864:22, 920:18, 920:22, 921:25, 928:18, 928:21, 978:9
**refers** [1] - 992:6
**reflected** [1] - 933:23
**reflecting** [1] - 924:7
**reflects** [2] - 937:3, 937:5
**refresh** [3] - 919:5, 919:9, 979:16
**refreshed** [1] - 916:23
**regard** [12] - 838:17, 839:3, 841:8, 849:13, 850:13, 851:25, 852:16, 931:20, 949:5, 951:15, 956:17, 967:5
**regarding** [19] - 844:23, 849:13, 864:14, 865:10, 866:4, 893:10, 896:16, 916:11, 919:2, 920:17, 940:20, 953:11, 958:13, 968:11, 970:21, 983:2, 988:24, 993:11, 995:9
**regards** [9] - 851:7, 882:23, 883:8, 888:3, 967:18, 981:21, 986:23, 992:5, 1000:6
**region** [2] - 859:24, 911:14
**regional** [4] - 854:6, 859:15, 908:23, 908:24
**reinforced** [1] - 843:21
**reinforcing** [1] - 968:23
**reiterated** [1] - 843:20
**rejogged** [1] - 916:24
**related** [19] - 849:9, 849:25, 902:17, 905:6, 915:21, 923:9, 936:14, 946:5, 947:24, 949:24, 951:11, 951:12, 962:13, 982:24, 983:5, 983:8, 995:12, 1012:13, 1012:17
**relation** [2] - 949:9, 952:23
**relationship** [8] - 898:24, 906:8,

906:9, 915:9, 932:11, 932:15, 932:20, 1018:12
**relationships** [16] - 854:5, 859:14, 907:15, 913:20, 913:25, 914:3, 914:4, 914:8, 915:1, 915:7, 915:8, 915:11, 915:13, 954:6
**relative** [1] - 866:25
**relatively** [2] - 851:25, 852:1
**relevance** [5] - 855:3, 1014:2, 1018:10, 1018:11, 1023:17
**relevant** [11] - 849:21, 850:17, 971:21, 972:10, 972:14, 977:14, 1010:9, 1013:5, 1018:23, 1019:4, 1021:1
**reliability** [1] - 843:18
**rely** [1] - 926:4
**remainder** [2] - 883:18, 887:22
**remaining** [1] - 851:8
**remember** [4] - 918:21, 939:2, 940:4, 1012:9
**remembered** [1] - 916:25
**remembering** [1] - 916:10
**remind** [7] - 861:10, 870:23, 872:6, 874:5, 885:1, 886:8, 890:9
**reminded** [2] - 909:21, 1011:21
**remove** [3] - 928:7, 929:6, 941:18
**remuneration** [6] - 967:14, 982:18, 991:9, 991:13, 994:24, 997:9
**repatriate** [1] - 947:17
**repatriated** [1] - 893:6
**repeat** [3] - 855:13, 878:2, 909:17
**rephrase** [1] - 894:5
**replace** [3] - 872:19, 891:24, 917:7
**report** [32] - 843:13, 843:16, 860:13, 860:18, 862:9, 876:10, 876:20, 879:25, 880:2, 880:5, 880:11,

880:24, 882:4, 882:7, 882:8, 882:11, 882:14, 882:15, 885:22, 885:24, 886:4, 886:24, 890:3, 890:5, 912:14, 912:16, 913:6, 919:6, 924:7, 940:8, 968:24, 1009:24
**reported** [6] - 860:14, 860:19, 912:3, 912:11, 939:1, 941:23
**Reporter** [3] - 836:24, 1027:6, 1027:17
**reporting** [10] - 862:6, 908:14, 908:16, 911:18, 937:25, 938:3, 939:17, 943:5, 943:7, 969:9
**reports** [1] - 919:2
**represent** [1] - 897:20
**representative** [2] - 888:3, 891:5
**representatives** [1] - 923:25
**represented** [1] - 960:2
**representing** [1] - 872:9
**request** [4] - 868:3, 886:5, 990:17, 1011:8
**requested** [2] - 962:2, 1015:4
**requesting** [2] - 902:4, 1001:13
**required** [11] - 839:3, 968:16, 969:14, 969:16, 969:19, 970:9, 1007:22, 1008:4, 1008:7, 1009:5, 1016:9
**requiring** [2] - 960:4, 960:9
**reredirect** [1] - 943:16
**research** [5] - 839:6, 1014:11, 1014:15, 1018:5, 1023:19
**reserved** [1] - 970:21
**resident** [1] - 1013:2
**resolved** [1] - 996:12
**Resources** [13] - 981:20, 982:7, 982:10, 982:23, 987:12, 988:2, 988:24, 992:13, 992:16, 993:3, 993:11, 994:3, 994:9

**Resources.pdf** [1] - 988:17
**Resources.zip** [1] - 987:13
**respect** [10] - 884:20, 893:4, 933:12, 939:13, 939:23, 970:23, 980:7, 994:21, 1006:9, 1010:24
**respectfully** [1] - 851:21
**respective** [2] - 937:25, 979:18
**respond** [3] - 845:24, 978:12, 1022:4
**responding** [6] - 926:10, 966:15, 966:16, 986:14, 996:4, 998:9
**response** [10] - 848:8, 961:1, 964:13, 965:21, 967:4, 976:12, 986:24, 1001:10, 1004:7, 1014:21
**responsibilities** [4] - 855:10, 947:9, 947:10, 949:5
**responsive** [2] - 936:1, 968:13
**rest** [2] - 873:2, 1025:16
**restricted** [1] - 868:4
**restyling** [1] - 1008:22
**result** [2] - 875:11, 1009:1
**resultingly** [1] - 976:14
**resume** [1] - 1005:14, 1005:17
**retained** [1] - 900:9
**retyped** [1] - 889:21
**revealed** [1] - 919:25
**revert** [1] - 964:24
**review** [6] - 949:8, 949:24, 951:12, 959:8, 983:5, 995:12
**reviewed** [5] - 915:20, 920:11, 949:1, 949:6, 949:14
**reviewing** [3] - 916:18, 948:12, 951:10
**rewards** [8] - 841:18, 882:23, 882:25, 883:8, 883:9, 883:12, 940:20, 941:4
**Reza** [105] - 838:15,

