UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                CRIMINAL NO. 3:12CR238 (JBA)

      v.

LAWRENCE HOSKINS                         January 7, 2020

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S RULE 29(C) MOTION FOR
A JUDGMENT OF ACQUITTAL AND RULE 33 MOTION FOR A NEW TRIAL**

# **TABLE OF CONTENTS**

I.  Introduction ......................................................................................................... 1

II.  Factual Background ........................................................................................... 3

III.  The Defendant's Rule 29(c) Motion For Judgment Of Acquittal Should Be Denied ...... 11

    A.  Standard Of Review ..................................................................... 11

    B.  The Defendant's Arguments Do Not Satisfy Rule 29 ........................................ 12

        1.  The Defendant Was An Agent Of API .................................................. 12

        2.  The Defendant Knew Bribe Payments Originated From The United States .. 20

        3.  There Is Venue In Connecticut For The Money Laundering Counts ............. 23

IV.  The Defendant's Rule 33 Motion For A New Trial Should Be Denied .......................... 29

V.  Conclusion ....................................................................................................... 30

The Government respectfully submits this opposition to the defendant's Rule 29(c) Motion for a Judgment of Acquittal and Rule 33 Motion for a New Trial. Doc. 589. The defendant's motions do not come close to meeting the exacting standard for a judgment of acquittal or a new trial, and should be denied in their entirety.

## I.    <u>INTRODUCTION</u>

After a two-week trial and convictions on 11 of 12 charged counts, the defendant seeks to set aside the verdict based on his reading, and in many instances misreading, of the evidence that was fully developed and examined by the jury.

Yet none of the defendant's arguments—each of which was ably made by defense counsel to the jury in opening and closing arguments and throughout the trial—leads to the conclusion that no rational jury could have convicted the defendant of the crimes charged. The defendant advances three principle arguments: (1) with respect to Counts 1 through 7 (conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and violations of the FCPA), the evidence does not support that the defendant was an "agent" of Alstom Power Inc. ("API"); (2) with respect to Counts 8, 9, 10, and 12 (conspiracy to launder money and money laundering), the evidence does not support that the defendant knew the bribe payments would be made from the United States; and (3) with respect to Counts 9, 10, and 12 (money laundering), there is not proper venue in Connecticut.[1]

Each of the defendant's arguments is unavailing. First, the Government proved beyond a reasonable doubt that the defendant was an agent of API for purposes of the Tarahan Project, and a rational jury could have easily reached that conclusion. At trial, the defendant relied heavily on general corporate process documents and organizational charts, none of which addressed how things worked on the Tarahan Project, as multiple witnesses with direct knowledge explained.

---

[1] At trial, the defendant also argued that he was not a participant in the bribery scheme and that, even if he was, he withdrew from the conspiracies. The defendant does not raise these issues in his motion for acquittal.

These witnesses were corroborated by overwhelming documentary evidence that proved that the defendant was acceding to, and carrying out, API's instructions in connection with the hiring of consultants on the Tarahan Project, and that API controlled the undertaking.

Second, with respect to the money laundering counts, even assuming that the Government must prove that the defendant knew that the bribe payments were being sent from the United States (which, as explained more fully below, is not legally required), there was clear evidence supporting such knowledge. Indeed, among other evidence, the defendant sent and received emails about the fact that Pirooz Sharafi, the consultant who sent the transfers underlying the money laundering counts, was using a U.S. bank account, and the defendant and his co-conspirators ultimately decided that API would wire payments directly to that U.S. account. Testimony also established that in all projects involving a consultant, the money originated from API (even if Alstom Prom in Switzerland would act as an intermediary in the payment process), something the defendant well knew given his role in consultancy agreements for the Asia region.

Third, there was more than sufficient evidence to support the jury finding venue for the money laundering counts. The jury convicted the defendant on three of four money laundering counts—acquitting on the one count (Count 11) for which there was not an API payment directly preceding—and thus was clearly attuned to venue. The defendant and API hired Sharafi for the primary purpose of paying a high-ranking member of Parliament in Indonesia. Each of the transfers from Sharafi's bank account in the United States to Indonesia for the benefit of that official (which form the basis of Counts 9, 10, and 12) followed shortly after Sharafi received a payment from API, and each of those transfers constituted approximately half of the money that he received from API. The Government proved by a preponderance, and a rational trier of fact

could have concluded, that the transfers from API that were then used by Sharafi to send money to Indonesia were each part of a continuing transaction.

The defendant's motion for a new trial pursuant to Rule 33 is equally unavailing.  The jury's verdict, which was reached after a full day of deliberations and two questions that reflected the jury's thoughtfulness and diligence, was neither "seriously erroneous" nor a "miscarriage of justice."

The defendant's motions should be denied in their entirety.

## II.    FACTUAL BACKGROUND

Alstom S.A. ("Alstom") was a multinational power generation and transportation company headquartered in France.  Trial Transcript ("Tr.") 78, 312.  Alstom had subsidiaries in various countries around the world, including a subsidiary headquartered in Connecticut, Alstom Power, Inc. ("API").  Tr. 78-79, 699.  Through its subsidiaries, Alstom bid on projects to secure contracts to perform power-related and transportation-related services, including in Indonesia.  *See e.g.*, Government Exhibit ("GX") 51, GX 410, GX 451, Tr. 79-81, 314-315.  During the relevant time period, Alstom's global boiler business was headquartered at API in Windsor.  Tr. 78-79.

Alstom maintained a function called International Network (which subsumed Alstom's "Country Network," collectively referred to herein as International Network) that supported its subsidiaries' efforts to secure contracts around the world.  GX 612, Defense Exhibit ("DX") 916, Tr. 162, 326, 1158-59.  International Network, which was organized by geographical region, performed a "corporate function," like Information Technology and Human Resources, in that it served Alstom's operating units based on their needs and requests.  DX 911A, GX 665. International Network did not have its own profits and losses, and was funded by the business units, including API.  GX 665, Tr. 328, 678, 709-10.