843:11, 843:14,
860:6, 860:8,
860:19, 860:20,
862:18, 865:20,
867:10, 868:17,
868:21, 870:5,
870:13, 871:18,
874:20, 876:16,
877:3, 878:7,
878:16, 879:3,
879:6, 879:9,
879:10, 879:22,
880:3, 880:4, 880:6,
880:21, 881:11,
881:16, 885:21,
886:7, 886:20,
888:22, 891:22,
891:23, 893:12,
893:13, 913:25,
915:15, 922:18,
923:13, 927:15,
929:20, 930:3,
930:5, 931:1,
931:13, 931:16,
931:23, 932:6,
932:10, 932:11,
932:15, 932:18,
932:23, 932:24,
940:8, 940:16,
941:13, 950:22,
950:23, 951:24,
952:16, 953:5,
955:7, 955:16,
955:22, 956:10,
958:25, 959:13,
959:23, 960:15,
961:6, 961:8,
961:11, 962:5,
964:17, 964:22,
965:4, 965:6,
965:21, 968:23,
983:14, 986:7,
996:5, 997:19,
997:25, 998:14,
998:22, 999:6,
999:11, 1000:2,
1000:7, 1001:3,
1001:22, 1002:6,
1003:2, 1004:8,
1004:22, 1004:24,
1009:14, 1009:18,
1017:5
**RI-1** [1] - 956:19
**Riau** [1] - 885:11
**right-hand** [8] - 956:1,
960:22, 987:25,
988:1, 988:20,
989:13, 993:7, 999:3
**ripe** [1] - 846:17
**rise** [1] - 1013:5

**risk** [1] - 1018:11
**RM** [1] - 957:10
**RMR** [3] - 836:24,
1027:5, 1027:17
**road** [2] - 926:9,
1023:4
**Road** [2] - 837:19,
991:1
**Roger** [10] - 950:6,
950:22, 957:9,
958:13, 958:23,
958:24, 960:4,
960:6, 960:15, 961:5
**role** [20] - 854:2,
854:3, 859:8,
859:10, 859:13,
859:25, 860:2,
860:8, 860:20,
861:20, 861:22,
891:20, 893:5,
912:11, 937:23,
942:15, 942:20,
949:25, 951:11,
951:13
**roles** [2] - 857:12,
936:17
**Room** [2] - 837:10,
1027:18
**Rothschild** [13] -
841:7, 905:17,
905:18, 905:19,
905:21, 906:11,
906:13, 906:25,
971:6, 971:8, 974:6,
1011:24, 1015:24
**route** [2] - 961:9,
965:9
**ruin** [1] - 1021:23
**Rule** [11] - 840:5,
845:13, 850:16,
970:7, 1007:16,
1008:8, 1008:12,
1008:18, 1009:5,
1009:8, 1019:7
**rule** [6] - 845:22,
970:12, 970:14,
978:9, 1007:12,
1021:11
**rules** [2] - 847:24,
1008:22
**Rules** [1] - 1008:20
**ruling** [4] - 980:2,
980:11, 1009:1,
1022:16

**S**

**Saito** [4] - 874:21,
876:2, 876:8, 880:1
**Sakti** [1] - 991:5

**salary** [6] - 855:1,
855:2, 855:7,
855:16, 855:17
**sale** [1] - 860:4
**Salerno** [1] - 908:17
**sales** [17] - 854:4,
854:12, 855:23,
855:24, 858:21,
861:1, 861:6,
861:11, 861:23,
863:20, 864:1,
877:2, 878:17,
888:10, 912:2, 912:6
**salesman** [2] - 861:8,
872:8
**salesperson** [1] -
861:23
**Salim** [3] - 959:13,
959:25, 960:2
**salvageable** [1] -
891:24
**Saneaux** [2] - 970:4,
1008:16
**satisfactory** [4] -
841:19, 882:25,
883:13, 941:4
**satisfied** [2] - 969:14,
973:11
**Saturday** [1] - 1022:1
**saw** [4] - 900:23,
919:16, 927:1,
951:18
**scandal** [1] - 950:25
**scheduled** [4] - 876:5,
890:5, 892:3, 1025:9
**scheme** [1] - 985:7
**scope** [5] - 944:6,
997:1, 997:4,
1005:21, 1010:23
**scores** [1] - 850:6
**screen** [10] - 873:3,
950:10, 950:12,
950:16, 950:18,
955:1, 955:2, 956:1,
993:7, 998:22
**screenshot** [4] -
957:25, 958:3,
958:4, 958:5
**scroll** [4] - 926:25,
989:1, 991:8, 994:23
**Sculy** [7] - 862:18,
871:17, 888:21,
998:15, 999:7,
1000:12, 1000:25
**search** [1] - 976:24
**seated** [8] - 838:7,
853:2, 910:24,
911:4, 944:23,
979:25, 980:23,
1006:11

**Second** [4] - 839:18,
839:21, 840:15,
969:25
**second** [18] - 839:20,
840:12, 844:9,
882:14, 896:4,
917:6, 917:17,
920:1, 921:18,
924:8, 930:19,
930:23, 940:19,
983:18, 985:5,
988:20, 994:23,
1003:11
**secretary** [7] - 875:11,
889:3, 896:22,
925:8, 925:11,
925:16, 927:6
**secretly** [2] - 906:19,
906:21
**section** [4] - 954:17,
982:18, 989:2,
991:10
**Section** [1] - 837:9
**sections** [1] - 982:6
**sector** [1] - 990:22
**secure** [5] - 884:5,
885:8, 885:14,
885:18, 895:4
**secured** [1] - 935:6
**see** [34] - 849:23,
863:10, 873:3,
876:23, 880:4,
881:12, 881:17,
882:4, 883:6,
890:23, 918:7,
940:10, 957:5,
958:2, 963:9,
964:23, 983:15,
989:13, 996:23,
998:13, 998:16,
998:23, 1000:21,
1003:12, 1004:1,
1004:5, 1005:3,
1005:9, 1010:7,
1013:8, 1014:2,
1020:3, 1021:6,
1023:9
**seeing** [1] - 951:21
**seek** [1] - 886:6
**seem** [1] - 1022:18
**Seg** [1] - 954:23
**segment** [3] - 951:4,
960:3, 960:9
**segment's** [1] - 959:9
**seize** [1] - 947:16
**select** [1] - 931:11
**selected** [3] - 913:12,
931:3, 931:24
**selection** [1] - 951:16
**sell** [3] - 855:18,