Between November 1, 2001 and August 31, 2004, the defendant was employed by Alstom UK Ltd. (a United Kingdom-based Alstom subsidiary) but was seconded to another subsidiary, Alstom Resources Management S.A., in France. GX 612. The defendant was assigned to work in Alstom's International Network as the Area Senior Vice President for the Asia region, later expanded to include Asia-Pacific and Eastern and Northern Europe. GX 612. In that capacity, the defendant performed functions and support services for and on behalf of various Alstom subsidiaries, including API. GX 665.

One of the projects that the defendant assisted API in securing was the Tarahan Project. The Tarahan Project was a project to provide power-related services to the citizens of Indonesia that was bid and contracted through Indonesia's state-owned and state-controlled electricity company, Perusahaan Listrik Negara ("PLN"), valued at roughly $118 million. GX 57, Tr. 121. PLN was responsible for choosing who would build the Tarahan Project. Tr. 83, 315, 826.

API led a consortium that also included Alstom's Indonesian subsidiary (Alstom Power Energy Systems Indonesia, or "PTESI") and a Japanese trading company, Marubeni Corporation, in the bidding and carrying out of the Tarahan Project in Indonesia. GX 51.

At a very early stage of the project, in mid-2002, API and its co-conspirators decided to hire a consultant to pay bribes to officials to help API, PTESI, and Marubeni win the Tarahan Project. The defendant, in his capacity as Alstom International Network Area Senior Vice President for the Asia Region, was directly involved in supporting API's efforts to win the Tarahan Project, including by assisting API in selecting the consultant, assisting API in negotiating terms of payment with the consultant, and in approving aspects of the consultancy agreement with the consultant, all along knowing that the purpose of hiring a consultant was to disguise bribe payments to Indonesian officials who had influence over the award of the Tarahan project.

Because it was API's project, API controlled the process of hiring the consultant. Initially, API, the defendant, and their co-conspirators discussed hiring a consultant, Harsono, who was very close with Emir Moeis, a high-ranking member of Parliament who carried significant influence with PLN. Tr. 87, 96-97, 104-105. However, David Rothschild, a regional sales manager at API who was leading the sales efforts on the Tarahan Project in 2002, advised his boss, Frederic Pierucci (the head of global boiler sales for Alstom), that Harsono was too closely connected with Moeis, and instead recommended Pirooz Sharafi and his company Pacific Resources Inc. ("PRI"). Tr. 106-107. When putting in place Sharafi's consultancy agreement, the defendant, another employee of International Network, and Pierucci discussed the fact that Sharafi was based in the United States and was using a U.S. company with a U.S. bank account. GX 439. The three co-conspirators discussed trying to avoid U.S. dollar transactions and having Sharafi use a company and bank account outside of the U.S. GX 439. However, ultimately the defendant and his co-conspirators agreed to allow Sharafi to use his U.S. company and U.S. bank account. GX 440.

Although Sharafi had a good relationship with Moeis and Eddie Widiono, the President of PLN, other members of the conspiracy—including Reza Moenaf, Alstom's country president for Indonesia and head of PTESI—were concerned that Sharafi did not have a good relationship with the PLN evaluation team for the Tarahan Project, and thus could not effectively make commitments to bribe them. *See*, *e.g.*, GX 415. Moenaf, who as country president directly reported to the defendant, expressed this concern to the defendant in connection with the bid for another Indonesian project—Muara Tawar—on which the defendant was helping another Alstom subsidiary. GX 422.

Moenaf's prediction proved true, and in September 2003, the PLN evaluation committee voiced its displeasure with Sharafi and his willingness to bribe them. GX 454. At the same time,

the defendant was dealing with a similar problem on Muara Tawar, for which Eddie Widiono conveyed a clear desire to receive bribes through Azmin Aulia and his company PT Gajendra Adhi Sakti ("PTGAS").  GX 455, Tr. 415

As a result, the defendant and his co-conspirators met with Sharafi to inform him that he would be responsible only for paying bribes to Moeis and that API and the Consortium would retain another consultant to bribe PLN officials.  Tr. 426-428.  Separately, the defendant, on behalf of API, met with Aulia and informed him that he would be retained at a 2% commission to pay bribes to PLN officials.  *Id*.  Shortly thereafter, API sent Sharafi an amended consulting agreement, reducing the amount of Sharafi's commission to reflect Sharafi's reduced responsibilities, and retained Aulia to bribe PLN officials.  GX 55, GX 56.

Following these meetings, the defendant and his co-conspirators set out to obtain terms of payment for Aulia and Sharafi that would allow them to most effectively bribe the Indonesia officials.  As with the decision to hire the consultants, API controlled the terms of payment negotiations because the payments to the consultants were going to come out of API's cash flow.  The defendant recommended a more aggressive schedule of payments and informed his co-conspirators that the aggressive payment plan was driven by elections in Indonesia.  Eventually, the defendant proposed a schedule of payments that API was able to approve.  GX 500.

In July 2004, API, PTESI, and Marubeni were successful in winning the Tarahan Project. GX 57.  Following the news, Pierucci sent a congratulatory email to those who worked on the project thanking everyone for playing their respective roles.  Pierucci thanked William Pomponi, the regional sales manager from API who replaced Rothschild on the project, for leading the negotiations.  Pierucci thanked the defendant and Moenaf (as well as Eko Sulianto, another PTESI employee) for their local support.  GX 510.

After the defendant successfully helped put in place the consultancy agreements for Sharafi and Aulia, and helped API secure the Tarahan Project, the defendant left Alstom.  GX 611.  The defendant did not notify several of his co-conspirators that he even left the company.  *See*, *e.g.*, Tr. 125 (Rothschild), 897 (Puckett).  In his communications with other co-conspirators, he had only positive things to say about Alstom and their efforts to secure the Tarahan Project.  The defendant's farewell e-mail to Pierucci stated: "Great news on Tarahan after all the efforts over several years." GX 512.  The defendant wrote to Moenaf, "As you say our efforts paid off after a lot of hard work by many people and I hope that Tarahan will be the start of many future successes for Alstom in Indonesia."  GX 519.   In a follow-up e-mail to Moenaf, the defendant gave advice on how to maintain the close relationship with PLN.  GX 520.

Beginning in 2005, the payments to Sharafi and Aulia became due pursuant to the consultancy agreements the defendant helped put in place.  Christopher Varney, who was the Finance Director for API, explained that, so long as the contractual terms of the consultancy agreements were met, he was required to approve these payments.  Tr. 731-32, 806.