856:1, 859:11
**selling** [2] - 855:20,
937:11
**send** [7] - 896:22,
898:22, 925:16,
926:5, 927:16,
987:3, 1014:14
**sending** [2] - 844:14,
927:13
**senior** [8] - 859:23,
892:16, 911:12,
933:20, 938:1, 943:4
**sense** [6] - 847:25,
939:16, 964:7,
967:12, 973:24,
1024:12
**sensitive** [6] - 864:12,
864:21, 864:25,
865:1, 880:2, 927:23
**sent** [34] - 843:2,
848:16, 863:14,
881:17, 882:10,
882:11, 886:4,
925:8, 927:7,
927:14, 940:2,
950:6, 952:16,
953:8, 955:8,
960:16, 961:17,
962:22, 963:25,
964:4, 965:14,
966:13, 984:6,
986:8, 986:22,
987:11, 989:18,
991:22, 992:12,
995:20, 996:18,
998:1, 1000:12,
1003:4
**sentence** [11] - 875:8,
883:11, 885:5,
887:8, 889:11,
891:9, 891:21,
904:2, 941:1, 941:2,
941:7
**sentenced** [1] -
903:24
**separate** [6] - 848:5,
911:18, 968:25,
975:23, 1008:2,
1021:7
**separately** [3] - 886:4,
891:22, 961:11
**September** [12] -
871:21, 874:24,
876:22, 881:1,
887:1, 889:1, 912:7,
921:13, 924:5,
925:10, 932:5,
983:17
**series** [4] - 898:11,
899:10, 991:15,

998:24
**serious** [4] - 886:1, 969:7, 969:10, 1010:1
**seriously** [3] - 841:23, 884:1, 884:15
**serve** [2] - 976:8, 1005:24
**service** [1] - 994:1
**services** [1] - 994:20
**sessions** [2] - 915:24, 920:1
**set** [2] - 854:5, 903:16
**sets** [1] - 978:23
**settlement** [2] - 891:5, 1020:14
**seven** [1] - 862:5
**several** [3] - 867:3, 949:16, 988:4
**several-page** [1] - 988:4
**shall** [3] - 876:2, 888:1, 888:5
**Sharafi** [72] - 849:11, 849:20, 862:17, 863:7, 866:13, 866:15, 866:22, 867:6, 867:13, 871:17, 872:11, 883:5, 884:13, 890:23, 891:8, 893:15, 896:2, 907:1, 907:3, 913:11, 913:14, 914:7, 914:13, 915:4, 917:7, 921:3, 929:9, 929:14, 929:24, 931:3, 931:25, 953:17, 956:25, 959:11, 959:25, 962:15, 963:19, 970:23, 971:8, 972:1, 972:11, 972:18, 973:23, 974:4, 974:14, 974:18, 975:9, 976:1, 976:11, 976:21, 977:1, 977:4, 978:18, 982:22, 984:5, 988:2, 992:17, 995:5, 1003:12, 1010:25, 1011:2, 1011:22, 1012:9, 1013:1, 1013:8, 1013:12, 1013:20, 1013:24, 1016:15, 1016:21, 1017:18
**Sharafi's** [13] - 851:1,

852:16, 893:18, 928:18, 964:8, 981:14, 988:10, 1012:23, 1013:7, 1013:10, 1014:3, 1018:12, 1022:14
**share** [1] - 839:7
**Sheckler** [1] - 871:19
**shocked** [1] - 1022:4
**Shoji** [1] - 874:21
**shook** [1] - 1004:13
**short** [4] - 861:2, 870:17, 912:7, 981:13
**shorthand** [5] - 858:7, 858:9, 886:8, 1013:21, 1027:10
**shot** [3] - 889:13, 925:11, 925:13
**shots** [2] - 892:7, 939:14
**show** [9] - 838:22, 862:13, 864:11, 864:19, 881:10, 892:25, 919:12, 940:6, 1020:9
**showed** [10] - 899:23, 915:25, 916:5, 916:6, 917:15, 917:23, 918:9, 919:6, 923:6, 1004:16
**showing** [11] - 867:16, 871:13, 874:15, 876:13, 880:12, 880:18, 886:16, 888:17, 950:10, 950:11, 1002:17
**shown** [16] - 841:20, 883:20, 899:24, 917:10, 918:2, 918:7, 918:15, 918:17, 919:7, 919:21, 919:23, 919:25, 954:18, 958:6, 969:17, 972:24
**shy** [1] - 847:3
**side** [20] - 864:1, 930:5, 955:1, 955:2, 956:1, 960:21, 960:22, 987:18, 987:24, 987:25, 988:1, 988:20, 989:9, 989:11, 989:12, 989:13, 993:7, 999:3, 1016:20
**sides** [1] - 1024:7
**sideshow** [1] - 977:11

**sign** [1] - 1016:5
**signed** [9] - 884:3, 885:6, 885:9, 901:17, 985:4, 992:25, 993:1, 993:3, 993:12
**significance** [1] - 869:23
**significant** [2] - 868:18, 1012:10
**Silver** [10] - 844:1, 897:20, 910:10, 911:6, 931:19, 938:25, 939:6, 940:1, 943:22, 1011:21
**SILVER** [88] - 837:14, 844:2, 844:8, 846:2, 846:8, 846:23, 847:1, 847:6, 848:25, 855:3, 863:1, 868:2, 872:2, 875:5, 877:10, 877:22, 878:8, 878:19, 879:14, 881:4, 887:4, 889:8, 892:20, 894:2, 894:11, 897:17, 901:11, 901:15, 901:16, 902:9, 902:10, 902:15, 910:12, 911:7, 911:8, 917:20, 917:22, 918:5, 918:12, 918:14, 919:12, 919:19, 920:3, 920:4, 920:7, 920:10, 921:6, 921:10, 922:8, 922:10, 922:19, 923:22, 925:2, 925:5, 926:22, 927:2, 928:7, 928:12, 929:6, 929:8, 930:13, 930:17, 930:18, 931:21, 931:22, 933:4, 933:5, 933:7, 933:9, 935:4, 935:8, 935:12, 935:17, 936:5, 936:6, 938:14, 939:8, 939:19, 941:17, 941:20, 943:13, 943:16, 944:1, 944:7, 944:9, 968:9, 968:17, 969:24
**similar** [1] - 954:21
**similarly** [1] - 1013:22
**simplest** [1] - 965:8