The process for the payments to each consultant was slightly different.  With respect to Aulia, API followed its normal process.  Specifically, API received an invoice from Alstom Prom in Switzerland, and then—operating from Windsor, Connecticut—API caused a payment to be made to Alstom Prom, at which point Alstom Prom then sent the money on to PTGAS's bank account in Singapore.  The payments from API to Alstom Prom for the benefit of Aulia were as follows:

- On or about July 20, 2005, employees of API in Connecticut caused a wire transfer in the amount of $418,906 from API's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom

Prom to PTGAS's bank account in Singapore for the purpose of paying bribes to officials at PLN. GX 2.

- On or about July 26, 2005, employees of API in Connecticut caused a wire transfer in the amount of $114,598 from API's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom Prom to PTGAS's bank account in Singapore for the purpose of paying bribes to officials at PLN. GX 2.

- On or about March 28, 2006, employees of API in Connecticut caused a wire transfer in the amount of $466,816 from API's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom Prom to PTGAS's bank account in Singapore for the purpose of paying bribes to officials at PLN. GX 2.

- On or about December 6, 2006, employees of API in Connecticut caused a wire transfer in the amount of $266,752 from API's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom Prom to PTGAS's bank account in Singapore for the purpose of paying bribes to officials at PLN. GX 2.

In total, API wired $1,267,072 through Alstom Prom to PTGAS for the purpose of bribing PLN officials. GX 5. The money sent by API to PTGAS could not be traced to its ultimate destination based on the records located by the Government because the money was withdrawn in cash or transferred to Aulia or another company and then withdrawn in cash. Tr. 1110-11. However, there is other evidence corroborating that Aulia did, in fact, pay PLN officials, including internal Alstom emails. GX 533.

With respect to Sharafi and his company PRI, API paid the bribe money directly to PRI's bank account in Maryland, as was planned by the defendant and his co-conspirators. GX 440. The payments from API to PRI were as follows:

- On or about November 16, 2005, employees of API in Connecticut caused a wire transfer in the amount of $200,064 from API's bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis. GX 2.

- On or about January 4, 2006, employees of API in Connecticut caused a wire transfer in the amount of $200,064 from API's bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis. GX 2.

- On or about March 7, 2007, employees of API in Connecticut caused a wire transfer in the amount of $200,064 from API's bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis. GX 2.

- On or about October 5, 2009, employees of API in Connecticut caused a wire transfer in the amount of $66,688 from API's bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis. GX 2.

In addition, Marubeni also paid PRI (Sharafi) on its own consultancy agreement, GX 54, as follows:

- On or about June 30, 2005, Marubeni caused a wire transfer in the amount of $151,781.70 from a bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis.  GX 3.

- On or about December 28, 2005, Marubeni caused a wire transfer in the amount of $154,462.30 from a bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis.  GX 3.

- On or about June 30, 2006, Marubeni caused a wire transfer in the amount of $154,630 from a bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis. GX 3.

- On or about November 14, 2008, Marubeni caused a wire transfer in the amount of $51,549.79 from a bank account in New York to PRI's bank account in Maryland for the purpose of paying bribes to Moeis. GX 3.

Using the payments from API and/or Marubeni, Sharafi periodically transferred money—$424,150 in total—from PRI in Maryland to an Indonesian bank account in the name of a company called PT Artha Nusantara Utama ("PT Artha"). GX 4. The bank account for PT Artha was set up on August 8, 2005, shortly before the transfers from PRI began, and PT Artha itself was only formed on April 1, 2005. GX 118. Other than a $1,000 opening deposit and interest payments, the only money deposited into the PT Artha account came from PRI. GX 121. From that money, $421,400 was withdrawn in cash from PT Artha, and $357,000 of that cash was deposited into an account in the name of Emir Moeis the same day as each of the withdrawals. GX 6.

The evidence showed that Sharafi used approximately half of the money PRI received from the API and Marubeni transfers to make payments to Moeis. For example:

- On August 29, 2005, approximately two months after receiving $151,781.70 from Marubeni, Sharafi wired $64,150 from PRI's bank account in Maryland to Indonesia for the benefit of Moeis. GX 3, 4.

- On December 14, 2005, less than a month after receiving $200,064 from API, Shrafi wired $100,000 from PRI's bank account in Maryland to Indonesia for the benefit of Moeis. GX 3, 4.

- On March 1, 2006, less than two months after receiving $200,064 from API, Sharafi wired $100,000 from PRI's bank account in Maryland to Indonesia for the benefit of Moeis.  GX 3, 4.

- On August 8, 2006, less than two months after receiving $154,630 from Marubeni, Sharafi wired $80,000 from PRI's bank account in Maryland to Indonesia for the benefit of Moeis.  GX 3, 4.

- And on March 9, 2007, two days after receiving $200,064 from API, Sharafi wired $80,000 from PRI's bank account in Maryland to Indonesia for the benefit of Moeis.  GX 3, 4.

## III.   THE DEFENDANT'S RULE 29(C) MOTION FOR JUDGMENT OF ACQUITTAL SHOULD BE DENIED

### A.   Standard Of Review

Rule 29 permits a defendant to move for a judgment of acquittal on the basis of insufficiency of the evidence. Fed. R. Crim. P. 29(c).  A judgment of acquittal should only be entered if the court concludes that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003).  A court should not grant a motion of judgment of acquittal if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotations omitted, emphasis in original).  "In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government.  All permissible inferences must be drawn in the government's favor."  *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal citations omitted).

The defendant erroneously suggests that the Court should use a variation of the "equipoise rule" derived from *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002): "'if the evidence viewed

in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt,' and acquittal is required." Defendant's Memorandum in Support of Motion for Acquittal and New Trial ("Def. Mem.") at 6 (quoting *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *Glenn*, 312 F.3d at 70)). As the Second Circuit has repeatedly explained since *Glenn* and *Cassese*, "that rule is of 'no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences.'" *United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018) (quoting *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005)).

### B.    The Defendant's Arguments Do Not Satisfy Rule 29

#### 1.    The Defendant Was An Agent Of API

The defendant first argues that the Government did not prove beyond a reasonable doubt that the defendant was an agent of API for purposes of the Tarahan Project. The defendant's motion, however, ignores the law and jury instructions, as well as the evidence adduced at trial.