**simply** [1] - 985:23
**simultaneously** [1] - 922:5
**Singapore** [4] - 964:22, 964:23, 965:6, 966:5
**single** [1] - 904:17
**Sirait** [1] - 880:1
**situated** [1] - 1013:22
**situation** [12] - 850:22, 871:24, 875:2, 883:25, 886:7, 891:6, 891:24, 932:3, 1002:25, 1004:9, 1004:20, 1013:18
**six** [8] - 862:5, 899:16, 899:17, 901:24, 946:4, 985:5
**six-year** [2] - 901:24
**skill** [1] - 1027:11
**Slide** [1] - 933:8
**slightly** [2] - 970:12, 1001:18
**slowing** [1] - 1004:10
**small** [2] - 852:1, 964:1
**smartphone** [2] - 926:19, 926:20
**someone** [11] - 848:10, 866:7, 866:8, 872:23, 872:25, 876:24, 914:1, 915:4, 922:15, 943:4, 1016:5
**sometime** [2] - 867:2, 875:12
**sometimes** [1] - 912:24
**somewhere** [2] - 937:21, 938:5
**soon** [4] - 846:9, 846:14, 846:18, 892:3
**sorry** [22] - 839:21, 842:9, 848:12, 848:20, 854:21, 861:24, 878:19, 880:16, 889:5, 893:3, 894:4, 909:11, 935:20, 940:12, 980:10, 980:17, 989:10, 991:3, 999:10, 1011:14, 1021:22, 1025:2
**sort** [9] - 908:9, 925:12, 926:16, 930:5, 932:24,

972:20, 975:1, 1018:7
**sounds** [1] - 954:9
**source** [2] - 1011:2, 1011:10
**sources** [4] - 949:18, 949:19, 1012:7, 1012:8
**Southeast** [1] - 874:10
**Southern** [1] - 970:3
**Southport** [1] - 837:20
**speaking** [1] - 935:17
**SPEARS** [74] - 837:18, 850:24, 950:9, 952:19, 953:21, 954:9, 955:11, 956:5, 957:13, 958:16, 960:18, 961:20, 963:1, 965:17, 966:20, 967:21, 967:23, 971:2, 971:15, 971:21, 971:24, 972:13, 973:18, 974:2, 974:25, 975:15, 975:22, 976:2, 978:11, 978:14, 978:20, 979:5, 979:12, 979:20, 982:2, 984:9, 985:12, 985:20, 986:11, 987:15, 987:21, 989:22, 991:25, 992:20, 993:21, 994:5, 995:25, 998:4, 1000:16, 1002:1, 1003:7, 1006:4, 1011:12, 1011:14, 1011:21, 1011:24, 1012:2, 1014:7, 1014:10, 1014:13, 1014:16, 1014:18, 1014:21, 1015:11, 1015:16, 1015:20, 1016:18, 1017:1, 1017:24, 1018:19, 1021:18, 1023:5, 1023:9, 1023:16
**Spears** [9] - 837:19, 850:23, 971:1, 971:20, 987:20, 1011:1, 1014:6, 1021:15, 1024:17
**Spears'** [2] - 976:13, 1013:6
**spec** [1] - 951:1
**Special** [15] - 849:6, 850:25, 851:9,

851:12, 851:16, 944:18, 950:21, 977:6, 977:17, 980:13, 981:4, 996:3, 1005:21, 1020:17, 1020:18
**SPECIAL** [1] - 945:6
**special** [5] - 945:9, 945:12, 945:15, 947:7, 997:21
**specific** [5] - 878:7, 904:21, 904:24, 962:14, 967:9
**specifically** [5] - 840:19, 923:14, 933:18, 982:13, 1006:16
**specification** [1] - 869:11
**specifics** [1] - 1017:17
**specify** [2] - 1007:17, 1008:12
**speculate** [2] - 929:25, 930:2
**speculation** [1] - 892:20
**speed** [1] - 961:25
**spelled** [1] - 945:2
**spelling** [1] - 944:24
**spend** [2] - 841:21, 883:21
**spent** [1] - 1018:22
**spoken** [2] - 1002:11, 1005:20
**spread** [3] - 996:24, 997:21, 1004:14
**squarely** [1] - 1008:5
**stage** [1] - 868:19
**stages** [2] - 950:1, 978:8
**stand** [7] - 846:3, 847:18, 848:22, 910:21, 979:23, 1017:11, 1026:12
**Standard** [1] - 876:6
**standard** [2] - 973:11, 978:14
**start** [8] - 844:8, 905:17, 963:8, 974:21, 976:13, 1019:23, 1026:3
**started** [7] - 867:1, 867:2, 867:6, 869:15, 935:22, 939:4, 1018:18
**starting** [5] - 875:22, 883:19, 905:23, 905:25
**starts** [1] - 998:12
**state** [2] - 944:24,

969:22
**statement** [11] - 840:20, 842:23, 843:18, 845:15, 1006:12, 1006:16, 1006:18, 1007:8, 1007:23, 1009:22, 1010:15
**statements** [20] - 839:3, 839:16, 839:22, 840:1, 840:2, 840:6, 840:7, 840:8, 848:5, 849:18, 849:19, 849:22, 850:17, 850:19, 850:21, 968:25, 1006:24, 1007:3, 1007:4, 1007:13
**STATES** [3] - 836:1, 836:4, 1027:3
**States** [10] - 839:14, 840:13, 852:20, 908:11, 947:16, 982:12, 1007:7, 1008:16, 1027:6, 1027:18
**states** [2] - 848:13, 1006:23
**Station** [1] - 862:21
**stationed** [2] - 873:13
**status** [6] - 1006:20, 1008:4, 1008:6, 1009:4, 1009:7, 1010:14
**statutes** [1] - 946:5
**stay** [3] - 906:4, 930:15, 934:23
**steam** [3] - 857:23, 937:11, 994:17
**Stefan** [1] - 961:17
**step** [9] - 861:6, 901:17, 910:18, 933:24, 934:2, 935:23, 952:10, 968:6, 1020:2
**Steven** [1] - 871:18
**still** [16] - 838:13, 851:9, 878:20, 882:25, 883:12, 884:2, 885:5, 906:13, 917:16, 940:13, 941:4, 954:22, 1010:22, 1012:4, 1013:12, 1024:23
**stolen** [1] - 947:18
**stood** [1] - 1012:10
**stop** [4] - 883:3, 967:25, 968:1,