As the Court noted in its order denying the defendant's first motion to dismiss in this case, "[t]he existence of an agency relationship is a 'highly factual' inquiry" that focuses on, among other things, the situation of the parties and the specific business at issue. Doc. 190 at 15 (quoting *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006)); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014) ("One may be an agent for some business purposes and not others so that the fact that one may be an agent for one purpose does not make him or her an agent for every purpose." (quoting 2A C. J. S. Agency § 43, p. 367 (2013))).

This clear statement of law was reflected in the Court's instructions on agency, which explained: "One may be an agent for some business purposes and not others. Here, the government must prove that the defendant was an agent of a domestic concern in connection with the specific events related to the Tarahan project." Tr. 1247.

Similarly echoing clear Second Circuit case law, the Court also appropriately instructed the jury: "To create an agency relationship, there must be. . . an understanding between the agent and the principal that the principal will be in control of the undertaking. . . . Such control need not be present at every moment, its exercise may be attenuated, and it may even be ineffective.  Proof of agency need not be in the form of a formal agreement between agent and principal.  Rather, it may be inferred circumstantially from the words and actions of the parties involved."  Tr. 1246-47; *see also Caplaw Enterprises*, 448 F.3d at 522 ("Nevertheless, the control asserted need not include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective." (internal quotes omitted)); *id* at 523 ("Slavish deference to contractual language is inappropriate in the highly-factual and often nuanced agency analysis").

The defendant ignored these principles at trial and in his motion, and instead relied on general corporate process documents and organizational charts.  Yet such documents do not dictate whether the defendant acted as an agent of API on Tarahan, a point that the witnesses at trial made clear.

Regarding the relevance of organizational charts, David Rothschild explained that they did not reflect how things worked on the Tarahan Project:

> Q.    Now, does this org chart capture every relationship that Alstom Power, Inc., had with other Alstom employees?
>
> A.    No.
>
> Q.    Does this org chart reflect how the Tarahan Project was run?
>
> A.    No.
>
> Q.    Does this org chart reflect the relationship between Alstom Power, Inc., and other Alstom employees on the Tarahan Project?
>
> A.    No.

> Q.     When you were working on the Tarahan Project, how many times did you look at an org chart to figure out how to do your job?
>
> A.     Probably none.

Tr. 284.

Larry Puckett, an API regional sales manager who worked on the Tarahan Project for approximately six weeks in 2003, also testified that the general process charts did not reflect how things worked on the Tarahan Project, and that the Tarahan Project was "unique":

> Q.     And as reflected in this chart, it was a necessary step in the hiring of any outside agent to have the approval of the International Network area SVP, right?
>
> A.     Well, it was a necessary step by charter.
>
> Q.     By charter, you said?
>
> A.     I mean by -- just like this approval process, I think this is part of air pollution control, but it would apply for Alstom in general.  But Tarahan was a unique case. Fred Pierucci made a decision.  I don't know if he made a decision with Lawrence's approval or not.
>
> Q.     Okay. Well --
>
> A.     But Fred Pierucci made a decision who the agent would be.

Tr. 934-35.

Indeed, the defendant appears to acknowledge that the Tarahan Project did not follow normal process when, despite arguing that the defendant's approval was required for all consultancy agreements, he nevertheless asserts that the defendant did not approve Sharafi's second consultancy agreement.  Def. Mem. at 25 ("Ultimately, the revised consultancy agreement with PRI, executed on February 25, 2004, removed the restriction on payments to Mr. Sharafi

within the United States. (Ex. 56, ¶ 6.2(a).) However, there is no evidence in the record that Mr. Hoskins ever approved or was even aware of this change.").

The witnesses were unequivocal that API controlled the hiring of consultants for the Tarahan Project. For example, David Rothschild testified:

> Q.    Who had ultimate decisionmaking authority over hiring the consultant?
>
> A.    Alstom Power, Inc.
>
> Q.    And who had ultimate decisionmaking authority over which consultant to hire?
>
> A.    Alstom Power, Inc.
>
> Q.    And who had ultimate decisionmaking authority over how much to pay the consultant?
>
> A.    Alstom Power, Inc.
>
> Q.    Who had ultimate decisionmaking authority over the terms of payment, not just how much the consultant received, but when they would receive those payments?
>
> A.    Alstom Power, Inc.

Tr. 281-82.

Larry Puckett likewise testified: "Mr. Hoskins didn't call the shots or the strategy on Tarahan. Fred Pierucci would call -- he was in control. So in that sense, Mr. Hoskins would have been reporting to Fred on the Tarahan Project." Tr. 940.

The witnesses were corroborated by significant documentary evidence establishing that API controlled the undertaking and that the defendant was acceding to API's requests in connection with the Tarahan Project. Indeed, at the outset of the relationship between API and the defendant on the Tarahan Project, Pierucci tasked the defendant with an assignment and the defendant carried it out. GX 410 (the defendant wrote in an email: "Fred P asked me to check with Resa on latest position on Tarahan. . . . Fred will pass through Paris next week and I will brief

him.").  Emails also reflected that the work that the defendant and others (such as Reza Moenaf) were doing in connection with the consultants on the Tarahan Project, were controlled, and subject to ultimate decision-making authority, by API:

- In an August 22, 2002 email from Moenaf to Pierucci and Rothschild, copying the defendant, Moenaf wrote: "Your position concerning the representation is urgently needed. . . . Appreciate *your decision* a.s.a.p."  GX 411 (emphasis added).

- In an August 28, 2002 email from Moenaf to Pierucci and Rothschild, copying the defendant and Eko Sulianto, with the subject "CONSULTANCY FOR TARAHAN," Moenaf wrote: "I spoke to Lawrence today.  A couple of days ago, he met Fred on the above subject.  According to Lawrence, Fred has already given his 'go-ahead' to proceed with the proposed consultant, Mr. M.  Please confirm.  If it is confirmed, could you please provide Eko with your accepted terms so that Eko can start the process and complete the necessary documents."  GX 412.