1002:20
**story** [1] - 977:10
**straighten** [1] - 932:2
**strange** [2] - 898:16, 898:22
**strategy** [7] - 858:20, 858:21, 858:22, 871:9, 871:12, 892:8, 939:15
**Street** [3] - 836:7, 837:4, 1027:18
**strictly** [1] - 864:16
**strike** [1] - 935:8
**strong** [2] - 1003:16, 1003:17
**stronger** [2] - 915:12, 915:13
**strongly** [4] - 841:22, 883:25, 884:14, 934:25
**struck** [1] - 975:8
**structure** [2] - 911:18, 967:12
**structured** [1] - 1016:7
**stylistic** [2] - 970:13, 1008:24
**subject** [48] - 841:4, 862:19, 862:20, 867:23, 867:24, 871:22, 874:25, 875:1, 876:19, 880:9, 880:10, 880:23, 881:22, 881:24, 886:22, 888:23, 888:24, 890:2, 891:25, 950:6, 951:16, 952:16, 955:8, 957:9, 961:18, 962:8, 962:12, 962:23, 964:18, 965:9, 965:15, 966:14, 966:23, 967:8, 984:6, 986:9, 987:12, 989:19, 991:23, 992:13, 995:13, 995:20, 998:2, 998:18, 1000:13, 1001:24, 1003:5, 1013:2
**subjects** [1] - 960:24
**submit** [2] - 988:13, 990:11
**submitted** [2] - 890:5, 962:2
**subpoena** [4] - 976:1, 976:3, 976:6, 976:8
**subsequent** [2] - 900:10, 962:5

**subsequently** [1] - 972:16
**subsidiaries** [1] - 949:16
**substance** [4] - 881:25, 882:13, 969:12, 972:6
**substantive** [2] - 900:13, 904:21
**success** [2] - 890:7, 890:12
**sufficient** [3] - 968:21, 1007:23, 1025:13
**sufficiently** [1] - 1007:10
**suggest** [2] - 851:22, 1004:18
**suggested** [5] - 844:12, 891:23, 959:13, 966:4, 1002:12
**suggesting** [1] - 959:23
**suggestion** [1] - 997:19
**Suguru** [1] - 874:21
**Suite** [1] - 837:19
**Sulianto** [22] - 859:12, 860:16, 860:18, 860:20, 862:17, 865:20, 866:5, 867:10, 871:18, 874:20, 876:17, 878:16, 886:20, 890:1, 893:13, 955:8, 956:12, 956:13, 1001:23, 1002:6, 1009:15, 1009:20
**Sumatra** [4] - 856:5, 856:15, 873:12, 873:14
**summary** [4] - 954:3, 977:24, 977:25, 1020:21
**summer** [1] - 899:14, 900:14
**Sunday** [5] - 987:1, 1021:18, 1022:3, 1022:6
**supervisor** [1] - 909:19
**supervisory** [2] - 945:9, 945:12
**Supp** [2] - 970:5, 1008:16
**supply** [2] - 857:17, 964:5
**support** [16] - 849:17, 854:4, 860:3, 861:7,

942:18, 959:15, 1001:17, 1001:19, 1002:16, 1003:16, 1003:17, 1003:20, 1003:21, 1007:25, 1020:5
**supported** [1] - 1008:10
**supporting** [1] - 1004:10
**supports** [2] - 868:19, 1023:20
**supposed** [8] - 857:14, 858:11, 878:5, 878:14, 879:8, 893:22, 893:23, 928:22
**Supreme** [1] - 1012:20
**surely** [1] - 978:16
**surprised** [1] - 1005:7
**surrounding** [1] - 851:1
**suspected** [3] - 907:21, 930:3, 930:9
**suspicions** [1] - 930:15
**sustain** [4] - 902:7, 930:10, 933:3, 944:8
**sustained** [3] - 892:22, 902:14, 939:10
**SVP** [2] - 934:1, 942:15
**swing** [1] - 865:2
**switch** [2] - 982:25, 983:10
**SWORN** [1] - 944:22
**system** [2] - 857:17
**systems** [1] - 963:18
**Systems** [4] - 857:10, 858:5, 860:11

**T**

**tactics** [1] - 871:10
**taint** [2] - 976:23, 976:24
**tainted** [2] - 976:14, 976:15
**Takeshi** [1] - 874:22
**tales** [1] - 907:17
**talks** [1] - 941:10
**tall** [1] - 907:17
**tangible** [1] - 907:12
**Tarahan** [128] - 838:17, 856:4, 856:17, 856:20, 857:7, 857:25, 859:9, 859:25, 860:2, 860:21,

860:24, 861:7,
861:21, 862:4,
862:7, 862:10,
862:20, 863:8,
863:22, 864:3,
865:11, 865:25,
866:14, 866:23,
867:6, 867:24,
868:25, 869:6,
869:7, 869:15,
870:24, 871:2,
871:23, 872:9,
872:12, 873:15,
874:6, 875:1,
875:19, 876:20,
877:4, 877:17,
878:5, 878:14,
878:23, 880:10,
880:24, 882:7,
883:4, 883:17,
885:2, 885:12,
886:14, 886:23,
888:24, 890:17,
893:5, 893:8,
893:10, 894:17,
894:20, 894:25,
895:6, 895:14,
895:23, 896:13,
896:14, 896:17,
897:4, 903:4,
905:16, 912:2,
912:16, 913:10,
915:21, 916:11,
916:20, 920:18,
924:22, 929:10,
930:20, 934:6,
936:11, 936:14,
938:11, 939:5,
939:12, 939:15,
939:17, 939:23,
941:22, 943:11,
943:24, 949:9,
949:25, 950:7,
950:23, 951:11,
961:11, 962:12,
962:23, 963:19,
964:5, 965:15,
966:14, 966:23,
981:21, 982:24,
983:2, 986:9,
988:11, 988:24,
989:19, 990:7,
993:11, 994:17,
995:16, 995:20,
996:14, 996:18,
996:23, 997:21,
998:18, 1000:13,
1001:5, 1002:18,
1004:17, 1009:10
**Tarahan.zip** [1] -
995:22