API's control of the undertaking was also reflected in communications surrounding the revision to Sharafi's consultancy agreement and the hiring of a second consultant, Azmin Aulia. Larry Puckett sent an email to Pierucci and Pomponi, copying the defendant and others, and explained that Marubeni wanted API, and particularly Pierucci, to exercise their decision-making authority to replace Sharafi: "Marubeni made clear their position that the consortium should take immediate measures to terminate our agreement with Mr. P [Sharafi], negotiate and settlement and engage a new representative to turn the situation around.  Marubeni pressed Puckett and Moenaf to convince Alstom Windsor, particularly Fred Pierucci, to agree to take this immediate action." GX 457.  Thus it was reasonable for the jury to infer from the evidence that, when the defendant told Sharafi his role was being reduced and then hired Aulia, he did so at the behest of API.  *See* Tr. 427 ("Q. Do you recall who conveyed the message to Pirooz and to Azmin as you've just explained it? A. That was Lawrence, yeah.").

16

The agency relationship was also proven by communications relating to the execution of the consultancy agreements and the terms of payment. Pierucci and Pomponi gave the defendant instructions, which he carried out, to execute the contracts:

- In an October 10, 2003 email from Pierucci to the defendant, copying Moenaf, Pomponi, and Sulianto, Pierucci instructed the defendant: "MC [Marubeni Corporation] has accepted the TOP [terms of payment] that we proposed for the agreement with Pirooz. I subsequently talked to Pirooz who accepted our proposal. Please reissue asap the revised consultancy agreement based on the following TOP:
  - 30% at DP [down payment]
  - 30% at DP+6 Months
  - 30% at DP+12 Months
  - 10% at PAC of Unit 2
  Please note as well the below address change.
  Please send the revised agreement by e-mail to Bill and myself." GX 469.

- In an October 13, 2003 email from Pomponi to the defendant, copying others, Pomponi wrote: "Based upon our telecom Sunday, pls go ahead, using today's date, and issue the fax official to Azmin. Please send copy via LN [Lotus Notes] attachment to myself." GX 470.

The defendant also assisted API in determining the best terms of payment it could obtain with the second consultant, Azmin Aulia, but the communications between API and the defendant made clear that API maintained control over those efforts as well:

- In response to an email from Pomponi stating that "the Tarahan estimate cannot tolerate" the terms of payment suggested by Reza Moenaf, the defendant responded in an email on March 18, 2004: "I cannot comment on your cash flow but my advice in this instance is to go with latest recommendation of Yves/Reza." GX 490.

- After Pomponi continued to push back and suggested different terms, the defendant wrote: "In my discussion with Fred and mails as per attached I recommended that we go with the latest proposal: 40/35/20/5. . . . We are all agreed the terms are lousy but there is no choice. Reza sees Eddie tomorrow and needs to confirm this position. Can you give him the all clear today?" GX 500.

- In response to the defendant's email, Pomponi responded: "Approval has just come regarding the terms. . . . Thanks for your support." GX 500.

In particular, the defendant's request that Pomponi give Reza the "all clear" must be understood in the context of Moenaf's role as Alstom's Indonesia country president, reporting to the

defendant.  The jury could easily infer that the defendant is seeking API's direction so that he can send his subordinate (Moenaf) to PLN with *API's* approved terms of payment, in order to get PLN to award the contract to API.

The defendant also ignores the significant evidence of International Network's supporting role within Alstom, which is consistent with the way in which API controlled the undertaking in connection with the Tarahan Project, including critical aspects of the defendant's activities on API's behalf.  For example, Christopher Varney testified that International Network did not generate profits and losses, and it was funded by the business units, including API.  Tr. 709-10.  According to Mr. Varney, this meant that API had the decision-making authority in business matters, not International Network.  *Id.*  This was also reflected in internal Alstom documents, which established that International Network was "serving all Sectors [business units] based on their needs and requests," was "a Sales Support and Service Organization," and was "financed by all ALSTOM Sectors based on their annual global sales, and that "the P/L responsibilities is with Sectors/Segments/Business/Units."  GX 665.

That the business units, such as API, "called the shots" was encapsulated in a February 3, 2004 email from Reza Moenaf to the defendant: "I do not know how we could change the way we work (Network – Sector), but today I feel that I have the responsibility without authority.  Since sector has the final call, perhaps the answer 'so be it', but if you have any advise how I could do better, please let me know."  GX 480; *see also* Tr. 558, 673 (Ed Thiessen testifying that International Network had "responsibility but no authority" and that he heard that statement from the Area Senior Vice President who replaced the defendant).

In the face of this overwhelming evidence of the defendant's agency, most of which he does not address in his motion, the defendant's principal rejoinder focuses on his purported

"approval" role over the consultancy agreements. This reliance is illusory. *First*, any so-called "approval" function was subservient to that of API. Puckett explained that the defendant's approval role was only "by charter," and in reality Fred Pierucci called the shots in connection with hiring of consultants, Tr. 934-35. *Second*, any official approval function was rote at best, limited to the "process of the document," ensuring "compliance with Alstom's policies," and not the key business-related components like "the terms of payment and commission," which were controlled by API. Tr. 281 (Rothschild). *Third*, even conceding the *existence* of this official role, the evidence showed that *in practice* the defendant actually exercised no meaningful oversight—even as the agreements he "approved" forbade bribery of public officials, he knowingly participated in a scheme to hire consultants to do just that. Tr. 282-83 (Rothschild). The consultancy agreements were simply designed to give the illusion of compliance with the law. *See* Tr. 71. The jury was certainly entitled to give little (if any) weight to a function limited to making sure the boilerplate in the consultancy agreement matched the boilerplate in other Alstom consultancy agreements, particularly when the defendant and his co-conspirators understood they would be ignored. *Fourth*, even if the defendant exercised some oversight over the consultancy agreement itself, that does not undermine API's well-documented control over the defendant in other aspects of retaining the Tarahan consultants. *See Caplaw Enterprises*, 448 F.3d at 522 ("the control asserted need not include control at every moment"). *Fifth*, even an approval role does not necessarily command that the approver has ultimate control over the undertaking. For example, Chris Varney's approval of API consultancy payments (*see* Tr. 700, 704)—like the defendant, slavishly making sure they followed Alstom policy—did not make him any less API's employee, just as Hoskins's own limited approval role did not make him any less API's agent.