**target** [1] - 1018:21
**targets** [2] - 855:23,
855:24
**tasks** [1] - 954:19
**Tatsuya** [1] - 874:21
**Tawar** [6] - 951:13,
952:24, 955:9,
956:13, 962:11,
995:16
**TC** [1] - 995:22
**team** [6] - 867:5,
868:22, 873:13,
912:2, 915:16,
954:20
**tease** [1] - 1023:10
**technique** [2] -
978:15, 1016:5
**techniques** [10] -
972:15, 972:22,
973:5, 973:9,
973:11, 973:14,
973:15, 1014:24,
1015:14, 1016:24
**technology** [2] -
865:17, 874:12
**telecon** [1] - 987:1
**telephone** [1] - 876:5
**Tellier** [4] - 839:15,
848:22, 1006:23,
1008:1
**TELLIER** [1] - 839:15
**temperature** [1] -
1002:23
**temporarily** [1] - 913:9
**ten** [4] - 846:6, 910:22,
947:3, 968:2
**tender** [1] - 954:20
**term** [4] - 870:17,
903:19, 940:2,
996:15
**terminate** [1] - 891:4
**terms** [20] - 842:24,
854:4, 854:5,
871:12, 894:5,
971:4, 971:12,
971:24, 979:7,
981:15, 991:16,
995:9, 997:20,
998:24, 999:13,
999:17, 1001:4,
1001:13, 1017:22,
1018:2
**terrorist** [1] - 970:1
**testified** [9] - 853:17,
902:16, 907:25,
913:11, 972:5,
1009:9, 1009:12,
1017:5, 1020:13
**testify** [10] - 846:16,
902:20, 903:10,

903:13, 972:3,
972:11, 973:24,
979:14, 1016:6,
1016:9
**testifying** [3] - 899:3,
902:23, 977:7
**testimony** [38] -
838:21, 841:6,
841:7, 849:6,
852:16, 899:9,
899:21, 899:22,
899:25, 900:24,
904:8, 910:19,
915:18, 916:7,
917:12, 919:16,
919:20, 919:24,
920:12, 922:12,
923:6, 923:24,
925:7, 941:24,
971:6, 975:11,
980:6, 995:8,
1005:22, 1009:7,
1010:4, 1010:12,
1012:12, 1012:23,
1013:5, 1014:4,
1025:16
**Texas** [2] - 893:6,
908:13
**text** [7] - 845:14,
845:22, 923:20,
928:9, 969:11,
1008:8
**Tg** [1] - 996:13
**THE** [186] - 836:18,
838:4, 839:18,
842:24, 843:5,
843:7, 843:24,
844:4, 845:25,
846:3, 846:21,
846:25, 847:3,
847:8, 848:18,
850:2, 850:23,
852:19, 852:22,
853:2, 853:10,
853:15, 855:8,
863:2, 868:6,
868:10, 872:3,
875:6, 877:12,
877:14, 877:24,
878:10, 879:16,
881:7, 887:5, 889:9,
892:22, 892:23,
894:4, 894:13,
901:14, 902:7,
902:14, 910:9,
910:13, 910:17,
910:20, 910:21,
910:24, 911:4,
918:1, 918:3, 918:8,
918:11, 918:13,

919:16, 930:8,
930:10, 930:15,
931:18, 933:3,
934:13, 934:18,
934:19, 934:20,
935:20, 938:16,
938:18, 938:20,
938:22, 939:10,
939:22, 940:11,
940:13, 943:14,
943:18, 944:4,
944:8, 944:11,
944:13, 944:14,
944:17, 944:20,
944:23, 945:1,
945:4, 950:11,
950:18, 952:20,
953:24, 954:14,
955:12, 956:2,
956:7, 957:14,
958:17, 960:19,
961:21, 963:2,
965:18, 967:25,
968:5, 968:15,
969:1, 969:6,
969:11, 969:23,
970:18, 971:12,
971:19, 971:23,
972:9, 973:6,
973:21, 974:13,
975:13, 975:16,
975:20, 975:25,
976:5, 976:9,
978:13, 979:11,
979:15, 979:21,
979:25, 980:17,
980:21, 980:23,
982:3, 984:10,
985:15, 985:25,
986:12, 987:16,
987:19, 987:22,
989:23, 992:1,
992:21, 993:22,
994:6, 996:1, 998:5,
1000:17, 1002:2,
1003:8, 1005:5,
1005:7, 1005:13,
1005:16, 1005:17,
1006:5, 1006:8,
1011:10, 1011:13,
1011:16, 1012:4,
1014:9, 1014:12,
1014:14, 1014:17,
1014:19, 1015:6,
1015:12, 1015:18,
1016:12, 1016:20,
1017:15, 1018:7,
1018:20, 1021:2,
1021:6, 1021:21,
1022:7, 1022:17,
1022:21, 1023:3,

1024:6, 1024:12,
1024:16, 1024:25,
1025:3, 1025:6,
1026:1, 1026:6
**themselves** [3] -
840:7, 1013:11,
1013:24
**theory** [1] - 1014:5
**thereafter** [2] - 974:19,
985:6
**therefore** [4] - 868:19,
925:16, 959:23,
967:17
**therein** [2] - 842:4,
1008:15
**thereof** [1] - 985:7
**they've** [1] - 899:20
**Thiessen** [2] - 841:8,
846:16
**thinking** [3] - 1012:24,
1013:6, 1014:22
**thinks** [1] - 1003:20
**third** [5] - 858:2,
858:3, 963:8,
981:24, 991:9
**thirty** [1] - 848:12
**thirty-five** [1] - 848:12
**three** [14] - 858:17,
899:18, 926:15,
926:16, 932:1,
932:4, 956:17,
958:8, 963:4,
982:21, 997:3,
999:21, 1003:10,
1004:14
**three-page** [1] - 963:4
**throughout** [2] -
907:15
**Thursday** [1] - 967:2
**tied** [3] - 855:23,
855:24, 855:25
**timeline** [1] - 901:13
**timing** [1] - 1000:6
**title** [1] - 945:8
**titles** [1] - 969:25
**today** [13] - 888:3,
899:4, 915:19,
915:20, 916:6,
919:20, 947:21,
948:21, 949:2,
961:12, 980:19,
985:14, 997:7
**today's** [2] - 875:10,
987:2
**together** [2] - 857:4,
857:5
**tolerate** [1] - 1001:5
**tomorrow** [4] -
868:15, 873:9,
1021:20, 1021:21