In short, the evidence proved beyond a reasonable doubt that the defendant was an agent of API, and a rational jury could reach that conclusion.

        2.      <u>The Defendant Knew Bribe Payments Originated From The United States</u>

The defendant next unpersuasively argues that a rational jury could not have convicted him of Counts 8, 9, 10, and 12 (money laundering and conspiracy) because the defendant did not know that the payments underlying those counts were being made from the United States. This is inconsistent with the law and the evidence.

As an initial matter, and as more fully explained in the Government's motion for supplemental jury instruction (Docs. 559 and 567), the Government need not prove that the defendant either knew or intended that the transfer of money was from a place inside the United States to or through a place outside the United States. This element merely establishes federal jurisdiction and there is no requirement that defendant had knowledge of it. In fact, the intent requirement in Section 1956(a)(2) is in a wholly separate subsection that appears *after* the from/to/through element. *See, e.g.*, *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009) (as to identity theft statute, finding that "[a]s a matter of ordinary English grammar, it seems natural to read the statute's word 'knowingly' as applying to all the *subsequently* listed elements of the crime") (emphasis added)).

Regardless, the evidence at trial established beyond a reasonable doubt, and a rational jury could have concluded, that the defendant was well aware that the money originated from the United States. The evidence supports the defendant's knowledge in two separate ways: the defendant knew that (1) the money originated from API in the United States; and (2) Sharafi was using a U.S. company and U.S. bank account to pass on the money to Moeis.

First, the defendant was aware that the bribe payments originated in the United States. Varney testified that consultancy payments originated from API in Windsor, *see* Tr. 703-04, and that this common practice was well known within Alstom:

> Q.    Defense counsel asked you about the money for PT Gajendra that went from Alstom Power, Inc., to Alstom Prom in Switzerland. Do you remember that?
>
> A.    Yes.
>
> Q.    Okay. That wasn't unique to the Tarahan contract, was it?
>
> A.    No, it was not.
>
> Q.    Is that how most projects worked?
>
> A.    Yes.
>
> Q.    So that was known within the company, right?
>
> A.    Yes.

Tr. 814.

Indeed, the defendant introduced at trial the Fund Administration Agreement between API and Alstom Prom that made abundantly clear that the money would originate from API in Windsor, Connecticut. DX 952.

Not only did the evidence show that this payment process well known within Alstom, and thus known to the defendant, but there was also compelling evidence that the defendant was specifically aware that the consultancy payments for Tarahan originated from API. The original and revised consultancy agreements for Sharafi were entered into with API (not Alstom Prom), and API was responsible for paying Sharafi directly under both agreements. GX 53, 56. The defendant approved this arrangement, and in fact was a party to specific discussions about the fact that API would enter into this contract directly and make the payments. GX 440 (the defendant received an email in which Bruno Kaelin stated: "In this specific case, I propose an agreement

21

between ALSTOM Power Inc and the agent directly.  In this case the US Company makes sens [sic], although its structure is very weak.  Do not forget, that you will have to make sure, that the remuneration, which is quite important, has to be justified and documented.  I have prepared the file and it is now in the approval process in IN (Lawrence Hoskins and Etienne De.")).

Alstom's "Consultancy Agreement File Sheet" for the PRI agreement also made clear that API would be making the payments to PRI.  GX 120 (referring to the contracting "entity" as "ALSTOM Power Inc. (Windsor-USA)").  Moreover, when negotiating the terms of payment for the other consultant, Azmin Aulia, the defendant specifically referenced API's cash flow in connection with their ability to make such consultancy payments, because he understood that it was API that would be making the consultant payments for Tarahan.  GX 490 ("I cannot comment on your cash flow but my advice in this instance is to go with latest recommendation of Yves/Reza.").

The defendant attempts to confuse the issue by referencing Alstom's general practice that payments under the consultancy agreements in general "shall not be made either to or via the United States."  Def. Mem. at 24.  Yet this applied to the payments between Alstom Prom and the consultant in most Alstom consultancy agreements.  It did not, of course, relate to payments between API and Alstom Prom, as demonstrated by the Fund Administration Agreement and the practices described by Mr. Varney.  It also does not address the specific instance of Sharafi and Tarahan, in which the defendant sent and received emails about payment coming directly from API to a U.S.-based consultant.

Second, the defendant also knew that money passed through the United States because he was well aware that Sharafi was receiving the payments in the United States.  As described above, the defendant sent and received emails about Sharafi's company, and the fact that ultimately

Sharafi's "US Company makes sens [sic]. . . ."  GX 440.  This is also reflected in the File Sheet, which called for payments being made to Sharafi's account at SunTrust Bank, a regional U.S. institution.  GX 120.

The defendant unsuccessfully attempts to obscure this clear evidence by (1) pointing to Sharafi's original consultancy agreement, which contained a clause stating that payment "shall not be made either to or via the United States," GX 53; and (2) claiming that he was unaware of Sharafi's revised agreement that made clear the payments were going to be made to Sharafi's U.S. bank account, GX 56.  *See* Def. Mem. at 25.  Yet the boilerplate clause in the original consultancy agreement is directly contradicted by the emails that the defendant sent and received, which ultimately concluded that API would pay Sharafi in U.S. dollars to his U.S. company.  GX 440.  Moreover, there is ample additional evidence that the defendant was aware that Sharafi was using his U.S. bank account, including the File Sheet, which the defendant signed, and emails showing that he was sent the revised consultancy agreement.  GX 120, 484, 484A.  The defendant's claim that there is no evidence that he actually reviewed the revised File Sheet or consultancy agreement was one that the jury was entitled to reject in light of all of the evidence.  *See Aquart*, 912 F.3d at 44 ("it is the task of the jury, not the court, to choose among competing inferences." (citation omitted)).

In sum, a rational jury could easily have concluded that the defendant knew that the payments underlying the money laundering counts came from the United States, because the defendant knew that the payments both originated from API and passed through Sharafi's U.S. bank account.

### 3.    There Is Venue In Connecticut For The Money Laundering Counts

Finally, the Government met its burden to prove venue in the District of Connecticut for Counts Nine, Ten, and Twelve, which concerned payments from API in Connecticut to Pirooz

Sharafi's company (PRI) in Maryland, and then on to Indonesia for the benefit of Emir Moeis, the high-ranking member of Parliament. There was more than sufficient evidence that these were continuing transactions that originated at API in Windsor, Connecticut.