**tonight** [5] - 875:12, 876:4, 876:5, 1021:20, 1024:24
**took** [4] - 906:17, 918:24, 937:9, 1014:1
**top** [13] - 864:8, 881:12, 917:21, 920:7, 923:20, 938:20, 960:23, 964:25, 965:1, 983:14, 999:20, 1003:12
**ToP** [5] - 996:19, 996:23, 997:8, 1004:13, 1004:14
**topic** [1] - 911:11
**topics** [3] - 929:2, 982:25, 995:7
**tops** [1] - 960:23
**Toru** [1] - 874:21
**total** [2] - 991:14, 993:4
**touch** [1] - 906:4
**tougher** [1] - 1001:13
**towards** [2] - 864:11, 864:20
**town** [1] - 944:25
**track** [1] - 1005:10
**trading** [1] - 984:16
**traffic** [1] - 1011:15
**training** [4] - 945:24, 946:1, 946:3, 946:5
**transcription** [1] - 1027:9
**transfers** [1] - 904:24
**transition** [1] - 977:21
**translation** [1] - 955:6
**traveling** [1] - 925:25
**tree** [1] - 976:25
**TRIAL** [1] - 836:12
**trial** [16] - 841:4, 842:7, 846:7, 850:10, 850:15, 899:21, 902:20, 902:23, 904:9, 951:19, 951:21, 976:18, 977:3, 978:5, 1011:3, 1024:7
**tricky** [1] - 938:20
**tried** [3] - 875:10, 975:5, 1002:21
**true** [8] - 930:3, 932:9, 932:22, 971:18, 977:8, 1004:10, 1019:1, 1027:9
**trust** [6] - 867:15, 882:23, 883:7, 907:6, 907:7, 907:9

**trustworthy** [1] - 974:15
**truth** [1] - 907:18
**truthful** [2] - 903:6, 1013:24
**try** [16] - 847:11, 857:6, 877:8, 886:6, 930:13, 937:13, 937:14, 938:8, 943:4, 943:7, 955:4, 989:11, 1009:12, 1016:22, 1023:10, 1026:6
**trying** [6] - 851:23, 857:25, 918:3, 961:6, 969:18, 984:15
**Tsuzaki** [1] - 874:21
**Tuban** [1] - 1002:24
**Tuesday** [1] - 1026:4
**turbine** [2] - 857:23, 937:11
**turn** [4] - 891:5, 915:3, 959:16, 997:10
**turned** [2] - 853:10, 929:16
**twice** [3] - 848:3, 966:1, 968:22
**two** [25] - 843:18, 843:19, 848:2, 850:5, 856:8, 857:2, 857:3, 865:17, 865:20, 865:24, 882:2, 883:23, 884:22, 899:17, 912:24, 929:2, 932:1, 932:4, 955:18, 968:12, 991:12, 997:3, 997:10, 1002:12, 1013:22
**types** [2] - 922:4, 948:25
**typically** [1] - 914:2

## U

**U.S** [21] - 837:3, 837:8, 854:16, 908:18, 908:20, 937:8, 947:12, 947:13, 964:6, 964:9, 964:10, 966:3, 966:25, 967:11, 970:2, 970:4, 981:14, 1006:23, 1008:1, 1010:8, 1013:1
**U.S.D.J** [1] - 836:18
**ultimate** [2] - 943:23,

1013:23
**ultimately** [5] - 895:4, 895:16, 930:22, 938:5, 1013:8
**unable** [1] - 954:19
**unavailable** [1] - 976:11
**under** [18] - 838:25, 840:5, 842:21, 872:16, 922:18, 933:17, 972:18, 978:21, 985:7, 991:4, 991:6, 991:9, 1006:11, 1006:18, 1007:16, 1009:7, 1015:5, 1018:10
**undergraduate** [1] - 945:20
**undermine** [2] - 850:20, 1014:3
**undermining** [1] - 1014:2
**understandable** [1] - 916:14
**understood** [7] - 883:10, 885:16, 935:10, 961:5, 1008:23, 1017:24, 1018:19
**uneasy** [1] - 964:20
**unfortunately** [1] - 887:9
**unhappy** [1] - 1003:20
**unhear** [2] - 1023:15, 1024:5
**unidentified** [1] - 844:13
**unique** [1] - 934:7
**Unit** [3] - 946:22, 947:8, 947:20
**unit** [6] - 861:23, 936:24, 937:10, 937:16, 937:22, 990:24
**UNITED** [3] - 836:1, 836:4, 1027:3
**United** [9] - 839:14, 840:13, 852:20, 947:16, 982:12, 1007:6, 1008:16, 1027:6, 1027:18
**Units** [1] - 994:17
**units** [7] - 854:4, 854:7, 854:24, 855:25, 859:15, 911:19, 937:7
**universe** [1] - 852:1
**University** [2] - 945:21, 945:22
**unless** [2] - 872:25,

1004:20
**unnecessary** [1] - 969:21
**unreliable** [1] - 840:8
**unreported** [1] - 852:15
**untrustworthy** [1] - 974:10
**up** [54] - 839:14, 844:4, 846:19, 849:5, 850:10, 851:3, 852:10, 852:17, 853:10, 853:12, 853:13, 854:6, 865:2, 883:22, 884:19, 898:22, 901:17, 904:5, 906:1, 906:2, 917:18, 920:5, 921:6, 924:13, 925:2, 925:23, 926:5, 926:23, 928:8, 930:13, 933:7, 935:21, 937:25, 938:6, 940:13, 943:3, 950:16, 950:18, 951:19, 955:2, 958:2, 961:24, 963:20, 964:13, 970:5, 997:1, 998:22, 999:1, 1003:23, 1016:5, 1019:3, 1021:11
**update** [1] - 961:24
**upper** [1] - 874:8
**upset** [1] - 921:16
**urgently** [1] - 1004:6
**urges** [1] - 1007:20
**US** [2] - 837:15, 1007:7
**USA** [3] - 990:23, 991:2, 994:13
**USD** [1] - 964:11
**useful** [1] - 1006:2
**useless** [1] - 1004:21
**utility** [1] - 861:12