The Court properly instructed the jury that in order to find venue as to the money laundering counts (Counts 9-12), "the government must prove that the monetary transaction charged in that count was conducted at least in part in the District of Connecticut. The term 'conducts' includes initiating, concluding or participating in initiating or concluding a transaction. If you find that a transfer occurred in multiple stages and you find that each stage was an integral part of a single plan to transfer funds, then you should consider any such transfers to be one single transaction for purposes of determining whether the government has proved the venue requirement." Tr. at 1283-84.

There was ample evidence that the plan from the beginning was for Sharafi to transfer money that PRI received from API to Moeis in Indonesia. As Rothschild testified:

> Q.    Now, Mr. Rothschild, were payments ultimately made to the consultants on the Tarahan Project?
>
> A.    Yes.
>
> Q.    And what was the purpose of paying those consultants?
>
> A.    So that they could make their bribery payments to the government officials in Indonesia.
>
> Q.    Did you expect Pirooz Sharafi to keep the money in his bank account?
>
> A.    Not for himself, no, to make his payments.
>
> Q.    And what was Pirooz Sharafi going to do with the money that Alstom Power, Inc., paid him?
>
> A.    Make bribery payments to Emir Moeis.

Tr. at 122-23; *see also id.* at 119 ("I called Pirooz and voiced a similar frustration, you know, why aren't you doing your job? And he blurted out to me, I'm not covering Palembang. I'm covering Emir and Eddie. I'm getting a third of the commission to Emir, a third to Eddie, and I'm keeping a third for myself for my efforts."); *id.* at 121 (David Rothschild testifying that the defendant and others told Sharafi "that his commission was being cut from 3 percent to 1 percent, and that he was only going to make bribe payments to Moeis, and that they were bringing in another consultant who was going to cover PLN from the president down to the working level.").

Trial exhibits also showed that the defendant and his co-conspirators planned for Sharafi to receive money from API and pass that money on to Moeis:

- In an email dated September 4, 2002, Reza Moenaf emailed David Rothschild and Fred Pierucci, stating: "Continuing our earlier discussion, we have met 'M' [Moeis] to confirm where he is comfortable with your suggested approach on Representation issue (through 'P' [Pirooz Sharafi])." GX 415.

- In an email dated December 3, 2002, Reza Moenaf emailed the defendant describing Pirooz Sharafi's role vis a vis Emir Moeis, stating: "Whereas Pirooz, is actually an old agent who no longer has a strong network. Except a contact with Emir and Eddie (contact through Emir) probably established in 2001 he is not well known in PLN current working/decision influence level. . . . Basically, his function is more or less similar to cashier which I feel we pay too much." GX 422.

- After the defendant and his co-conspirators cut Sharafi's commission from 3% to 1% and informed him that he would only be responsible for bribing Moeis, Reza Moenaf sent an email to the defendant on September 30, 2003, stating: "Eko also informed me there has been discussion between Fred, Marubeni and Pirooz yesterday where Pirooz committed to convince EM that 'one' is enough." GX 485.

Each of the money laundering counts on which the jury convicted the defendant—Counts 9, 10, and 12—followed the blueprint devised by the defendant and his co-conspirators. API transferred money to PRI (Sharafi), and then Sharafi transferred approximately half of this money to an account for the benefit of Emir Moeis in Indonesia. GX 3, 4. Specifically:

- On November 16, 2005, API transferred $200,064 from Windsor, Connecticut to PRI's bank account in Maryland.  Less than one month later, on December 14, 2005, Sharafi transferred $100,000 from PRI's Maryland bank account to an account in Indonesia for the benefit of Moeis.  This is Count Nine.

- On January 4, 2006, API transferred $200,064 from Windsor, Connecticut to PRI's bank account in Maryland.  Less than two months later, on March 1, 2006, Sharafi transferred $100,000 from PRI's Maryland bank account to an account in Indonesia for the benefit of Moeis.  This is Count 10.

- On March 7, 2007, API transferred $200,064 from Windsor, Connecticut to PRI's bank account in Maryland.  Just two days later, on March 9, 2007, Sharafi transferred $80,000 from PRI's Maryland bank account to an account in Indonesia for the benefit of Moeis.  This is Count 12.

Although Marubeni also sent money to PRI's Maryland bank account, there were no intervening payments from Marubeni between the payments from API to PRI and the payments from PRI to Moeis described above.  GX 3, 4.

Thus, the jury was entitled to conclude by a preponderance that the transfers underlying Counts 9, 10, and 12 originated in Connecticut, those transfers "occurred in multiple stages," and "each stage was an integral part of a single plan to transfer funds."  *See* Tr. at 1283-84.

Indeed, the verdict evidences that the jury was clearly mindful of venue.  A principal difference between the counts of conviction (9, 10, and 12) and Count 11, on which the jury acquitted, was the timing of the payments immediately preceding Sharafi's payments to Moeis.  Unlike in Counts 9, 10, and 12, where Sharafi's payment to Moeis was preceded more recently by an API payment than a Marubeni payment, in Count 11 the Marubeni payment was more recent.

GX 3, 4.  Specifically, Marubeni paid PRI $154,360 on June 30, 2006, and less than two months

later, on August 8, 2006, Sharafi sent $80,000 from PRI's account to an account in Indonesia for

the benefit of Moeis.  GX 3, 4.  It was entirely reasonable for the jury to conclude that Counts 9,

10, and 12 constituted continuing transactions that originated with API in Connecticut, and to

reject Count 11 since the charged transaction was closer in time to a payment from Marubeni.

Once again faced with clear evidence supporting the jury's verdict, the defendant instead

argues that the charged transactions could not have been continuing transactions because "there is

no evidence that there was any communication between anyone at API and Mr. Sharafi regarding

the timing or manner of his subsequent payments, nor is there any evidence of any knowledge on

the part of anyone at API (or elsewhere) as to how or when Mr. Sharafi would transfer funds to

Mr. Moeis," and because one of the transactions involved commingled funds from Marubeni.  Def.