## V

**valuable** [1] - 979:7
**value** [1] - 991:14
**various** [4] - 915:20, 915:25, 949:16, 996:13
**vehemently** [1] - 1022:13
**verbally** [1] - 903:1
**verify** [1] - 984:15
**verifying** [1] - 843:12

**Veronique** [14] - 962:22, 963:22, 965:2, 965:14, 986:8, 987:10, 989:17, 991:20, 992:11, 997:18, 997:19, 998:15, 999:8, 1000:12
**version** [4] - 881:5, 993:9, 993:13, 1013:10
**versus** [4] - 847:16, 850:3, 1006:23, 1018:10
**via** [6] - 889:14, 925:17, 926:5, 959:12, 960:2, 987:3
**vice** [5] - 859:23, 861:11, 892:16, 911:12, 952:5
**view** [5] - 923:8, 941:22, 972:20, 977:5, 1021:16
**VIII** [2] - 952:6, 956:19
**violations** [1] - 972:2
**Virginia** [2] - 945:22, 946:4
**visit** [4] - 876:20, 880:10, 880:24, 882:7
**visitors** [1] - 953:6
**voice** [1] - 853:13
**voices** [1] - 853:12
**VOLUME** [1] - 836:13
**VP** [3] - 933:20

## W

**wait** [4] - 888:1, 888:5, 934:13, 944:4
**waiting** [4] - 852:9, 901:5, 902:3, 997:3
**wants** [5] - 866:7, 914:11, 976:20, 1013:6
**Washington** [4] - 837:10, 945:3, 946:25, 964:3
**water** [1] - 938:17
**ways** [1] - 954:3
**weak** [1] - 967:12
**week** [4] - 872:18, 951:7, 963:17, 984:21
**weekend** [6] - 1005:9, 1005:11, 1005:15, 1005:25, 1014:11, 1026:10
**weeks** [5] - 851:24, 862:5, 932:1, 932:4

**welcome** [1] - 852:12
**Wheeler** [5] - 856:25, 857:1, 869:4, 873:23, 885:17
**Wheeler's** [1] - 869:5
**Whereas** [2] - 994:12, 994:19
**White** [1] - 1010:24
**white** [4] - 1012:16, 1012:19, 1013:18, 1013:21
**whole** [3] - 912:23, 927:1, 1011:19
**Widiono** [10] - 875:16, 875:18, 890:10, 890:11, 890:20, 892:18, 913:21, 959:11, 959:13, 1002:11
**William** [15] - 862:17, 872:7, 874:19, 886:20, 888:21, 986:6, 987:9, 989:16, 990:18, 991:21, 992:4, 992:10, 999:6, 1000:25, 1003:4
**willing** [5] - 841:21, 883:21, 902:11, 996:25, 1004:20
**win** [11] - 857:7, 857:25, 859:9, 874:8, 874:9, 877:4, 877:8, 895:4, 896:13, 1009:10, 1009:12
**Winan** [23] - 838:16, 843:5, 876:24, 877:1, 877:2, 878:17, 879:7, 880:6, 880:8, 882:4, 882:10, 922:12, 922:22, 923:2, 923:8, 923:15, 940:9, 968:24, 980:13, 1006:16, 1009:9, 1009:13, 1010:18
**Winan's** [8] - 843:12, 843:15, 879:24, 880:5, 882:13, 882:14, 885:23, 1009:23
**Windsor** [24] - 861:16, 862:1, 868:16, 870:14, 870:17, 870:20, 870:22, 872:18, 872:22, 872:23, 885:3, 886:3, 886:9,

886:11, 888:16, 891:11, 891:13, 891:14, 891:17, 912:3, 991:1, 999:13, 999:15
**winning** [2] - 856:20, 895:5
**wire** [1] - 904:24
**wireless** [1] - 925:21
**wiretap** [1] - 978:5
**wish** [1] - 868:16
**wished** [1] - 897:3
**wishes** [2] - 852:18, 994:19
**witness** [36] - 838:3, 838:21, 846:3, 846:5, 846:10, 846:12, 848:2, 849:5, 849:7, 850:15, 852:11, 868:3, 878:20, 901:8, 901:12, 919:12, 935:12, 935:17, 944:16, 953:23, 954:3, 968:8, 973:1, 974:9, 974:21, 975:21, 977:24, 978:25, 985:20, 1016:8, 1019:14, 1019:15, 1019:19, 1019:21, 1024:9, 1024:22
**WITNESS** [14] - 892:23, 910:20, 918:3, 918:11, 918:13, 934:18, 934:20, 938:18, 938:22, 944:13, 944:17, 944:22, 945:1, 1005:16
**witness's** [4] - 935:15, 1012:11, 1012:12, 1014:4
**witnesses** [10] - 948:16, 954:4, 972:25, 974:8, 974:23, 976:19, 976:21, 1018:16, 1019:20, 1024:18
**WL** [1] - 852:21
**won** [9] - 841:18, 865:13, 865:15, 882:24, 883:12, 890:17, 935:6, 941:1, 941:3
**word** [1] - 941:7
**words** [4] - 922:1, 953:1, 985:23, 1013:18
**world** [1] - 936:19

**worry** [1] - 996:25
**worst** [1] - 959:15
**write** [4] - 955:22, 988:9, 992:3, 1000:3
**writing** [1] - 863:16
**written** [1] - 859:21
**wrote** [2] - 1009:23

## Y

**Yamamoto** [2] - 874:22, 889:24
**year** [10] - 901:22, 901:24, 908:5, 918:19, 936:10, 993:3, 996:24, 997:12, 1004:15
**years** [10] - 842:16, 905:22, 906:2, 906:3, 916:15, 945:17, 946:8, 947:3, 949:16, 997:3
**yesterday** [12] - 838:15, 838:19, 846:9, 846:23, 851:6, 853:17, 856:9, 900:24, 915:19, 961:6, 984:1, 992:25
**York** [3] - 837:9, 837:15, 970:3
**yourself** [5] - 864:9, 912:6, 921:12, 936:7, 938:17
**Yusril** [1] - 984:16
**Yves** [7] - 995:20, 997:14, 997:18, 998:13, 999:9, 999:14, 1000:11
**Yves/Reza** [1] - 1001:16

## Z

**zero** [1] - 978:3
**zoomed** [1] - 873:3