Mem. at 33-34.  Yet these heightened requirements are nowhere in the jury instructions, the

defendant never requested that they be included in the instructions (*see* Doc. 552 at 13-14), and

the defendant does not cite to any statute or case to support these propositions (*see* Def. Mem. at

33-34).[2]  A lack of authority is unsurprising—in the context of a continuing transaction the law

---

[2] Instead, the defendant cites to *United States v. King*, 259 F.Supp.3d 1267 (W.D. Okla. 2014), a district court case in the Western District of Oklahoma having nothing to do with the issue in this case.  Rather, as the court in *King* explained: "The question presented is whether an 18 U.S.C. § 1957 money laundering charge may be tried in this district when the government does not assert, and the record does not show: (i) that any of the specific transactions listed in the substantive money laundering counts had anything to do with the Western District of Oklahoma, or with any financial institution in this district, or (ii) that any of the transactions comprising the laundering offenses charged were begun, continued or completed in this district, or (iii) that any funds identifiably connected with the charged transactions were—by any person, money laundering defendant or not—transferred out of or through the Western District of Oklahoma to the recipients listed in the substantive money laundering counts."  *King*, 259 F.Supp.3d at 1268-69.  Indeed, in *King*, it was the Government that put forth a "commingling" theory that the court rejected.  *Id.* at 1269.

A tracing requirement is unsupported here, and inconsistent with similar areas of Second Circuit law.  For example, the Second Circuit recently rejected a tracing requirement for 18 U.S.C. § 1957, holding that "a requirement that the government trace each dollar of the transaction to the criminal, as opposed to the non-criminal activity, would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds."  *United States v. Silver*, 864 F.3d 102, 115 (2d Cir. 2017).  It would be all the more illogical here to allow a defendant to evade responsibility in Connecticut just because his co-conspirator co-mingled funds without his knowledge.

imposes no such formalistic timing or tracing requirement, and it would be entirely illogical to absolve the defendant of criminal liability in Connecticut because his chosen bagman was not particularly prompt in executing their agreed-upon plan. That plan—to pass bribes from API, through PRI's account, to Moeis—was straightforward and well-supported in the evidence. The defendant and his co-conspirators agreed to pay Sharafi only in order to funnel bribes to government officials, and actually cut Sharafi's commission because Sharafi was not effectively committing to bribe certain officials. *See, e.g.*, GX 454 (in advance of cutting Sharafi's commission, Reza Moenaf forwarding to the defendant an email stating that "[n]othing has been shown by the agent [Sharafi] that the agent is willing to spend money…"); GX 533 (Ed Thiessen stating that "AA [Azmin] has honored his pro rata portion of the commitment" but that Sharafi "did not," and if Sharafi had not yet received payment from Alstom, "we should block the payments until he takes care of" the official).

Ultimately, the defendant's arguments regarding the timing of payments and co-mingling of funds do not demand acquittal as a matter of law, but were properly left to the jury. *See* November 5, 2019 Charge Conference Tr. 79 ("THE COURT: I mean, we're leaving it to the jury to determine whether this is a single transaction composed of parts or a multitransaction set of activities."). Indeed, the defendant conceded as much in his briefing—he requested no formal timing or co-mingling instruction, and noted that "whether the transaction in fact constitutes a 'single, continuing transaction' within the meaning of the statute, are of course matters to be determined by a properly instructed jury." Doc. 563 at 6. Instead, the defendant made these very arguments to the jury. Tr. 1430 (Mr. Morvillo: "These don't look like single transactions. Money is sent days, weeks, months later. It's also commingled with money from Marubeni. That can't be money laundering. It has to come from API first. That's the charge."). That the jury rejected the

defendant's arguments does not provide a basis for acquittal as a matter of law. The jury reasonably concluded that the counts of conviction were each integral parts of continuing transactions that originated in Connecticut.

Simply put, the evidence establishes that API paid PRI (Sharafi) so that he would pass money on to Moeis in Indonesia, and the jury reasonably found that the payments from API to PRI and from PRI to Moeis were integral parts of a single plan.

## IV.    THE DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL SHOULD BE DENIED

The defendant devotes less than a page to his argument that the Court should grant a new trial under Rule 33. Rule 33 authorizes a district court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotations omitted). A motion for a new trial should be granted only "sparingly and in the most extraordinary circumstances." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (internal quotations omitted); *see also United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001) ("Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." (internal quotations omitted)). "In other words, there must be a real concern that an innocent person may have been convicted" for the Court to grant such a motion. *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (internal quotations and citations omitted).

The defendant points to no such extraordinary circumstance here. Rather, he refers back to the arguments he makes in connection with this Rule 29 motion for a judgment of acquittal. For

example, this is not a case where there was the danger of prejudicial spillover from acquitted counts or from co-defendants that could have been severed from the trial.  *See Ferguson*, 246 F.3d at 137. In short, if the Court finds the evidence sufficient to support the jury's guilty verdicts, the defendant has pointed to no other issue that would warrant a new trial.

**V.    CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motion for a judgment of acquittal under Rule 29, and his motion for a new trial under Rule 33.


Respectfully submitted,

| | |
|---|---|
| ROBERT ZINK | JOHN H. DURHAM |
| CHIEF | UNITED STATES ATTORNEY |
| Fraud Section, Criminal Division | District of Connecticut |
| United States Department of Justice | |
| | |
| /s/ | /s/ |
| | |
| DANIEL S. KAHN | DAVID E. NOVICK |
| SENIOR DEPUTY CHIEF | ASSISTANT U.S. ATTORNEY |
| Federal Bar No. phv04243 | Federal Bar No. phv02874 |
| LORINDA LARYEA | 157 Church St., 25th Floor |
| ASSISTANT CHIEF | New Haven, Connecticut 06510 |
| Fraud Section, Criminal Division | Tel. (203) 821-3700 |
| U.S. Department of Justice | |
| 1400 New York Avenue, N.W. | |
| Washington, D.C.  20005 | |
| Tel. (202) 616-3434 | |

<u>CERTIFICATION OF SERVICE</u>

      This is to certify that on January 7, 2019, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


BY:        /s/_____
             DAVID E. NOVICK
             ASSISTANT UNITED STATES ATTORNEY